**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASHA SMITH and EMMA NEDLEY, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 2:20-cv-02086-TJS |
| Plaintiffs, | ) ) ) | Hon. Timothy J. Savage |
| v. | ) ) | |
| UNIVERSITY OF PENNSYLVANIA, | ) ) | |
| Defendant. | ) ) ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNIVERSITY OF
PENNSYLVANIA'S MOTION TO DISMISS
<u>PLAINTIFFS' CONSOLIDATED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

LEGAL STANDARD .........................................................................................................6

ARGUMENT .....................................................................................................................6

I.      PLAINTIFFS FAIL TO STATE BREACH-OF-CONTRACT CLAIMS. .........................6

       A.      Pennsylvania Law Requires Contract Claims Against Educational Institutions To Allege A Breach Of A Specific, Written Contractual Promise. ...................................................................................6

       B.      The Contract Governing Payment Of Tuition And Fees Does Not Support Plaintiffs' Contract Claims .......................................................9

       C.      Plaintiffs' Alternative Sources Do Not Establish Any Contractual Promises That Support Their Breach-Of-Contract Claims. ...............10

       D.      Plaintiffs Fail To Allege Legally Cognizable Damages ....................16

II.     PLAINTIFFS FAIL TO STATE UNJUST ENRICHMENT CLAIMS. ..........................20

III.    PLAINTIFFS FAIL TO STATE A CONVERSION CLAIM. ......................................24

CONCLUSION..................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALA, Inc. v. CCAir, Inc.*,
   29 F.3d 855 (3d Cir. 1994) ...................................................................................................15

*AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*,
   No. CIV.A. 10-6087, 2011 WL 3241356 (E.D. Pa. July 29, 2011)......................................21

*Antczak v. TD Ameritrade Clearing, Inc.*,
   No. CV 17-4947, 2018 WL 2298494 (E.D. Pa. May 21, 2018) (Savage, J.) ..........................5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................................................... 6, 17

*Atain Ins. Co. v. E. Coast Bus. Fire, Inc.*,
   No. CV 17-2545, 2018 WL 637579 (E.D. Pa. Jan. 31, 2018) (Savage, J.) ..................... 20, 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................................................6

*Berger & Montague, P.C. v. Scott & Scott, LLC*,
   153 F. Supp. 2d 750 (E.D. Pa. 2001).................................................................................25

*Bourke v. Kazaras*,
   746 A.2d 642 (Pa. Super. Ct. 2000) ...................................................................................12

*Bradshaw v. Pa. State Univ.*,
   No. CIV.A. 10-4839, 2011 WL 1288681 (E.D. Pa. Apr. 5, 2011) ................................. 11, 22

*Brahmbhatt v. Ocwen Servicing Inc.*,
   No. CV 17-5139, 2018 WL 4760278 (E.D. Pa. Sept. 28, 2018) .............................................5

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)............................................................................................3, 5

*Cavaliere v. Duff's Bus. Inst.*,
   605 A.2d 397 (Pa. Super. Ct. 1992) ......................................................................... 7, 17, 18

*Cohn v. Pa. State Univ.*,
   No. 19-cv-2857, 2020 WL 738496 (E.D. Pa. Feb. 12, 2020)...............................................14

*CoreStates Bank, N.A. v. Cutillo*,
   723 A.2d 1053 (Pa. Super. Ct. 1999) ...................................................................................6

ii

# TABLE OF AUTHORITIES—Continued

**Page**

*Cuesnongle v. Ramos*,
   713 F.2d 881 (1st Cir. 1983)...................................................................................15

*David v. Neumann Univ.*,
   177 F. Supp. 3d 920 (E.D. Pa. 2016)................................................................. 11, 22

*Debbs v. Chrysler Corp.*,
   810 A.2d 137 (Pa. Super. Ct. 2002) ........................................................................26

*DiBonaventura v. Consol. Rail Corp.*,
   539 A.2d 865 (Pa. Super. Ct. 1988) ........................................................................12

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
   66 F.3d 604 (3d Cir. 1995) ......................................................................................26

*eToll, Inc. v. Elias/Savion Advert., Inc.*,
   811 A.2d 10 (Pa. Super. Ct. 2002) .................................................................... 24, 25

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ......................................................................................6

*Gupta v. New Britain Gen. Hosp.*,
   687 A.2d 111 (Conn. 1996) ........................................................................................7

*Harris v. Saint Joseph's Univ.*,
   No. CIV.A. 13-3937, 2014 WL 1910242 (E.D. Pa. May 13, 2014) ......................11

*Hart v. Arnold*,
   884 A.2d 316 (Pa. Super. Ct. 2005) ........................................................................25

*Hart v. Univ. of Scranton*,
   No. 3:11-CV-1576, 2012 WL 1057383 (M.D. Pa. Mar. 28, 2012) ..........................9

*Hopkins v. GNC Franchising, Inc.*,
   288 F. App'x 871 (3d Cir. 2008) ...............................................................................6

*Kaymark v. Bank of Am., N.A.*,
   783 F.3d 168 (3d Cir. 2015), *abrogated on other grounds by Obduskey v.*
   *McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019) ...............................................17

*Kunda v. Muhlenberg Coll.*,
   621 F.2d 532 (3d Cir. 1980)) .....................................................................................7

\\BA - 057471/003040 - 857308 v12

iii

## TABLE OF AUTHORITIES—Continued

**Page**

*Linnet v. Hitchcock*,
471 A.2d 537 (Pa. Super. Ct. 1984) ...................................................................14

*Lomma v. Ohio Nat'l Life Assurance Corp.*,
283 F. Supp. 3d 240, 265 (M.D. Pa. 2017)..........................................................21

*McCabe v. Marywood Univ.*,
166 A.3d 1257 (Pa. Super. Ct. 2017) ...........................................................22, 23

*McKesson Corp. v. Campbell*,
No. 2579 EDA 2014, 2015 WL 7571502 (Pa. Super. Ct. Nov. 24, 2015) ...........25

*Michael S. Rulle Family Dynasty Tr. v. AGL Life Assur. Co.*,
No. CIV.A.10-231, 2010 WL 3522135 (E.D. Pa. Sept. 8, 2010), *aff'd*, 459 F.
App'x 79 (3d Cir. 2011) ......................................................................................21

*Miller v. Thomas Jefferson Univ. Hosp.*,
908 F. Supp. 2d 639 (E.D. Pa. 2012), *aff'd*, 565 F. App'x 88 (3d Cir. 2014) .............. 9, 17, 20

*Moss v. Wayne State Univ.*,
No. 286034, 2009 WL 4344193 (Mich. Ct. App. Dec. 1, 2009) ..........................23

*Murphy v. Duquesne Univ. Of The Holy Ghost*,
777 A.2d 418 (Pa. 2001)........................................................................................7

*Paladino v. Adelphi Univ.*,
454 N.Y.S.2d 868 (N.Y. App. Div. 1982).............................................................17

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
633 F.3d 81 (2d Cir. 2011) ............................................................................ 15, 16

