# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASHA SMITH and EMMA NEDLEY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO. 2:20-CV-02086-TJS |
| v. | ) ) | Hon. Timothy J. Savage |
| UNIVERSITY OF PENNSYLVANIA, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND................................................................................. 4

ARGUMENT ..................................................................................................... 5

I.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH
     OF CONTRACT........................................................................................... 5

   A.  The Financial Responsibility Statement is Not Applicable to This Action ......... 6

      1.  The Financial Responsibility Statement is Not a Contract ............................... 6

      2.  Plaintiffs' Claims Fall Outside the Scope of the Financial Responsibility
          Agreement.......................................................................................... 9

      3.  The Financial Responsibility Statement is Ambiguous and Incomplete .......... 10

   B.  Defendant is Not Entitled to Special Deference ..................................... 12

      1.  Educational Malpractice Claims ....................................................... 13

      2.  Claims Involving Student Discipline, and other Highly Specialized
          Subjects of a Purely Academic Nature ............................................... 13

      3.  All Other Claims ........................................................................... 14

   C.  Plaintiffs Have Alleged A Specific Contract................................... 18

   D.  Plaintiffs' Have Sufficiently Pleaded Damages................................ 25

II.  PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR UNJUST
     ENRICHMENT ........................................................................................ 27

III. PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR
     CONVERSION....................................................................................... 31

CONCLUSION.............................................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.*,
2016 Pa. Super. 266, 151 A.3d 646 (2016)..................................................................... 26

*Ansari v. New York University*,
1997 WL 257473 (S.D.N.Y. 1997).......................................................................... 16, 19

*B.G. Balmer & Co. v. Frank Crystal & Co., Inc.*,
2016 Pa. Super. 202, 148 A.3d 454 (2016)..................................................................... 32

*Berger & Montague, P.C. v. Scott & Scott, LLC*,
153 F. Supp. 2d 750 (E.D. Pa. 2001) ............................................................................. 31

*Biddle v. Johnsonbaugh*,
444 Pa.Super. 450, 664 A.2d 159 (1995)......................................................................... 7

*Bradshaw v. Pa. State Univ.*,
No. CIV.A. 10-4839, 2011 WL 1288681, *2 (E.D. Pa. Apr. 5, 2011) ......................... 29

*Bruno v. Erie Ins. Co.*,
630 Pa. 79, 106 A.3d 48 (2014) ..................................................................................... 32

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)............................................................................................ 20

*Cavaliere v. Duff's Bus. Inst.*,
413 Pa. Super. 357, 605 A.2d 397 (1992)...................................................................... 13

*CenCor, Inc. v. Tolman*,
868 P.2d 396 (Colo. 1994)............................................................................................. 15

*Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*,
795 F.2d 291 (3d Cir. 1986).............................................................................................. 9

*Chong v. Northeastern University*,
1:20-cv-10844-RGS, Order (D. Mass. Oct. 1, 2020).................................................... 11

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
648 Pa. 604, 194 A.3d 1010 (2018)......................................................................... 20, 21

*David v. Neumann Univ.*,
177 F. Supp. 3d 920 (E.D. Pa. 2016) ...................................................................... 29

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
66 F.3d 604 (3d Cir. 1995)...................................................................................... 32

*Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
2014 Pa. Super. 99, 91 A.3d 723 (2014) ................................................................. 20

*Geisinger Clinic v. Di Cuccio*,
414 Pa. Super. 85, 606 A.2d 509 (1992).................................................................... 6

*Goldman v. McShain*,
432 Pa. 61, 247 A.2d 455 (1968) .............................................................................. 9

*Greene v. Oliver Realty Co.*,
363 Pa.Super. 534, 526 A.2d 1192 (1987).................................................................. 6

*Ingrassia Const. Co., Inc. v. Walsh*,
486 A.2d 478 (Pa. Super. Ct. 1984).................................................................... 21, 22

*Johnson v. Schmitz*,
119 F. Supp. 2d 90 (D. Conn. 2000) ........................................................................ 15

*Kashmiri v. Regents of Univ. of Cal.*,
156 Cal. App. 4th 809 (Ct. App. 2007)..................................................................... 15

*Kaymark v. Bank of America, N.A.,*
783 F.3d 168 (3d. Cir. 2015)............................................................................. 26, 27

*Kazanjian v. New England Petroleum Corp.*,
332 Pa.Super. 1, 480 A.2d 1153 (1984).................................................................... 9

*Lackner v. Glosser*,
2006 Pa. Super. 14, 892 A.2d 21 (2006)................................................................ 7, 8

*Lombardo v. Gasparini Excavating Co.*,
385 Pa. 388, 123 A.2d 663 (1956)........................................................................ 8, 9

*Mikos v. Kida*,
314 Pa. 561, 172 A. 101 (1934) ............................................................................... 6

*Miller v. Thomas Jefferson University Hospital*,
908 F. Supp. 2d 639 (E.D. Pa. 2012) ...................................................................... 28

*Murphy v. Duquesne Univ. Of The Holy Ghost*,
565 Pa. 571, 777 A.2d 418 (2001) ........................................................... 15

*Ohama v. Markowitz*,
434 F. Supp. 3d 303 (E.D. Pa. 2020) ......................................................... 6

*Park v. Temple Univ.*,
No. CV 16-5025, 2019 WL 1865060, at *18 (E.D. Pa. Apr. 25, 2019) ...................... 29

*Pashak v. Barish*,
303 Pa. Super. 559, 450 A.2d 67 (1982)...................................................... 27

*Paynter v. New York University*,
319 N.Y.S.2d 893 (N.Y. App. Div. 1971) ............................................... 23, 24

*Pollock Industries, Inc. v. General Steel Castings Corp.*,
203 Pa.Super. 453, 201 A.2d 606 (1964)...................................................... 21

*Regents of the Univ. of Mich. v. Ewing*,
474 U.S. 214 (1985)........................................................................... 14

*Reynolds v. University of Pennsylvania*,
747 F. Supp. 2d (E.D. Pa. 2010) .............................................................. 28

*Roe v. Loyola Univ. New Orleans*,
2007 WL 4219174 (E.D. La. Nov. 26, 2007) ........................................... 22, 23

*Ross v. Creighton University*,
957 F.2d 410 (7th Cir. 1992) .................................................................. 15

*Ross v. Penn. State Univ.*,
445 F. Supp. 147 (M.D. Pa.1978).............................................................. 20

*Schulman v. Franklin & Marshall Coll.*,
371 Pa. Super. 345 (1988)..................................................................... 25

*Susan M. v. New York Law Sch.*,
76 N.Y.2d 241 (1990) ..................................................................... 13, 14

*Swartley v. Hoffner*,
734 A.2d 915 (Pa. Super. Ct. 1999)........................................................ 14, 19

*Tedeschi v. Wagner Coll.*,
49 N.Y.2d 652 (1980) ......................................................................... 14

*Udodi v. Stern*,
438 F. Supp. 3d 293 (E.D. Pa. 2020) ........................................................................ 26

*Vantage Learning (USA), LLC v. Edgenuity, Inc.*,
246 F. Supp. 3d 1097 (E.D. Pa. 2017) ................................................................ 27, 28

*Villarreal v. Art Institute of Houston, Inc.*,
20 S.W.3d 792 (2000) ........................................................................................ 12, 19

*Wolfe v. Allstate Prop. & Cas. Ins. Co.*,
790 F.3d 487 (3d Cir. 2015) .................................................................................... 27

*Zumbrun v. Univ. of S. Cal.*,
25 Cal. App. 3d 1 (Ct. App. 1972) ........................................................ 15, 23, 30, 31

*Zwiker v. Lake Superior State Univ.*,
No. 20-000070, Opinion and Order (Mich. Ct. Claims, Aug. 31, 2020) ............... 10, 11

**Rules**

Fed. R. Civ. P. 8 ............................................................................................ 27, 31

**Analogous Tuition Refund Orders Nationally**

*Cross v. Univ. of Toledo*,
No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121 (Ct. Cl. July 8, 2020) .................... 17

*Garland v. Western Michigan Univ.*,
20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) .................................................................. 18

*McDermott v. Ohio State Univ.*,
No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127 (Ct. Cl. Aug. 24, 2020) ................ 17

*Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*,
2020 Ind. Super. LEXIS 854 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) ............ 18

*Milanov v. Univ. of Mich.*,
Case No. 20-000056-MK, 2020 Mich. Ct. Cl. LEXIS 1 (Ct. Cl. July 27, 2020) ......... 17

*Salerno v. Fla. S. Coll.*,
No. 8:20-CV-1494-30SPF, 2020 WL 5583522 at *4 (M.D. Fla. Sept. 16, 2020) ........ 17, 28

*Smith v. The Ohio State Univ.*,
2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) ................................................................ 18

*Waitt v. Kent State Univ.*,
2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) ............................................................... 18

**INTRODUCTION**

The University of Pennsylvania has an endowment of $14.9 billion.[1] This gives Defendant a higher net worth than the GDP of 69 countries[2] and would place them at the number 338 spot on the S&P Market Cap Index, ahead of companies such as Nucor, Tiffany and Co., Halliburton, Hewlett Packard, MGM Resorts, and others.[3]  From the endowment alone, Defendant generates roughly $410 million a year in profit distributions to the general operating fund, more than Pennsylvania's entire appropriation to the Unified Judicial System of Pennsylvania.[4]  Even this pales in comparison to Defendant's total yearly revenue.  In fiscal year 2019, Defendant generated more revenue than 210 of the companies on the Fortune 500 list, besting companies such as eBay, Xerox, Raymond James, Boston Scientific, and others.[5]  An astronomical portion of this yearly revenue (over $1.1 billion of it) is paid by students in the form of tuition and fees.  Defendant now argues that, in response to that exorbitant amount of money, students should not expect anything specific in return, so long as they receive their credits.

In order to maintain this house of cards, Defendant must attract students to its University, and convince them to pay $100,000 or more over the course of their education.  In other words, the student consumers must find Defendant's product compelling enough to spend this kind of money.  To this end, Defendant markets a first-class student experience, centered around its 1,085 acre, 361 building campus.  Since 2006, Defendant has added 6 million square feet of new

---

[1] *See* https://www.investments.upenn.edu/about-us (as cited in ¶7 of the Consolidated Complaint) for updated numbers.
[2] https://www.worldometers.info/gdp/gdp-by-country/
[3] https://fknol.com/list/stock-list-sp-500-index.php
[4] http://www.pacourts.us/judicial-administration/budget
[5] *Compare* https://investments.upenn.edu/sites/default/files/downloads/FY19-Annual-Report_1.pdf *with* https://fortune.com/fortune500/2020/search/

construction at a cost of $3.8 billion dollars. Defendant has plans to add an additional 3 million square feet of space to campus in the next five years.

Against this backdrop, Defendant argues that it is no different than Phoenix University Online. Specifically, Defendant argues that notwithstanding its marketing materials; notwithstanding its catalogs, circulars and bulletins; notwithstanding its registration platform; and notwithstanding its 280-year prior course of conduct, it never offered to provide in-person instruction, never promised to provide access to campus facilities or student activities, and has never obligated itself to do anything in exchange for the billions of dollars it has collected from students. Instead, Defendant contends that it should be free to keep all the money that students pre-paid for the spring 2020 semester, even though Defendant evicted students and closed campus for nearly half the semester. Moreover, Defendant contends that even if it did make such promises, and even if it broke those promises, the students cannot do anything about it because academic institutions should all but be immune from lawsuits. Most troubling, Defendant argues that this is perfectly just and equitable. In fact, Defendant's position seems to be that students should be thankful for the opportunity to pay hundreds of thousands of dollars to the University of Pennsylvania in exchange for basically nothing else, so long as they receive intangible educational credits.

Contrary to Defendant's suggestion, colleges and universities do not get special treatment with respect to commercial transactions in the marketplace. They are not subject to their own special set of laws, nor immune from basic contractual principles simply by virtue of their status as an educational institution. Defendant essentially argues that, in all instances, a university is entitled to do as it pleases without legal repercussion, because it is entitled to vast deference from the Court. This is simply not the law with respect to a university's commercial activities.

It is true that a university is entitled to judicial deference with respect to academic matters. Indeed, this is good public policy, as many courts have noted that the judiciary is not well suited to substitute its judgment for the special expertise of educators in their exercise of academic decision making.  However, this deference does not extend broadly to universities in all matters. Not every decision that a university makes or action that a university takes is academic in nature. Universities are not entitled to such deference in basic transactions not involving academic judgment.

Here, it is vitally important to highlight that Plaintiffs' claims are not academic in nature, but rather commercial.  Plaintiffs' primary claims are not premised upon the specific academic decisions of instructors, although by all accounts, the quality of the online education they received was poor.  Instead, when students pay hundreds of thousands of dollars to enroll in schools perhaps hundreds or thousands of miles from their home, they are purchasing an on-campus educational experience with multiple appurtenant benefits, services, experiences and opportunities - the exact product that Defendant offered to provide over and over again, until they did not.

Once the switch to online learning was mandated, not even the best professor exercising the best academic judgment could have given the students that which they were deprived and that which forms the basis of this lawsuit –the on-campus experience for which they had bargained and paid handsomely.  Even if it could be shown that Plaintiffs received a better quality of education after the online transition, this suit would still lie, because Plaintiffs remained deprived of the other benefits and opportunities for which they contracted and paid.

Simply put, when Defendant offered an on-campus product and Plaintiffs accepted the offer and paid tuition and fees for the same, Plaintiffs were entitled to receive a number of benefits and experiences that have nothing to do with the quality of the education, including those specified

in ¶ 23 of the Complaint.  Defendant did not provide those access or services, even though Plaintiffs paid for them, and Defendant has refused and continues to refuse to issue appropriate refunds.

## FACTUAL BACKGROUND

Plaintiffs were enrolled as students at Defendant's institution for the spring semester of Defendant's 2019-20 academic year. Compl. ¶ 17.  Defendant is a university that markets and offers a comprehensive in-person, on-campus education. *Id. at* ¶¶ 20-21.  Plaintiffs chose to attend Defendant's institution over all other colleges and universities, and specifically chose to accept Defendant's offer of admission to Defendant's on-campus program. *Id. at* ¶ 22.

In recruiting students, Defendant promises, among other things, that students can "participate in social, political, artistic, and multicultural activities that put learning into practice," *id. at* ¶ 83; "from one-of a kind museums on campus to accomplished student performances in music, dance, and theatre, culture and the arts play a leading role in life at Penn," *id.*; "participate in competitive team sports and stay physically fit at state-of-the-art, world class training centers," *id.*; and "there are many clubs, organizations, and activities on campus…you will also live and learn in the vibrant city of Philadelphia." *Id. at* ¶ 85.

In addition to tuition, Defendant charges a substantial mandatory fee that is intended to provide students with access to "a variety of student related activities, services, and spaces." *Id. at* ¶ 28.  Plaintiffs paid all required tuition and fees for the spring 2020 semester.  *Id. at* ¶¶ 18, 33. However, on March 15, 2020, Defendant suspended all in-person classes and asked all student living on campus to vacate their dormitories. *Id. at* ¶ 41.  Likewise, Defendant cancelled all campus activities and closed most campus buildings, including, but not limited to Hospitality Services; Morris Arboretum; Off-Campus Services; Penn Bookstore; Penn Children's Center; University Ice Rink; all on-campus libraries; all student activities; and student centers. *Id. at* ¶ 30.  In so doing,

4

Defendant's President acknowledged not delivering on the contractual promises of enrollment, stating, "you have goals and dreams left undone, plays not being performed, games and meets not taking place, research interrupted, spontaneous late-night conversations not occurring, and thousands of other losses both large and small that we all mourn." *Id. at* ¶ 50.

Nonetheless, Defendant has refused and continues to refuse to reduce or refund any of the tuition and fees that had already been pre-paid by Plaintiffs and members of the proposed Class. *Id. at* ¶¶ 48, 51.

