# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHA SMITH and EMMA NEDLEY, individually and on behalf of all others similarly situated, | |
| *Plaintiffs*, | Case No. 2:20-cv-02086-TJS |
| v. | |
| UNIVERSITY OF PENNSYLVANIA, | |
| *Defendant*. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

## I.     <u>INTRODUCTION</u>

This case addresses the question of who should bear the financial burden of a breach of contract related to the Covid-19 pandemic. University of Pennsylvania ("UPenn" or "Defendant") seems to be believe it can actively market its rich campus life, promise its students a variety of services and amenities, showcase and tout the facilities in which enrolled students traditionally have access, but then fail to provide its students with access to campus or state-of-the-art facilities for a portion of the semester and stick students with the full cost. The students who comprise the proposed class disagree.

As such, the questions for class certification in this case address central issues that do not vary by student: can UPenn charge students for an in-person educational services and access to campus that it did not provide? And if not, how much should UPenn refund to its students?

As to Defendant's telegraphed class certification denial arguments (through meet and confers, discovery responses, deposition questions, and arguments in Chambers at last Fed. R. Civ. P. 16 conference), a very recent class certification decision in a directly analogous "fee only" action very effectively summarizes and rejects them:

> GCU argues that Plaintiff lacks standing to bring the proposed class claims because his parents paid for his room, board, fees, and textbooks. (Doc. 60 at 10–11.) "Every class member must have Article III standing in order to recover individual damages." TransUnion LLC v. Ramirez, 141 S.Ct. 2190, 2208 (2021). Named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting  Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 40, n. 20 (1976)).
>
> GCU argues that because Plaintiff's parents paid for his room and board, fees, and textbooks, he has not established a particularized and

concrete injury to give him standing to represent the class. (Doc. 60 at 11.) GCU also argues that Plaintiff seeks to pursue claims for fees that he was not required to pay because they did not apply to him. (Id. at 11.) GCU additionally contends that Plaintiff lacks a personalized or concrete injury to assert claims for fees unaffected by GCU's response to COVID-19. (Id. at 12.) Moreover, GCU argues that Plaintiff does not have standing to pursue claims for fees for which he does not know the purpose, that he cannot pursue claims for fees paid for facilities because he did not use them, and that he has abandoned his claims for room and board by not specifically mentioning it in his amended class definition. (Id. at 12–13.) [. . .]

GCU's argument that Plaintiff lacks standing because his parents paid his fees and costs must be rejected. While Plaintiff's parents paid his fees and costs, he is ultimately the individual who had a contract with GCU. In other words, if he had failed to pay, he—not his parents—would be on the hook. It does not matter how he procured the money to pay his obligations to GCU, it was ultimately his obligation. As Plaintiff points out, if this were not the case, students could rarely sue a university because students often do not have the means to pay their own tuition, fees, and room and board. This would lead to absurd results. It is irrelevant if Plaintiff got the money from his parents, a student loan, or a scholarship. Thus, the Court rejects GCU's argument that Plaintiff lacks standing on this basis.

The Court will also reject GCU's argument that Plaintiff lacks standing because he did not pay every type of fee that GCU charged students. Under Plaintiff's theory of liability, he suffered the same type of harm as other students at GCU: he was unable to take advantage of the services, facilities, and amenities for which he paid fees and room and board charges because GCU encouraged students to leave campus and closed facilities on campus due to the COVID-19 pandemic. What matters most is that the same decision, made by GCU, deprived students of campus benefits they contracted with GCU to receive. The exact fees paid by each student is a matter of damages, which the Court need not address at this stage in the case.

*4 Likewise, the Court also rejects GCU's argument that Plaintiff lacks standing because he did not use all the services or facilities for which he paid. Regardless of whether Plaintiff used the facilities, GCU breached the contract between the parties if GCU failed to offer the facilities or services due to the COVID-19-related closures on campus. Plaintiff is correct that he is entitled to have what he paid for regardless of whether he chose to use those services. Thus, this argument, too, is rejected.