*Park v. Temple Univ.*,
No. CV 16-5025, 2019 WL 1865060 (E.D. Pa. Apr. 25, 2019) ..........................22

*Paynter v. New York Univ.*,
319 N.Y.S.2d 893 (N.Y. App. Div. 1971)..........................................................16

*In re Penn Cent. Transp. Co.*,
831 F.2d 1221 (3d Cir. 1987)..............................................................................14

*Phila. Hous. Auth. v. CedarCrestone, Inc.*,
562 F. Supp. 2d 653 (E.D. Pa. 2008)..................................................................21

# TABLE OF AUTHORITIES—Continued

**Page**

*Pittsburgh Const. Co. v. Griffith*,
    834 A.2d 572 (Pa. Super. Ct. 2003) ...................................................................25

*Promark Realty Grp., Inc. v. B & W Assocs.*,
    No. 02-CV-1089, 2002 WL 862566 (E.D. Pa. May 1, 2002)................................22

*Quorum Health Res., Inc. v. Carbon-Schuylkill Cmty. Hosp., Inc.*,
    49 F. Supp. 2d 430 (E.D. Pa. 1999) ...................................................................25

*Reardon v. Allegheny Coll.*,
    926 A.2d 477 (Pa. Super. Ct. 2007) ...................................................................20

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) (opinion of Powell, J.)..........................................................8

*Regents of Univ. of Mich. v. Ewing*,
    474 U.S. 214 (1985) ............................................................................................8

*Reimer v. Tien*,
    514 A.2d 566 (Pa. Super. Ct. 1986) ...................................................................18

*Reynolds v. Univ. of Pa.*,
    747 F. Supp. 2d 522 (E.D. Pa. 2010), *aff'd*, 483 F. App'x 726 (3d Cir. 2012) ......................20

*Roe v. Loyola Univ. New Orleans*,
    No. CIV.A. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) ....................16

*Ross v. Creighton Univ.*,
    957 F.2d 410 (7th Cir. 1992) ........................................................................ 11, 17

*Schulman v. Franklin & Marshall Coll.*,
    538 A.2d 49 (Pa. Super. Ct. 1988) .......................................................................7

*Sola v. Lafayette Coll.*,
    804 F.2d 40 (3d Cir. 1986) ...................................................................................7

*Steuart v. McChesney*,
    444 A.2d 659 (Pa. 1982).......................................................................................7

*Stevenson v. Econ. Bank of Ambridge*,
    197 A.2d 721 (Pa. 1964).....................................................................................17

*Swartley v. Hoffner*,
    734 A.2d 915 (Pa. Super. Ct. 1999) ................................................... 8, 9, 11, 13

# TABLE OF AUTHORITIES—Continued

**Page**

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957) ...................................................................................8

*Vanderklok v. United States*,
  868 F.3d 189 (3d Cir. 2017) ......................................................................3

*Vantage Learning (USA), LLC v. Edgenuity, Inc.*,
  246 F. Supp. 3d 1097 (E.D. Pa. 2017)..............................................20, 21

*Vurimindi v. Fuqua Sch. of Bus.*,
  435 F. App'x 129 (3d Cir. 2011) ..............................................................11

*Wilson Area Sch. Dist. v. Skepton*,
  895 A.2d 1250 (Pa. 2006)...................................................................20, 21

*Zwiker v. Lake Superior State Univ.*,
  Case No. 20-000070-MK (Mich. Ct. Claims Aug. 31, 2020) ..................20

\\BA - 057471/003040 - 857308 v12

Defendant University of Pennsylvania ("Penn" or the "University") respectfully submits this opening brief in support of its motion to dismiss the Consolidated Complaint ("Complaint").

**INTRODUCTION**

With just five and half weeks of classes remaining in the spring 2020 semester, the COVID-19 pandemic forced Penn and its students to grapple with an unprecedented public health crisis. In-person instruction threatened the health and lives of faculty, staff, and students, and state and city orders prohibited regular on-campus operations. Penn responded by shifting rapidly to online instruction so that instructors and students could safely continue and complete their courses. As a result, students—including Plaintiffs—continued to receive a Penn education from the University's world-class instructors. Students were able to progress towards their degree without interruption or delay; seniors were able to graduate on time with a Penn diploma. To accomplish this pivot to distance learning, Penn invested substantial resources. Plaintiffs do not contest that Penn was absolutely correct to transition to distance learning. Nonetheless, Plaintiffs responded by filing this lawsuit seeking refunds and alleging breach of contract, unjust enrichment, and conversion.

Penn shares Plaintiffs' disappointment that this once-in-a-century pandemic upended the normal functioning of society and campus life along with it. But just as Penn worked hard to fulfill its commitments to students to provide instruction and uninterrupted progress towards their degrees, so too did Plaintiffs retain their obligations to pay tuition and fees for the instruction and academic credit they continued to receive.

Although COVID-19 is novel, this suit is governed by venerable contract-law principles. Pennsylvania, like most states, requires that (with limited exceptions not applicable here) students suing their private university do so based on specific, written contractual promises. That standard serves important policy and constitutional concerns: It prevents plaintiffs from

1

using tort law, quasi-contract, or vague assertions of implied contracts to second-guess educational decisions, and it protects universities' academic freedom guarded by the First Amendment. Here, there *is* a relevant contract with specific terms about tuition and fee payments, and it does not entitle Plaintiffs to a refund. Both Plaintiffs agreed to a Financial Responsibility Statement and related policies, which provide that students owe tuition and fees upon registering for classes. Nothing in that contract entitles Plaintiffs to refunds because instruction moved off-campus for the end of the semester during a global pandemic. Pennsylvania law does not allow Plaintiffs to circumvent the contract that specifically governs tuition and fees by pointing to promotional and course-registration materials that merely describe Penn's campus during normal times but which make no promises that tuition and fees will be refunded if on-campus instruction becomes untenable.

Nor can Plaintiffs circumvent their contracts by reframing their claims in the guise of unjust enrichment or conversion. Pennsylvania law does not allow unjust enrichment claims where a contract governs the subject of the suit, and Plaintiffs have anyway failed plausibly to plead that Penn was unjustly enriched by responding swiftly to an unprecedented public-health emergency to finish the semester remotely. Nor does Pennsylvania law allow a conversion claim where, as here, the defendant's duties to the plaintiffs are a product of contractual obligation.

## BACKGROUND

On March 6, 2020, Governor Tom Wolf confirmed the first two presumed positive cases of COVID-19 in Pennsylvania and signed an emergency disaster declaration effective throughout the Commonwealth.[1] Five days later, the World Health Organization declared COVID-19 a

---

[1]    *See* Ex. 1 (March 6, 2020 Proclamation of Emergency Disaster) to Decl. of Michael L. Kidney ("Kidney Decl.") in Supp. of Penn's Mot. to Dismiss the Consolidated Complaint. This Court may take judicial notice of "information" that "is publicly available on government

2

\\BA - 057471/003040 - 857308 v12

pandemic.[2] Penn moved quickly to safeguard the health and safety of its students, employees, and campus visitors. During spring break, the University reduced the population density on its roughly 50,000-person campus by asking those residents still on campus to leave university housing by March 17, 2020. Compl. ¶ 41.[3] Penn then quickly transitioned to distance learning to allow classes and educational support to continue during the ongoing health emergency for the approximately five and half weeks that remained in the semester. Compl. ¶ 41.[4]

Subsequent actions by the mayor and governor vindicated Penn's efforts to slow the spread of COVID-19. By March 23, the City of Philadelphia had ordered all non-essential businesses, including universities, to close, and the governor had issued a stay at home order, which he later extended until after the spring semester had ended.[5] In a prior iteration of the complaint, Plaintiff Asha Smith conceded that closing campus and transitioning to distance

---

websites . . . ." *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (citation omitted). For the Court's convenience, copies of the websites cited in this motion are being provided in PDF form as exhibits to the declaration of Michael L. Kidney.