## ARGUMENT

### I.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR BREACH OF CONTRACT

In seeking dismissal of Plaintiffs' breach-of-contract claim, Defendant raises essentially three issues.  First, Defendant argues that the entire relationship between itself and its students is governed by a single three-page document entitled the "Financial Responsibility Statement" (hereafter "FRS").  Specifically, Defendant argues that this document forms an express written contract, and that such contract expresses the entire agreement between the parties, to the exclusion of any other agreement, implied or otherwise.  This argument fails because the FRS is not a contract at all and because, even if such agreement did form a contract (or part of a contract), such contract would be limited in scope, would not control the entirety of the relationship between Defendant and its students, and would not govern the facts and circumstances giving rise to this action.

Second, Defendant attempts to recast Plaintiffs' claims as educational malpractice and argues that it is entitled to vast judicial deference under the guise of "academic freedom."  As a subset of this argument, Defendant argues that Plaintiffs have failed to identify a sufficiently specific contractual relationship.  In doing so, Defendant advances two arguments rejected by

every court to have considered similar claims in this context. *See,* Ex. A-H.  Similar to the plaintiffs

in those cases, the Amended Complaint does not seek remedy for educational malpractice, and this

Court should not recast the pleadings to read as such.

Defendants final argument, while unclear, appears to be that Plaintiff has failed to plead

specific damages.  Never mind that Plaintiffs are not required to plead damages with the specificity

demanded by Defendant, this argument is also factually inaccurate.

As such, Defendant's Motion to Dismiss should be denied.  The Complaint properly sets

forth a claim for breach of contract that is not barred by the educational malpractice doctrine or

otherwise entitled to the judicial deference urged by Defendant.

## A. The Financial Responsibility Statement is Not Applicable to This Action

### 1. The Financial Responsibility Statement is Not a Contract

As an initial matter, the FRS cannot be a contract at all because it lacks mutual

consideration. "If a mutuality of promises is absent, the contract is unenforceable." *Geisinger*

*Clinic v. Di Cuccio*, 414 Pa. Super. 85, 91, 606 A.2d 509, 512 (1992)(citing *Greene v. Oliver*

*Realty Co.*, 363 Pa.Super. 534, 526 A.2d 1192 (1987), appeal denied, 517 Pa. 607, 536 A.2d 1331

(1988). "A mutuality of obligation exists when both parties to the contract are required to perform

their respective promises." *Id.*  "The test for consideration is 'whether the promisee, at the instance

of the promisor, has suffered any detriment, or whether, in return for the promise, he has done

something that he was not bound to do, or has promised to do some act, or has abstained from

doing something.'"  *Ohama v. Markowitz*, 434 F. Supp. 3d 303, 315 (E.D. Pa. 2020),

*reconsideration denied*, No. CV 19-2150, 2020 WL 1124402 (E.D. Pa. Mar. 6, 2020)(quoting

*Mikos v. Kida*, 314 Pa. 561, 172 A. 101, 102 (1934)).

Here, the FRS imposes no obligation on Defendant.  The Agreement reads, in pertinent

part, "[b]y registering for class(es) offered by the University of Pennsylvania, I am agreeing to pay

tuition, fees and other charges associated with my enrollment in these classes on or before the scheduled due dates. This constitutes a legal financial obligation." While the document purports to bind the student to pay charges "associated with enrollment" the document does not actually require Defendant to provide any benefits or services in exchange for such payment.

There is no indication within the FRS that the University intends to be bound by any of its terms. Indeed, the document is not even styled as an "agreement," but rather a "statement." In reality, the FRS is merely a one-sided "acknowledgment" on the part of the student (such as Plaintiffs and Class members) regarding a student's financial obligations, plus additional acknowledgments—*all by the student*—regarding the University's rights to take certain actions in furtherance of collection in the event of a student's delinquency.

No part of the FRS obligates the University to provide or perform anything in any way, or to refrain from doing anything, and the FRS does not confer any enforceable rights on the student. The FRS does not even state that the University is a party to the agreement or indicate that the University agrees to be bound by any part of it. The FRS is not signed by the University or any of its representatives. Although the student apparently must "confirm that [they] understand" the statement, not a single phrase or sentence anywhere in the FRS indicates a similar intention to be bound on the part of the University.

Assuming, *arguendo,* that the students' promise to pay charges "associated with enrollment" actually obligates Defendant to provide educational (or any) services following the enrollment, the document fails to address numerous material terms. "An enforceable contract requires, among other things, that the terms of the bargain be set forth with sufficient clarity." *Lackner v. Glosser*, 2006 Pa. Super. 14, 892 A.2d 21, 30 (2006)(citing *Biddle v. Johnsonbaugh*, 444 Pa.Super. 450, 664 A.2d 159, 163 (1995)). "Where… there is no agreement or even a

discussion as to any of the essential terms of an alleged bargain, such as time or manner of performance, or price or consideration, the 'agreement' is too indefinite…" *Id.* at 31(citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663 (1956)).

Here, the FRS contains no material terms at all.  The document fails to address what (if any) services Defendant will provide or the duration that such services will be provided.  Furthermore, the document fails to even establish the price that will be paid for the undefined services.  While the document references a "published" tuition and fee schedule, it does not purport to limit the student's "agreement to pay" to the prices as scheduled.  Instead, Defendant appears free to assess any charge it sees fit, so long as that charge is "associated" to "enrollment" another undefined term that appears left to Defendant's unfettered discretion.   Indeed, under a literal reading of the document, once a student "registers for classes," the student then becomes liable to pay *any* amount charged by Defendant as a result, even if Defendant provides nothing in exchange.  This is not a hyperbolic statement.  In fact, this is the exact interpretation Defendant urges the Court to adopt.  See Def.'s Memo [ECF 26-1] at pg. 9 ("The agreement is therefore clear that the act of registration alone triggers an obligation to pay tuition and fees").  According to Defendant, the University could close its doors and expel all students (for any reason or no reason at all) the day after registration and such students would remain obligated to pay full tuition.  This is simply absurd.

More troubling, the document fails to set forth the rights or remedies of either party with respect to the services rendered.  For example, the document does not even contemplate the conferral of a degree – an important reason students would seek educational services in the first instance.  According to Defendant, its students could show up to class every day for four years, follow all the rules, pass all required classes, and just prior to graduation, be denied a degree for

8

no reason at all.  This is not only contrary to common sense and well-established contract law, it is contrary to public policy.  Likewise, while the document (through incorporation) provides students with certain refund options in the event the student *elects* to withdraw, and provides remedies for Defendant to pursue collection in the event of student nonperformance, the document provides no remedies whatsoever for the students in the event of the University's nonperformance (likely because the document does not require bona fide performance from the University in the first instance).

For these reasons, the FRS is not a contract at all.  Instead, it is a mere agreement to agree. The student agrees that, once he/she reaches a future agreement with Defendant regarding what classes the student will take, and what tuition Defendant will charge, if the student takes the agreed upon classes, the student will pay the agreed upon tuition.  "It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291 (3d Cir. 1986)(citing *Goldman v. McShain*, 432 Pa. 61, 68, 247 A.2d 455, 458 (1968); *Lombardo,* 385 Pa. at 388; *Kazanjian v. New England Petroleum Corp.*, 332 Pa.Super. 1, 7, 480 A.2d 1153, 1157 (1984)).

## 2. Plaintiffs' Claims Fall Outside the Scope of the Financial Responsibility Agreement

For similar reasons as to why the FRS lacks consideration, so too does the FRS lack applicability here. Even Defendant admits that the FRS contains no obligations under which they could be sued. Def. Memo [ECF 26-1] at p. 10. ("There is thus nothing in the specific, contractual provisions governing tuition and fees upon which Plaintiffs can base a breach of contract action."). Said another way, the FRS is not applicable to Plaintiffs' claims because there are no obligations therein for which a claim for breach can be made. The FRS contains obligations only of the

students, and only as it relates to making payments to the Defendant for tuition and fees. Again, nowhere in the Consolidated Complaint do Plaintiffs disclaim financial responsibility for the services provided. To the contrary, Plaintiffs allege that they have paid (Compl. ¶ 2, 34, 35), and the proposed classes are made up of those "who paid" tuition and fees (*Id.* ¶ 56). Plaintiffs are, however, saying that they paid for certain in-person education and experiences, but received something materially different. Therefore, they do not contend they are not obligated to pay for *anything*, but do contend that what they paid for is not what they received. Plaintiffs merely seek appropriate prorated refunds, not full refunds.