2

*Little v. Grand Canyon Univ.*, 2022 WL 266726, *3-4 (D. Az. Jan. 28, 2022) ("*Grand Canyon*")

## II.      FACTUAL BACKGROUND

### A. Students Attending UPenn's Campus Are Promised Access to Campus And In-Person Services

Students attending UPenn are consistently promised access to campus and in-person services. UPenn publicizes the importance of its campus and touts its facilities on its website and in its marketing materials. *See*, *e.g.*, Amended Complaint ("AC") ¶¶78-88 (UPenn's website discussing benefit of on-campus enrollment, including its "Beautiful Urban Campus," "Life at Penn," 400+ clubs and organizations, and state-of-the-art facilities). UPenn aggressively markets dozens of colleges, schools, and programs, the majority of which can only be accessed in-person and on-campus. *See* UPenn's course catalog, available at 2019-20 Undergraduate Catalog < University of Pennsylvania (archive.org) (last visited February 4, 2022) attach as Exhibit A. UPenn entices prospective students to visit campus and the President of the University tells admitted students that he "look[s] forward to our encounters on Locust Walk in the coming years, but in the meantime, I send my sincere well-wishes and deep gratitude for your application. Welcome to Penn!" *See* AC ¶¶ 94-95.

Once students are enrolled, UPenn emphasizes all that the campus has to offer. *See* UPenn's Facts, available at University of Pennsylvania (upenn.edu) (last visited February 4, 2022) ("12 intramural leagues and 20 special events," "100+ research centers," "many clubs, organizations, and activities on campus," "state-of-the-art classrooms" "world-class recreational facilities.") All first- and second-year students are required to live on-campus as well as to attend an in-person orientation. *See* UPenn Housing, available at Room Selection | Penn Residential Services (upenn.edu), (last visited February 4, 2022). UPenn touts the number of student groups and organizations available to students and holds student group fairs to highlight the ways students can

become involved on-campus. *See*, [Student Activities | Penn Admissions (upenn.edu)](upenn.edu) (more than 450 student-run organizations).

Admitted students are provided with materials discussing the many activities and services they are entitled to access. *See* Exhibit B (discussing, among other things, Counseling and Psychological Services, Student Health Services, Career Services, student clubs and programs; computer labs, which provide access to technology services; the Student Recreation and Wellness Center; and Multicultural Resource Center). Some of these services, like the Student Recreation and Wellness Center, can ***only*** be accessed in-person, and is available to students enrolled on the UPenn's as part of their fees. *See Id*. Once students are enrolled, they are subject to a variety of policies regulating their behavior on campus. *See* University Policies, available at [Policies | University of Pennsylvania (upenn.edu)](upenn.edu) (last visited February 4, 2022) (policies regarding classroom disruptions, student organizations, protesting and posting on-campus, and student conduct and affairs generally).

When it comes to classes, UPenn represents to the U.S. Department of Education that it is *not* an exclusively distance learning institution. *See* University of Pennsylvania IPEDS information. Further, students can choose to take their classes in-person and on-campus. Students can search for classes by "Course Location" (*i.e.*, on-campus or online) and can see detailed information about the specific rooms, hours, and dates the course meets. Indeed, the UPenn website also contains instructions regarding how to choose in-person classes. *See* [Choosing Courses | College of Arts & Sciences - University of Pennsylvania (upenn.edu)](upenn.edu). In other words, students can choose their class location and delivery method, including on-campus and in-person

classes.[1] By choosing to participate in the campus-life that was marketed as a valuable commodity, with a hefty price tag, there was a mutual understanding that for the entirety of a student's enrollment, they would have continued access to campus, the facilities, and on-campus services for which they paid. UPenn breached this promise, yet retained all funds paid by the putative class members.

### B.  Plaintiffs Enrolled In And Paid For UPenn's On-Campus Program

Plaintiffs attended UPenn's on-campus program. *See* AC ¶11. In Spring of 2020, both Plaintiffs paid fees to UPenn. Plaintiff Nedley paid the General Fee, Clinical Fee, and Technology Fee and Plaintiff Smith paid the General Fee and the Clinical Fee. *See generally* Deposition of Asha Smith ("Smith Dep.") attached as Exhibit C; Deposition of Emma Nedley ("Nedley Dep.") attached as Exhibit D.  Throughout their time at UPenn (prior to March 2020), Plaintiffs were able to fully access the UPenn's Campus and all in-person classes and services to which they were entitled. *See* AC ¶¶23, 113. For example, Plaintiff Smith frequently used the printing and technology services and regularly worked out at the campus gym. *See* Asha Dep. Pgs. 46; 56 ("I used all of the weight room accessories, the bars, lifting, and I also used the cardio equipment'" "We were having access to expensive software packaging, for example, expensive computers, that I don't have here in my personal home."). Plaintiff Nedley frequently used career and student health services. Nedley Dep. Pg. 92 ("Access to career services, access to student health services, and access to all of the athletic facilities and everything that comes along with athletics.")