[2]    *See* Kidney Decl. Ex. 2 (opening remarks by the Director-General of the World Health Organization at the March 11, 2020 media briefing on COVID-19).

[3]    The facts taken from the Complaint are assumed to be true for this motion only. *See also* Kidney Decl. Ex. 3 (March 14, 2020 message from Penn's Provost to Penn Families) (cited at Compl. ¶ 41 n.9). This Court may consider the contents of the webpages Plaintiffs cite "without converting [Penn's] motion to dismiss into one for summary judgment" because those webpages are "integral to and explicitly relied upon in" the Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[4]    *See also* Kidney Decl. Ex. 3 (March 14, 2020 message from Penn's Provost to Penn Families) (cited at Compl. ¶ 41 n.9); Kidney Decl. Ex. 4 (Penn's Three-Year Academic Calendar, 2019-2020 through 2021-2022) (the academic calendar for the spring semester was cited at Compl. ¶ 38 n.7, but has, since the filing of the Complaint, been archived at the webpage address listed in Kidney Decl. ¶ 5).

[5]    *See* Kidney Decl. Ex. 5 (March 16, 2020 announcement from the City of Philadelphia); Kidney Decl. Ex. 6 (March 23, 2020 Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home); Kidney Decl. Ex. 7 (May 7, 2020 Amendment to Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home) (extending the stay at home order until June 4, 2020).

3

learning "was the right thing for" Penn "to do" under the circumstances. ECF No. 1 ¶ 2. While the Complaint no longer includes this admission, Plaintiffs do not contend that Penn should have offered in-person, on-campus education for the final weeks of the spring semester. Nor do they deny that Penn's pivot to distance learning was the only reasonable approach available to Penn based on public health concerns.

Although unprecedented, the pandemic did not prevent Penn from fulfilling its educational mission. Both Plaintiffs acknowledge that Penn continued to provide academic instruction after the pandemic began. Compl. ¶¶ 24, 45. Conversely, Plaintiffs do not identify any course that was not completed, any exam that was not conducted, or any circumstance where they had to withdraw or forgo earning credits toward their degrees as a result of the pandemic. In other words, the Complaint's allegations are consistent with both Plaintiffs receiving instruction in the remaining weeks of the spring semester from the same professors, in the same courses, and for the same number of course credits as in the earlier portion of the semester.

Nonetheless, Plaintiffs seek partial refunds of tuition and fees on the grounds that the education they received in the last weeks of the spring semester was allegedly less valuable than in-person instruction would have been. *Id.* ¶¶ 34, 122, 126, 134, 141. On the other hand, Plaintiffs do not seek refunds for room and board presumably because Penn already provided pro-rated credits for the unused portions of spring semester housing and dining costs.[6] And while Penn enhanced certain services associated with the fees students pay to support them during the transition to distance learning,[7] Plaintiffs focus on those services that were not

---

[6]     Kidney Decl. Ex. 8 (excerpts from Penn's responses to students' frequently asked questions) (cited at Compl. ¶ 30 n.5).

[7]     For example, Penn's library staff "increase[d] support for a remote teaching, research and learning environment," including by digitizing "course materials and faculty-selected works for

4

available during the semester's final weeks.  Compl. ¶¶ 26, 28-30.  Based on these allegations, the Complaint pleads claims for breach of contract (Counts I, III), unjust enrichment (Counts II, IV), and conversion (Count V).

Plaintiffs are correct that their relationship with Penn is contractual.  *Id.* ¶ 70.  Each academic year, before making required tuition and other payments, Penn students must agree to abide by the terms of a "Financial Responsibility Statement."  Exhibits A & B to Declaration of Sharon Pepe ("Pepe Decl."); *see also* Pepe Decl. ¶ 2.[8]  For the 2019-2020 academic year, Penn's records show that both Plaintiffs accepted the terms of the Financial Responsibility Statement in August 2019.  Pepe Decl. ¶¶ 3-4.  Among other things, the Financial Responsibility Statement that each Plaintiff accepted states:

- **Financial Obligation**: By registering for class(es) offered by the University of Pennsylvania, I am agreeing to pay tuition, fees and other charges associated with my enrollment in these classes on or before the scheduled due dates.  This constitutes a legal financial obligation.

- **Tuition & Fees**: I understand that my school publishes tuition and fee schedules.  The PennBook (https://catalog.upenn.edu/pennbook/) documents policies and procedures regarding changes or cancellation of my registration.  I am aware that non-attendance does not relieve me of my financial responsibility for the class(es) I signed up for.

Exs. A & B to Pepe Decl.

---

classes . . . ."  Kidney Decl. Ex. 9 (March 15, 2020 message from Penn libraries) (cited at Compl. ¶ 30 n.5).

[8]     The Financial Responsibility Statement is also available online.  *See* Kidney Decl. Ex. 10.  At the motion-to-dismiss stage, this Court may consider this Statement because Plaintiffs' "claims are based on" the contract between Penn and its students.  *Antczak v. TD Ameritrade Clearing, Inc.*, No. CV 17-4947, 2018 WL 2298494, at *1 n.4 (E.D. Pa. May 21, 2018) (Savage, J.) (citing *Burlington Coat*, 114 F. 3d at 1426).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them."  *Burlington Coat*, 114 F.3d at 1426; *see also Brahmbhatt v. Ocwen Servicing Inc.*, No. CV 17-5139, 2018 WL 4760278, at *1 n.1 (E.D. Pa. Sept. 28, 2018) (considering a note and mortgage securing that note as the plaintiff relied on those documents without quoting them).

\\BA - 057471/003040 - 857308 v12

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the court should accept the non-conclusory facts and disregard the plaintiffs' legal conclusions. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

## ARGUMENT

### I.    PLAINTIFFS FAIL TO STATE BREACH-OF-CONTRACT CLAIMS.

#### A.    Pennsylvania Law Requires Contract Claims Against Educational Institutions To Allege A Breach Of A Specific, Written Contractual Promise.

To plead a breach of contract, "Pennsylvania law requires that a plaintiff allege: '(1) the existence of a contract, *including its essential terms*, (2) a breach of a duty imposed by the contract, and (3) resultant damages.' " *Hopkins v. GNC Franchising, Inc.*, 288 F. App'x 871, 874 (3d Cir. 2008) (emphasis added) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). In a breach of contract suit against a college or university, this requires pleading a specific, written contractual promise and precisely how it was broken. As further explained below, this requirement flows from both general contract-law principles and the well-settled case law holding that courts should avoid second-guessing educational decisions in an area suffused with First Amendment academic-freedom concerns.