### 3.  The Financial Responsibility Statement is Ambiguous and Incomplete

Even if the FRS evidences a *portion* of the overall contract between Defendant and its students, it cannot, as Defendant suggests, form the *complete* agreement, such as to prohibit the consideration of extrinsic evidence. As an initial matter, the FRS contains no merger or integration clause. Therefore, it does not even *purport*, on its face, to be the entire agreement between the parties.[6]

Defendant suggests that this case is analogous to the recently issued opinion by the Michigan Court of Claims in *Zwiker v. Lake Superior State Univ.*, No. 20-000070, Opinion and Order (Mich. Ct. Claims, Aug. 31, 2020). However, Defendant's reliance on *Zwiker* is entirely misplaced. While Defendant attaches a copy of the *Zwiker* opinion to its Motion, the actual "Tuition Contract" that was the subject of that case is not included. It is impossible to know whether and to what extent the *Zwiker* document mirrored the FRS at issue in this case or,

---

[6] *Green Valley Dry Cleaners, Inc. v. Westmoreland Cty. Indus. Dev. Corp.*, 832 A.2d 1143, 1155 (Pa. Commw. Ct. 2003) ("The absence of such a clause serves as persuasive evidence that the parties did not intend the Option Agreement to serve as a complete and exclusive statement of the terms of their transaction.").

importantly, whether it contained a merger and integration clause.  However, it is clear that the legal issue before the *Zwiker* court was not akin to the issue before this court.  In *Zwiker*, the Plaintiffs conceded that the Tuition Contract was the valid, binding, and controlling agreement between the parties.  *See*, *Id.* at pg. 9 ("In arguing for a different outcome, plaintiff has not disputed the existence of the Tuition Contract, nor has she disputed that the document controls the parties' relationship.").  Here, Plaintiffs concede neither point.  As addressed above, Plaintiffs deny that the FRS was a contract at all or is otherwise inapplicable, much less a complete, valid and binding "tuition contract."  Moreover, as addressed in this section, Plaintiffs deny that the FRS controls the parties' relationship in the present case.

In full candor, Plaintiffs have become aware of another order issued since the filing of Defendant's Motion to Dismiss.  In *Chong v. Northeastern University*, 1:20-cv-10844-RGS, Order (D. Mass. Oct. 1, 2020), the Court partially dismissed a tuition and fee refund action for reasons substantially similar to *Zwiker*.  As in *Zwiker*, the *Chong* Plaintiffs conceded the existence and applicability of a Financial Responsibility Agreement and plead that the Financial Responsibility Agreement was the contract that gave rise to the entitlement for in-person instruction, a concession not made in the present case.  *Chong* at pg. 6.  Then, in opposing the Motion to Dismiss, the *Chong* Plaintiffs pivoted to an argument more akin to the arguments made here.  However, the Court was not permitted to consider those arguments because they were not set forth in the Complaint.  *Id.* at pg. 8 ("In their oppositional briefing, plaintiffs attempt to rectify their pleading deficiencies…The court cannot consider this evidence, however, because the [Second Amended Complaint] makes no mention [of it]."  Importantly, the Court did not reject these arguments.  In fact, the dismissal was issued **without prejudice**, indicating the Court's belief that such arguments had merit and that a future Complaint on those grounds would not be futile.  As such, and as with *Zwiker, Chong*

11

is not instructive to the present action because the Court was addressing an entirely different issue as framed by the plaintiffs' own pleadings.

Instead, the present case is much more analogous to *Villarreal v. Art Institute of Houston, Inc.*, 20 S.W.3d 792 (2000). In *Villarreal*, the Texas Court of Appeals was faced with the issue of whether or not to permit parol evidence in the face of a written and signed enrollment agreement. Unlike the FRS in the present case, which contains almost no terms aside from an alleged promise to pay an undefined price in exchange for an undefined right to register for classes, the enrollment agreement in *Villarreal* contained "general terms regarding the amount of tuition, the policy for raising tuition, a notice that the student had the right to cancel the transaction prior to the expiration of five days from date of signing, a list of supplies, and other general policies of the school, such as a note that the school reserves the right to cancel enrollment of a student who does not appear to be making satisfactory progress." *Id.* at 796. Still, the Court found, "while the promises contained in the enrollment agreement may be clear, it is not clear that those are the only promises between the parties, and the plaintiff testified that they were not. Rather, we find that the entire agreement was made partly through written documents, partly through oral representations, and partly through implicit promises ascertained by the parties' actions and surrounding circumstances." *Id.* at 797.

Such is the case here. Plaintiffs allege that Defendant offered to provide in-person instruction and an on-campus educational experience. The circumstances and terms of that offer are clearly set forth in the Complaint and in the sections below. There is nothing about the FRS that contradicts or forecloses Plaintiffs from proceeding under those theories.

### B.  Defendant is Not Entitled to Special Deference

In a further attempt to escape responsibility from this straightforward contract action, Defendant argues that educational institutions are automatically entitled to great deference and/or

subject to their own special set of rules.  While it is true that such deference is due in certain instances, this deference does not apply to any and all actions that may ever be brought against such an institution.  There are essentially three scenarios in which educational institutions find themselves defendants in court, and each requires a different analysis.  While Defendants' scattershot citation to various cases does well to highlight these different scenarios, it does little to accurately define them or assist the Court in properly categorizing the instant action.

### 1.   Educational Malpractice Claims

The first type of claim against an academic institution is a type of claim that courts have labeled "educational malpractice."   These claims are generally not allowed.  *See, e.g., Cavaliere v. Duff's Bus. Inst.*, 413 Pa. Super. 357, 605 A.2d 397 (1992).  The gravamen of an educational malpractice claim is the allegation that a school failed to provide an effective education.  Thus, an educational malpractice claim is one that "amounts to a general allegation of lack of quality education, without more" *Id.* at A.2d 404.

### 2.   Claims Involving Student Discipline, and other Highly Specialized Subjects of a Purely Academic Nature

The second type are claims involving faculty hiring, student discipline, and other highly specialized subjects of a purely academic nature.  Indeed, the plethora of cases upon which Defendant relies fall into this category.  These claims are not disallowed, but courts do generally afford the type of deference that Defendant's Memorandum recites *ad nauseum*.  The rationale behind this is simple and well-reasoned.  "Strong policy considerations militate against the intervention of courts in controversies relating to an educational institution's judgment of a student's academic performance." *Susan M. v. New York Law Sch.*, 76 N.Y.2d 241, 245 (1990). "[I]nstitutional assessments of a student's academic performance, whether in the form of particular grades received or actions taken because a student has been judged to be scholastically deficient,

13

necessarily involve academic determinations requiring the special expertise of educators." *Id.* The Superior Court of Pennsylvania has espoused similar views. "We are not now and will never be experts in each and every academic field open to scholarly pursuit." *Swartley v. Hoffner*, 734 A.2d 915, 921 (Pa. Super. Ct. 1999).

As a result, the rule in Pennsylvania is "[w]hen judges are asked to review the substance of a **genuinely academic decision** ... they should show great respect for the faculty's professional judgment." *Id.* (quoting and adopting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985)) (**emphasis added**). Generally, courts will not intervene in such cases absent a showing of bad faith or arbitrary and capricious conduct. This deference, however, is not applicable to situations involving non-academic decisions or decisions not involving determinations requiring the special expertise of educators, although it is often confused by litigators, such as Defendant. As the New York Court of Appeals noted, in describing the distinction between standards of deference, "when urged in academic achievement as distinct from non-academic matters the contract tends to be limited to the implied in law condition of good faith, i.e., not to act arbitrarily…[there is] ultimate confusion of the rules applicable in the two situations." *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 659 (1980).

### 3. All Other Claims

All other claims are subject to the same general contract principles that apply in cases involving non-educational institutions. In fact, the Pennsylvania Supreme Court has stated, "[f]rom our perspective, this is a breach-of-contract case between private parties, in which the issues raised are no different from those the Pennsylvania judiciary has typically adjudicated when presented with allegations of a contract's breach. Although one of the parties to this dispute is an institution of higher learning, we see no need or reason to devise special rules for restricting

14

review." *Murphy v. Duquesne Univ. Of The Holy Ghost*, 565 Pa. 571, 589, 777 A.2d 418, 428 (2001).