---

[1] When students chose to attend the on-campus program, they necessarily chose not to attend an online program. This expectation is reinforced by the difference in the way the two programs are marketed and presented to students. *See* AC ¶¶103-115 (noting the difference in the number of programs offered on-campus with the number of programs offered online).

**C.  In March 2020, UPenn Closed Its Campus And Cancelled All In-Person Classes**

In the Spring 2020 Semester, however, UPenn cancelled its in-person classes and severely restricted access to its campus in response to the Covid-19 pandemic. On approximately March 15, 2020, UPenn announced that it was moving all classes online for the remainder of the semester, starting on or about March 23, 2020. AC ¶ 41. UPenn also closed or severely limited access to its buildings, canceling most in-person student activities and services. *See* Exhibits E, F, G. In internal communications, UPenn officials acknowledged that transitioning to remote instruction was not what the students signed up for and disrupted student's education. *See* Exhibits E, F. ("We are deeply saddened that your instruction cannot continue in person, and that you will not have access to your studios," "However, we agree that this emergency measure is not the preferred format for providing architectural education. Like you, we are eager to return to classrooms and studios to continue our important work," "We are deeply saddened that your instruction cannot continue in person, and that you will not have access to your studios or the School's on-campus resources.")

Even though UPenn did not offer full access to its campus or in-person classes from March 23, 2020, it did not offer refunds to students for any fees. *See* SAC ¶¶ 48, 118; *See also* Exhibits H, I.

## III.   <u>ARGUMENT</u>

**A.  LEGAL STANDARD**

A party seeking class certification must first satisfy all of the requirements of Fed. R. Civ. P. 23(a). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Rule 23(a) requires a showing that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(1)– (4). The party

moving for certification must also satisfy at least one of the three requirements in Rule 23(b). In this case, Plaintiff seeks certification under Rule 23(b)(3), "which requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *In re Cmty. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir. 2010). "A class certification decision requires a thorough examination of the factual and legal allegations*." In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 309 (3d Cir. 2008) (internal citation omitted).   "[F]actual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *Id.* at 307.

In a similar college refund case, the Ohio Court of Claims certified the class action and held "[w]here [the named plaintiff], as well as those similarly situated, are entitled to remediation for tuition … and fees are questions of law or fact common to [class representative] and those similarly situated, and, in the Court's view, [the class representative]'s claims relate to remediation for tuition … and fees are typical of the claims of the proposed classes. The Court, therefore, finds that there are questions of law or fact common to members of the proposed classes …" *Cross v. Univ. of Toledo*, 2021 Ohio Misc. LEXIS 43, *10-11 (Ohio Ct. Claims, 2021) (granting certification on behalf of a tuition Class, a room, and board Class, and a fee Class); *See also Grand Canyon*, *Alexander v. Florida Int'l Univ. Bd. of Trustees*, Case No. 2021-009869-CA-01 (44), Omnibus Order on Plaintiff's Motion for Class Certification and Defendant's Motion to Dismiss (Miami-Dade County 11th Jud. Cir. Ct., December 30, 2021)(Attached as Exhibit J); *.Weiman v. Miami Univ.*, Case No. 2020-00614JD (Ohio Ct. Claims, December 13, 2021)(Attached as Exhibit K).

**B.  PLAINTIFFS HAVE SATISFIED ALL PREREQUISITES OF RULE 23(a)**

**1.      The Class is so numerous that joinder is impracticable.**

To certify the purported Class, this Court must determine whether Plaintiff's proposed "class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1) "Rule 23(a)(1) requires a finding that the class is so numerous that joinder of all class members is impracticable.  Although there is no precise number for establishing numerosity, classes that exceed forty or more class members generally satisfy this prerequisite." *In re Wellbutrin XL Antitrust Litigation*, No. 08-2431, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011) (citing *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001)).

Here, the proposed Class is so numerous that the joinder of all members is impracticable. The proposed Class is defined as:

> All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester.

*See* Am. Compl. ¶ 56. Plaintiffs further allege that in the Spring 2020 Semester, the University of Pennsylvania had approximately 24,000 students enrolled. Am. Compl. At ¶ 48. Further, Defendant cannot contest that over 40 students enrolled for classes at UPenn during the Spring 2020 Semester. Accordingly, there are enough Class members to satisfy the numerosity requirement of FRCP Rule 23(a)(1).