*First*, the requirement that a plaintiff provide a specific, written contractual promise in alleging breach of contract flows from basic principles of Pennsylvania contract law. "The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself."

6

\\BA - 057471/003040 - 857308 v12

*Murphy v. Duquesne Univ. Of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (citation omitted). A plaintiff cannot try to construct the terms of a contract post-hoc in litigation because "[i]t is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves." *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982) (internal quotation marks and citation omitted).

*Second*, these contract-law principles are sharpened in suits against colleges and universities, where courts consistently decline to second-guess educational decisions in the absence of a concrete and specific promise to enforce. Pennsylvania's courts recognize that a "college is a unique institution which, to the degree possible, must be self-governing." *Schulman v. Franklin & Marshall Coll.*, 538 A.2d 49, 52 (Pa. Super. Ct. 1988). Because of educational institutions' unique character, Pennsylvania's judiciary has agreed with "the many courts that have refused to recognize a general cause of action for educational malpractice, whether framed in terms of tort or breach of contract, where the allegation is simply that the educational institution failed to provide a quality education." *Cavaliere v. Duff's Bus. Inst.*, 605 A.2d 397, 403 (Pa. Super. Ct. 1992).

Federal courts applying Pennsylvania law have followed these principles, and the Third Circuit has repeatedly "expressed our reluctance to interfere with the internal operations of academic institutions absent direction from the legislature." *Sola v. Lafayette Coll.*, 804 F.2d 40, 42-43 (3d Cir. 1986) (citing *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 546-51 (3d Cir. 1980)). Pennsylvania law is also consistent with the case law in nearly all other states, which holds that the judiciary is ill-suited to second-guess colleges and universities' educational decisions. *See, e.g.*, *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 119 (Conn. 1996) ("[C]ourts have almost

7

universally held that claims of 'educational malpractice' are not cognizable.  Among other problems for adjudication, these claims involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." (footnote omitted) (collecting cases)).

*Third,* the national common-law rule barring contract claims against universities in the absence of a specific contractual promise safeguards First Amendment values by protecting academic freedom.  The Supreme Court has recognized a "national commitment to [] safeguarding" the "essential freedoms" of a university " 'to determine for itself' " both " 'what may be taught' " and " 'how it shall be taught.' " *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in the result)).  "Academic freedom thrives . . . on autonomous decisionmaking by the academy itself," and "[w]hen judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225-226 & n.12 (1985).

In light of the foregoing general contract principles, the reluctance of courts to supervise universities' educational judgments, and the imperative to respect universities' academic freedom to decide how to provide instruction, Pennsylvania law requires that contract suits against private universities be governed strictly by specific terms of written contracts.  "[T]he relationship between a private educational institution and an enrolled student is contractual in nature" and "comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  A contract complaint "cannot

8

stand unless linked to the written policies of the university," *id.*, and "a complaint must point to specific failures on the part of a university within these written materials," *Hart v. Univ. of Scranton*, No. 3:11-CV-1576, 2012 WL 1057383, at *3 (M.D. Pa. Mar. 28, 2012); *accord, e.g.*, *Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 655-656 (E.D. Pa. 2012) (To allege breach of contract, "a plaintiff must point to specific undertakings in the handbook that were not provided."), *aff'd*, 565 F. App'x 88 (3d Cir. 2014).  A contract claim cannot succeed if the plaintiff "fails to show how the university breached any *specific written* contract provisions." *Swartley*, 735 A.2d at 921 (emphasis added).

### B.   The Contract Governing Payment Of Tuition And Fees Does Not Support Plaintiffs' Contract Claims.

There is just such a specific, written contract between Penn and Plaintiffs governing the payment of tuition and fees:  the Financial Responsibility Statement to which all Penn students (including Plaintiffs) agree in order to register for classes. *See supra* p. 5.  But Plaintiffs have not alleged facts showing that the Statement was breached because it makes no promise of in-person instruction at all, much less during a pandemic.

The Financial Responsibility Statement sets out clearly what the contractual bargain is in its leading section, titled "Financial Obligation."  Pepe Decl. Exs. A & B.  "By registering for class(es) offered by the University of Pennsylvania," Plaintiffs "agree[d] to pay tuition, fees and other charges associated with [their] enrollment." *Id.*  Such registration "constitutes a legal financial obligation." *Id.*  The agreement is therefore clear that the act of registration alone triggers an obligation to pay tuition and fees.  There is nothing in the Financial Responsibility Statement even addressing, let alone promising, in-person classroom instruction.

The Financial Responsibility Statement further provides that the University's PennBook "documents policies and procedures regarding changes or cancellation of [the student's]

9

registration" and provides a hyperlink to the PennBook. *Id.* The referenced section of the PennBook, in turn, lays out the University's "Financial Policies" and specifically its policy on "Payment of Tuition, Fees, and Other Charges." Kidney Decl. Ex. 11 (PennBook) at 57. It requires that "[a]ll amounts billed to the students are due on the due date indicated on the bill," without reference to in-person instruction. *Id.* The Financial Policies do, however, contemplate refunds of tuition and fees—specifically, they provide that a "student who withdraws from the University" under certain circumstances "will be eligible for a reduction in tuition and fees," and they set out a schedule of various percentage reductions based on how many weeks into the term the student withdraws. *Id.* No reduction is available after four weeks. *Id.* As with the Financial Responsibility Statement itself, the detailed terms of the Financial Policies do not contemplate a reduction in tuition or fees based on *how* the classes are taught, including whether they are in-person or remote.

Plaintiffs have thus alleged no facts indicating that Penn breached either the Financial Responsibility Statement or the Financial Policies it references. Plaintiffs do not deny that they registered for classes, which triggered their responsibility to pay tuition and fees. They do not allege that they withdrew, and certainly not that they withdrew within the four weeks from the start of classes required for a reduction. Nor do they allege that Penn failed to provide instruction and credit towards their degrees in the classes for which they registered. There is thus nothing in the specific, contractual provisions governing tuition and fees upon which Plaintiffs can base a breach-of-contract action.

**C.    Plaintiffs' Alternative Sources Do Not Establish Any Contractual Promises That Support Their Breach-Of-Contract Claims.**

The breach-of-contract allegations in Plaintiffs' Complaint ignore these specific contractual provisions governing the payment of fees and tuition. Instead, Plaintiffs seek to

10

imply some independent promise that Penn would provide in-person instruction, no matter the circumstances, by pointing to promotional materials and course catalogs that discussed on-campus opportunities.  Unlike the Financial Responsibility Statement and the Financial Policies it references, none of the materials Plaintiffs invoke rise to the level of a "written contract between the university and its students that sets forth the[ir] obligations."  *Swartley*, 734 A.2d at 919.  Because Plaintiffs "cannot show where [their] contract with the university requires that [they] be given" in-person instruction or a refund, the Court "must find that, as a matter of law, [they are] not entitled to relief for breach of contract."  *Id.* at 921.