Not every action by a student against a school is an educational malpractice claim, or a claim involving highly specialized subjects of a purely academic nature. Courts across the country have found cognizable breach-of-contract claims where: an academically challenged student-athlete had been promised academic-assistance services in exchange for attending the university that he claimed were not provided, *Ross v. Creighton University*, 957 F.2d 410, 416-17 (7th Cir. 1992); a university "raised professional education fees for continuing students after promising on its website and in its catalogues that such fees would not be raised for the duration of the students' enrollment in the professional program," *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809 (Ct. App. 2007); university may have "obligated itself to provide modern equipment in good working condition, qualified instructors, and computer training for all students, but did not fulfill those obligations," *CenCor, Inc. v. Tolman,* 868 P.2d 396, 300 (Colo. 1994); a professor ceased teaching classes on May 1 despite the course set to conclude "with a final examination on or before June 2, 1970," the professor did not give a final examination, and the professor provided each student with a score of B for the course due to the professor's engagement in a faculty strike protest of American military involvement in Cambodia, *Zumbrun v. Univ. of S. Cal.,* 25 Cal. App. 3d 1, 7 & 10-11 (Ct. App. 1972); where "Yale failed to deliver on its express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures" that resulted in misappropriation of the plaintiff's idea by faculty, *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 96 (D. Conn. 2000); and where university promised to provide state-of-the-art

facilities and hands-on training, but allegedly failed to do so, *Ansari v. New York University*, 1997 WL 257473 (S.D.N.Y. 1997).

Just as in those cases, the Consolidated Complaint in the instant case does not allege a cause of action for educational malpractice, or involve highly specialized subjects of a purely academic nature.  The Consolidated Complaint does not take issue with the specific ways that individual professors elected to teach their classes once remote learning was mandated. Plaintiffs do not suggest, for example, that teachers should have used one video conferencing platform over another, or that the content of lesson plans should have been adjusted.  Rather, Plaintiffs allege that they paid a large sum to Defendant for the purchase of an in-person, on-campus educational experience with multiple benefits, services, experiences and opportunities, and that Defendant, in breach of contract, did not provide that experience.  Plaintiffs, like all parties to a contract, are entitled to receive the benefit of their bargain. The law does not permit Defendant—a university with a nearly *fifteen-billion-dollar* endowment—to refuse to issue appropriate refunds and insist that Plaintiffs (and other similarly-situated students) bear 100% of the loss resulting from Defendant's breach.

The decision to retain monies paid for products and services that were never delivered is a standard commercial business decision, and one encountered by all market participants who take money in return for the promise to deliver services and/or products.  Defendant's decision to retain such monies in this case was not academic in nature and clearly not a highly specialized academic judgment.  It was, however, illegal and unjust.

While Defendant may dispute these allegations, it is abundantly clear that the Consolidated Complaint alleges a claim that falls into the third category of contract actions against higher education institutions, and does not allege generalized educational malpractice or require any

heightened judicial deference. These allegations must be taken as true for purposes of the instant

motion to dismiss, and accordingly, dismissal is not warranted. Indeed, there are approximately

150 lawsuits currently pending throughout the country related to the failure of colleges and

universities to provide appropriate refunds after switching to remote instruction during the spring

of 2020. Although Defendant characterizes these lawsuits as alleging "educational malpractice"

and/or necessitating judicial deference, no court has yet to agree. Instead, of the eight cases where

12(b)(6) arguments have been fully adjudicated, all eight motions have been denied. *See Salerno*

*v. Fla. S. Coll.,* No. 8:20-CV-1494-30SPF, 2020 WL 5583522 at *4 (M.D. Fla. Sept. 16,

2020)(finding complaint sufficiently alleged "that the College's publications clearly implied that

courses would be conducted in-person" and "underscore[ing] that this case is not about the quality

of the College's education… This case is simply about an alleged promise to provide in-person

learning that was allegedly breached.") (Ex. A); *Milanov v. Univ. of Mich.*, Case No. 20-000056-

MK, 2020 Mich. Ct. Cl. LEXIS 1, *8-9 (Ct. Cl. July 27, 2020)("[Plaintiffs] are arguing that the

university promised one method of instruction, charged tuition and fees commensurate with that

method of instruction, yet provided a different (allegedly lesser) method of instruction. This is a

claim potentially sounding in contract or in quasi-contract, not in due process" and "while [case

law] describes a number of areas into which a Court should be hesitant to intrude, principles of

contract and quasi-contract are not among those areas.") (Ex. B); *McDermott v. Ohio State Univ.*,

No. 2020-00286JD, 2020 Ohio Misc. LEXIS 127, *5 (Ct. Cl. Aug. 24, 2020)("Plaintiff's complaint

does not merely assert that the education she received was substandard due to the clinic being

closed. Rather, plaintiff alleges that defendant charged a fee specifically to support the dental clinic

and then closed the clinic. That is sufficient to assert an unjust enrichment claim.") (Ex. C); *Cross*

*v. Univ. of Toledo*, No. 2020-00274JD, 2020 Ohio Misc. LEXIS 121, *7-8 (Ct. Cl. July 8, 2020)

(Ex. D); *Mellowitz v. Ball State Univ. & Bd. of Trs. of Ball State Univ.*, 2020 Ind. Super. LEXIS 854, *1 (Marion Sup. Ct. Civil Div. 14 Aug. 12, 2020) (Ex. E); *Waitt v. Kent State Univ.,* 2020-00392JD (Oh. Ct. Cl. Sept. 28, 2020) at *3 ("Waitt's first amended class action complaint does not present a claim of 'educational malpractice' as KSU suggests.") (Ex. F); *Garland v. Western Michigan Univ.*, 20-0063-MK (Mi. Ct. Cl. Sept. 15, 2020) at *7 ("the Court disagrees that plaintiff's complaint asks the Court to interfere with WMU's academic autonomy…") (Ex. G); *Smith v. The Ohio State Univ.,* 2020-00321JD (Oh. Ct. Cl. Sept. 9, 2020) at *3 ("Plaintiff alleges that when she paid tuition to defendant a contract was created and that by holding classes virtually and not refunding a portion of the previously paid tuition and fees, defendant breached said contract…The mere mention of possible consequences to plaintiff's educational or professional future does not render plaintiff's complaint a claim for educational malpractice.") (Ex. H).

Plaintiffs are not aware of any tuition and fee refund cases across the country that have been dismissed as improper educational malpractice actions or on the grounds of "academic freedom."

### C.  Plaintiffs Have Alleged A Specific Contract

Through this framework, the Court must examine Plaintiffs' Consolidated Complaint.  In seeking dismissal, Defendant advances one additional legal exaggeration that must be debunked. Defendant argues that a contract with a university can never be formed absent a written document expressing an absurd level of specificity.  For example, under Defendant's theory, an express written promise to provide state-of-the-art facilities (such as the one made by Defendant, Compl. ¶ 83) does not actually mean that students should expect access to those facilities.  Instead, Defendant argues the university would have to exclaim something to the effect of, "we did not build these facilities just for the sake of doing so.  We did not create videos about them and plaster pictures of them on our website and marketing brochures for no reason.  We did not invite you to

campus to tour these facilities because we were bored.  Instead, we built these facilities for you to

use and we wanted to show them to you so that you would be excited to come to our school and

have access to them.  Enjoy!"  This simply is not the law anywhere in the country.  *See, e.g.,*

*Ansari*, 1997 WL 257473.

Neither do such promises always have to be in writing.  To be sure, a contractual promise

in the university setting must be sufficiently clear and specific.  The court and finder of fact must

be able to decipher the intent of the parties.  The law does not allow for students to turn every

minor grievance with their university into a breach-of-contract lawsuit alleging vague and

indefinite broken promises.  But neither does the law require the level of specificity urged by

Defendant, particularly in the third category of contract action, i.e., those not involving student

discipline or other highly specialized subjects of an academic nature such as those issues facing

the Court in *Swartley*, 734 A.2d at 915.