**2.      Defendant's conduct presents factual and legal issues common to Plaintiffs and all class members.**

Rule 23(a)(2) requires that plaintiffs seeking Class certification demonstrate that Class members "share at least one question of fact or law with the grievances of the prospective class." *In re Natl. Football League Players Concussion Injury Litig.*, 821 F.3d 410, 426–27 (3d Cir. 2016), as amended (May 2, 2016) (internal citations omitted). "[A] common question is one where the

same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Only a single common question is required. *Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do."). The "claims must depend upon a common contention . . . that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.* at 350. "[T]h[e] bar is not a high one," and "is easily met." *Reyes v. Netdeposit*, LLC, 802 F.3d 469, 486 (3d Cir. 2015). "[T]he focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a 'colorable' claim." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 299 (3d Cir. 2011). Furthermore, Class members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all Class members are subject to the same harm will suffice. *Hassine v. Jeffes*, 846 F.2d 169, 177-78 (3d Cir. 1988).

This case centers on Defendant's misconduct, which was uniformly experienced by the entirety of the Class, raising common issues of fact and law. The multiple common questions of law and fact predominate over any questions affecting solely individual Class members. The Amended Complaint alleges common legal or factual questions (Am. Comp. at ¶ 49) which include, but are not limited to:

      a.    Whether Defendant engaged in the conduct alleged herein;

      b.    Whether there is a difference in value between online distance learning and live in-person instruction;

      c.    Whether Defendant breached its contracts with Plaintiffs and the other members of the Fees Class by retaining fees without providing the services the fees were intended to cover;

> d.    Whether certification of the Class proposed herein is appropriate under Fed. R. Civ. P. 23;
>
> e.    Whether Class members are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and
>
> f.    The amount and nature of relief awarded to Plaintiffs and the other Class members.

Given that the common questions of law and fact are "capable of classwide resolution," the commonality requirement of Rule 23(a)(2) is easily satisfied. *See Walmart v. Dukes*, 131 S. Ct. 2541, 2551 (2011). These common issues are subject to a common answer, proven through the introduction of common proof. Notably, UPenn transitioned all students to online remote learning in the same manner, at the same time. The evidence which will be used to establish that a contract existed, and that UPenn committed a breach of the same, is common among all students. An individualized examination of treatment of Plaintiffs or any Class member is not necessary to prove liability here. As such, commonality is established. *See Grand Canyon* at \*5:

> Here, Plaintiff clearly has satisfied the commonality requirement for his breach of contract claim, . . . . The class members allegedly all suffered a common injury: GCU failed to provide campus services and facilities for which students paid for the Spring 2020 semester. Whether GCU breached contracts when it encouraged students to go home during the Spring 2020 semester and retained money for some services are questions that can be resolved on a class basis. Additionally, contrary to GCU's argument, the fact that GCU may have charged different fees to different students does not preclude a finding of commonality. Whether or not the fees charged were the same student is not the issue. Instead, the issue is whether GCU's alleged breach of contract or unjust enrichment was the same for each student

### 3.    Plaintiffs' claims are typical of the proposed class.

To satisfy Rule 23(a)(3)'s requirement of typicality, the named plaintiff must show that their claims are "typical of the claims … of the class." Fed. R. Civ. P. 23(a)(3). "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether

the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." *Baby Neal*, 43 F.3d at 57.  Typicality "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Id*. "When a defendant has engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent class members." *Sherman v. American Eagle Exp., Inc.*, No. 09-575, 2012 WL 748400, at *5 (E.D. Pa. March 8, 2012) (citing *In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 207 (E.D. Pa. 2001)). "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories' or where the claim arises from the same practice or course of conduct." *In re Natl. Football League Players Concussion Injury Litig.,* 821 F.3d at 427–28. Therefore, the threshold for typicality is low. *Id.*