As a general matter, courts applying Pennsylvania law have routinely dismissed complaints alleging breaches of contract against educational institutions where plaintiffs have failed to allege specific and definite contractual language that was breached.  *See, e.g.*, *Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011) (case properly dismissed where plaintiff "did not point to any specific and definite terms that were violated in his case"); *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016) (dismissing claim where "Plaintiff has failed to set forth any specific contractual provisions that the University allegedly breached" (and collecting cases)); *Harris v. Saint Joseph's Univ.*, No. CIV.A. 13-3937, 2014 WL 1910242, at *3 (E.D. Pa. May 13, 2014) ("Conclusory allegations . . . , with no clear averments as to what statement or regulations included in the Handbook . . . were violated or breached, are insufficient to survive a motion to dismiss."); *Bradshaw v. Pa. State Univ.*, No. CIV.A. 10-4839, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5, 2011) (dismissing claim where "[t]he plaintiff does not identify in the complaint the provisions of the handbook that the defendant allegedly breached"); *accord Ross v. Creighton Univ.*, 957 F.2d 410, 416-417 (7th Cir. 1992) ("[T]he plaintiff must . . . point to an identifiable contractual promise that the defendant failed to honor.").

11

None of the documents Plaintiffs cite amount to a specific and definite promise to provide in-person instruction, and so Plaintiffs have not stated a breach-of-contract claim against Penn. The shortcoming is made plain by considering each class of documents, in turn:

- **Promotional Materials**. First, Plaintiffs cite a series of promotional materials on the Penn website and in acceptance letters, none of which includes a promise that Penn will *only* provide in-person instruction. *See* Compl. ¶¶ 75-101. The materials do describe the off-campus and on-campus opportunities that are available in normal times and invite prospective students to visit, *e.g. id.* at ¶¶ 78, 83, 93, but they include no guarantees of access to one or more campus facilities or in-person instruction or any offer of refunds in the event an emergency that makes such access infeasible. Plaintiffs state that "there were no references or disclaimers" in these materials to "in-person classes being changed to fully online classes for any reason whatsoever," *id.* at ¶ 90, but that only undermines any inference that these materials made any specific promises about in-person instruction, and certainly not about what would happen in the event of a public-health emergency. Contracts require "clarity," and courts do not "give legal significance to vague promises or to statements that reflect only . . . aspirations or hopes." *DiBonaventura v. Consol. Rail Corp.*, 539 A.2d 865, 868–69 (Pa. Super. Ct. 1988) (internal quotation marks omitted). Likewise, "advertisements generally do not constitute [contractual] offers." *Bourke v. Kazaras*, 746 A.2d 642, 644 (Pa. Super. Ct. 2000) (citing Restatement (Second) of Contracts § 26 cmt. b (1981)).

- **Course catalogs**. Next, Plaintiffs discuss course catalogs and registration materials. *See* Compl. ¶¶ 103-107. They note that some (but not all) classes were accompanied by a "physical classroom location," *id.* ¶ 107; *see also id.* ¶ 112, but cannot point to any

12

\\BA - 057471/003040 - 857308 v12

statement that the location was not subject to change. Plaintiffs also note that online classes were "listed separately" and were "priced differently than [Penn's] undergraduate tuition." *Id.* ¶¶ 104-106; *see also id.* ¶¶ 115-116. However, many of the classes on the website Plaintiffs reference are continuing-education classes or free enrichment classes that offer a certificate, as opposed to full-time academic classes offering credit towards a Penn degree, *id.* ¶ 104 n.31 (citing https://platform.onlinelearning.upenn.edu); so it is not surprising they were "offered at a higher discount," *id.* ¶ 105. More to the point, Plaintiffs cite no statements that make any specific promises about classes being held in-person. Plaintiffs also allege that some individual course instructors imposed "strict personal attendance requirements," *id.* ¶ 108; *see also id.* ¶ 112, but again they provide no written statements pledging that such classes would be offered in-person or even make any allegations that attendance requirements did not remain in effect when a class was conducted remotely.

- **Prior course of conduct**. Plaintiffs also contend that Penn's "prior course of conduct" in "offering in-person instruction" and giving "students . . . access to the full campus" before the pandemic implies a contract to provide "live, in-person education" and "a full on-campus experience." *See id.* ¶¶ 109-114. Attempting to infer a contractual promise from a pre-pandemic course of conduct flies in the face of Pennsylvania law requiring a "specific written contract" to make out a breach-of-contract claim against a university. *Swartley*, 734 A.2d at 921; *see supra* pp. 6-9, 11. It is also thoroughly unreasonable for Plaintiffs to have inferred from Penn's conduct during normal public health circumstances that the exact same physical-space offerings would be available during a pandemic when the Pennsylvania government compelled a campus shut-down. That is

13

especially so when there was an express contract governing tuition and fees. *See Cohn v. Pa. State Univ.*, No. 19-cv-2857, 2020 WL 738496, at \*10 (E.D. Pa. Feb. 12, 2020) ("[N]o implied-in-fact contract can be found when . . . the parties have an express agreement dealing with the same subject." (quoting *In re Penn Cent. Transp. Co.*, 831 F.2d 1221, 1229 (3d Cir. 1987))).

- **Fee Descriptions**. Last, Plaintiffs point to online descriptions of what various fees were intended to support. *See* Compl. ¶¶ 146-149. The bulk of the services listed in those descriptions were not precluded by distance instruction and may well have been in greater demand, such as: "counseling and wellness," "career services," "learning support," "data and network security," "technology support," "email services and support," "electronic research tools," and "Counseling and Psychological Services." *Id.* Indeed, one of the purposes of the fees was expressly to support "*online learning* resources." *Id.* ¶ 148 (emphasis added). Moreover, Plaintiffs cite nothing that contradicts or supplements the express contractual provision from the Financial Responsibility Statement that fees are due in full upon registration.

All of these asserted bases for implying a contract present a striking contrast with the precise terms of the Financial Responsibility Statement and Financial Policies. Nothing that Plaintiffs invoke explains the precise contours of the promise they allege, and if the "essential terms of the agreement are so uncertain that there is no basis for determining whether the agreement has been kept or broken, there is not an enforceable contract." *Linnet v. Hitchcock*, 471 A.2d 537, 540 (Pa. Super. Ct. 1984). Nor can such vague allegations override the actual contract, because "[w]here there is a disparity between a written instrument annexed to a

14

pleading and an allegation in the pleading based thereon, *the written instrument will control*." *ALA, Inc. v. CCAir, Inc.,* 29 F.3d 855, 859 n.8 (3d Cir. 1994) (emphasis added).