Defendant's urged standard undercuts even the most basic contractual promise between

student and university, that, "[a]t a minimum, an implied contract exist[s] between [students] and

[the school] that [the school] [will] provide [students] an educational opportunity and confer upon

[them] a degree…in consideration for [the student's] agreement to successfully complete degree

requirements, abide by university guidelines, and pay tuition…" *Villarreal,* 20 S.W.3d at 797.

Surely even Defendant would not dispute this baseline premise.  However, this exact sentiment is

not expressed anywhere in Defendant's written policies and procedures.  There are written degree

requirements and there are written university guidelines, but there is no express statement saying

"if you complete the requirements and abide by the guidelines, we promise to award a degree."

Instead, that promise is implied and universally recognized.

Applying Defendant's heightened standard, a student could pay all tuition and fees, complete all degree requirements, and follow all university guidelines and then, on the eve of graduation, Defendant could simply refuse to confer a degree.  Worse, Defendant could hold the degree hostage.[7]  Imagine a scenario where, just prior to graduation, the University implements a new "conferral fee," requiring students to pay thousands of additional dollars before the university will grant the degree.  This cannot be the law.  The Pennsylvania Superior Court has already held that promise from a school, so long as specific and definite, can be implied.  "'A student has a reasonable expectation based on statements of policy by [the school] **and the experience of former students** that if he performs the required work in a satisfactory manner and pays his fees he will receive the degree he seeks.'"*Gati v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 2014 Pa. Super. 99, 91 A.3d 723, 731 (2014)(quoting *Ross v. Penn. State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa.1978)) (**emphasis added**).

In the instant case, Plaintiffs have pointed to several specific, written promises.  Defendant dismisses them as "vague…statements that reflect only…aspirations or hopes." Def. Memo. At pg. 12.  Essentially, Defendant categorizes these specific written promises as "puffery."  A statement may be deemed puffery where "the impression created by the statement is one of exaggeration or overstatement expressed in broad language." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 625 194 A.3d 1010, 1023 (2018)(citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993)).[8]  "A salient characteristic of statements deemed to be 'puffery' is that consumers understand that the statements are not to be taken literally." *Id.*

---

[7] This is particularly true if read in conjunction with Defendant's argument that supposedly allows Defendant to charge any amount it deems appropriate under the FRS that is "associated" with enrollment.

[8] It should be noted that *Shapiro* is discussing "puffery" in the context of a Lanham Act false advertising claim, not a breach of contract claim.  Nonetheless, the basic definition of "puffery" does not differ based upon the cause of action in which it is raised as a defense.

Here, it strains logic to suggest that students receiving published course catalogs and registration materials directing them to be physically present at specific locations during specific times to earn credits in specific classes would not take those instructions literally.  Likewise, to assume that students promised state-of-the art facilities and touring those facilities at Defendant's direction would not literally believe that they were paying for access to those facilities.  In any event, "[s]tate and federal courts are united in the principle that the determination as to whether a statement is deemed puffery is a question of fact to be resolved by the finder of fact except in the unusual case where the answer is so clear that it may be decided as a matter of law." *Id.*  As such, this defense is not appropriate for consideration at the motion to dismiss stage.

The specific written promises identified in the Consolidated Complaint also give rise to an implied contract, especially when coupled with the parties' prior course of dealing.  "A contract implied in fact has the same legal effect as any other contract.  It differs from an express contract only in the manner of its formation." *Ingrassia Const. Co., Inc. v. Walsh,* 486 A.2d 478, 483 n.7 (Pa. Super. Ct. 1984).  "A contract implied in fact can be found by looking to the surrounding facts of the parties' dealings." *Id.* at 483.  "Implied contracts ... arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Pollock Industries, Inc. v. General Steel Castings Corp.*, 203 Pa.Super. 453, 201 A.2d 606, 610 (1964).

Here, there is ample evidence of an implied contract.  Defendant offers both in-person and online classes.  The tuition for in-person classes is significantly higher than for online classes.  Defendant heavily markets the on-campus experience and its vast facilities as a benefit of enrollment.  Defendant heavily markets its on-campus activities and opportunities as a benefit of enrollment.  Plaintiffs paid *more* money to enroll in the on-campus classes.  Plaintiffs registered

for classes that were listed on the registration portal by physical location.  Plaintiffs showed up for in-person classes, and otherwise had access to campus facilities and services, every day for the weeks and months leading up to the time that they were evicted from campus.  No reasonable person paying tuition prior to COVID-19 could have believed anything other than that they were signing up for on-campus, in-person education.  In fact, it would be disingenuous for Defendant to suggest that, prior to COVID-19, their official response to student asking if classes were taught in-person would have been "no."  Even if Defendant were to make this absurd claim, "it matters not whether [the Defendant] truly believed a contract did not exist if his manifested intent reasonably suggested the contrary to [the plaintiff]." *Walsh*, 486 A.2d at 483.  Accordingly, Defendant's Motion should be denied.  *See*, *id.* at 486 A.2d 478 at 482 ("Where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.").

In support of its position, Defendant points to *Roe v. Loyola Univ. New Orleans*, 2007 WL 4219174 (E.D. La. Nov. 26, 2007).  However, *Loyola* is not analogous to the present case.  Loyola University did not decide to transfer its students to other universities in the aftermath of Hurricane Katrina, but rather, in conjunction with Tulane University, the American Bar Association, and the American Association of Law Schools, "developed a policy whereby Loyola and Tulane students would be able to attend classes, without payment of tuition, at other ABA-accredited law schools and receive full credit for those courses towards their Loyola and Tulane degrees, provided the students paid their tuition for the Fall 2005 semester to their home universities." *Id.* at *2. In other words, Loyola provided **the option** for its students to attend other accredited law schools as visiting students (in-person and on-campus) without application to those other schools and without paying tuition to those schools, so long as they paid tuition to Loyola. *Id.* at *2-3. In dismissing his claim, the court explained "[p]laintiff has pointed to no provision of the student bulletin or Handbook

that would entitle him to a free semester of law school. Rather, by attending classes during the Fall 2005 semester at SMU, plaintiff received the benefit of the emergency policy made possible by Loyola." *Id.*, at *5-6. Further, the unjust enrichment claim failed because "if he hadn't paid tuition to Loyola, he would have been required to pay SMU's tuition, which was more expensive than that of Loyola." *Id.* at *7.

Contrasting to the situation at hand, Plaintiffs were not given an option when Defendant shut down its campus mid-semester—they were forced to either accept a product that was not bargained for (online education) or receive no education at all and forfeit the tuition and fees they had already paid in full. This Hobson's choice was no option at all.  Moreover, Plaintiffs are not seeking a tuition-free semester; they only seek a prorated refund based on the difference between tuition for on-campus and online courses, as well as a prorated refund of the fees for access and services for which he did not receive the benefit.

Defendant's reliance on *Paynter v. New York University*, 319 N.Y.S.2d 893 (N.Y. App. Div. 1971) is equally misplaced.  In *Paynter*, classes were suspended on May 7, 1970 until the examination period after the tragic shooting at Kent State University.  In denying relief, the court explained that this "***insubstantial change*** made in the schedule of classes does not permit a recovery of tuition." *Id.* at 894.  However, *Paynter* was a reversal of a judgment awarding a tuition refund, not an order granting a motion to dismiss. As explained by the California appellate court analyzing *Paynter*, "whether the partial failure of consideration was minimal so as to render applicable the maxim '*de minimis non curat lex*' or whether it justifies refund of a portion of the tuition and fee allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an appropriate forum." *Zumbrun v. Univ. of S. Cal.*, 101 Cal. Rptr. 499, 505 (1972). Thus, *Paynter* supports Plaintiffs' position that this case should be heard on the merits. In any event, it

23

is distinguishable in that it involved a suspension of a few days of courses not a half a semester's worth of courses.