In the instant action, Plaintiffs, and the other Class members each contracted with Defendant for in-person, on-campus instruction, educational services, and use of facilities in exchange for Plaintiffs and the Class'sMandatoryFee payments. UPenn stopped providing in-person, on-campus instruction, educational services, and use of facilities to Plaintiffs and each member of the Class in March of 2020. As Plaintiffs allege, Plaintiffs and the other members of the Class received a formal offer of admission via their Acceptance Letter and received other documents from UPenn that made specific representations about what Plaintiffs and the Class would receive in exchange for their tuition and Mandatory Fees. *See* Am. Compl. at ¶ 21-23 Thereafter, Plaintiffs (i) enrolled as on-campus students at UPenn, (ii) registered for classes and complied with the school's policies and procedures to remain in good standing, and (iii) paid their

tuition and Mandatory Fees for on-campus, in-person instruction, educational services, and use of campus facilities. Plaintiffs further testified that they and other Class Members were denied the on-campus, in-person educational services, including access to the campus, access to the in-person community, and use of campus facilities that UPenn promised to provide after it closed all of its facilities and switched to fully remote online learning.

Moreover, the members of the proposed Class have no individual interests in controlling the litigation because, unlike a tort claim, all of their claims share a common set of facts. The Defendant committed their unlawful acts and representations (or absence thereof) generally concerning each Class member. Accordingly, there is no individual advantage to proceeding separately. Instead, there is a distinct disadvantage as the individual damages of any one Class member may be relatively small when compared with the potential costs of bringing this action, making the expense and burden of this litigation unjustifiable for individual actions. Thus, their claims are uniformly typical and ideals for disposition by class action.

4. **Plaintiffs are adequate class representatives and their Counsel will adequately represent the interests of the Class.**

Rule 23(a)(4) requires that the Class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Rule 23(a)(4)'s purpose is to "test[] the qualifications of class counsel and the class representatives. It also aims to root out conflicts of interest within the class to ensure that all class members are fairly represented in the negotiations." *In re Natl. Football League Players Concussion Injury Litig.*, 821 F.3d at 428. The "linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Id.* at 431. The adequate representation requirement of Rule 23(a)(4) guarantees "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to

12

those of the class are such that there is not likely to be divergence in viewpoint or goals in the conduct of the suit." *In re Loewen Group Secs. Litig.*, 233 F.R.D. 154, 166 (citing *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977)).

Plaintiffs clearly understand their responsibility as Class representatives. *See* Smith Dep pg. 89-91; Nedley Dep. pg.162-163. As the record demonstrates, Plaintiffs have spent numerous hours consulting with Class counsel, responding to Defendant's discovery requests, and sitting for a deposition. Throughout the deposition, Plaintiffs answered questions regarding their experiences at UPenn as well as the claims alleged in the Complaint. Plaintiffs' testimony makes it abundantly clear that they understand the claims asserted on behalf of themselves and the Class they seek to represent. In addition, Plaintiffs are represented by experienced counsel who has decades of experience prosecuting cases on behalf of Class members.

There is also no evidence of any conflicts of interest between Plaintiffs and members of the Class. Plaintiffs Asha Smith and Emma Nedley were undergraduate students during the Spring 2020 semester with an expected graduation date of May 18, 2021. See Am. Compl. at ¶ 39. UPenn charged Plaintiffs and the Class approximately the same amount in tuition and Mandatory Fees for the Spring 2020 semester. Plaintiffs seek, for themselves on behalf of the Class, the return of a portion of the Mandatory Fees prorated for the portions of the Spring 2020 semester when UPenn closed all campus-based services and provided exclusively online-only learning. Given the identical nature of the claims between the Plaintiffs and the Class members, there is no potential for conflicting interests between the named Plaintiffs and the Class.

Further, the Plaintiffs' counsel is adequate, as set forth more fully below. Counsel has considerable expertise in complex litigation, including specific expertise as to this area of litigation, and has the financial and legal resources to meet the substantial costs and legal issues

associated with this type of litigation. Accordingly, the adequacy of representation requirement of Rule 23(a)(4) is satisfied.

### C.  THE PROPOSED CLASS SATISFIES THE REQUIREMENTS OF RULE 23(B)(3)

Under Rule 23(b)(3), a Class may be certified if "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). For the reasons set forth below, Plaintiff satisfies both the predominance and superiority requirements.

#### 1.      Predominance

The predominance standard is akin to the commonality required by Rule 23(a)(2). The Third Circuit has explained, "[The] predominance test asks whether common issues of law or fact in the case predominate over non-common, individualized issues of law or fact.  Predominance begins, of course, with the elements of the underlying cause of action."  *Neale v. Volvo Cars of North America, LLC*, 794 F.3d 353, 370 (3d Cir. 2015) (citations and quotation marks omitted).  Nevertheless, "the presence of individual questions does not *per se* rule out a finding of predominance.  If issues common to the class overwhelm individual issues, predominance should be satisfied."  *Id.* at 371. "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (internal quotation marks omitted).