Plaintiffs' efforts to infer contractual promises from promotional materials, general descriptions of Penn programs, and prior Penn offerings illustrate why Pennsylvania and other states insist on precise, written contractual provisions to support breach-of-contract claims against educational institutions. Under Plaintiffs' theory, if an admissions letter poetically says a dean "look[s] forward to our encounters on Locust Walk," Compl. ¶ 95, some student may then argue that the university is contractually bound to make sure that the dean camps out on Locust Walk to meet every student. Or if a popular course is mentioned in promotional materials, and the professor retires, other students may argue that the university is liable for failing to continue its course of conduct in offering the class. Allowing such unbounded and unpredictable liability from loosely implied "promises" would fundamentally undermine Pennsylvania courts' doctrine against second-guessing universities' educational choices, would prevent schools from printing any descriptions of their offerings that they could not be certain would always be available to every student, and would straight-jacket schools' abilities to adapt to changing circumstances or introduce new modes of instruction. "Even to think that a university could be found to have broken its contract when it changed the dates of classes, or the curriculum, for reasons beyond its control . . . should startle anyone at all familiar with university life." *Cuesnongle v. Ramos*, 713 F.2d 881, 885 (1st Cir. 1983). And it is not what Pennsylvania law requires.

Rather, what binds universities are contracts with express, clear terms like the Financial Responsibility Statement. To the extent that enrollment implies any additional agreement, it is simply that "if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree." *Papelino v. Albany Coll. of*

15

*Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011). That gives universities leeway to respond to unanticipated emergencies. Thus, in *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971), the court rejected a breach-of-contract claim by the parent of a student who sued New York University after the school entirely suspended classes for the remainder of the semester following anti-war demonstrations after the Kent State shooting. The court explained that "services rendered by the university cannot be measured by the time spent in a classroom" and overturned the trial court's award of a tuition refund, holding that the lower court had "erred in substituting its judgment for that of the University administrators and in concluding that the University was unjustified in suspending classes." *Id.* at 894. Here, Penn did not even suspend classes, but merely shifted the mode of instruction. In the absence of a precise written promise that Plaintiffs allege was broken, this Court should not second-guess Penn's judgment about the necessity of shifting to remote learning during the global pandemic.

Likewise, in *Roe v. Loyola Univ. New Orleans*, No. CIV.A. 07-1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007), the court rejected a breach-of-contract claim seeking refunds from Loyola University New Orleans when it arranged for students to take classes at another school following Hurricane Katrina. The court explained that the "plaintiff received the benefit of the emergency policy" and that no express policies precluded the university from responding by offering credits for attendance at another school. *Id.* at *2. The same logic precludes a breach-of-contract claim against Penn for responding to an emergency by offering *its own* instruction in a different format.

### D.    Plaintiffs Fail To Allege Legally Cognizable Damages.

Plaintiffs' contract claim should be dismissed for the additional reason that they failed to plead the final element of breach of contract: legally cognizable damages. They do not suggest that they have been wholly deprived of the value of a Penn education. Instead, they demand

16

"refunds . . . on a pro-rata basis." Compl. ¶ 4. But they do not say exactly what proportion of tuition or fees they want refunded, only that it should be "the difference between the fair market value of the online learning provided versus the fair market value of the value of the live in-person instruction in a physical classroom on a physical campus." *Id.* ¶ 126.

That asks this Court to make precisely the kind of inquiry about educational quality that is foreclosed by Pennsylvania law. *See supra* pp. 7-8.[9] To avoid that kind of inquiry, courts have insisted that plaintiffs suing private educational institutions "must point to specific undertakings" that were promised in contractual documents and which "were not provided." *Miller*, 908 F. Supp. 2d at 655. Without such a concrete failure to deliver a contractually promised service, a plaintiff is simply "attempt[ing] to repackage an educational malpractice claim as a contract claim." *Ross*, 957 F.2d at 416 (and collecting cases). Such a claim "requires judicial displacement of complex educational determinations made by those charged with the responsibility to instruct." *Paladino v. Adelphi Univ.*, 454 N.Y.S.2d 868, 872 (N.Y. App. Div. 1982). It also violates the basic principle of Pennsylvania law that requires a plaintiff to establish a "non-speculative loss" to support a contract claim. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 183 (3d Cir. 2015), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019); *see Stevenson v. Econ. Bank of Ambridge*, 197 A.2d 721, 727 (Pa. 1964) ("This Court has held repeatedly that a claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough.").

Plaintiffs' claims share the same fatal flaws as those rejected by the court in *Cavaliere*, where the court rejected claims that would require it "to determine which of several alternative

---

[9]     Plaintiffs baldly assert that they "do[ ] not seek to allege 'academic malpractice,' " Compl. ¶ 119, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

17

methods of teaching . . . was the appropriate one" and to assess whether "any damages [the plaintiffs] may have suffered were actually caused by deficiencies in the instruction given or, alternatively, by other factors." 605 A.2d at 403-404. The court refused to consider a claim unless "the nature of the contractual undertaking and the breach thereof are clear." *Id.* at 404.

Plaintiffs' claims against Penn are insufficient for the same reasons. They have not alleged that any classes did not continue (or even that any of their instructors changed) after the pandemic closed campus and instruction shifted to an online format. Instead, they state in conclusory fashion that the instruction they received was "a materially different product" than what they anticipated. Compl. ¶ 122. The Complaint thus "invites the court to enter into precisely the kind of generalized review of the entire course of instruction that so many other courts have wisely refrained from doing," *Cavaliere*, 605 A.2d at 404, and then to assign dollar values to the quality of that education. Under the facts alleged in the Complaint, "[a]ll the basic courses were taught," and Plaintiffs have not alleged "that any of the professors were unqualified." *Reimer v. Tien*, 514 A.2d 566, 575 (Pa. Super. Ct. 1986). "This is hardly a breach of contract." *Id.*

To the extent that Plaintiffs' Complaint provides any suggestion of how the Court is to determine damages, it reveals that the Plaintiffs seek to ultimately ask a factfinder to evaluate the distance learning that Plaintiffs received for a little more than five weeks and somehow calculate the relative value of this education as compared to a hypothetical education in which the last five weeks of the semester were not remote. The closest Plaintiffs come to providing a basis for that comparison is contrasting Penn with a series of primarily online schools, Compl. ¶ 20, but a Penn education delivered remotely for part of a semester cannot simply be equated with those very different programs.

18

The Complaint also seeks to place a value on five and one half weeks of such intangible experiences as "[f]ace to face interaction with professors, mentors, and peers"; "[s]tudent governance and student unions"; "[e]xtra-curricular activities"; "[s]ocial development and independence"; and "[n]etworking and mentorship opportunities." *Id.* ¶ 23.  Any attempt to value these experiences would constitute an impermissible evaluation of educational benefits; moreover, the finder of fact would have to determine which students would have taken advantage of which opportunities—Plaintiffs do not even make allegations about which opportunities they supposedly had to forgo—and the extent to which these activities continued online.  To the extent they did not, the finder of fact would then have to disentangle how much is attributable to Penn shifting to online instruction versus students, professors, and mentors reacting to a global pandemic.  The Complaint also faults Penn for declining to apply for CARES Act funds, *id*. ¶ 8, asking the Court to imply a duty for universities to seek public subsidies and to assess how much of a refund is warranted by failure to follow that novel duty.[10]

All told, the Complaint makes clear that any damages inquiry will be prohibitively speculative and inexorably involve the Court in second-guessing educational choices and evaluating (and monetizing) educational quality, which is impermissible under Pennsylvania law. Plaintiffs seemingly recognize this and disclaim that they are alleging "academic malpractice," Compl. ¶ 119; *see supra* n. 9, but any damages calculation will raise all the problems of evaluating educational quality that have led courts to reject academic-malpractice torts.