Finally, Defendant suggests that a whole list of terribleness that might ensue if this case is permitted to proceed. Def Memo. At pg. 15 ("if a popular course is listed in promotional materials, and the professor retires, other students may argue that the university is liable for failing to continue its course of conduct in offering the class."). This is an inapplicable strawman. Students paid for an in-person education not a specific classroom or even a specific professor. This is evidenced by the fact that there are not tuition and fees for specific rooms or professors, just for on-campus education. Moreover, Defendant is asking this Court to solve a problem not before it. Rather than delve into these extreme hypotheticals, the Court should focus on the actual dispute at issue. Surely classrooms and even professors change all the time in higher education, but there has never been a flood of litigation over minor schedule changes, likely because reasonable students recognize that an insubstantial change in a class schedule would not permit the recovery of tuition. *See, e.g., Paynter.* Likewise, there is a difference between changes made prior to and between academic terms (before students pay) and those made mid-semester after tuition and fees have already been pre-paid. The change here, was not insubstantial. Here, students are rightfully upset that the universities have foisted this burden upon them at the most financially vulnerable time in many of their lives. This is not a reason to dismiss this or any other lawsuit, but rather is reason to let a jury hear it on the merits.

In sum, breach-of-contract actions can sometimes trade in the minutia. Parties may disagree as to the meaning of specific terms or the highly technical application of lengthy contracts written by overpriced lawyers containing more Latin phrases than English ones. This is no such case. Plaintiffs do not seek to enforce some obscure provision buried deep within a university

catalog.  This action does not seek to overturn a disciplinary decision or poor performance assessment by latching onto a vague procedural statement in the student handbook. Rather, this action contemplates one of the most fundamental and universally understood and accepted relationships ever existing between student and university, and one about which there has been no confusion since the first universities were established in this country dating back to the 1600's. That is that when young adults "go off to college," there is indeed a campus to which they go to complete their studies.  The Merriam-Webster dictionary defines "university" as "an institution of higher learning providing facilities for teaching and research and authorized to grant academic degrees."

As the Superior Court recognized in 1988, "[a] college is frequently selected by parents and students because of the special aura or quality of life on campus that distinguishes it from other institutions." *Schulman v. Franklin & Marshall Coll.*, 371 Pa. Super. 345, 351 (1988).

### D.  Plaintiffs' Have Sufficiently Pleaded Damages

Defendant argues that Plaintiffs' breach-of-contract claim "failed to plead the final element of breach of contract: legally cognizable damages." Def. Memo [ECF 26-1] at p. 16. In making this argument, Defendant attempts yet again to convince this Court that Plaintiffs' claims sound in educational malpractice, and that the damages stemming therefrom would therefore be speculative and would put this Court in the position of "second-guessing education choices and evaluating (and monetizing) educational quality…" Def. Memo [ECF 26-1] at p. 19. As aforementioned, there is a clear distinction between the claims brought forth by Plaintiffs, i.e., paying for one product and receiving something materially different, as compared to an educational malpractice claim in regard to the quality of education provided. *See supra* A(3)(b).

"Under Pennsylvania law, breach of contract claims contain three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

contract[,] and (3) resultant damages.' (citation omitted)." *Udodi v. Stern*, 438 F. Supp. 3d 293, 299 (E.D. Pa. 2020). "'While not every term of a contract must be stated in complete detail, every element must be specifically pleaded.' (citation omitted)." *Id.* "Resultant damages" are those damages suffered from the breach. *412 N. Front St. Assocs., LP v. Spector Gadon & Rosen, P.C.*, 2016 Pa. Super. 266, 151 A.3d 646, 657 (2016).

Plaintiffs' suffered and sufficiently alleged damages because of Defendant's providing a different product than originally contracted for. Compl. ¶ 124. Defendant relies on *Kaymark v. Bank of America, N.A.,* 783 F.3d 168 (3d. Cir. 2015) in stating that Plaintiffs must "establish a 'non-speculative loss' to support a contract claim." Def. Memo at p. 17. In *Kaymark,* the plaintiff defaulted on his mortgage and a lien was placed on his property, which lien amount included not-yet-performed services such as legal fees associated with a foreclosure action. *Id.* The plaintiff in *Kaymark* never suffered any damages because he never paid those fees, the foreclosure action was ultimately filed, and the legal expenses were ultimately incurred. *Id.* at 181. Because of this, the Third Circuit found that "Kaymark's temporary injury, which by all accounts shrank to zero after the filing of the foreclosure action, is too speculative . . . ." *Id.* at 181. This is clearly distinguishable from the instant action, where the Plaintiffs' and members of the putative Class did indeed already pay a sum certain for a specific product, and did in fact suffer real damages by the University's changing of the product offered. Defendant seems to use *Kaymark* to say, not that there is no damage in the instant case, but only that the amount is speculative. However, "[t]he test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.... Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the *amount*."

(original emphasis) *Id.* at 181. (quoting *Pashak v. Barish*, 303 Pa. Super. 559, 450 A.2d 67 (1982)). Therefore, the question as to amount is unwarranted.

Plaintiffs' sufficiently plead that they have suffered damages by way of Defendant's breach. Compl. ¶ 124. Nowhere in Fed. R. Civ. P. 8(a) is there a requirement for Plaintiffs' to allege a specific dollar amount. Plaintiffs' intend to use discovery and expert testimony to establish damages at trial. Even if damages are unable to be determined, "[u]nder Pennsylvania law, if a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is nonetheless entitled to recover nominal damages." *Wolfe v. Allstate Prop. & Cas. Ins. Co.,* 790 F.3d 487, 497 (3d Cir. 2015). The absence of provable damages is improper even at the summary judgment stage, let alone by motion to dismiss. *Id.* at 497-498. However, Plaintiffs' are confident that provable damages can be ascertained from discovery and expert testimony, the same way Defendant can calculate the appropriate amount to charge for tuition in-person as compared to its online courses. Otherwise, such figures would be completely arbitrary.

## II.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR UNJUST ENRICHMENT

Defendant first argues that "the student's right to recover (if any) lies not in a quasi-contractual unjust-enrichment claim, but in the parties' contract." Def.'s Mem. at 20.  Defendant's argument ignores the plain reading of Fed. R. Civ. P. 8(d)(3), which provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."  *See, e.g.,* Fed. R. Civ. P. 8(a)(3) ("[A] demand for relief sought, which may include relief in the alternative or different types of relief.").  Defendant relies on *Vantage Learning (USA), LLC v. Edgenuity, Inc.,* 246 F. Supp. 3d 1097 (E.D. Pa. 2017), in stating that "[u]njust enrichment is an equitable claim that may not be brought when there is an express contract between the parties." at 1100. However, Defendant conveniently leaves out the very next line in the *Vintage Learning* opinion, which

states, "Rule 8(d)(2) nonetheless permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances, even where the existence of a contract would preclude recovery for unjust enrichment." (internal quotations omitted)). *Id.* "Such circumstances require either that (i) the contract at issue covers only a part of the relationship between the parties, or that (ii) the existence of a contract is uncertain or its validity is disputed by the parties." (citations omitted) *Id.* As stated herein *ad nauseam*, Plaintiffs' dispute that the FRS relied on by Defendant is valid, dispute that it governs any of the terms of the agreement, or, in the alternative, that it does not govern all of the terms of the agreement between the parties. Defendant's reliance on *Miller v. Thomas Jefferson University Hospital*, 908 F. Supp. 2d 639 (E.D. Pa. 2012) and *Reynolds v. University of Pennsylvania*, 747 F. Supp. 2d (E.D. Pa. 2010) is also misplaced, as neither were decided on a motion to dismiss based on the pleadings.

Moreover, Defendant argues that although there is a contract governing Plaintiffs' claims, they dispute any obligation therein that they could even breach. *Compare* Def.'s Mem. at 9 ("There is nothing in the Financial Responsibility Statement even addressing, let alone promising, in-person classroom instruction."), *with id.* at 9 ("Plaintiffs have not alleged facts showing that the Statement was breached because it makes no promise of in-person instruction at all, much less during a pandemic."), *and id.* at 10 ("There is thus nothing in the specific, contractual provisions governing tuition and fees upon which Plaintiffs can base a breach of contract action." (emphasis in original)). Defendant cannot argue both that the FRS is the contract governing, and that it contains no obligations or promises of the university therein. Cases in which the existence of the governing contract is in dispute are exactly the type where it is permissible to plead unjust enrichment in the alternative. *Vantage Learning*, 246 F. Supp. 3d; *Salerno,* 2020 WL5583522

28

(allowing unjust enrichment to be plead in the alternative where "[r]egardless of whether a contract exists, the College disputes the merits of the breach-of-contract claim").