Plaintiffs are fully cognizant of the impact of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) on the predominance inquiry.  However, in the aftermath of *Comcast*, most courts—including the Third Circuit—have agreed that "it is a misreading of *Comcast* to interpret it as precluding certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for class-wide measurement."  *Neale v. Volvo Cars of North American, LLC*, No. 14-1540, 2015 WL 4466919, at *17 (July 22, 2015 3d Cir.) (citing *In re Deepwater Horizon*, 739 F.3d 790, 815 & n.4 (5th Cir. 2014)). Indeed, the Third Circuit has treated the Court's holding in *Comcast* as narrow and fact-specific. *See Neale*, 2015 WL 4466919, at *16 ("Comcast held that an antitrust litigation class could not be certified because

14

the plaintiffs' damages model did not demonstrate the theory of antitrust impact that the district court accepted for class-action treatment. [] A close reading of the text makes it clear that the predominance analysis was specific to the antitrust claim at issue. That is eminently sensible.").

Here, the common issues that exist in this case—whether Defendant breached its contracts with Plaintiffs and the members of the Class by failing to provide them with in-person, on-campus instruction, educational services, and use of facilities after March of 2020—clearly predominate over any individual issues that may exist. Each Class member suffered the same harm for the same amount of time due to the same actions or inactions of Defendant. Further, the contractual arrangements between each of Defendant's students and Defendant—receiving in-person, on-campus instruction, educational services, and use of facilities—are effectively identical. Similarly, the nature of Defendants' breach is the same for each member of the Class, regardless of their academic major, scholarships, or any other ancillary criteria— Defendant failed to provide any in-person, on-campus instruction, educational services, or use of campus facilities AND Defendant elected to maintain the entire amount of fees despite its breaches. Similarly, the Defendant's excuse for the breach remains identical in that it relates to the COVID-19 pandemic.

Damages calculations will also not overwhelm questions common to the Class in this case. Class-wide damages can be provided directly, based upon information in possession of Defendant. Alternatively, a sampling methodology and formula can be used to compute each class members' damages, using objective, quantifiable data provided by individual Class members or the Defendant. In short, Plaintiffs will be able to present evidence at trial supporting class-wide proof of damages, and will retain an expert to make the necessary calculations. *See generally Grand Canyon,* at 6-7.

## 2.     Superiority

In addition to finding the predominance of common questions, Rule 23(b)(3) also requires that a court determine that "a class action must represent the best available method for the fair and efficient adjudication of the controversy." *Johnston v. HBO Mgmt., Inc*., 265 F.3d 178, 194 (3d Cir. 2001) (internal quotations omitted); see also Fed. R. Civ. P. 23(b)(3). The Federal Rules of

15

Civil Procedure direct courts to weigh the following factors to determine whether a class action is superior to other alternative methods of adjudication: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). In light of these factors, this Court should find that class action treatment is most appropriate in this case.

In the present case, each factor weighs in favor of superiority. Plaintiffs and the other Class members, due to Defendant's misconduct, experienced almost identical circumstances. Seeing that these cases involve a relatively small amount of damages compared to the enormous investment of time and money that it will take to litigate them, individual Plaintiffs have little interest in and gain little benefit from initiating separate actions.

Even if Class members could afford individual litigation, the Court system could not. As noted herein, at least 24,000 persons meet the definition of the Class as proposed. Due to the large number of people meeting the Class definition, individualized litigation creates a potential for inconsistent or contradictory judgments, increases the delay, and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, comprehensive supervision by a single court, and the finality of the litigation. Accordingly, a class action is a superior procedure for managing this case, and Rule 23(b)(3)'s superiority requirement is satisfied. *Id.* at 7.

### 3.        The Class is ascertainable

A plaintiff seeking class certification of Rule 23(b)(3) class must prove by a preponderance

of the evidence that the class is ascertainable. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the17efinetion." *Byrd*, 784 F.3d at 163 (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 355 (3d Cir. 2013)). Plaintiff satisfies both requirements in the instant matter.

Plaintiffs are moving to certify a class defined with objective criteria, *i.e.*, "people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester." Additionally, given that the Defendant maintains records of the students enrolled at Upenn, there is a reliable and administratively feasible mechanism for the inclusion of class members within the proposed Class. Accordingly, the proposed Class is ascertainable. *See Grand Canyon* at 7.