---

[10]     To the extent that the Complaint suggests that Penn is giving a "3.9% discount on tuition" for the fall 2020 Semester and implies that could be a barometer for a refund, Compl. ¶ 53, it is misleading.  The 3.9% reduction is a roll back of planned tuition increases and a return "to last year's rates," so fall undergraduate tuition will be exactly the same as the spring 2020 tuition for which Plaintiffs seek a partial refund.  Kidney Decl. Ex. 12 (Aug. 11, 2020 news article entitled "Penn Tells Students to Stay Home Amid Coronavirus, Offers Tuition Cuts") (cited at Compl. ¶ 53 n.12).

\\BA - 057471/003040 - 857308 v12

\*     \*     \*

Plaintiffs have failed to allege either a breach or damages. The Court should therefore dismiss the first and third causes of action in the Complaint.

## II.     PLAINTIFFS FAIL TO STATE UNJUST ENRICHMENT CLAIMS.

Plaintiffs' unjust enrichment claims fail for multiple reasons. First, they are barred by the existence of a contract between the parties. "It is well-settled in Pennsylvania that the existence of a contract prevents a party from bringing a claim for unjust enrichment." *Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) (citing *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006)); *see also Atain Ins. Co. v. E. Coast Bus. Fire, Inc.*, No. CV 17-2545, 2018 WL 637579, at \*3 (E.D. Pa. Jan. 31, 2018) ("Unjust enrichment is an equitable claim that may not be brought when there is an express contract between the parties." (Savage, J.) (citation omitted)). And under Pennsylvania law, "[t]he relationship between a privately funded college and a student" is "strictly contractual in nature." *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007). As a result, a student's right to recover (if any) lies not in a quasi-contractual unjust enrichment claim, but in the parties' contract. *See Miller*, 908 F. Supp. 2d at 656 ("Because the relationship between a student and university is governed by a contract . . . the Plaintiff cannot recover under the theory of unjust enrichment"); *Reynolds v. Univ. of Pa.*, 747 F. Supp. 2d 522, 546 (E.D. Pa. 2010) (unjust enrichment claim was unavailable as a matter of law because "there was an express contract between" Penn and its student), *aff'd*, 483 F. App'x 726 (3d Cir. 2012).[11]

---

[11]     Other states follow the same principle, and at least one court has held that the existence of a contract precluded a plaintiff from asserting an unjust enrichment claim against a university related to its response to the COVID-19 pandemic. *See* Kidney Decl. Ex. 13 (Opinion and Order at 12, *Zwiker v. Lake Superior State Univ.* (Mich. Ct. Claims Aug. 31, 2020) (Case No. 20-000070-MK)).

20

Plaintiffs cannot avoid dismissal by asserting their unjust enrichment claims in the "alternative" to their breach of contract claims. Compl. ¶¶ 129, 160. Here, there is no dispute that a valid, applicable contract exists. *See AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. CIV.A. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29, 2011) (dismissing unjust enrichment claim because "neither party contests the validity of the" contract); *Michael S. Rulle Family Dynasty Tr. v. AGL Life Assur. Co.*, No. CIV.A.10-231, 2010 WL 3522135, at *2 (E.D. Pa. Sept. 8, 2010) (same), *aff'd*, 459 F. App'x 79 (3d Cir. 2011). The Complaint repeatedly affirms the existence of a contract. *See* Compl. ¶¶ 34, 70 (alleging that Plaintiffs "entered into contracts with" Penn); *see also Lomma v. Ohio Nat'l Life Assurance Corp.*, 283 F. Supp. 3d 240, 265 (M.D. Pa. 2017) (dismissing unjust enrichment claim that alleges the existence of a contract). Penn also agrees that, under Pennsylvania law, it shares a contractual relationship with Plaintiffs and even attached to this motion copies of the relevant contractual provisions. While the parties dispute the scope of the contract and Plaintiffs' entitlement to relief under its terms, that a contract exists remains undisputed. *See Vantage Learning*, 246 F. Supp. 3d at 1100 ("a dispute regarding the scope of the Agreement's fee provision . . . does not call into question the validity of the Agreement").[12]

In addition, the subject matter of Plaintiffs' unjust enrichment claims falls within the scope of the parties' contracts. *See Phila. Hous. Auth. v. CedarCrestone, Inc.*, 562 F. Supp. 2d 653, 656 (E.D. Pa. 2008) (framing the inquiry as "whether the scope of the contract includes the transaction that is the basis for the [unjust enrichment] claim"). Plaintiffs allege that they

---

[12]    Nor would the dismissal of Plaintiffs' contract claims allow them to maintain unjust enrichment claims. As the Supreme Court of Pennsylvania has explained, "the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract, *regardless of how harsh the provisions of such contracts may seem in the light of subsequent happenings*." *Wilson Area Sch. Dist.*, 895 A.2d at 1254 (emphasis added) (internal quotations and citation omitted).

21

"entered into contracts with" Penn requiring them to "pay tuition" and fees. Compl. ¶¶ 70, 150. In other words, "all the benefits Plaintiff[s] could possibly have conferred on" Penn "were to be provided pursuant to the contract . . . ." *Promark Realty Grp., Inc. v. B & W Assocs.*, No. 02-CV-1089, 2002 WL 862566, at \*4 (E.D. Pa. May 1, 2002). Conversely, any benefits Penn owed to Plaintiffs are established by the contract too. This Court has recognized that a plaintiff's theory the defendant "failed to perform [a contract] is an allegation that it breached the contract, not that [the defendant] was unjustly enriched." *Atain Ins. Co.*, 2018 WL 637579, at \*3. A similar conclusion is appropriate for Plaintiffs' allegations that Penn "failed to provide the services for which the tuition" and "fees were collected" under contract. Compl. ¶¶ 135, 165.

Moreover, even if there were no contract, Plaintiffs would fail adequately to state unjust enrichment claims. Courts in this District have repeatedly held that it is not unjust for universities to retain students' tuition payments even after involuntarily terminating the students' enrollment. *See Park v. Temple Univ.*, No. CV 16-5025, 2019 WL 1865060, at \*18 (E.D. Pa. Apr. 25, 2019); *David*, 177 F. Supp. 3d at 927; *Bradshaw*, 2011 WL 1288681, at \*2. Here, not only did Plaintiffs remain enrolled for the final weeks of the spring semester after the transition to distance learning, but they attended the same classes, taught by the same professors, and for the same credit towards their degrees. *See* Compl. ¶¶ 24, 45 (acknowledging that Penn continued "academic instruction" after the pandemic began). The Complaint has thus failed to plausibly "allege how it would be unconscionable for the University to retain the tuition paid for classes that" Plaintiffs "attended" for credit. *David*, 177 F. Supp. 3d at 927; *see also McCabe v. Marywood Univ.*, 166 A.3d 1257, 1264 (Pa. Super. Ct. 2017) (no unjust enrichment where plaintiff "paid tuition and received academic credit for courses she enrolled in as a student").