Defendant then argues that even if there is no contract, Plaintiffs fail to state an unjust-enrichment claim, because, according to Defendant, "it is not unjust for universities to retain students' tuition payments even after involuntarily terminating the students' enrollment." Def. Memo at p. 22. If this were true, Defendant can accept tuition and fees from students, terminate their enrollment, and retain all funds in a just and fair manner.  As support, Defendant cites *Park v. Temple Univ.*, No. CV 16-5025, 2019 WL 1865060, at *18 (E.D. Pa. Apr. 25, 2019), *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016), and *Bradshaw v. Pa. State Univ.*, No. CIV.A. 10-4839, 2011 WL 1288681, at *2 (E.D. Pa. Apr. 5, 2011). None of these cases have any bearing on the instant case. *Park* involved Temple University expelling a dentist hired at the university's clinic after finding that he lied on his application. The unjust-enrichment claim was not based on tuition paid, but rather, the value added to the university through his participation in the clinic. *Id.* at *18. The plaintiff in *David* finished the classes as paid for, received a failing grade, and was terminated from the university's program for such failure. She brought a claim for unjust enrichment, despite having attended all of the classes paid for. The plaintiff in *Bradshaw* was similarly dismissed from the university, and failed to allege that she was prevented from attending the classes for which she paid. *Id.* at *2. Far removed from those cases, the Plaintiffs and putative Class members in the instant case were not dismissed, did not attend all of the classes as paid for, and *did* allege that they were prevented from taking the class in-person, as paid for. Compl.1-2.

In any event, Plaintiffs have plead that Defendant's retention of full tuition and fees is unjust under the circumstances.  Compl. ¶¶ 135-40 and 165-70.  As a result of closing campus and moving classes online, Defendant saved significant sums of money in the way of reduced utility

29

costs, reduced maintenance and staffing requirements, etc.  *Id.*  It is unjust for Defendant to continue to collect the same tuition and fees while, at the same time, reducing its costs by discontinuing and depriving its students of the very services for which those tuition and fees were paid.

Defendant's final argument is that, because Plaintiffs' and members of the putative Class received "the same classes, taught by the same professors, and for the same credit towards their degree," a claim for unjust enrichment should fail. Plaintiffs' Complaint, however, alleges that they were *not* the same classes. Compl. 1-2. The crux of the Consolidated Complaint is that they were not the same classes as paid for. *See* Compl. Indeed, they were a different product altogether. That Plaintiffs received something in exchange for their tuition payments, but not what Plaintiffs paid for, does not warrant dismissal of their unjust-enrichment claim.  For instance, in *Zumbrun,* 25 Cal. App. 3d 1, the court recognized that a student who paid tuition for a course had a cause of action for unjust enrichment after the instructor failed to deliver the anticipated number of lectures announced in the university catalog.  *Id.* at 10 ("The allegations heretofore summarized spell out a contract obligating defendant USC to give the course 'Sociology 200' consisting of a given number of lectures and a final examination in consideration of the tuition and fees for the course paid by plaintiff.  The stated number of lectures and the normal type of final examination were not given.").  That the instructor in *Zumbrun* still gave some degree of instruction was of no import. Similarly, here, that Plaintiffs continued to be educated after the move to online learning does not mean Plaintiffs "receive[d] all that [they] bargained for when [they] enrolled."  *Id.* 10–11.  And even though Defendant provided partial consideration, it is a question of fact whether Defendant's failure to deliver the remaining consideration—the provision of in-person instruction and access to facilities—was a minimal or severe breach.  As the *Zumbrun* court noted:

30

> It is obvious that plaintiff did not receive all that she bargained [] for when she enrolled in 'Sociology 200.' She was credited with a 'B' for the course. To the average undergraduate this would be received with delight as full satisfaction for taking the course. It was enough to enable plaintiff to academically qualify for advanced courses for which it was a prerequisite. It has been held that a minimal departure from a projected course of study does not entitle the student (or his parent who paid for it) to recover the tuition paid to any part of it. However, whether the partial failure of consideration was minimal so as to render applicable the maxim '*de minimis non curat lex*' or whether it justifies refund of a portion of the tuition and fee allocable to the course is a matter of proof, under the present state of the pleadings, at trial in an appropriate forum.

*Id.* at 10–11 (internal citations omitted; emphasis added); *Murillo*, ECF No. 44, at 10–11 (sustaining unjust-enrichment claim based on plaintiff's allegation that "[t]his case is simply about an alleged promise to provide in-person learning that was allegedly breached"). Moreover, Plaintiffs' unjust enrichment claims also concern fees charged by Defendant for access and use of on-campus facilities and services, which were unavailable or limited for part of the semester. Thus, Plaintiffs have adequately stated a claim for unjust enrichment.

## III.   PLAINTIFFS HAVE SUFFICIENTLY STATED A CLAIM FOR CONVERSION

Defendant argues that Plaintiffs' conversion claim should be dismissed as it is "precluded because of the contract between Plaintiffs and Penn." MTD at 19. However, as discussed previously, it is well established that a Plaintiff may plead claims in the alternative. Fed. R. Civ. P. 8(d); *Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F. Supp. 2d 750, 754 (E.D. Pa. 2001) ("Federal Rule of Civil Procedure 8(d)(2) allows Berger to plead two or more alternative claims against Scott for either breach of contract or conversion, regardless of their consistency"). Further, to the extent that Defendant relies upon the FRS to try and preclude Plaintiffs' conversion claim, Plaintiffs' again dispute the validity and applicability of the FRS.

Defendant further claims that the gist-of-the-action doctrine and economic-loss doctrine both bar Plaintiffs' claim for conversion. Neither argument is correct. The gist-of-the-action doctrine "prohibits a plaintiff from re-casting ordinary breach-of-contract clams into tort claims."

*B.G. Balmer & Co. v. Frank Crystal & Co., Inc.,* 2016 Pa. Super. 202, 148 A.3d 454 (2016). However, if the contract is merely a "vehicle, or mechanism, which established the relationship between the parties, during which the tort . . . [is] committed," the tort is "not viewed as an action on the underlying contract itself, and is not barred by the gist-of-the-action doctrine . . . ." *Bruno v. Erie Ins. Co.*, 630 Pa. 79, 106 A.3d 48 (2014). If "the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." *Id.*

In the instant case, the conversion claim is based on the retention of funds by the University, rather than the contractual breach itself. The contract that Defendant relies on, which Plaintiffs' dispute even governs, does not bar Plaintiffs' claims for conversion because it is merely the vehicle which established the relationship between the parties – assuming it is a contract. The same goes for all other contracts that promise to provide in-person instruction and services. The subsequent conduct of retaining the fees is a violation by the Defendant of a broader social duty, and sufficiently alleged against the Defendant in order to withstand dismissal.

Similarly, the economic-loss doctrine does not preclude Plaintiffs' from bringing a claim for conversion in the alternative. The economic-loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). As explained above, the claim for conversion rests upon Defendant's conduct of retaining funds, rather than from the breach of contract itself. Further, Defendant's reference to the Financial Policies' cut-off to withdraw to receive refunds has no merit, as the Plaintiffs did not withdraw from the university. Plaintiffs' have sufficiently plead their claim for conversion, and such claim is not barred here.

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court deny Defendant's Motion to Dismiss in its entirety.

Dated October 13, 2020

**CARLSON LYNCH LLP**

  */s/ Gary F. Lynch*
Gary F. Lynch
Edward W. Ciolko**
Nicholas A. Colella**
1133 Penn Avenue 5th Floor
Pittsburgh, PA 15222
P. (412) 322-9243
F. (412) 231-0246
E. glynch@carlsonlynch.com
   eciolko@carlsonlynch.com
   ncolella@carlsonlynch.com

-and-

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin**
Roy T. Willey, IV **
32 Ann Street
Charleston, SC 29403
P. (843) 614-8888
F. (843) 494-5536
E. eric@akimlawfirm.com
   roy@akimlawfirm.com

-and-

**CARPEY LAW, P.C.**
Stuart A. Carpey, #49490
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
(610) 834-6030
scarpey@carpeylaw.com

**Admitted Pro Hac Vice

**ATTORNEYS FOR PLAINTIFFS**

33