## D.   THE COURT SHOULD APPOINT PLAINTIFFS AS CLASS REPRESENTATIVES AND THEIR COUNSEL AS CLASS COUNSEL[2]

Pursuant to Rule 23(g), Plaintiffs request their counsel be appointed to represent the Class and identified as "Class Counsel." This factor focuses "on the actual performance of counsel acting on behalf of the class." Fed. R. Civ. P. 23 Advisory Committee Notes (Dec. 1, 2018); *see also In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 439 (3d Cir. 2016) (class counsel should "develop [] enough information about the case to appreciate sufficiently the value of the claims"). Rule 23(g)(1)(A) provides, in relevant part, that in appointing Class counsel the Court must consider:

  (i)  the work counsel has done in this action for identifying or investigating potential claims;
  (ii) counsel's experience in handling class actions, other complex litigation, and the type of claims asserted in this action;

---

[2] Plaintiffs' clear and unconflicted suitability as class representatives are discussed above im the Fed. R. Civ. P. 23(a)(4) "Adequacy" discussion.

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

While no one factor under Federal Rule of Civil Procedure 23(g)(1) "should necessarily be determinative," Advisory Committee Notes (2003), the investigative and analytical efforts of counsel can be a deciding factor:

> In a case with a plaintiff class, the process of drafting the complaint requires some investigatory and analytical effort, tasks that strangers to the action most likely will not have undertaken. All other things being equal, when an attorney has performed these or other investigative and analytical tasks before making the application for appointment, he or she is in a better position to represent the class fairly and adequately than attorneys who did not undertake those tasks.

MOORE'S FEDERAL Practice § 23.120(3)(a) (3d ed. 2007) (emphasis added).

Here, Plaintiffs have assembled a reputable team consisting of national counsel experienced in this particular field of litigation, reliable and reputable local counsel, and are intimately familiar with the local rules and customs of this Court. This team of lawyers and law firms has and will continue to work tirelessly to represent the interests of the Class.

Plaintiffs' counsel's work in identifying and investigating the claims, in this case, demonstrates that they have and will continue to represent the proposed Class fairly and adequately. For example, the proposed Class Counsel have performed the following investigative and other work thus far:

a) Investigated the facts of the complaint, including UPenn's website, academic catalogs, academic calendars, and numerous other documents and materials; looked into the tuition and fees paid by Defendant's students; investigated UPenn's response to the COVID-19 pandemic, including if there were limited refunds made and if, so in what amounts;

b)  Investigated the response to the COVID-19 pandemic at other universities, including, for example, the Anastopoulo Law Firm's investigation of over 30 other colleges and universities against which the Firm has already filed suit, as well as other schools across the country, which have similar campus shut-down orders and have also refused to refund tuition and fees. Some of the undersigned Plaintiffs' counsel currently represents plaintiffs and proposed Class members who paid fees at these other universities and are also seeking refunds relating to COVID-19 closures.

c)  Engaged the services of expert witnesses and consultants who will be necessary during the course of litigation, although such experts have not yet been formally retained;

d)  Analyzed Defendant's response to COVID-19 pandemic and failure to provide adequate refunds;

e)  Investigated the appropriate remedies for Plaintiffs and other members of the proposed Class;

f)   Investigated the adequacy of the named Plaintiffs;

g)  Drafted and filed the complaint;

h)  Served the Defendant; and

i)  Opposed Defendant's Motion to Dismiss and preparing written discovery.

These investigative efforts represent a high standard of professionalism, dedication, and thoroughness, marshaled to identify, develop, and demonstrate the claims alleged in the Complaint. These measures are precisely the type of work that the Advisory Committee Notes to Rule 23 state that the Court should consider when appointing Class counsel.

Concerning tuition refund litigation generally, the Anastopoulo Law Firm is believed to have filed, on April 8, 2020, the second tuition refund case in the nation, and thereafter filed the

third, fifth, and sixth complaints of this type nationally. Since then, thousands of students throughout the country have contacted their undersigned attorneys regarding bringing tuition refund lawsuits against their university for COVID-related closures. Currently, the Anastopoulo Law Firm has approximately 40 such cases pending throughout the country in various state and federal courts and is in contact with hundreds of students at those schools.