22

Similarly, Plaintiffs also fail to adequately allege how it would be inequitable for Penn to retain the fees they allegedly paid.  The Complaint does not allege that Penn discontinued all the services associated with those fees.  *See* Compl. ¶ 29 (alleging that many but not all of the services covered by the General Fee were interrupted).  There is no allegation, for example, that the "online learning resources" paid for by student fees were inaccessible after the transition to distance learning.  *Id.* ¶ 148.  And Penn supplemented its preexisting services with new offerings intended to respond to an extraordinary situation.  Penn's library staff worked overtime "to increase support for a remote teaching, research and learning environment," including by digitizing "course materials and faculty-selected works for classes . . . ." [13]  Penn's Writing Center also offered "extended hours" during which tutors were available to work with students in "one-on-one online appointments."[14]  In short, Plaintiffs do not—and cannot—allege that the fees they paid were used for any improper purpose.  *See Moss v. Wayne State Univ.*, No. 286034, 2009 WL 4344193, at *2 (Mich. Ct. App. Dec. 1, 2009) (no unjust enrichment where university retained fees that were collected for a contingency that never materialized, but used those fees "to further the educational goals of the institution").

Ultimately, there is no plausible basis to infer that Penn has been enriched, much less unjustly.  *See McCabe*, 166 A.3d at 1264 ("most critical element of" claim is "whether the enrichment of the defendant is unjust" (internal quotations and citations omitted)).  The transition during the last weeks of the spring 2020 semester to distance learning did not result in some financial windfall to Penn.  While Plaintiffs allege in a conclusory manner that Penn saved

---

[13]   Kidney Decl. Ex. 9 (March 15, 2020 message from Penn libraries) (cited at Compl. ¶ 30 n.5).

[14]   Kidney Decl. Ex. 8 (excerpts from Penn's responses to students' frequently asked questions) (cited at Compl. ¶ 30 n.5).

23

money in discrete areas, *see* Compl. ¶ 46, the pandemic has in reality had a "serious financial impact" on Penn.[15]  Plaintiffs do not allege, for example, that the salaries of faculty decreased simply because they were teaching online, as opposed to in-person.  In addition, like many non-profit universities, Penn "experienced a substantial increase in costs to support students in the move from campus to online learning, combined with lost revenue across many areas of the University."[16]  Under the circumstances, the Complaint fails to adequately allege why Penn may not retain and use tuition and fees for the very purposes for which they were paid—the education of its students, which continued even in the face of an unprecedented pandemic.  Plaintiffs second and fourth causes of action should be dismissed.

## III.    PLAINTIFFS FAIL TO STATE A CONVERSION CLAIM.

Plaintiffs' conversion claim is also precluded because of the contract between Plaintiffs and Penn.  Plaintiffs allege that they paid Penn "tuition and fees" "for specific, identifiable services" and that Penn "has not provides those services."  Compl. ¶¶ 175, 178.  But what services Penn promised and must provide for the tuition and fees is a question governed entirely by the contracts Plaintiffs entered with Penn.  Because of that, two doctrines bar a separate claim for conversion:  the gist-of-the-action doctrine and the economic-loss doctrine.

*First*, the gist-of-the-action doctrine "precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims."  *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals."  *Id.* (internal quotation marks omitted); *accord*

---

[15]    Kidney Decl. Ex. 14 (April 23, 2020 announcement entitled "Penn will not apply for CARES Act funding" (cited at Compl. ¶ 8 n.2).

[16]    *Id.*

24

*Quorum Health Res., Inc. v. Carbon-Schuylkill Cmty. Hosp., Inc.*, 49 F. Supp. 2d 430, 432 (E.D. Pa. 1999).  A claim is only properly brought in tort where "the contract [is] collateral" to it. *eToll*, 811 A.2d at 14 (internal quotation marks omitted).

Here, the contract is anything but collateral; rather, it defines what tuition and fees were owed and what Plaintiffs were owed in return.  Only if Plaintiffs were owed in-person instruction under the contract—which they were not—can Penn be said to have "failed to apply" the funds at issue "to the particular purpose for which they were paid."  Compl. ¶ 179.  Therefore, Plaintiffs' "tort and breach of contract claims are inextricably intertwined, the success of the conversion claim depending entirely on the obligations as defined by the contract." *Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. Ct. 2003).  Put another way, "the claim for conversion rests on the same facts as would a claim for breach of contract," and "[c]laims for conversion have been consistently disallowed where such claims are based on the same facts as the contract claim." *McKesson Corp. v. Campbell*, No. 2579 EDA 2014, 2015 WL 7571502, at *9 (Pa. Super. Ct. Nov. 24, 2015) (non-precedential) (citing *Pittsburgh Const*, 834 A.2d at 584).

More generally, Penn's supposed "breach was not of duties imposed by law or social policy, as is required of a conversion claim." *Id.* (citing *Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. Ct. 2005)).  There is no Pennsylvania tort law requiring that Penn provide any particular service to Plaintiffs, and in fact Pennsylvania courts squarely reject educational malpractice torts. *See supra* pp. 7-8.  Rather, any duties owed by Penn are a creature of contract, and if Penn did not breach any contract, it also did not unlawfully convert any of Plaintiffs' property.

*Second*, "under Pennsylvania's 'economic loss doctrine,' a plaintiff is prohibited 'from recovering in tort economic losses to which their entitlement flows only from a contract.' " *Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F. Supp. 2d 750, 753 (E.D. Pa. 2001)

25

(quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995));

*accord Debbs v. Chrysler Corp.*, 810 A.2d 137, 164 n.32 (Pa. Super. Ct. 2002). The doctrine

prevents plaintiffs from using tort to plead around limitations in the terms of the contract, such as

limitations on damages, *see id.*—like the Financial Policies' four-week cut-off to withdraw to

receive a partial refund. Here, whether Plaintiffs are entitled to any refund is governed by their

contracts with Penn. The economic-loss doctrine thus bars a separate conversion claim.

Plaintiffs' fifth cause of action for conversion should be dismissed.

## <u>CONCLUSION</u>

For all the foregoing reasons, all Plaintiffs' claims—for breach of contract, unjust

enrichment, and conversion—should be dismissed.

26

Dated:  September 21, 2020

Respectfully submitted,


By:  /s/Virginia A. Gibson
Virginia A. Gibson, Esq. (Pa. Bar No. 32520)
virginia.gibson@hoganlovells.com
HOGAN LOVELLS US LLP
1735 Market Street; Floor 23
Philadelphia, PA 19103
Telephone: (267) 675-4635
Facsimile: (267) 675-4601

Michael L. Kidney (admitted *pro hac vice*)
Jessica L. Ellsworth (*pro hac vice* pending)
James W. Clayton (admitted *pro hac vice*)
Benjamin A. Field (*pro hac vice* pending)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone:    (202) 637-5600
Facsimile:    (202) 637-5910

*Attorneys for Defendant University of Pennsylvania*

27