The undersigned counsel has been leaders and innovators in this area and has taken the risk to represent students across the country in these first-of-their-kind lawsuits. For example, Eric M. Poulin and Roy T. Willey IV of the Anastopoulo Law Firm have already been appointed co-lead counsel in the *In Re Columbia University Tuition Refund Litigation*, 1:20-cv-03208-JMF (S.D.N.Y.); *In Re: University of Miami COVID-19 Tuition and Fee Refund Litigation, 20-cv-60851-CIV-SINGAL (S.D. Fla.); Montesano v. Catholic University of America*, 1:20-cv-01496 (D.D.C.); *Faber v. Cornell University*, 3:20-cv-00467-MAD-ML (N.D.N.Y.); *Bergeron v. Rochester Institute of Technology*, 6:20-cv-06283-CJS (W.D.N.Y.); *Ford v. Rennselaer Polytechnic Institute*, Case No. 1:20-cv-470 (N.D.N.Y); *Levin v. Bd. of Regents of the University of Colorado*, Case No. 20 CV31409 (St. Ct. Denver Co.); and *Alderman v. Bd. of Governors of Colorado State Univ.*, 2020CV031410 (Dist. Ct. Denver Co).

Lynch Carpenter has spent significant resources in response to repeated inquiries by concerned and confused college kids and their parents who wondered why they were still made to pay full (and sometimes increasing) tuition and mandatory fees to colleges and universities who were moving to virtual learning and closing campuses.  Lynch Carpenter responded by surveying the variety of COVID responses of public and private universities around the country (some attended by our own sons and daughters), consulting with industry experts, evaluating some of the earliest cases, and digging deep into federal and state law across the country.  The firm decided

the basic question was one of: what was bargained for, what was provided, and who was in the weakest and most vulnerable position by the total change in circumstances.  In a situation with no clear heroes or villains, we came down on the side of students left with few options and parents faced with a depressed economy and new health responsibilities.

Lynch Carpenter now represents such students in cases across the country, leading breach of contract and unjust enrichment actions against private universities such as Cornell, Northwestern, Temple, and the University of Pennsylvania.  Further, Lynch Carpenter has become the premier firm in the nation in bringing similar cases against public university schools and systems.  The law here is more complex, often involving novel applications of Constitutional due process and "takings" claims, as well as specialized courts, U.S. Department of Education regulations, and state agency proceedings.  The firm leads or helps lead COVID refund cases against the state university systems of Washington, Colorado, Arizona, Illinois, and Georgia, to name a few.  And our motion to dismiss victories in cases against Ohio University and Kent State University were among the first in the country to allow these actions to move into discovery and have our basic "breach of contract" theory blessed by courts.   With more than 40 of these cases being actively litigated, these claims and the students and parents so affected have quickly become some of our most important and largest group of clients.

Thus, Plaintiffs propose the appointment  of Anastopoulo Law

Firm, LLC and Lynch Carpenter, LLP, as co-lead  for the Class Counsel pursuant to FED. R. CIV. P. 23(g) or pr.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion, certify the proposed Class and appoint Class Counsel.

Dated: February 4, 2022                    Respectfully Submitted:


                                           */s/ Edward W. Ciolko*
                                           **LYNCH CARPENTER, LLP**
                                           Gary F. Lynch
                                           Edward W. Ciolko**
                                           Nicholas A. Colella**
                                           1133 Penn Avenue 5th Floor
                                           Pittsburgh, PA 15222
                                           P. (412) 322-9243
                                           F. (412) 231-0246
                                           gary@lcllp.com
                                           eciolko@lcllp.com
                                           nickc@lcllp.com

                                           **ANASTOPOULO LAW FIRM, LLC**
                                           Eric M. Poulin**
                                           Roy T. Willey, IV**
                                           Blake G. Abbott**
                                           32 Ann Street
                                           Charleston, SC 29403
                                           P. (843) 614-8888
                                           F. (843) 494-5536
                                           eric@akimlawfirm.com
                                           roy@akimlawfirm.com
                                           blake@akimlawfirm.com

                                           **CARPEY LAW, P.C.**
                                           Stuart A. Carpey, #49490
                                           600 W. Germantown Pike, Suite 400
                                           Plymouth Meeting, PA 19462
                                           (610)834-6030
                                           scarpey@carpeylaw.com

                                           **Admitted Pro Hac Vice

                                           **ATTORNEYS FOR PLAINTIFFS**