Exhibit D

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
3
4      ASHA SMITH and EMMA NEDLEY,)No. 2:20-CV-02086-TJS
       Each Individually and on   )
5      Behalf of all others        )
       Similarly situated,         )
6                  Plaintiffs      )
                                   )
7            vs.                   )
                                   )
8      UNIVERSITY OF PENNSYLVANIA,)
                  Defendant        )
9
                   DEPOSITION OF EMMA NEDLEY
10
11               Taken remotely via Zoom on Monday,
12     January 10, 2022, commencing at 10:00 a.m., by
13     Leandra M. Stoudt, RPR, CBC, CCP, CRR, Notary
14     Public.
15
       APPEARANCES:
16
               LYNCH CARPENTER, LLP
17             By:  Edward Ciolko, Esq.
               1133 Penn Avenue, 5th Floor
18             Pittsburgh, PA 15222
               Eciolko@carlson.com
19             610-306-4413
               -- For the Plaintiff
20
               HOGAN LOVELLS US LLP
21             By:  Michael L. Kidney, Esq.
               And James W. Clayton, Esq.
22             555 Thirteenth Street, N.W.
               Washington, DC 20004-1109
23             202-637-5600
               -- For the Defendant
24
25

Page 2

1      APPEARANCES (Continued):

2              ANASTOPOULO LAW FIRM

               By:  Blake G. Abbott, Esq.

3              418 River Street

               Greenville,  SC 29601

4              Blake@akimlawfirm.Com

               -- For the Plaintiff Asha Smith

5

       ALSO PRESENT:  Bailey Corbin (Lynch Carpenter)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX TO WITNESSES
 2        WITNESSPAGE
 3        Emma Nedley
 4        By Mr. Kidney 5
 5
 6
 7                    INDEX TO EXHIBITS
 8
 9        EXHIBITDESCRIPTION      PAGE
10        1           Amended Notice of        7
                      Depostiton
11
          2           Nedley production       10
12
          3           Financial Responsibility
13                    Statement for Emma Nedley  26
14        4           Nedley Responses to RFAs   32
15        5           Excel document/Emma Nedley
                      Award Notice             35
16
          6           Excel document/Emma Nedley
17                    Tuition Account          35
18        7           The Wayback Machine
                      Printout                135
19
          8           Fees Printout           137
20
          9           Complaint               138
21
          10          Consolidated Complaint  140
22
          11          Nedley Responses to
23                    Interrogatories         157
24        12          RFP Responses           158
25
```

Page 4

1

2                        R E Q U E S T S

3                   Page  38,  Line  14

4                   Page  60,  Line  13

5                   Page  78,  Line  18

6                  Page  171,  Line  22

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (It is stipulated by and between
 2          counsel for the respective parties that all
 3          objections except as to the form of the question
 4          are reserved until the time of trial.)
 5                    THE REPORTER:  The attorneys
 6          participating in this deposition acknowledge that I
 7          am not physically present in the deposition room
 8          and that I will be reporting this deposition
 9          remotely.  They further acknowledge that, in lieu
10          of an oath administered in person, I will
11          administer the oath remotely.  The parties and
12          their counsel consent to this arrangement and waive
13          any objections to this manner of reporting.
14                    EMMA NEDLEY, having been duly
15          sworn, was examined and testified as follows:
16                               * * *
17                         EXAMINATION
18          BY MR. KIDNEY:
19          Q.         Would you please state your name for
20          the record, your full name?
21          A.         Emma Nedley.
22          Q.         And, Miss Nedley, have you been
23          deposed before?
24          A.         No.
25          Q.         Have you ever been a plaintiff before?
```

Page 6

1      A.          No.

2      Q.          Since you have not been deposed

3      before, let me tell you a little bit about what is

4      going to happen today.

5               The court reporter is going to

6      transcribe everything I ask you and everything you

7      say in response.  I will assume that if I ask a

8      question and you don't tell me that you -- you have

9      problems understanding it, that you do understand

10     it.  Is that fair?

11     A.          Yes.

12     Q.          And since the court reporter is

13     transcribing this, please try to remember not to

14     nod yes or no but to give verbal answers.

15               If at any time you want to take a

16     break, that is fine.  This is not necessarily a

17     marathon.  I would just ask that if there's a

18     question on the floor, that you answer the question

19     before we take a break.

20               And if -- one other thing to remember

21     is, if I ask you a question and you think you know

22     what the answer is, and you're eager to answer it,

23     try to wait until I finish with the question

24     because the court reporter will have trouble

25     transcribing both my question and your answer if

1       we're both speaking at the same time.

2                       So let me -- let me direct you to a

3       document, which I'm going to have marked as Exhibit

4       1, which is the amended notice of deposition.  Do

5       you see that in the documents that you received

6       this morning?

7       A.          Yes.

8                       (Exhibit 1 was marked.)

9       BY MR. KIDNEY:

10      Q.          Have you seen that document before?

11      A.          Yes.

12      Q.          And when did you see that document?

13                      MR. CIOLKO:  One second.  Just as a

14      general -- just a general direction to the witness.

15      I'm sorry.  It seems to be reverb.

16                      You can absolutely answer Mr. Kidney

17      these questions.  The only thing I would caution is

18      that that if he asks anything about our

19      conversations, please don't -- sorry -- please

20      don't divulge any substance -- the substance of the

21      conversations we had.

22                      If he -- Mr. Kidney asks you about a

23      time or a place, that's fine.  But in response to

24      any questions, please don't divulge any substantive

25      conversations that we've had.  And I'm sure

1      Mr. Kidney is not asking for those.

2                      MR. KIDNEY:  That's correct.

3      Q.            That's why I just asked you when you

4      saw this document.  I don't want to know what you

5      and your counsel discussed.

6      A.            I'm --

7                      MR. CIOLKO:  Thank you, Michael.

8                      MR. KIDNEY:  Sure.

9      A.            I'm not sure of the exact date.

10     Q.            Approximately?

11     A.            Within the last three months.

12     Q.            So where are you today, Miss Nedley?

13                     MR. CIOLKO:  Objection to form.

14     Q.            Where are you physically located?  Are

15     you at your counsel's office?

16     A.            No.

17     Q.            Where are you today?

18     A.            I'm in Philadelphia at Veritext.

19     Q.            And your counsel is with you there

20     today?

21     A.            Yes.

22     Q.            What did you do to prepare for today's

23     deposition, other than speaking with your counsel?

24     A.            I spoke with my counsel and read over

25     the necessary documents.

1    Q.           And again, I don't want to know what
2    you discussed with your counsel, but how many times
3    did you speak with your counsel in preparation for
4    today's deposition?
5    A.           More than ten.
6    Q.           And how much time did you spend
7    speaking with your counsel about today's
8    deposition, approximately?
9    A.           Around ten hours.
10   Q.           And when was the last time you spoke
11   with your counsel about today's deposition?
12   A.           Last night.
13   Q.           And did you discuss the deposition
14   with anyone other than your counsel?
15   A.           Yes.
16   Q.           And who is that?
17   A.           Another attorney in the firm.
18   Q.           And who --
19              MR. CIOLKO:  You want to clarify what
20   you mean by counsel?
21              MR. KIDNEY:  Other than Mr. Ciolko.
22              MR. CIOLKO:  You can answer.
23   A.           So, yes.  Kelly Iverson.
24   Q.           Okay.  Anybody else?
25   A.           No.

1     Q.        And as you -- have you had a chance to

2     look at the documents that we sent to Mr. Ciolko

3     this morning?

4     A.        No.

5               MR. CIOLKO:  Based on an email,

6     Michael, that I thought you had sent to Blake

7     before the prior deposition, I did not show the

8     substance of the documents to Miss Nedley.

9               MR. KIDNEY:  Understood.  Thank you,

10    Ed.

11    BY MR. KIDNEY:

12    Q.        Have you searched for any documents in

13    your own files that are relevant to this lawsuit

14    prior to today?

15    A.        Yes.

16    Q.        And let me show you what I'm going to

17    have marked as Exhibit Number 2, which I'll

18    represent to you are documents that we received

19    from your counsel, Mr. Ciolko, who I understand

20    received those documents from you.

21              (Exhibit 2 was marked.)

22    BY MR. KIDNEY:

23    Q.        Do you see those documents?

24    A.        Yes.

25    Q.        And how many pages do you see?

1     A.          Roughly ten.

2     Q.          I think exactly there are seven pages,

3     but take your time.

4                 MR. CIOLKO:  Which document are you

5     referring to?

6                 MR. KIDNEY:  Jim, can you share your

7     screen so that we're -- there's no question about

8     this?

9                 MR. CLAYTON:  Yes.

10    A.          Do you know the name of that document?

11    I just have the folder.

12                MR. CIOLKO:  We're only seeing the

13    folder.  Are you speaking about Nedley production?

14                MR. KIDNEY:  Yes, Nedley production.

15    A.          Okay.  I have access.

16    BY MR. KIDNEY:

17    Q.          Okay.  And are there seven pages in

18    that document, Miss Nedley?

19    A.          Yes.

20    Q.          When you were looking through your

21    files for documents regarding this lawsuit, did you

22    find any documents other than the documents that

23    are in this deposition exhibit, Nedley production?

24    A.          Yes.

25    Q.          What documents did you find?

Page 12

```
 1      A.          The emails from my president and her
 2      staff.
 3      Q.          And did you share -- did you send
 4      those emails to your counsel?
 5      A.          I sent the link to all of the emails.
 6      Q.          Were there any other documents you
 7      located other than those?
 8      A.          I don't believe so.
 9      Q.          And in the room today with you, do you
10      have any documents, other than the documents that
11      we have -- that you received this morning from your
12      counsel, that we had sent to you?
13      A.          No.
14      Q.          So, Miss Nedley, tell me, what is your
15      understanding of this lawsuit in your own words?
16                  MR. CIOLKO:  Objection to form.  You
17      can answer.
18      A.          My understanding is I paid for an
19      education during the spring of 2020 and my
20      expectations were not exceeded with the coronavirus
21      outbreak.
22      Q.          And what are you seeking as a result
23      of this lawsuit?
24                  MR. CIOLKO:  Vague.  You can answer,
25      if you can.
```

 1    A.            Sorry.  Can you repeat the question?
 2    There was an echo.
 3    Q.            Sure.  What are you seeking through
 4    this lawsuit?
 5    A.            I'm seeking a refund for the services
 6    that I did not receive during the spring of 2020
 7    that I came in expecting.
 8    Q.            And are you seeking a refund of
 9    tuition or fees as opposed to tuition?
10    A.            Fees.
11    Q.            Let me ask you a couple background
12    questions.
13                  Where did attend high school?
14    A.            I went to Penn-Trafford High School.
15    Q.            When did you graduate?
16    A.            2018.
17    Q.            And did you play any sports in high
18    school?
19    A.            I played softball and volleyball.
20    Q.            And you also played softball at Penn;
21    is that correct?
22    A.            Yes.
23    Q.            And are you still on the softball
24    team?
25    A.            Yes.

1      Q.          When did you apply to college?

2                  MR. CIOLKO:  Objection; form.  You can

3      answer.

4      A.          December of 2017 was my acceptance.

5                  MR. CIOLKO:  Unless I instruct you not

6      to answer --

7                  (Discussion held off the record.)

8      BY MR. KIDNEY:

9      Q.          So did you not take a gap year; is

10     that correct?

11     A.          I did not.

12     Q.          And what colleges did you apply to?

13     A.          Just Penn.

14     Q.          You -- that was the only college you

15     applied to?

16     A.          Yes.

17     Q.          Did you apply early decision?

18     A.          Yes.

19     Q.          And was your plan, if you were not

20     accepted early decision, you would have applied to

21     other schools?

22                 MR. CIOLKO:  Objection to form and

23     speculation.  You can answer.

24     A.          Yes.

25     Q.          Had you decided that -- you -- you

Page 15

1      received notification in the middle of December

2      2017 that you had been accepted to Penn; is that

3      correct?

4      A.          Yes.

5      Q.          And in general, is the deadline to

6      apply to other colleges January 1st?

7                  MR. CIOLKO:  Objection; form,

8      speculation.  You can answer.

9      A.          I'm not sure.

10     Q.          Had you formed a list of colleges that

11     you planned to apply to if you were not accepted to

12     Penn?

13     A.          No.

14     Q.          Had you been told by anybody at Penn

15     that you would likely be accepted prior -- let me

16     rephrase that.

17                 Prior to receiving the official

18     notification from Penn in December, in the middle

19     of December of 2017, had you been told by someone

20     at Penn that you would likely be accepted?

21                 MR. CIOLKO:  Objection; form.  You can

22     answer.

23     A.          I received a likely letter from the

24     university earlier in the fall, but I'm not sure

25     when.

Page 16

1    Q.          Okay.  Why did you -- why did you

2    decide on applying to Penn?

3    A.          It has very high placement rates for

4    dental school, which is what I was assigned to be.

5    I was very interested in the student athlete

6    experience, the ability to network, to meet other

7    people, to grow my cultural awareness, and for the

8    endless opportunities in Philadelphia.

9    Q.          Was the total cost charged a factor in

10   your decision?

11   A.          Can you repeat the question?

12   Q.          Was the total cost of attending Penn a

13   factor in your decision?

14   A.          Yes.

15   Q.          And tell me more about that.  How did

16   that factor into your decision?

17   A.          I'm a first generation college

18   student, and I'm responsible for paying for my own

19   education as well as all future education.

20   Q.          Have your parents contributed to your

21   Penn education?

22               MR. CIOLKO:  Objection to form.  You

23   can answer.

24   A.          No.

25   Q.          And so -- well, we'll -- I'll -- we'll

Page 17

1      come back to that.

2                    Did it matter to you how the cost of a

3      Penn education was broken out by tuition and fees?

4      A.          Yes.

5      Q.          And tell me more.  Why did that matter

6      to you and how did it matter?

7      A.          Because at the end of the day, I was

8      responsible for both, and seeing where my money was

9      going was very important to me.

10     Q.          Did it matter to you -- was the total

11     cost what you were really focused on as opposed to

12     whether the total cost was comprised more of

13     tuition than fees?

14                    MR. CIOLKO:  Objection; asked and

15     answered.  But you can answer again.

16     A.          I'm sorry.  Can you repeat that?

17     Q.          Sure.  You -- what I'm trying to

18     understand is, I understand from your prior

19     response that the total cost of the Penn education

20     was important to you.  Is that correct?

21     A.          It was.

22                    MR. CIOLKO:  Objection; form.  You can

23     answer.

24     A.          It was my money regardless.  So I was

25     interested in all aspects of it.

1      Q.            Understood.  And what I'm trying to

2      get at is, did it matter to you that the total cost

3      was comprised of fees versus tuition?

4                   In other words -- let me give you an

5      example.  If the university told you you had to pay

6      $10,000 in a particular year, is it -- am I correct

7      in thinking that it didn't matter to you if that

8      $10,000 went to tuition or to fees; what really

9      mattered is how much money you had to pay total?

10                  MR. CIOLKO:  I'm going to object as to

11     form as mischaracterizes prior testimony and asked

12     and answered.  But you can -- you can answer.

13     A.            I'm interested in the breakdown

14     because I was being charged for clinical fees,

15     off-campus housing, and just other fees for general

16     services.  And those were what -- unfulfilled.

17     Q.            Unfulfilled?

18     A.            Yes.

19                  MR. CIOLKO:  I'm trying to move as far

20     away as I can.

21     BY MR. KIDNEY:

22     Q.            Did you ever compare the amount of

23     fees -- the amount of the fees charged to Penn to

24     those of other schools while you were deciding

25     whether to apply to Penn versus other schools?

1               MR. CIOLKO:  Objection; form.  And

2     objection; mischaracterizes prior testimony.  You

3     can answer.

4     A.           Yes, I compared it to local state

5     schools.

6     Q.           And what local state schools did you

7     compare it to?

8     A.           None in particular.  I was just

9     looking in general, but not with the intent to

10    apply.

11    Q.           Did you -- were you -- did you compare

12    it to Penn State?

13              MR. CIOLKO:  Objection; asked and

14    answered.  You can answer.

15    A.        No.

16    Q.           What materials, if any, did you review

17    in making your decision about applying to the

18    University of Pennsylvania?

19    A.           I reviewed the cost of attendance, the

20    average cost of living, the placement rates of

21    dental school, and potential majors and minors.

22    Q.           And I'm hearing a lot of echoes.  Can

23    you say the last part again?

24    A.           And potential majors and minors.

25    Sorry.  That was really --

1      Q.           Whoa.

2                   MR. KIDNEY:  Ed, are you -- just

3      trying to think --

4                   MR. CIOLKO:  Actually, I was muted

5      then.

6                   (A break was taken.)

7      BY MR. KIDNEY:

8      Q.           So, Miss Nedley, were you recruited by

9      any other schools, other than Penn, for your

10     softball abilities?

11     A.           Yes.

12     Q.           What other schools?

13     A.           The University of Pittsburgh and

14     Georgetown.

15     Q.           And why did you decide to apply to

16     Penn rather than those two schools?

17                  MR. CIOLKO:  Objection to the extent

18     it's been asked and answered.  But you can answer.

19     A.           Georgetown closed their dental school.

20     And the University of Pittsburgh, their dental

21     school is not as well renowned as the University of

22     Pennsylvania's.  And the University of Pennsylvania

23     would set me up or put me in the best position to

24     see my dreams of attending a top dental school.

25     Q.           So -- and just to be clear, I'm -- my

Page 21

1     question was about attending an undergraduate

2     constitution, not dental school.  Is that how you

3     understood it?

4     A.          Yes.  And depending on where my

5     undergrad education is from sets me up for the best

6     spot to go to my dream dental school.

7     Q.          Okay.

8                 (Discussion held off the record.)

9     BY MR. KIDNEY:

10    Q.          We were having some audio problems.

11    And I just want to make sure you had finished the

12    answer to the last question I had asked you.

13                I asked you:  What materials did you

14    review in making your decision about what

15    university to attend?  And had you finished your

16    response to that?

17    A.          I did.

18    Q.          Okay.  When did you begin your studies

19    at the University of Pennsylvania?

20    A.          In the fall of 2018.

21    Q.          And what's your major?

22    A.          Health and society.

23    Q.          And have you ever changed majors?

24    A.          Yes.

25    Q.          What were your -- what was your major

Page 22

1     prior to health and societies?

2     A.          Biology.

3                 Can I clarify?  I was -- I came in

4     with the intent of biology, but I did not

5     officially declare until the end of my sophomore

6     year when I went with health and society.

7     Technically I did not change majors on paper.

8     Q.          Okay.  And why did you decide to

9     pursue health and societies rather than biology?

10    A.          I was interested in looking at health

11    from a sociological and historical perspective and

12    anthropological, and health and societies put me in

13    the best position to do that.

14    Q.          Your undergrad degree --

15                MR. CIOLKO:  Would it be okay with you

16    if miss Nedley wants to come back to a question she

17    already answered to clarify an answer?  Are you

18    okay if she did that during the deposition?

19                MR. KIDNEY:  Sure.

20                MR. CIOLKO:  Okay.  Thank you.  Sorry

21    about that.

22    BY MR. KIDNEY:

23    Q.          You're graduating in May of this year;

24    is that correct?

25    A.          Yes.

Page 23

```
 1      Q.            And so your undergraduate studies will
 2      take you four years; is that correct?
 3      A.            Yes.
 4      Q.            Eight semesters?
 5      A.            Yes.
 6      Q.            And your plan after you graduate is to
 7      attend dental school; is that correct?
 8      A.            Yes.
 9      Q.            And where are you attending dental
10      school?
11      A.            The University of California, San
12      Francisco.
13      Q.            And you earlier had referred to your
14      dream dental school.  Is that your dream dental
15      school?
16      A.            Yes.
17      Q.            Was that your first choice dental
18      school?
19      A.            Yes.
20      Q.            Where else did you apply to dental
21      school?
22      A.            University of Pennsylvania, University
23      of Pittsburgh, Temple, Boston University, Columbia
24      University --
25      Q.            And --
```

1   A.            -- University of Maryland, Touro

2   College of Dental Medicine, Lake Erie College of

3   Medicine, A.T. Still University, the University of

4   Southern California, Northwestern University.

5   Q.            And which of -- which of the schools

6   were you accepted?

7   A.            University of California, San

8   Francisco, University of Pittsburgh, University of

9   Pennsylvania, Boston University.

10   Q.            And what made you decide on the

11   University of California, San Francisco?

12   A.            Its tuition and fees are $150,000 less

13   than University of Pennsylvania.  Those were my

14   final two.  It's a pass/fail system.  It's ranked

15   higher than the University of Pennsylvania.  And

16   it's been the top 25 -- or sorry -- the number 1

17   research-funded university in the last 25 years.

18   And I was excited to grow my culture and make new

19   connections on the West Coast.

20   Q.            What fees does the University of

21   California, San Francisco charge as opposed to

22   tuition?

23   A.            Access to clinicals, dental tools,

24   housing.  And I'm not sure of the rest off the top

25   of my head.

Page 25

1      Q.          And off the top of your head, do you

2      know what the tuition is at the University of

3      California, San Francisco for one year?

4                  MR. CIOLKO:  I'm going to object as to

5      speculation, form, and just note a general

6      relevance objection to this line of questioning.

7      You can answer.

8      A.          I do not know.

9      Q.          And off the top of your head, do you

10     know the total fees that the University of

11     California, San Francisco will charge you next year

12     for an academic year?

13                 MR. CIOLKO:  Same objection.  You can

14     answer.

15     A.          I do not know.

16     Q.          So let me direct you to a document

17     that you received this morning.  It is the fourth

18     document in the ZIP file, and it's called docket

19     26-4, financial responsibility statement for Emma

20     Nedley.  And I'm going to eventually have this

21     exhibit marked as Exhibit Number 3.  And tell me

22     when you finished taking a look at that document.

23                 MR. CIOLKO:  Take your time.

24                 (Exhibit 3 was marked.)

25                 THE WITNESS:  Okay.

Page 26

1    BY MR. KIDNEY:

2    Q.          Have you read it now, Miss Nedley?

3    A.          Yes.

4    Q.          Do you -- prior to today, do you

5    recall seeing this document before?

6    A.          Yes.  Several years ago.

7    Q.          And tell me about that.  What is your

8    recollection -- what was the context of when you

9    saw it several years ago?

10                  MR. CIOLKO:  Objection; form.  You can

11   answer.

12   A.          I don't remember.

13   Q.          Do you recall that you -- the

14   university asked you to review this document and

15   asked whether you agreed with it, indicating that

16   you had read and accepted the financial

17   responsibility statement?

18                  MR. CIOLKO:  Objection; form.  Assumes

19   facts not in evidence.  But you can answer.

20   A.          Yes.

21   Q.          And does it refresh your recollection

22   if I represent to you that Penn's records indicate

23   that you pressed the I agree button on August 20th,

24   2019?

25                  MR. CIOLKO:  Objection; form.  You can

Page 27

1      answer.

2      A.          Yes.

3      Q.          And does that sound about right to

4      you?

5      A.          Yes.  That would be before I started

6      classes.

7      Q.          Do you know what the Penn book is?

8      A.          No, not by that name.

9      Q.          Do you know the name of a book that

10     contains undergraduate regulations or requirements?

11                 MR. CIOLKO:  Objection; form.

12     Objection; speculation.  You can answer.

13     A.          No, because everything was sent

14     virtually.

15     Q.          How about prior to the pandemic?

16     A.          I'm not sure.

17                 MR. CIOLKO:  Same objection.

18     Q.          Do you recall ever reviewing any

19     policies of the University of Pennsylvania

20     regarding the cancellation of activities for

21     classes prior to the pandemic?

22     A.          No.

23     Q.          As part of your enrollment in -- for

24     the spring 2020 semester, do you recall signing or

25     agreeing to anything other than the financial

1      responsibilities statement?

2                      MR. CIOLKO:  Objection; form, vague.

3      You can answer.

4      A.          No.

5      Q.          You were a full-time student during

6      the spring 2020 semester; is that correct?

7      A.          Yes.

8      Q.          And how many courses were you taking?

9      A.          Between four and six, but I'm not sure

10     of the exact credit number.

11     Q.          Did you withdraw from any classes

12     during the spring 2020 semester?

13     A.          No.

14     Q.          Before March 16th, 2020, where were

15     you living?

16     A.          In an apartment in Philadelphia.

17     Q.          And what was the address of the

18     apartment?

19     A.          ██████████████████    ██████ .

20                     MR. CIOLKO:  Michael, are you done

21     with that exhibit?

22                     MR. KIDNEY:  Yes.

23                     MR. CIOLKO:  Okay.  Just saving space.

24     I can't see you.

25                     MR. KIDNEY:  Okay.

Page 29

```
 1    BY MR. KIDNEY:
 2    Q.          Were you living with anybody else?
 3    A.          Yes.
 4    Q.          Who were you living with?
 5    A.          Three roommates.
 6    Q.          What -- can you give me their names,
 7    please?
 8                MR. CIOLKO:  I'm going to object to
 9    form and relevance.  You can answer.
10    A.          ████████████████████████████████,
11    and ████████████████.  (phonetically)
12    Q.          And how many bedrooms did you have in
13    your apartment?
14    A.          Four.
15    Q.          So you each had your own bedroom?
16    A.          Yes.
17    Q.          Is ██████████████████ a highrise?
18    A.          Yes.
19    Q.          Is that owned by the university or is
20    it a privately owned building?
21    A.          I believe privately owned.
22    Q.          How did you find that apartment?
23                MR. CIOLKO:  I object as to form, as
24    to relevance.  But go ahead.
25    A.          Stephanie and Reagan had lived there
```

Page 30

1      the year prior.

2      Q.            And are they all on the softball team,

3      your three roommates?

4      A.            No.

5                    MR. CIOLKO:  Same objection.  Go

6      ahead.

7      A.            No.  Only Stephanie.

8      Q.            And when did you start living there?

9                    MR. CIOLKO:  Objection; form.  You can

10     answer.

11     A.            August of 2019.

12     Q.            And after Penn transitioned to remote

13     education in mid-March 2020, where did you live for

14     the remainder of the spring 2020 semester?

15     A.            I stayed in my apartment for a few

16     days before my coach and the university suggested

17     to get out of Philadelphia.  And I returned to my

18     home in Pittsburgh, the suburbs of Pittsburgh.

19     Q.            Did you remember what day you left

20     Philadelphia?

21     A.            No.

22     Q.            And how did you get from Philadelphia

23     to your home in the suburbs of Pittsburgh?

24     A.            I rented a vehicle.

25     Q.            And your three roommates, what did

Page 31

1      they do?

2                     MR. CIOLKO:  Objection; form.

3      Objection; relevance.  You can answer.

4      A.             They all also left the city, but I'm

5      not sure of their transportation method.

6      Q.             Did you receive any financial relief

7      from the university related to the cost of your

8      residence prior to mid March?

9                     MR. CIOLKO:  Objection; form.  You can

10     answer.

11     A.             You're asking if I received aid for my

12     housing?

13     Q.             Yes.

14     A.             Not during the 2019-2020 school year.

15     But yes during 2018-2019.

16     Q.             And in 2018 to 2019, did you live on

17     campus?

18     A.             Yes.  I was required to.

19     Q.             Why were you required to?  Because you

20     were then a first-year?

21     A.             Yes.

22     Q.             And so the -- the 2019 to 2020 school

23     year you were a sophomore; is that correct?

24     A.             Yes.

25     Q.             Or second-year?

1    A.          Second-year, yes.

2                MR. CIOLKO:  Are you allowed to --

3                THE WITNESS:  I have no clue.

4    Q.          Let me show you another document,

5    which in the ZIP file that you received -- one,

6    two, three, four, five, six, seven, eight -- it

7    looks like it's the eighth document.  And it's

8    called Nedley responses to RFAs.  Do you see that

9    document?

10   A.          Yes.

11               MR. KIDNEY:  Okay.  I'm going to ask

12   that this be marked as Exhibit Number 4.

13               (Exhibit 4 was marked.)

14   BY MR. KIDNEY:

15   Q.          And when you open the document, let me

16   direct your attention to page -- page 4, and you'll

17   see a request for admission number 1 and a

18   response.  And I'd like you to read that request

19   and response.  And I'm looking specifically at the

20   request that says, admits that you did not withdraw

21   or seek to withdraw from the spring 2020 semester.

22   A.          I should read that again?

23   Q.          The request says that, admits you did

24   not withdraw or seek to withdrawal from the spring

25   2020 semester.  Do you see that?

Page 33

```
 1        A.          Yes.

 2        Q.          And -- and can you read the response?

 3        A.          Plaintiff admits this request in as

 4     much as there was no realistic possibility or

 5     option for her to do so.

 6        Q.          Do you agree with that response?

 7        A.          Yes.

 8        Q.          And can you explain what you mean by,

 9     there was no possibility or realistic option to

10     withdraw?

11        A.          I financially could not return home

12     without any job and to just sit and wait for

13     education again when it was no longer virtual.  It

14     did not make sense for me to leave this prestigious

15     undergrad institution.

16                    And as far as my future education, I

17     didn't want to be a dentist when I was 35.  I

18     didn't want to wait even longer, because after

19     undergrad, I had at least seven more years of

20     school.

21        Q.          Do you recognize this document, Nedley

22     responses to RFAs?

23        A.          Yes.

24        Q.          Have you reviewed it before?

25        A.          Yes.
```

Page 34

1       Q.          Did you assist in preparing the

2       responses?

3       A.          Yes.

4       Q.          And let me direct your attention to

5       two other documents.  One is called Emma Nedley

6       award notice.

7       A.          I'm not sure I see that.  Is it in the

8       ZIP file?

9                   MR. CIOLKO:  I don't see that either,

10      Michael.

11                  MR. KIDNEY:  Hold on one second.

12                  MR. CIOLKO:  Is it one of the ones

13      that says plaintiff 000 --

14                  MR. KIDNEY:  Yes.  It says -- in the

15      ZIP file, this one is called -- the last three

16      digits are 866.

17                  MR. CIOLKO:  Got it.

18                  THE WITNESS:  Yes.

19                  MR. CIOLKO:  Yes.

20                  MR. KIDNEY:  And I'm going to ask that

21      this document be marked as Exhibit Number 5.

22                  (Exhibit 5 was marked.)

23      BY MR. KIDNEY:

24      Q.          And then I'm also going to ask you

25      about the document that ends in 865, which is --

1          when you open it, IT'S A -- it's not a PDF.  It's

2          an Excel.  And when you open it up, it says, Emma

3          Nedley tuition account.  Do you have that document?

4          A.          Yes.

5                      MR. KIDNEY:  Okay.  And I'm going to

6          ask that this document be marked as Exhibit Number

7          6.

8                      (Exhibit 6 was marked.)

9                      MR. CIOLKO:  Which is the second

10         document Excel spreadsheet?

11         A.          Yes.

12         BY MR. KIDNEY:

13         Q.          So let me -- actually, I think there's

14         an even easier document to deal with here.

15         A.          Please.

16                     MR. CIOLKO:  You exceed your limit,

17         Michael.

18                     MR. KIDNEY:  I'm sorry?

19                     MR. CIOLKO:  Two is your limit.  I'm

20         running out of space.

21                     MR. KIDNEY:  Understood.

22         Q.          I'm going to go back -- so Excel has a

23         lot of lines.  So I'm going to instead direct you

24         to one of the documents you produced, Miss Nedley.

25         So if you go back to the Nedley production, which

Page 36

1          is one, two, three, four -- it's the sixth document
2          in the PD -- in the ZIP file.
3          A.          Yes.
4          Q.          Open that -- open that document up.
5          And again, just to make the transcript clear, this
6          will -- this document, this PDF will be marked as
7          Exhibit 2.
8                      And I want you to scroll in that
9          document to Nedley 3.  So on the lower right-hand
10         corner, there's what lawyers call a Bates stamp.
11         And it says Nedley 0003.
12         A.          Yes.
13         Q.          Okay.  So on that document, do you see
14         there is a line, one, two, three, four -- five
15         lines down that says, Penn grant.  The date is
16         1/21/20 and the amount is 21,850 -- I'm sorry,
17         $21,851.  Do you see that?
18         A.          Yes.
19         Q.          What is a Penn grant?
20         A.          That is money from the university
21         based on my financial need.
22         Q.          And you do not have to repay that
23         grant; is that correct?
24         A.          Correct.
25         Q.          And you said that's money from the

1     university based on your financial need.  Did I get

2     that right?

3     A.          Yes.

4                MR. CIOLKO:  Asked and answered.  You

5     can clarify -- you can confirm.

6     BY MR. KIDNEY:

7     Q.          Is -- would you agree with me that

8     another way of saying that is, this is a need-based

9     grant as opposed to a merit-based grant?

10    A.          Can you --

11                MR. CIOLKO:  Objection; speculation.

12    But you can answer or ask for clarification.

13    A.          Can you define what you mean by merit

14    based, you mean based on academic or --

15    Q.          Yes.  A merit-based grant -- by

16    merit-based, I mean a grant that is based solely on

17    merit and does not look at financial need.

18                MR. CIOLKO:  Objection; speculation

19    and form.  But you can answer.

20    A.          This was based on financial need.

21    Q.          Did you have to submit an application

22    for this grant?

23    A.          Yes.

24    Q.          And is that the FAFSA?

25    A.          There was the FAFSA, and then Penn had

```
1       their own additional supplement.  And then I also

2       had to submit through the college board, which is

3       basically a FAFSA equivalent.

4       Q.          And do you have a copy of those

5       documents still today?

6       A.          I don't know.  I would imagine.  But

7       not on me.

8       Q.          Okay.  I'd ask that when the

9       deposition is finished, that you send those to your

10      counsel, please, Mr. Ciolko.

11                  MR. CIOLKO:  If you can find them,

12      I'll take a look at them and I'll discuss with

13      Mr. Kidney whether or not they're appropriately

14      appropriate for production.  But go ahead.

15      BY MR. KIDNEY:

16      Q.          So now let me direct you to the award

17      notice, which, again, is going to be marked as

18      Exhibit 5.  And that is ending in 866.  Do you have

19      that document in front of you?

20      A.          Yes.

21      Q.          Do you see that the Penn -- do you see

22      where the document says, the Penn grant is in the

23      full amount of $43,702 for the 2019 to 2020

24      academic year?

25      A.          Yes.
```

Page 39

```
 1      Q.              Is -- did you receive that amount for
 2      the 2019-2020 academic year?
 3      A.              Yes.
 4      Q.              And did you receive half that amount
 5      for the spring 2020 semester?
 6      A.              Yes.
 7      Q.              And do you see on -- give me a second.
 8      The document disappeared on me.  Just let me pull
 9      it back up.
10                      Okay.  Do you see on this document
11      there is a line -- there is a line that says, total
12      direct cost?  And then there's another line that
13      says, total indirect cost.
14                      MR. CIOLKO:  Where are we looking,
15      Michael?
16                      MR. KIDNEY:  This is -- we're still on
17      the award letter, which is -- the last digits are
18      866.
19                      MR. CIOLKO:  I was wondering where on
20      the document.
21                      MR. KIDNEY:  Under the red -- if you
22      -- if you go --
23                      MR. CIOLKO:  I got it.  I got it.
24                      MR. KIDNEY:  -- half -- okay.
25                      MR. CIOLKO:  Thank you.
```

Page 40

1    BY MR. KIDNEY:

2    Q.          Do you see those two lines, Miss

3    Nedley, total direct cost and total indirect cost?

4    A.          Yes.

5    Q.          What is the difference -- what's your

6    understanding of the difference between direct cost

7    and indirect cost?

8    A.          Direct cost will be owed no matter

9    what because those go directly to the university.

10   Whereas indirect cost is based on averages and is

11   what they anticipate me spending, yet I may not

12   spend all of that money.

13   Q.          And the indirect costs do not go to

14   the university; is that correct?

15               MR. CIOLKO:  Objection; form and

16   speculation.  But go ahead.  You can answer.

17   A.          As far as transportation, dining,

18   housing, those do not go to the university.  But

19   books and supplies are -- for me, were normally

20   bought at the book store.  So it does eventually

21   end back up at the university.

22   Q.          And the personal expenses they are not

23   charged by the university; is that correct?

24   A.          They're not charged directly by the

25   university, but at the end of the day, most of the

Page 41

1      money goes back to the university.
2      Q.            I'm not following you.  So how do --
3      can you give me an example of a personal expense
4      that is not charged by the university but goes back
5      to the university?
6                    MR. CIOLKO:  I'm going to object as to
7      form and as to assuming facts that are not in
8      evidence.  But you can answer.
9      A.            For example, paying to be part of
10     clubs, that contributes to my undergrad experience,
11     as far as the pre-dental societies, but that's part
12     of my personal expense.
13     Q.            So let me direct you to your -- the
14     student account page that you produced.
15     A.            Which document is this?
16     Q.            So this is in the -- in the -- in the
17     Nedley production.  Let's go back to the same page
18     we were looking at, which is marked Nedley000003.
19                    MR. CIOLKO:  Michael, can we close out
20     the other pages?
21                    MR. KIDNEY:  Yes.
22                    MR. CIOLKO:  Thank you.
23     BY MR. KIDNEY:
24     Q.            So do you have that document in front
25     of you?

Page 42

1      A.          Yes.

2      Q.          So do you see where it says dining

3      club activities plan for -- twenty -- 4/22/20 and

4      the amount is $806.23?

5      A.          Yes.

6      Q.          Do you see that, Miss Nedley?

7      A.          Yes.

8      Q.          What is that for?

9      A.          My dining plan through the university.

10     Q.          And what was your dining plan?  Was it

11     a certain number of meals a week?

12     A.          Yes.

13     Q.          How many meals a week?

14                 MR. CIOLKO:  Objection; form.  You can

15     answer.

16     A.          I'm not sure because I got a different

17     dining plan every year.

18     Q.          And did you receive a refund of -- for

19     the dining plan after the pandemic hit in the

20     spring of 2020?

21     A.          I'm not sure.

22     Q.          Do you see the next line that says,

23     Penn grant COVID-19 expense, 420.20 and negative

24     465?

25     A.          Yes.

Page 43

1      Q.          What is that for?

2      A.          My transportation back to Pittsburgh.

3      Q.          So did the university pay for your

4      rental car back to Pittsburgh?

5      A.          Yes.

6                  MR. CIOLKO:  Objection; form.  You can

7      answer.

8      A.          Yes.

9      Q.          And did they pay any other expenses in

10     connection with your transportation back to

11     Pittsburgh?

12     A.          No.

13     Q.          In the -- do you see where it says,

14     plus direct loan, negative $11,768?

15     A.          Yes.

16     Q.          What is that?

17     A.          A loan I took for my education.

18     Q.          And did you sign that loan yourself or

19     did your -- alone or did your parents fund that

20     loan with you?

21     A.          I believe my parents signed it with

22     me.

23     Q.          And do you know -- as you sit here

24     today, do you have an understanding of whether you

25     are obligated to pay that loan back as opposed to

1    your parents?

2    A.          I'm obligated.

3    Q.          And what's your basis for saying that?

4               MR. CIOLKO:  Objection; form.  Call

5    for legal conclusion.  You can answer.

6    A.          My parents told me I'm responsible for

7    my education for undergrad and dental school.

8    Q.          And I'm sorry.  I didn't hear the last

9    thing you said.  You said your parents told you you

10   were responsible for your education, undergrad and

11   what?

12   A.          Dental school.

13   Q.          Okay.  Have you ever -- has anybody

14   ever told you --

15              MR. CIOLKO:  Michael, Michael, after

16   this question, can we take a break?  After this

17   question.

18              MR. KIDNEY:  Sure.

19   BY MR. KIDNEY:

20   Q.          Has anybody ever told you that plus

21   loans, when they're taken out for an undergraduate

22   education, the government will not expect the

23   student to pay back the loan, only the parents?

24   A.          Yes.  But that was not decided between

25   my parents and I.

Page 45

1     Q.          Understood.

2                 MR. KIDNEY:  Happy to take a break.

3                 (A break was taken.)

4                 MR. KIDNEY:  Back on the record.

5     A.          Do you mind if -- (indiscernible)

6     Q.          Say that again.

7     A.          Do you mind if I clarify one thing

8     real quick?

9     Q.          Sure.

10    A.          So you had asked how many semesters

11    I've been enrolled in the university.  I said

12    eight, but I'd also taken a summer class in the

13    summer of 2020.  So I don't know if that

14    constitutes as nine or eight and a half.

15    Q.          Understood.  Thank you for that

16    clarification.  I was actually going to ask you

17    next if you had taken any courses in the summer of

18    2020.

19                What course did you take?

20    A.          I took Spanish.

21    Q.          And where were you physically located

22    while you took that course?

23    A.          I was at my home in the suburbs of

24    Pittsburgh.

25    Q.          And in the fall of 2020, where were

1      you physically located for that semester?

2      A.          I was located in an apartment in

3      Philadelphia.

4      Q.          And the fall 2020 semester was a

5      virtual semester; is that correct?

6      A.          Yes.

7      Q.          All your courses were remote in the

8      fall of 2020?

9      A.          Yes.

10     Q.          And why did you decide to return to

11     Philadelphia for the fall 2020 semester even though

12     the semester was remote?

13     A.          I was already in a lease for my

14     apartment, as I had signed it roughly a year in

15     advance.  And I do not have a designated spot at

16     home to do any schoolwork.  And all libraries, et

17     cetera, were closed.

18     Q.          All libraries in Pittsburgh were

19     closed, do you mean?

20     A.          In Pittsburgh and in Philadelphia.

21     But in Philadelphia I had a desk to do work.

22     Q.          And where did you do work for the last

23     portion of the spring 2020 semester when you were

24     at home in the suburbs of Pittsburgh?

25     A.          On my bedroom floor or at my kitchen

Page 47

1       table.

2       Q.          And how about during the summer of

3       2020?

4       A.          I was also at home.

5       Q.          And were you again working at the

6       kitchen table or in your bedroom?

7       A.          Yes.  But at that time, my hometown

8       had started to open up as well, So I was able to go

9       to the local library.

10      Q.          And then in the fall of 2020, did your

11      -- did the local library close?

12                  MR. CIOLKO:  Objection to form.

13      Q.          After reopening?

14      A.          No.

15      Q.          So let me direct you to your

16      production.  This is Nedley production.  We have

17      been looking at page 3.  Now I would like to direct

18      you to the next page, page 4.  And, again, this

19      document will be marked as Exhibit Number 2.

20                  And I'm looking at the page that, at

21      the very bottom, says Nedley000004.  And at the top

22      it says, payment history for Emma Nedley.  Do you

23      have that in front of you?

24      A.          Yes.

25      Q.          The very first line says, Penn pay,

Page 48

```
 1      payment received, 5/15/20 in the amount of $4,493.
 2      Do you see that?
 3      A.          Yes.
 4      Q.          Is it your understanding that that
 5      represents an amount paid by your family to Penn?
 6      A.          That was paid by me to Penn.
 7      Q.          By you personally?
 8      A.          Yes.
 9      Q.          And was that for your summer course in
10      the summer of 2020?
11      A.          Yes.
12      Q.          And where did you get the money for
13      that -- for that payment?
14                  MR. CIOLKO:  Objection; form.  You can
15      answer.
16      A.          I had been working for my father's
17      landscaping company since I was about 10 years old
18      and I've been saving up.
19      Q.          When I -- when -- there are other
20      payments that were made to the University of
21      Pennsylvania throughout your four years at the
22      University of Pennsylvania; is that correct?
23                  MR. CIOLKO:  Objection; form.  Assumes
24      facts not in evidence.  But you can answer.
25      A.          I'm confused if that was a question.
```

Page 49

```
 1     BY MR. KIDNEY:
 2     Q.            So did you make other payments to the
 3     University of Pennsylvania during your four years
 4     at the University of Pennsylvania?
 5     A.            Other than this $4,493?
 6     Q.            Yes.
 7     A.            Yes.
 8     Q.            Approximately how much have you paid
 9     to the University of Pennsylvania over your four
10     years there?
11                   MR. CIOLKO:  Same objection.  You can
12     answer.
13     A.            I'm unsure.
14     Q.            And approximately how much have your
15     parents paid during your four years at the
16     University of Pennsylvania?
17                   MR. CIOLKO:  Same objection.  You can
18     answer.
19     A.            I'm unsure.  As of the end of the day,
20     it's my responsibility.
21     Q.            I'm not asking for an exact amount,
22     Miss Nedley.  I'm asking for approximation.
23                   MR. CIOLKO:  Objection; asked and
24     answered.
25     BY MR. KIDNEY:
```

Page 50

```
 1      Q.          Approximately how much money from you

 2      paid -- have your parents paid for your four years

 3      at the University of Pennsylvania?

 4                  MR. CIOLKO:  Same objection.  You can

 5      answer.

 6      A.          I'm unsure.

 7      Q.          Have they paid more than zero?  Are

 8      you unsure of that?

 9                  MR. CIOLKO:  Objection; form.  You can

10      answer.

11      A.          They've contributed to my dining plan.

12      Q.          And approximately how much have they

13      contributed?

14                  MR. CIOLKO:  Objection; asked and

15      answered.  But you can answer.

16      A.          Well, if we looked at the dining plan

17      before, it was $800 for spring of 2020.

18      Approximately $800 for fall of 2020 -- sorry, fall

19      of 2019.  And then I'm currently -- I was on the

20      dining plan my junior year, which was nonexistent

21      in the fall.  So that would have been fall of 2020.

22      And spring of '21, I was on a dining plan.  And I'm

23      currently on a dining plan in the fall.  And I've

24      yet to decide if I will be on a dining plan in the

25      spring of 2022.
```

Page 51

1          Q.          And your parents paid for all of the
2     dining plan charges; is that correct?
3          A.          As far as I can remember, yes.
4          Q.          And did they pay for anything else, as
5     far as you can remember, that was in terms of money
6     paid to the University of Pennsylvania?
7                      MR. CIOLKO:  Objection; asked and
8     answered.  You can answer.
9          A.          Not to the University of Pennsylvania.
10         Q.          And to the extent that the University
11    of Pennsylvania charged other amounts, other than
12    for the dining plan to your family, who paid for
13    that?
14                     MR. CIOLKO:  Objection; asked and
15    answered.  You can answer.
16         A.          Can you repeat the question, please?
17         Q.          Other than the amounts paid for the
18    dining plan, to the extent that the University of
19    Pennsylvania charged your family certain amounts,
20    who paid those amounts?
21                     MR. CIOLKO:  Objection; form.  Asked
22    and answered.  You can answer.
23         A.          My great aunt and great uncle had
24    established a -- I'm not sure of the name of the
25    fund, but that has paid my senior year thus far.

Page 52

1          Q.          And did your great aunt and great
2     uncle pay for any charges imposed to the University
3     of Pennsylvania prior to your senior year?
4          A.          I don't believe so.
5          Q.          Let me direct you back, in light of
6     your answer, to the awards letter that we earlier
7     looked at.  This is in the ZIP file, and it is
8     ending in 866.  Tell me when you pull that up.
9          A.          Yes.
10                      MR. CIOLKO:  Hold on.
11         A.          Hold on one second.  Okay.
12         Q.          Okay.  So do you see at the -- at the
13    bottom of 866, it says your estimated net cost per
14    2019 to 2020, and it says, total net cost, 24,620.
15                      MR. CIOLKO:  Objection.  I'm going to
16    ask maybe for you to rephrase.  That's not what
17    this document says or -- either I misheard you or
18    -- are you speaking about expected family
19    contribution?
20                      MR. KIDNEY:  I am speaking of expected
21    family contribution.  But I'm looking at your -- at
22    -- if you're looking at 867, Ed, you're one page
23    ahead.
24                      MR. CIOLKO:  Okay.  Of the -- you're
25    866, last line?

Page 53

1                    MR. KIDNEY:  Right.

2                    MR. CIOLKO:  Thank you.

3                    Did you get that?

4                    THE WITNESS:  This?

5                    MR. CIOLKO:  Yeah.

6                    THE WITNESS:  Okay.

7                    MR. KIDNEY:  I'm sorry, Michael.

8       Thank you.

9       BY MR. KIDNEY:

10      Q.           So do you see where it says, total net

11      cost, 24,620?

12      A.           Yes.

13      Q.           Okay.  And do you see on the next

14      page, your expected family contribution for 2019 to

15      2020, it says, parent contribution, 21,150?

16      A.           Yes.

17      Q.           Do you see where it says that?

18      A.           Yes.

19      Q.           Do you see student summer savings,

20      3200?

21      A.           Yes.

22      Q.           Okay.  So let me ask you this.

23                   Is it your testimony, Miss Nedley --

24      well, let me -- let me begin this way.

25                   Student summer savings, $3200.  Did

Page 54

1      you pay that $3200 for the 2019/2020 year?  Did you
2      personally pay that?
3                      MR. CIOLKO:  I'm going to object
4      because it misrepresents the documents itself.  And
5      if you can answer, go ahead.
6                      MR. KIDNEY:  How does that
7      misrepresent the document, Ed?
8                      MR. CIOLKO:  I believe that's expected
9      family contribution, but that does not mean that
10     Miss Nedley -- that that is actually how the
11     breakdown was for the cost themselves.  So to ask
12     whether she paid that particular portion -- it's
13     not a bill.  This is just an expected family
14     contribution and this is how it's broken down.
15                     So is -- to ask whether -- it's not
16     like you're asking about an invoice.  You're asking
17     about an expectation.
18                     MR. KIDNEY:  I -- I did -- I disagree.
19     I asked whether she paid $3200.  She might have
20     paid more than that, but I'm beginning with one
21     question at a time.
22     BY MR. KIDNEY:
23     Q.         So, Miss Nedley, do you see where it
24     says, student summer savings, 3200?
25     A.         Yes.

Page 55

```
 1      Q.          Did you pay $3200 to the University of
 2      Pennsylvania, you personally?
 3                  MR. CIOLKO:  Objection.
 4                  THE WITNESS:  Huh?
 5                  MR. CIOLKO:  You can answer.
 6      A.          Yes.
 7      Q.          And did you pay that from summer
 8      savings?
 9                  MR. CIOLKO:  Objection; form.  You can
10      answer.
11      A.          Not that particular summer.
12      Q.          Why not --
13      A.          That was --
14      Q.          -- that particular summer?
15      A.          I've about working --
16      Q.          This --
17      A.          For years -- I've been working for
18      years.  So this money was not directly this summer,
19      not all of it.
20      Q.          So the $3200 that you were expected to
21      contribute to the University of Pennsylvania, you
22      contributed that money, but it did not come from --
23      from a summer job in the summer of 2019;  is that
24      correct?
25                  MR. CIOLKO:  Objection;
```

Page 56

1      mischaracterizes the testimony.  But you can

2      answer.

3      A.             Some of it was from that summer, but

4      some of the money was from previous work, also.

5      Q.             Okay.  Then do you see the next line

6      that says $270?

7      A.        Yes.

8      Q.             And next to that it says, student

9      assets?

10     A.        Yes.

11     Q.             At some point in time, did the

12     University of Pennsylvania ask you what your

13     student assets were; in other words, how much you

14     had saved up?

15                    MR. CIOLKO:  Objection; form.  You can

16     answer.

17     A.        Yes.

18     Q.             And is it your understanding that the

19     University of Pennsylvania expected you to

20     contribute a portion of your assets to your

21     education?

22     A.        Yes.

23     Q.             And is it your understanding that the

24     $270 they expected you to contribute was calculated

25     as a portion of the assets that you had reported to

Page 57

```
 1      them?
 2                      MR. CIOLKO:  Objection; speculation.
 3      You can answer.
 4      A.              Can you repeat the question?
 5      Q.              Yes.  One second.
 6                      Is it your understanding that the $270
 7      that the University of Pennsylvania expected you to
 8      contribute from your assets was calculated as a
 9      percentage of the assets that you had reported to
10      them?
11                      MR. CIOLKO:  Same objection.  You can
12      answer.
13      A.              No.  I'm not sure if it was a
14      percentage, or how this was calculated.
15      Q.              So let me direct your attention to
16      parent contribution, 21,150.  Do you see that?
17      A.              Yes.
18      Q.              Is it your testimony -- I want to make
19      sure I understand.
20                      You had earlier told me that your
21      parents paid for the dining fees to the University
22      of Pennsylvania; is that correct?
23                      MR. CIOLKO:  Objection to the extent
24      it mischaracterizes testimony.  But you can answer.
25                      MR. KIDNEY:  How does that
```

Page 58

```
 1      mischaracterize the testimony?
 2                     THE WITNESS; yes.
 3                     MR. KIDNEY:  No, let's stop.  How did
 4      that --
 5                     MR. CIOLKO:  Whether she testified
 6      that the parents had paid all of the dining fees
 7      for prior semesters.  So, obviously, Miss Nedley
 8      can answer.
 9      BY MR. KIDNEY:
10      Q.          Okay.  You can answer, Miss Nedley.
11      A.          Can you repeat the question?
12      Q.          Sure.  I want to make sure I
13      understand your prior testimony correctly.
14                     Am I correct in saying that you had
15      earlier told me that your parents paid for the
16      dining fees paid to the University of Pennsylvania?
17      A.          Yes.
18      Q.          So is it -- and is it your testimony
19      that you paid the $21,150 parent contribution,
20      other than the dining fees?
21                     MR. CIOLKO:  I'm going to lodge the
22      same objection as vague.  This is not a bill.  But
23      you can answer, if you think you can.
24      A.          I'm not sure.
25      Q.          Okay.  Let me -- okay.  I'll circle
```

Page 59

1      back on that later.  Let me move on to Pennsylvania

2      state grant.

3                   What is a Pennsylvania state grant?

4      A.           That was money from the state based on

5      financial need.

6      Q.           You do not have to pay that; is that

7      correct?

8      A.           Correct.

9                   MR. CIOLKO:  Michael, you're coming

10     over a little muffled.

11                  MR. KIDNEY:  Is that any better?

12                  MR. CIOLKO:  That's better.  Thank

13     you.

14                  MR. KIDNEY:  Okay.

15     BY MR. KIDNEY:

16     Q.           Did you have to submit a application

17     for that grant?

18     A.           Yes.

19     Q.           What did the application ask for?

20     A.           All financial records.

21     Q.           Do you have a copy of that

22     application?

23     A.           I'm not sure.

24                  MR. CIOLKO:  I'll object only because

25     I thought it was asked and answered, but I'm not

1       sure, so I want to lay the objection down.  I want

2       you to answer.

3       BY MR. KIDNEY:

4       Q.            I ask, Miss Nedley, that you search

5       for that today, and if you have it, you send that

6       to your counsel.

7                     MR. CIOLKO:  If she has that, I will

8       get that over to you, Michael.

9                     MR. KIDNEY:  Thank you.

10      BY MR. KIDNEY:

11      Q.            So do you still have the award notice

12      in front of you, which is 866 -- it ends in 866?

13      A.            Yes.

14                    MR. CIOLKO:  Yeah.  That one.

15      BY MR. KIDNEY:

16      Q.            Do you see there's a reference to

17      federal work study job?

18      A.            Yes.

19      Q.            What is a federal work study job?

20      A.            Jobs that are through the university.

21      But I believe the money comes from the federal

22      government.

23      Q.            And what was your potential work study

24      job during the 2019-2020 year?

25      A.            I'm a tutor at the Marcks Family

1          Center -- it changed names -- Marks Family Center

2          for Excellence in Writing.  And I also worked all

3          of the athletic events for the university,

4          including Penn relays.

5          Q.              And how much did you make through

6          those jobs during the 2019 to 2020 year?

7          A.              I'm not sure of the exact amount.

8          Q.              Approximately?

9          A.              $3,000.

10         Q.              Is anyone making payments on the plus

11         direct loans that have been taken out on your

12         behalf?

13         A.              Has anyone?

14         Q.              Yes.

15         A.              No.

16         Q.              Let me direct you back to your

17         production page Nedley 000003.  Very first line is

18         refund, 3916.27.  Do you see that?

19         A.              So this is Exhibit 2, page -- page

20         0003.  At the top, it says, student account, spring

21         2020 account activity.  And I'm focused on the very

22         first line, refund, 423.20 in the amount of

23         $3,916.27.  Do you see that, Miss Nedley?

24                         Miss Nedley, are you still looking for

25         this?  Miss Nedley, can you still hear us?

Page 62

1                    (Discussion held off the record.)

2                    MR. CIOLKO:  I don't know what

3          happened.

4                    MR. KIDNEY:  We thought you were

5          really studying one line.

6                    THE WITNESS:  I saw your mouth moving,

7          but nothing was coming out.

8          BY MR. KIDNEY:

9          Q.         So, Miss Nedley, let me direct you

10         back to your document production.

11                    So this is Nedley production, which

12         will be marked as Exhibit 2.  And I'm specifically

13         looking at Nedley 3, so 000003.  And I'm looking at

14         the first line --

15         A.         Yes.

16         Q.         -- that says, refund 42320.  And what

17         is the amount you see?

18         A.         3,916.27.

19         Q.         What is your understanding of why you

20         were refunded this amount?

21         A.         I'm not sure.

22         Q.         Is it possible, Miss Nedley, that this

23         was for your indirect costs?

24                    MR. CIOLKO:  Objection; form.

25         A.         I'm unsure.

Page 63

1      Q.          Do you -- as you sit here today, do

2      you have any reason or any basis to refute that

3      this refund was for your indirect costs?

4                  MR. CIOLKO:  Objection; asked and

5      answered.  You can answer.

6      A.          I'm confused by the question.

7                  MR. KIDNEY:  Let me -- let me ask, Ed,

8      why do you -- I think that objection is

9      inappropriate.  She said before she wasn't sure.

10     And now I'm asking her if she has a basis to

11     refute, which is a different question.  Why do you

12     think that is an inappropriate question?

13                 MR. CIOLKO:  I --

14                 MR. KIDNEY:  I don't want to have a

15     lot of unnecessary objections, and that's what

16     we're having now.  I made a point of rephrasing the

17     question.  What is the problem with the question?

18                 MR. CIOLKO:  Where is the term

19     indirect costs identified and -- and defined?  I'm

20     not going to have my client --

21                 MR. KIDNEY:  We can go back to that.

22     We -- all right.  We'll go back to that.  We --

23     it's been asked and answered, but I'll go back and

24     refresh her -- well, let me ask.

25     BY MR. KIDNEY:

Page 64

1      Q.          Miss Nedley, do you remember seeing a

2      document that listed indirect costs?

3      A.          Much earlier on.  But can we please

4      refresh?

5                  MR. KIDNEY:  Okay.  I will say this

6      for the record.  I don't think I have ever been in

7      a deposition where I've received so many

8      objections.  It's going to cause this deposition to

9      go much longer.  It's impeding the progress of the

10     deposition.  And I would ask that my opposing

11     counsel limit his objections to ones that are truly

12     necessary.

13                 MR. CIOLKO:  Michael, I hear what

14     you're saying.  I'll take that into account.  And

15     to the extent that I can, I will limit my

16     objections.  I will not limit my ability and

17     responsibility to defend my client.

18                 MR. KIDNEY:  I'm not asking you to

19     limit your professional obligations.  But I will

20     say that in 20 years, I don't think I've ever had a

21     deposition with so many objections.

22     BY MR. KIDNEY:

23     Q.          Miss Nedley, I'm going to direct you

24     back to something we've already gone over.  But

25     this is -- it is a document -- it's your award

Page 65

1      letter.  It ends in 866.

2                     And do you see on page 1 there are --

3      there is a total of indirect costs, and above that,

4      the indirect costs that are listed are books and

5      supplies, personal expenses, off-campus housing,

6      off-campus dining, off-campus transportation?

7      A.           Yes.  And no, I do not think this

8      refund was for indirect costs.

9      Q.           You do not?

10     A.           No.

11     Q.           What do you think this refund was for?

12                   MR. CIOLKO:  Objection; asked and

13     answered.  You can answer.

14     A.           For overpaying.  The indirect costs

15     were not paid to the university in the first place

16     for me to receive this refund from the university.

17     Q.           Do you see that the loan amounts --

18     let me -- let me direct you to one, two, three,

19     four, five, six -- seven lines down.  Plus direct

20     loan refund, what's the amount of that refund?

21                   MR. CIOLKO:  That the original

22     document, Nedley production.

23                   MR. KIDNEY:  This is Nedley production

24     exhibit, which is -- will be marked as Exhibit

25     Number 2, page Nedley 00003.

Page 66

```
 1                    MR. CIOLKO:  Thank you.
 2      A.            And the amount is $3,3403.50.
 3      Q.            Miss Nedley, was this refund because
 4      the plus direct loan that was taken out exceeded
 5      the direct costs?
 6      A.            Yes.
 7      Q.            And why did you or your parents take
 8      out a plus direct loan that exceeded the direct
 9      costs owed to the University of Pennsylvania?
10                    MR. CIOLKO:  Speculation.  But if you
11      know, you can answer.
12      A.            I'm not sure.
13      Q.            You're not sure why the loan amount --
14      did you tell me before that you were the one
15      responsible for the loan?
16      A.            Yes.
17      Q.            But you're not sure why you took out a
18      loan that you are responsible for in the amount
19      listed?
20      A.            I am responsible for it.
21      Q.            I understand.
22                    What I'm asking is:  Since you are
23      responsible for this loan, did you carefully
24      consider the amount of the loan that you asked for?
25      A.            Yes.
```

Page 67

```
 1      Q.          And so why did you ask for a loan of
 2      11,768 if that -- if that was more than the direct
 3      cost owed to the University of Pennsylvania?
 4                  MR. CIOLKO:  Objection to form.  You
 5      can answer.
 6      A.          I'm not sure.
 7      Q.          How did you determine the amount of
 8      the loan that you would ask for?
 9                  (Phone ringing.)
10                  MR. CIOLKO:  Somebody --
11                  THE WITNESS:  Is that our call?
12      Sorry.
13                  MR. KIDNEY:  No, it's -- you can
14      ignore that.
15      BY MR. KIDNEY:
16      Q.          Do you want me to repeat the question?
17      A.          Yes, please.
18      Q.          So how did you determine the amount of
19      the loan that you or your family would ask for?
20      A.          Based on the tuition and fees.
21      Q.          So is it your testimony that you would
22      only ask for a loan to cover the tuition and fees?
23                  MR. CIOLKO:  Objection; form.  You can
24      answer.
25      A.          I'm not sure what the additional money
```

1    was requested for off the top of my head.  I would
2    have to look back.
3         Q.         What -- what -- how about rent for
4    your apartment?
5                    MR. CIOLKO:  Objection; form.
6         A.         That wasn't --
7         Q.         How did you pay for the rent -- how
8    did you pay for the rent for your apartment?
9         A.         My parents assisted me with that.
10        Q.         Did your parents pay for the rent?
11        A.         Yes.  But I don't --
12        Q.         Your parents paid --
13                   MR. CIOLKO:  Hold on.  Hold on,
14   Michael.  She's not done answering.
15                   Go ahead and finish your answer.
16        A.         But this amount would not cover my
17   entire rent.
18        Q.         Your parents paid for your apartment
19   rent and your dining plan.  Did they also pay for a
20   portion of the tuition and fees due to the
21   University of Pennsylvania?
22        A.         No.
23        Q.         Why did your parents pay for the rent
24   and the dining plan but not tuition and fees?
25                   MR. CIOLKO:  Objection; speculation.

Page 69

1    You can answer.

2    A.         That was not agreed upon between my

3    parents and I, for them to cover tuition and fees.

4    Q.         What is a co-out of house member fee?

5    A.         I believe that was because I'm -- I

6    was in a sorority, and I did not live in the house.

7    Q.         When did you join the sorority?

8    A.         Give me one second.  The spring of

9    freshman year, so spring of 2019.

10   Q.         Did you ever pay for -- I'm sorry.

11   Did you ever live in the sorority house?

12   A.         No.

13   Q.         Are you still a member of the

14   sorority?

15   A.         This is complicated because I

16   technically dropped, but it is not official on

17   paperwork yet.

18   Q.         When did you drop?

19   A.         Approximately around Christmas.

20   Q.         And why did you drop?

21   A.         Because I cannot justify paying when I

22   will be an in-season athlete and unable to attend

23   all events.

24   Q.         Do you know whether Penn reduced the

25   student summer savings requirement for the summer

1      of 2020?

2                    MR. CIOLKO:  Objection; vague and

3      assumes facts not in evidence.  But you can answer.

4      A.           I'm not sure.

5                    MR. KIDNEY:  What is -- does that

6      assume that is not in evidence?

7                    MR. CIOLKO:  What is the summer --

8      could you repeat the term?

9                    MR. KIDNEY:  Do you know whether Penn

10     reduced the student summer savings requirement for

11     the summer of 2020?

12                   MR. CIOLKO:  So you're talking about a

13     different part of the document; is that correct?

14                   MR. KIDNEY:  I'm -- this is not on a

15     document.

16                   MR. CIOLKO:  It actually is.  It's on

17     0067.

18                   MR. KIDNEY:  Well, the summer savings

19     requirement is referenced there.  But my question

20     is:  For the summer of 2020, which is not

21     referenced in that document, whether Penn reduced

22     the student summer savings requirement?

23     A.           I'm not sure what you're talking

24     about.

25     Q.           Okay.  So let me -- let me direct you

Page 71

1    back to the award letter.  And this is Penn 866,

2    Exhibit 5 -- or will be Exhibit 5.  And I want to

3    direct you to the student summer savings line.

4    A.          Yes.

5    Q.          Tell me when you get there -- I'm

6    sorry.

7    A.          On page 2?

8    Q.          Yes.  Exactly right.  Do you see that?

9    A.          Yes.

10   Q.          Is it your understanding from this

11   document that when Penn calculated your expected

12   family contribution for 2019 to 2020, they -- Penn

13   expected you to contribute $3200 from your student

14   summer savings from any job you had in the summer

15   of 2019?

16   A.          Yes.

17   Q.          Now, in the summer of 2020, the

18   pandemic, had hit; is that correct?

19   A.          Yes.

20   Q.          Is it your -- do you have an

21   understanding of whether Penn told students, we do

22   not -- we no longer expect you to contribute money

23   that you earn from the summer of 2020 because of

24   the pandemic?

25   A.          I was not aware.

Page 72

1    Q.          Do you recall ever receiving a summer

2    savings grant from the University of Pennsylvania?

3    A.          Not off the top of my head.

4    Q.          And certainly, when you applied to the

5    University of Pennsylvania and you were accepted,

6    the University of Pennsylvania never promised to

7    give you a summer savings grant if a pandemic hit;

8    is that correct?

9    A.          Can you rephrase that, please?

10   Q.          The -- prior to the pandemic   hitting

11   --

12   A.          Uh-huh.

13   Q.          -- is it correct that the University

14   of Pennsylvania never promised to give you a summer

15   savings grant in response to the pandemic?

16   A.          I'm unsure.

17   Q.          You're unsure whether they promised

18   that?

19   A.          Correct.

20   Q.          As you sit here today, do you have any

21   recollection of the University of Pennsylvania

22   promising to give you a summer savings grant prior

23   to the onset of the pandemic?

24   A.          I'm unsure.

25   Q.          That's not my question.

Page 73

1      A.          Can you rephrase it?

2                      MR. CIOLKO:  That's her answer.  You

3      don't like it -- that's --

4                      MR. KIDNEY:  That's not my question.

5      The witness is not answering my question.  In order

6      to finish this deposition we need direct answers to

7      questions, like most deponents give.  This --

8                      MR. CIOLKO:  That is your answer,

9      period.

10                     MR. KIDNEY:  The witness said she is

11     unsure.

12     BY MR. KIDNEY:

13     Q.          I have a different question.  And I'm

14     going to read it back to you.  And I will keep

15     asking the question until we get an answer.

16                     MR. CIOLKO:  As long as I let you.

17     Q.          As you sit here -- I understand you're

18     unsure, miss Nedley, of my -- of the earlier

19     question I asked you.  I have a different question.

20                     I'm not asking you if you're sure

21     about something.  I'm asking you:  As you sit here

22     today, do you have any recollection of the

23     University of Pennsylvania promising, prior to the

24     pandemic, to give you a summer savings grant as a

25     result of a future pandemic hitting?

Page 74

```
 1    A.          No.
 2    Q.          Thank you.
 3                I just -- just so you know, Miss
 4    Nedley, if you're unsure of something, that's
 5    completely fine, but I need to know, as a lawyer,
 6    if we get to trial, are you going to say something
 7    like -- are you going to refute it?  Are you going
 8    to say, well, I was unsure of the answer, but had
 9    the university promised something, I would have
10    remembered that.  So that --
11                MR. CIOLKO:  Is there a question?
12    Michael, is there a question?
13                MR. KIDNEY:  There is.  It is a
14    question of -- no, there's not a question.  But I
15    wanted to give you an -- I wanted to explain to you
16    why I need to ask effective questions.
17                MR. CIOLKO:  She answered.
18    BY MR. KIDNEY:
19    Q.          So, Miss Nedley, let me direct you to
20    a spreadsheet that you have seen before.  This is
21    in the ZIP file, and it ends with 865.  Do you see
22    that document?
23    A.          Yes.
24    Q.          Let's go to --
25    A.          I'm sorry.  I would like to clarify
```

Page 75

1     that I haven't seen this document before you had me

2     open it earlier and then suggested a different

3     document.

4     Q.          Understood.  Thank you for that

5     clarification.

6                 Miss Nedley, let me direct you --

7                 MR. KIDNEY:  And just for the court

8     reporter's benefit, this document is eventually

9     going to be marked as Exhibit 6.

10    BY MR. KIDNEY:

11    Q.          I can represent to you, Miss Nedley,

12    that this is a printout -- this has been produced

13    in discovery in response to your lawyer's request

14    for a copy of the university account statement

15    regarding you.

16                MR. CIOLKO:  Michael, is there a page

17    number you can direct us to?

18                MR. KIDNEY:  Yes.  It is 865.

19                MR. CIOLKO:  Thank you.

20                MR. KIDNEY:  00000865.

21                MR. CIOLKO:  Thank you.

22                MR. KIDNEY:  You're welcome.

23    BY MR. KIDNEY:

24    Q.          Miss Nedley, let me direct you to line

25    45.

Page 76

1      A.          Yes.

2      Q.          Can you -- do you see under column B

3      does that says, COVID-19 summer savings grant?

4      A.          Yes.

5      Q.          And what is the amount?

6      A.          $1600.

7      Q.          And in column F, what is the date?

8      A.          July 8th of 2020.

9                  MR. CIOLKO:  Michael, quick

10     clarification.  Is that column that you're

11     referencing a payment column as opposed to a

12     charge?

13                 MR. KIDNEY:  That is -- this -- my

14     understanding is this was -- since it's a grant,

15     this was a -- this was a credit to Miss Nedley's

16     account.

17                 MR. CIOLKO:  Thank you.

18                 MR. KIDNEY:  Just like the other

19     grants.  You're welcome.

20                 MR. CIOLKO:  I wanted to make sure I

21     understood that.

22     BY MR. KIDNEY:

23     Q.          Miss Nedley, does this refresh your

24     recollection?  Do you recall receiving a COVID-19

25     summer savings grant?

1      A.            Yes, now I do.

2      Q.            And it was in the amount of $1600?

3      A.            I believe so.

4      Q.            And is it your understanding that, as

5      the case with other grants, you do not have to

6      repay this amount?

7      A.            Correct.

8      Q.            Other than your aunt -- your great

9      aunt and your great uncle and your parents, did any

10     other third parties financially assist with paying

11     for your undergraduate education?

12     A.            When I was a senior in high school,

13     there were -- I don't know if you call them

14     third-party scholarships available.  So I had

15     applied to money plus, and I received around, I

16     think, $10,000 in outside scholarships.

17                    MR. CIOLKO:  20 plus as the number --

18                    THE WITNESS:  I applied to 20 or so

19     applications, like separate applications for

20     separate scholarships.

21     BY MR. KIDNEY:

22     Q.            And do you still have a record of

23     those, Miss Nedley?

24     A.            I might.  But I'm honestly not sure

25     because most of them were just handed to me.  And

1      not any official documents online.  So it's all via

2      paper.

3      Q.          I would ask, Miss Nedley, when you

4      can, check your records.  And if those records

5      still exist, please send them to your counsel.

6      A.          Okay.

7      Q.          I don't remember whether I asked you

8      this, Miss Nedley.  And I apologize I'm asking you

9      this again.

10          Do you have a copy of the application

11     you submitted to Penn to get the Penn grant

12     COVID-19 expense for your rental car?

13              MR. CIOLKO:  You did ask.

14              Please answer again.

15     A.          I will have to look because I'm not

16     entirely sure because it was so long ago.

17     BY MR. KIDNEY:

18     Q.          Again, I would ask, Miss Nedley, if

19     you please look for that, and if you find it, give

20     it to your counsel.  I would appreciate it.

21              MR. CIOLKO:  That one is already

22     noted.

23     BY MR. KIDNEY:

24     Q.          You are not required to repay that

25     amount; is that correct?  Is that your

Page 79

1      understanding?

2      A.          What?

3      Q.          The $465 for the rental car.

4      A.          Correct.

5      Q.          Was -- the $465, did that cause the

6      university to recalculate your financial aid?

7      A.          From my understanding, if you were on

8      financial aid of any sort, you were, like,

9      available -- you were able to request for

10     transportation home to be covered.

11     Q.          And -- and the $465 that you received,

12     did the university -- do you have an understanding

13     whether the university factored that into the cost

14     of attendance?

15     A.          I'm not sure.

16     Q.          Okay.  So let me direct you to your

17     award letter.

18     A.          What was the --

19     Q.          I'm sorry.  Your -- let me -- this is,

20     let's see, 866.

21     A.          Yes.  And which portion of it?

22     Q.          So let me -- let me first show you --

23     on page 1, do you see where it says, towards the

24     top of the page, January 16th, 2020?

25     A.          Yes.

Page 80

1      Q.          And the total cost of attendance on

2      that page is 76,444?

3      A.          Yes.

4      Q.          Okay.  And now scroll down.  And on

5      page 3 of this document, which is Bates-stamped

6      868, you see now this -- this document is dated

7      April 16th, 2020?

8      A.          Yes.

9      Q.          And the -- the total cost of

10     attendance has increased from $76,444 to $76,909?

11     A.          Yes.

12     Q.          Do you have a calculator handy, or

13     maybe there's one on your phone?

14     A.          Yes.

15     Q.          Would you subtract 76,909 and then do

16     minus 76,444 for me?

17     A.          Yes.

18     Q.          And what is that difference?

19     A.          $465.

20     Q.          And does that match up to the other --

21     still looking at page 3 of this document, third --

22     do you see what -- if you look at total cost after

23     attendance and you look up two lines, do you see

24     other expense, 465?

25     A.          Yes.

1    Q.          And is that the same amount that the

2    -- you asked for for the rental car?

3    A.          Yes.

4    Q.          And then if you look below under your

5    financial aid resources for 4/29/2020, do you see

6    the third line down, Penn grant for 65?

7    A.          Yes.

8    Q.          And do you also see the total net cost

9    24620 at the bottom of page 868?

10   A.          Yes.

11   Q.          And can you tell me, if you compare

12   that total cost number on page 868 to the total net

13   cost number at the bottom of 866, is it the same

14   number?

15   A.          Yes.

16   Q.          So is it your understanding from these

17   two documents that your -- your total net cost of

18   attending the University of Pennsylvania did not

19   change as a result of requesting money for a rental

20   car to return to your home in the suburbs of

21   Pittsburgh?

22   A.          Correct.

23   Q.          But your total cost of attendance went

24   up, as well as the amount of financial aid went up?

25   A.          Yes.

Page 82

1      Q.          And -- and the total cost of

2      attendance increased in the amount of $465,

3      representing the cost of rental car, correct?

4      A.          Yes.

5      Q.          And the total financial aid increased

6      in the amount of $465, representing the cost of the

7      rental car?

8                  MR. CIOLKO:  I'm only going to object

9      to that it assumes is facts not in evidence.  The

10     numbers are the same, but there's nowhere that

11     indicates that's exactly what that number was based

12     for.

13                 I'm not suggesting it isn't, but all

14     you're asking is, is one number the same as the

15     other.

16                 MR. KIDNEY:  I understand the

17     objection.  You can answer, if you can.

18                 MR. CIOLKO:  You can answer.

19     A.          I'm so sorry.  Can you please repeat

20     the question?

21     BY MR. KIDNEY:

22     Q.          Sure.  So if you compare pages 866 --

23     A.          Yes.

24     Q.          -- and 868 --

25     A.          Yes.

1    Q.          -- the financial aid resources for

2    2019 to 2020 increased by the amount of 465, which

3    is the same amount as the amount you requested for

4    a rental car to return to your home in the suburbs

5    of Pittsburgh?

6    A.          Yes.

7    Q.          Prior to the onset of the pandemic,

8    you did not know that you were going to receive

9    this $465; is that correct?

10   A.          Correct.

11   Q.          Would you agree that the $465 should

12   be deducted from any amount of damages that you're

13   seeking in this case?

14               MR. CIOLKO:  Objection; calls for a

15   legal conclusion.  You can answer.

16   A.          Oh, no, because I'm representing my

17   class, and not everyone was able to receive

18   compensation for return travel home.

19   Q.          And I'm sorry.  I missed the last part

20   of that answer.

21   A.          Oh, I'm sorry.  Not everyone was able

22   to request further travel home to be covered by the

23   university.

24   Q.          Would you agree that for those people

25   who did receive money to travel home from the

Page 84

```
 1        university, that for those people, those amounts
 2        should be deducted from any damages that they are
 3        owed?
 4                    MR. CIOLKO:  Same objection; calls for
 5        expert testimony.  You can answer.
 6        A.          No, because that was not factored into
 7        the fees that I had set forth to pay in the first
 8        place or were -- was anticipated in terms of, like,
 9        what the -- I imagined those fees would end up
10        totaling.  This was not included in the first
11        place.  So no, I don't think it should be deducted
12        because it's like an afterthought.
13        Q.          And would you agree that this money
14        assisted you in transitioning after the onset of
15        the pandemic?
16                    MR. CIOLKO:  Objection to form.  You
17        can answer.
18        A.          Can you define what you mean by
19        transitioning?
20        Q.          Let me ask it a different way.
21                    Would you agree that the $465 assisted
22        you in continuing your studies as a result of the
23        pandemic?
24                    MR. CIOLKO:  Same objection.  You can
25        answer.
```

1      A.            I'm not sure of that.  Because it's

2      not really continuing it.  I was expected to

3      continue my education based on my own reasoning to

4      finish my education on time and also for my

5      professors to stay in class.  So this was a

6      necessity in order for me to continue my education

7      or to stay in class, honestly.

8      Q.            And would you agree that this is money

9      that you would not have received but for the

10     pandemic?

11     A.            Yes.

12     Q.            Let me direct you back to the

13     spreadsheet.  And by spreadsheet, I mean what will

14     be marked as Exhibit 6.

15     BY MR. KIDNEY:

16     Q.            And it is Bates number 865.  And let

17     me direct you to lines 56 and 57.  Or actually,

18     just 56.

19     A.            Yes.

20     Q.            Do you see on line 56 it says,

21     COVID-19 dining adjustment?

22     A.            Yes.

23     Q.            And is the amount there $683.27?

24     A.            Yes.

25     Q.            And the prior line refers to -- says

Page 86

1      refund.  And then it says the same amount, 683.27?

2      A.        Yes.

3      Q.        Does this refresh your recollection of

4      the amount that the university refunded to you from

5      your dining plan?

6      A.        Yes.

7      Q.        And do you see on line 70 it says,

8      dining club activities plan, 1489.5?

9      A.        Yes.

10     Q.        Can you take out your calculator again

11     for me, please?

12     A.        Yes.

13     Q.        Put in 148.5.

14     A.        One second, please.  148.5.

15     Q.        And then do minus 683.27 for the

16     dining adjustment.

17     A.        Yes.

18     Q.        And what do you get?

19     A.        $806.23.

20     Q.        And is that amount that you just read

21     into the record, does that line up with line 2 of

22     the document you produced, which is Bates-stamped

23     Nedley 3?

24                 MR. CIOLKO:  Hold on.  We'll take a

25     look.  Can you repeat that, please?  Sorry.  I just

Page 87

1    have the documents up now.

2    Q.        Sure.  So you -- the number -- you

3    took 1489.50, representing the charge for the

4    dining club activities plan.

5    A.        Yes.

6    Q.        And subtracted the refund of 683.27,

7    and you told me you came up with the number 806.23.

8    A.        Yes.

9    Q.        And then I'm asking you:  Is that

10   806.23, does that line up with line 2 of Nedley 3?

11   A.        Yes.

12   Q.        So let me just make sure I understand.

13   So the $806.23 represents, according to Nedley 3,

14   what you ended up paying net for the dining club?

15   A.        Yes.

16   Q.        And is it -- does this refresh your

17   recollection that the -- that had the pandemic not

18   hit, the cost of your dining club plan would have

19   been 1489.50, and you received a refund of $63.27?

20             MR. CIOLKO:  Objection based on

21   speculation.  But you can answer.

22   A.        Yes.

23   BY MR. KIDNEY:

24   Q.        What -- and so -- let me just clarify

25   the record.

1              You had earlier told me that your

2     parents paid for the dining fees.  So in a semester

3     where they would have been $1489.50, your parents

4     would have paid for that?

5     A.          Yes.

6     Q.          So let me direct you to -- are you --

7     do you still have Nedley Bates number 3 in front of

8     you?

9     A.          Give me one second.

10    Q.          Okay.

11    A.          Okay.  Yes.

12    Q.          I want to direct you to the last three

13    lines.  For the last four lines, is it your

14    understanding that the university charged you

15    $25,578 for tuition for the spring 2020 semester?

16    A.          Yes.

17    Q.          Is it your understanding that Penn

18    charged your account a general fee in the amount of

19    2,568 for the spring 2020 semester?

20    A.          Yes.

21    Q.          Is it your understanding Penn charged

22    you a clinical fee in the amount of $304 for the

23    spring 2020 semester?

24    A.          Yes.

25    Q.          Is it your understanding that Penn

Page 89

1     charged your account a technology fee in the amount

2     of $435 for the spring 2020 semester?

3     A.          Yes.

4     Q.          And you are seeking a refund of the

5     portion of these three fees; is that correct?

6               MR. CIOLKO:  I'm going to object to

7     the extent it calls for a legal conclusion.  But

8     you can answer.

9     A.          Yes for the technology fee, general

10    fee, and clinical fee.

11    Q.          Prior to the spring 2020 semester, did

12    you know what the general fee amount was for the

13    spring 2020 semester?

14    A.          Yes.

15    Q.          And prior to the spring 2020 semester,

16    did you know what the clinical fee amount and the

17    technology fee amount was for the spring 2020

18    semester?

19    A.          Yes.

20    Q.          So let me -- we can flip back to your

21    award letter, which is 866.

22    A.          Okay.

23    Q.          And let's look at page 868.  And I

24    want to direct you to under the blue bar.  It says

25    your financial -- your financial aid resources for

Page 90

1    2019 to 2020, and you see where it says, Penn

2    grant, $43,702?

3    A.          Yes.

4    Q.          And if -- is it -- let me ask it this

5    way.

6              Did Penn ever make any representation

7    to you about whether this grant in the amount of

8    $43,702 would be applied first to tuition or first

9    to mandatory fees?

10   A.          I don't recall them specifying.

11   Q.          Prior to the spring 2020 semester, do

12   you -- did you know what student services the

13   general fee supported?

14   A.          Where are you referencing student

15   services?

16   Q.          Good question.  I'm not.  It's -- it's

17   -- so that is not -- I'm not asking you a question

18   about this document.  So you can put this document

19   down.

20              What I'm asking is:  Prior to the

21   beginning of the spring of 2020 semester, you knew

22   there was a general fee, correct?

23   A.          Yes.

24   Q.          Did you know what that general fee

25   supported, what services?

Page 91

1        A.          Yes.

2        Q.          How did you know that?

3        A.          On the website, reading it.

4        Q.          So you went to the website that the

5   University of Pennsylvania put together that

6   explained what the general fee -- what services the

7   general fee supported?

8        A.          Yes.

9        Q.          Did you have -- were there any other

10   sources of information or was it that website?

11        A.          I believe I also, in years past, would

12   receive the financial aid packages in, like, a

13   physical package.  And I'm sure it was within that,

14   also.  I'm not sure.  I would imagine it was in

15   there.

16        Q.          And when you say you would imagine it

17   was in there, do you mean a printout of the website

18   or the information on the website?

19        A.          The information on the website.

20        Q.          Okay.  So prior to the onset of remote

21   instruction in the spring 2020 semester, what

22   services did you make use of that the university

23   offered?

24                    MR. CIOLKO:  Objection; form.  You can

25   answer.

Page 92

1    A.          Access to career services, access to
2    student health services, and access to all of the
3    athletic facilities and everything that comes along
4    with athletics.  As far as people for academics,
5    people to help be a liaison between athletics and
6    academics, as well as the mental health counselors
7    that they had and performance counselors and
8    endurance and conditioning coaches.  Did I say the
9    dietitians?
10   Q.          Anything else?
11   A.          That's all that is coming to mind
12   right now, but I'm sure there's others that I would
13   have to think more.  And I'm sorry.  I guess I
14   could add access to different clubs and various
15   activities, such as the pre-dental society.
16   Q.          Okay.  So let me -- let's -- I'm going
17   to take you back through each of the things you
18   mentioned.
19   A.          Okay.
20   Q.          And what I would like to know is, for
21   each of the services, activities, clubs, did you
22   participate in them in the first half of the spring
23   2020 semester prior to the pandemic?
24   A.          Okay.
25   Q.          So let's start with the last -- what's

Page 93

1      -- so career -- let's start with career services.

2                  Did you make -- did you take advantage

3      of career services in the first half of the spring

4      2020 semester?

5      A.          Yes.

6      Q.          And did you go to the career service

7      building?

8      A.          No.

9      Q.          How -- so you accessed the resources

10     online?

11     A.          Yes.

12     Q.          And was that -- what were you

13     accessing?  Was it information about dental school

14     or summer job or something different?

15     A.          Yes, for dental school.  They have

16     advisors that help with the entire process.

17     Q.          And after the pandemic hit, did you

18     take advantage of career services offered online

19     during the spring 2020 semester?

20     A.          Yes.  They have -- can I elaborate?

21     So they have a book that the university houses in

22     career services.  And when I was switched to

23     online, I no longer gained access to that.  And it

24     has all of the information on all the dental

25     schools across the currently as well as their

Page 94

1      statistics and acceptance rates and a breakdown of

2      the schools.

3                    And Penn career services marketed that

4      very early on, that I would be able to walk in and

5      use that at any time.  And I had organized for me

6      to go on and use it, and then we were switched

7      online, so I no longer had access.

8      Q.           And did you ever ask anybody in career

9      services if they could arrange for you to access it

10     virtually?

11     A.           Yes.  And they said they only had it

12     in-house.

13     Q.           I'm sorry.  They only had it in-house?

14     A.           Yes, like, in career services.

15     Q.           And do you -- did they offer any other

16     solution to you?

17     A.           You could buy it online, which is what

18     I ended up doing and paying for that out of pocket.

19     Q.           And how much is that cost?

20     A.           I'm not sure of the exact cost off the

21     top of may head.  But it was a year-long

22     subscription.  I wanted --

23     Q.           Did you?

24     A.           I want to say between, like, $60 and

25     $100.

1    Q.          So next, student health services.  Id
2    you visit student health service in the first half
3    of 2020?
4    A.          I was always sick.
5    Q.          I'm sorry.  That was a poor question.
6    Let me ask you again.
7                Did you visit the student health
8    services in the first half of the spring 2020
9    semester?
10   A.          I would need to look back.  I was
11   constantly sick, so I would imagine so.  But I
12   can't recall what exact sickness I was in there
13   for.
14   Q.          And when you say you were constantly
15   sick, you mean you had cold and flus and things
16   like that?
17   A.          Yes.  And ear infections and pink eye
18   and strep.  And my teammates had mono.  So we were
19   all always in there.  It was --
20   Q.          I'm sorry.
21   A.          It was like daycare.  We were all in
22   daycare and got sick.
23   Q.          Sorry to hear it.
24                So after the pandemic hit, did you
25   take advantage of student health services?

Page 96

1    A.           My mother is now a nurse.  So I did

2    not feel the need to talk to a nurse at student

3    health, and I had my mother at home.

4    Q.           Understood.

5                 And were you aware that you could

6    access student health services virtually?

7    A.           Yes.

8    Q.           And were you aware that if you were

9    still living in Philadelphia, you could walk into

10   the student health services building during the

11   pandemic?

12   A.           I was not aware of that.  There was a

13   lack of communication, I feel, on that end because

14   they -- we were all just essentially told to go

15   home.  It seems that communication was cut off.

16   Q.           You also mentioned access to all of

17   the athletic facilities and the -- the -- the

18   people connected with the athletic facilities for

19   academics.  Let's start there.

20   A.           Okay.

21   Q.           In the first half of the spring 2020

22   semester, did you make use of any of the academic

23   resources for athletes?

24   A.           Yes.  That is when I was in season.

25   So the academic department within athletics, they

Page 97

```
 1      helped me notify my professors when I would be
 2      missing class for softball, arrange for my
 3      professor -- or sorry, my coach to proctor exams
 4      for various students.  I had one exam proctored by
 5      my coach that spring -- or I'm sorry.  That was the
 6      spring before.  Ignore that comment.
 7                   But, yes, in general they were there
 8      as a liaison.  I was in contact with the dietitian
 9      at the time or the nutritionist.
10                   And then in terms of an athletic
11      trainer, I was with my athletic trainer every day,
12      roughly twice a day.
13                   And then access with my coach.  I was
14      working out with my strength and conditioning coach
15      also.  We were with him two days a week at the
16      time.
17      Q.          And after the pandemic, did you have
18      access to those some people virtually?
19      A.          No.
20      Q.          Did you have access -- were you able
21      to talk to your coach?
22      A.          Via text or calling but not --
23      Q.          And did you ever have a --
24      A.          Oh, go ahead.
25      Q.          No, you go ahead.  I didn't mean to
```

Page 98

1    cut you off.
2              You said via texting what?
3    A.        Just via texting, calling.  I was not
4    able.
5    Q.        Okay.
6    A.        The major portion of strength and
7    conditioning is being there and someone watching
8    you and your form, and you couldn't necessarily do
9    that over the phone because, one, all of the gym
10   were closed, so we didn't have access to any
11   facilities at home or on campus.  So there was no
12   way for that tool to be utilized.
13   Q.        Did you have Zoom calls with your
14   coach?
15   A.        Yes.
16   Q.        And did you have contact with the
17   dietitian?
18   A.        Yes.
19   Q.        Did you have contact with the mental
20   health counselors?
21   A.        Yes.
22             Can I add one thing?
23   Q.        Sure.
24   A.        So I had knee surgery in December of
25   2019.  That was covered by the university because

1    it was an injury I sustained while at the

2    university.  And with COVID, I was sent home in the

3    middle of rehab and I was unable to access the

4    resources that Penn Athletics had guaranteed me as

5    far as rehab through the athletic center.

6    Q.          And when were you sent home?

7    A.          In March.

8    Q.          Oh, so the surgery occurred in

9    December, but you were still rehabing in March?

10   A.          Yes.

11   Q.          Okay.  So were you not playing in

12   games in the spring 2020 semester because of your

13   knee surgery?

14   A.          So I was playing, but I was eased back

15   into the process.  And I was still meeting with my

16   doctor regularly and receiving injections to keep

17   on playing.

18   Q.          During the first half of the spring

19   2020 semester, did you access mental health

20   counseling?

21   A.          No.

22   Q.          During the first half of the spring

23   2020 semester, were there any clubs you

24   participated in such -- let's see, you mentioned

25   the pre-dental society; is that correct?

Page 100

1          How often does the pre-dental society

2     meet in normal times?

3     A.          At that time, we would have been

4     meeting roughly once a month or once every month

5     and a half.

6     Q.          And post pandemic, did the pre-dental

7     society continue to meet?

8     A.          Not in spring of 2020 but following.

9     We Zoomed in dental professionals.  But we were

10    unable to go into -- it's -- in previous times,

11    they would go into local schools and teach dental

12    hygiene, and that was no longer available to us.

13    Q.          But would you -- could -- did the

14    pre-dental society have any Zoom meetings among

15    themselves during the second half of the spring

16    2020 semester post pandemic?

17    A.          I don't recall.  I think it was email

18    at that point because everyone was just up in the

19    air with moving and . . .

20    Q.          Other than the organizations and the

21    activities and the services we just discussed, are

22    there any other activities, services, or clubs that

23    you participated in in the first half of the spring

24    2020 semester that you could not participate in the

25    second half of the spring 2020 semester?

Page 101

```
 1      A.          Can I talk about employment here?
 2      Q.          Sure.
 3      A.          Okay.  So with my athletic operations
 4      position, I'm involved in setting up for all
 5      events, running all events.  So say for soccer, if
 6      somebody kicks a ball out of bounds, I get them a
 7      new ball and chase the other ones.  And I do that
 8      for various sports.  And then I also break down the
 9      events.  And with Penn relays, we run the entire
10      events.
11                  So in the spring of 2020, I was no
12      longer given access to that position, as all
13      athletic events were, obviously, cancelled.  And
14      then I have another job whenever you're ready.
15                  MR. CIOLKO:  You might want to ask
16      that question again.
17                  MR. KIDNEY:  Yes.
18                  MR. CIOLKO:  I -- I want to make sure
19      you got an answer.
20                  MR. KIDNEY:  Yep.  Yep.  I appreciate
21      that, Ed.
22      BY MR. KIDNEY:
23      Q.          So I'll let you talk about the jobs,
24      Miss Nedley, but let me just repeat the question
25      and make sure, other than -- let's make sure
```

1     there's nothing else you want to mention.

2     A.          Okay.

3     Q.          So other than the organization and the

4     activities and the services and any jobs that you

5     have -- we've just discussed, are there any other

6     activities, services or clubs that you participated

7     in in the first half of the spring 2020 semester

8     that you could not participate in in the second

9     half of the spring 2020 semester?

10    A.          I was also a member of the Fellowship

11    of Christian Athletes.  And that met every week.

12    And once we were switched -- like, sent home, there

13    was a disconnect there.

14    Q.          And -- and -- and were there any Zoom

15    meetings after the pandemic hit in the spring 2020

16    semester?

17    A.          There was nothing that replicated what

18    we did in person because it was about activities

19    and bonding between people and, like, physical

20    standing up and doing different things.  So we

21    couldn't replicate that, but there was a different

22    -- I ended up forming all female Bible study with

23    several members from there, but it was not the same

24    experience as in person.

25    Q.          And how often did that all female

Page 103

1       Bible study group meet?

2       A.          Once a week.

3       Q.          And was that over Zoom?

4       A.          Yes.

5       Q.          Now, you wanted to tell me about your

6       job, your second job.

7       A.          Yes.

8       Q.          So tell me about that.

9       A.          So I'm a tutor through the Marks

10      Family Center for Excellence in Writing.  And

11      during this time, I -- we were required to work

12      three hours a week.  I'm not sure of the exact

13      hours I was in person.  I want to say three of six,

14      I'll have to look back.  But that was all in

15      person.

16                  And then when the pandemic hit, they

17      switched us to an online platform.  And the

18      platform I personally was rarely able to use

19      because I was constantly kicked out of it.

20                  So this is called WCONLINE, but I

21      believe the WC stands for writing center.  And with

22      that, students would sign up for appointments and

23      then meet with me among -- there were, like, 40

24      tutors at the time.  But the platform itself rarely

25      worked, so students were unable to gain access to

Page 104

1    the services, the tutoring services provided by the

2    university.

3    Q.          Were you also a member of the Penn

4    Athletics Wharton Leadership Academy?

5    A.          Yes.

6    Q.          Did that organization meet in the

7    spring of 2020, either before or after the

8    pandemic?

9    A.          Yes, both.  Before the pandemic, we

10   would meet -- it was a little scattered.  I would

11   say we would meet three times a month.  So kind of

12   every week, kind of biweek it.  Depended.

13                And in the sophomore program, it was

14   teaching us how to be leaders.  And this was

15   facilitated by the McNulty Leadership Program in

16   Wharton.  And during this time, the university or

17   the program leaders would bring in renowed leaders

18   basically to talk to us about how to be leaders on

19   our team.

20                At the end of it, us sophomores were

21   supposed to go on a trip.  And the current

22   sophomores just did it, where they take you -- I'm

23   not sure of details because they were very hushed,

24   but I was told they went to Berwyn, New York and

25   were placed into team building activities, I

Page 105

1      believe for one full day, one night, and then the

2      next half day.  And they were essentially off the

3      grid, learning how to be leaders in this situation

4      and how to work with people that you necessarily

5      wouldn't interact with sometimes.

6                  But that's what's a team is, a bunch

7      of people from different backgrounds coming

8      together.  So I was never able to go on this trip.

9      We missed it.

10     Q.          Were there any meetings of this group

11     in the second half of the spring 2020 semester

12     after the pandemic hit?

13     A.          There was a gap because everyone --

14     most of our season were just ripped from us.  And

15     then, yes, eventually we did come back together via

16     Zoom.

17     Q.          And that was during the spring 2020

18     semester?

19     A.          Yes.

20     Q.          And do you remember when that occurred

21     that you eventually started having meetings in the

22     spring 2020 semester?

23     A.          I'm not sure of the exact date, but I

24     believe by the end of March or the beginning of --

25     first week of April.

Page 106

```
 1      Q.           And Penn Athletics health and wellness
 2      captain, you -- what is that?
 3      A.           So that they just take captains from
 4      teams.  So some teams nominate people and some
 5      teams people just step up and they go to the center
 6      where there are meetings.  And those are typically
 7      held once a month, where we were together and were
 8      able to discuss various aspects of what athletes at
 9      Penn experienced at the time.
10                   So one group we broke up into groups.
11      And my group was focused on allowing the incoming
12      freshman the following year to be able to, like,
13      understand the experience that we're going through.
14                   So the plan was to have an in-person
15      during our NSL where the students could get to meet
16      everyone and really understand the expectations of
17      athletics.  And we had prepared all semester for
18      that, and then that was turned virtual.  And that
19      would have been early fall of 2020, so in August.
20      But the prep that we had done throughout the spring
21      didn't necessarily translate because we were
22      planning for in-person, and it was online.
23      Q.           And did you continue to prepare during
24      the pandemic period of the spring 2020 semester?
25      A.           Yes.  But it was hard because that was
```

Page 107

```
1     the time when we could come together in person.
2     Because I was working with a rower and a track
3     athlete, and we -- that was our set time -- with
4     our busy schedules, that was our set time to come
5     together and plan everything, and that was
6     exchanged.
7     Q.          And were you still able to meet with
8     those two people?
9                 MR. CIOLKO:  Objection to form.  Asked
10    and answered.
11    Q.          Well, let me -- you -- let me ask it
12    another way.
13                You said it was difficult with the
14    busy schedules.  In spite of the difficulty, were
15    you able to meet either over Zoom or on the phone
16    during the pandemic portion of the spring 2020
17    semester?
18                MR. CIOLKO:  Same objection.  You can
19    answer.
20    A.          Yes.  I believe we communicated via
21    email, but we used our academic liaison as our
22    liaison for this process.
23    Q.          In the spring -- do you have an
24    understanding as to whether the general fee
25    supports intercollegiate athletics?
```

Page 108

```
 1     A.            Yes, I believe it does, as well as --
 2     Q.            And what --
 3                   MR. CIOLKO:  Let her finish.
 4     Q.            As well as what?
 5     A.            Intramurals, like open rec.
 6     Q.            And what is that -- what is your
 7     understanding based on?  The Penn website?
 8     A.            Yes.
 9     Q.            In the spring 2020 semester, did you
10     ever use the Pottruck fitness center?
11     A.            No.
12     Q.            Did you ever use the Fox Fitness
13     Center?
14     A.            Yes.
15     Q.            And as a varsity athlete, you also had
16     access to your own athletic facilities; is that
17     correct?
18     A.            It's called Weiss, W-E-I-S-S.
19     Q.            And why, if you had access to Weiss,
20     did you go to the Fox Fitness Center?
21     A.            Based on timing of when other teams
22     were in the Weiss Athletics Center, when the
23     equipment was taken, Fox was directly upstairs, and
24     it was in close proximity to my locker room and
25     field.  So it was easy to go right there and not
```

Page 109

1     interrupt other teams.

2     Q.          How many times did you visit the Fox

3     Fitness Center in the spring 2020 semester?

4     A.          I would say between 10 to 15 times.

5     Q.          And -- and -- go ahead.  Finish.

6     A.          Starting -- whenever my team came back

7     together, we did all of our team workouts in the

8     Weiss facility.  And there was no need to be in Fox

9     at that point.

10    Q.          So when you went to the Fox Fitness

11    Center, to gain access, did you swipe in with your

12    Penn card?

13    A.          Most of the time not.  It was to get

14    into the door.

15    Q.          To what?

16    A.          To get into the door.  And then you

17    could just walk past.

18    Q.          But did you need your Penn card to

19    swipe into the door?

20    A.          Yes.

21    Q.          So if we check the university records

22    for the Fox Fitness Center, would you expect that

23    there are going to be 10 to 15 records of you

24    swiping in in the spring 2020 semester?

25    A.          Yes.  And it's into the door.  I

Page 110

1      didn't have to swipe into the actually facility.

2      So in that door, also gave me access to my varsity

3      gym.

4                      MR. CIOLKO:  Maybe there's one door.

5      A.              There's one door that leads to both

6      areas.

7      BY MR. KIDNEY:

8      Q.              Oh, Okay.  Gotcha.

9      A.              So that's the way of deciphering.

10     Q.              So from the swipe, we wouldn't know

11     whether you went to the Fox Fitness Center or

12     Weiss?

13     A.              Correct.

14     Q.              And you also had access to the

15     Weightman -- to Weightman physical therapy; is that

16     right?

17     A.              Yes.  And that's where I did my knee

18     rehab from the surgery.

19     Q.              So is it fair to say that not every

20     student at Penn uses the recreational facilities

21     available to them?

22                     MR. CIOLKO:  Objection; speculation.

23     Q.              You can answer.

24     A.              I'm not sure of that answer.  I was

25     saying not everyone, but a fair amount of students

Page 111

1      do use these facilities.

2      Q.          And that was true during the first

3      half of the spring 2020 semester?

4      A.          I would imagine so.

5      Q.          And is it fair to say that during the

6      first half of the spring 2020 semester, not every

7      student at Penn participated in student activities?

8                  MR. CIOLKO:  Objection; speculation.

9      You can answer.

10     A.          Again, I'm not really sure.

11     Q.          Is it fair to say that during the

12     first half of the spring 2020 semester, not every

13     student at Penn participated in campus events?

14                 MR. CIOLKO:  Same objection.  You can

15     answer.

16     A.          Same answer.  I'm not sure.

17     Q.          Do you -- when you say you're not

18     sure, do you know -- do you know of any students

19     who would just study all the time and not

20     participate in campus events?

21                 MR. CIOLKO:  Objection; form.  If you

22     can answer.

23     A.          No, everyone used different things.

24     Q.          And your recollection is that every

25     student on campus would use -- would take advantage

Page 112

1      of some sort of campus event?

2      A.            Yes, to my knowledge, of the people

3      that I know.

4      Q.            And is it fair to say that during the

5      first half of the spring 2020 semester, not every

6      student at Penn participated in fraternity and

7      sorority life?

8      A.            That is fair to say.

9      Q.            Is it fair to say that during the

10     first half of the spring 2020 semester, some

11     students participated in student activities or

12     utilized services offered by the university more

13     frequently than other students?

14                  MR. CIOLKO:  Objection; speculation.

15     You can answer.

16     A.            I would imagine, yep.

17     Q.            Are you aware that after the

18     university transitioned to remote instruction in

19     the spring 2020 semester, at least some student

20     services remained available in person, such as

21     student health?

22     A.            Can you repeat.

23                  MR. CIOLKO:  Objection; form.  But you

24     can answer.

25     A.            Can you repeat that, please?

Page 113

1      Q.          Sure.  Are you aware that after the

2      university transitioned to remote instruction in

3      the spring 2020 semester, at least some students --

4      I'm sorry -- at least some student services

5      remained available on an in-person basis?

6      A.          Based on our conversation earlier,

7      what student health is now, yes.

8      Q.          And how about the division of public

9      safety, do you have an understanding of whether

10     they continued to provide safety and security and

11     walking escort following the university's

12     transition to remote instruction?

13     A.          I believe they remained in effect but

14     in a decreased capacity.

15     Q.          And why do you say they were in a

16     decreased capacity?  What's that based on?

17     A.          So when I was still at school for a

18     few days before returning home, walking around, I

19     didn't see the same police or allied service

20     presence that I had seen prior.

21     Q.          Are you aware that the university

22     counseling and psychological services, CAPS,

23     continued to maintain an on-campus presence and

24     allowed drop-in appointments following the

25     university's transition to remote instruction in

Page 114

1      the spring 2020 semester?

2      A.          Yes, I was aware of that.  And I did

3      not seek direct service.  But several people that I

4      had talked to had sought to receive services, and

5      there was such a backlog that it was hard to

6      physically, like, do a drop-in appointment.  But

7      yes, it was there, but availability was limited.

8      Q.          And was there less of the wait if you

9      wanted to do a virtual appointment?

10               MR. CIOLKO:  Objection; speculation.

11     A.          I'm not sure, because most students

12     wanted to do virtual appointments, I would imagine,

13     because there were not many students left on

14     campus.  Once the pandemic hit -- I'm sorry -- to

15     clarify.

16     Q.          So -- so -- I'm confused.  The -- it

17     was hard to physically drop in to student health

18     services according to what you -- according to your

19     understanding, but was it easier -- do you know how

20     long of a wait there was for virtual appointments?

21               MR. CIOLKO:  Objection; asked and

22     answered.  You can answer.

23     A.          I'm not sure of the exact time.  But

24     speaking from this current semester, which we're

25     still kind dealing with the after affects, the wait

Page 115

1      time is upwards of two months.

2      Q.            Are you aware that the recreation

3      center provided virtual exercise classes following

4      the university's transition to remote instruction

5      in the spring 2020 semester?

6      A.            Yes.

7      Q.            And did you take advantage of any of

8      those?

9      A.            Not that I remember.

10     Q.            Do you know of any of your friends

11     that did?

12     A.             I believe several of my friend did.

13     I believe they did, but I'm not sure of the

14     specifics.

15     Q.            Are you aware that the university

16     continued to provide remote and virtual services to

17     students involved in fraternity and sorority life

18     following the university transition to remote

19     instruction in the spring 2020 semester?

20     A.            Can you rephrase that?  I'm sorry.

21     Access to the sororities or --

22     Q.            No, just services.  Well, let me ask

23     you this.

24                    Are you aware that there's an office

25     at Penn called The Office of Fraternity and

Page 116

1       Sorority Life?

2       A.          Yes.

3       Q.          And does that office support

4       fraternities and sororities?

5       A.          Yes.

6       Q.          And did that office continue to

7       provide services, if you know, during the second

8       half of the 2020 -- spring 2020 semester after the

9       pandemic hit?

10      A.          Are you able to define what you mean

11      by services?  Like, such as what?

12      Q.          Whatever that office was doing prior

13      to the pandemic, was it able to provide at least

14      some of those services after the pandemic?

15      A.          So it was providing housing for some

16      students, and they no longer received that housing.

17      So no.

18      Q.          Did that office provide other services

19      other than housing?

20                  MR. CIOLKO:  Objection; form.  You can

21      answer.

22      A.          They were the governing body over all

23      the official fraternities and sororities.  So it

24      was more of a -- like an umbrella organization, but

25      it was, I would say, more of the individual

1    sororities that determined the events.

2              But those sororities, which was not my

3    -- I was never in a leadership position in my

4    sorority.  So my leaders were more aware of the

5    benefits of OFSL, and I got to see the aftermath or

6    results of whatever my leaders were doing.

7    Q.         Understood.  --

8              MR. CIOLKO:  Is there a natural stop

9    for a break soon?

10             MR. KIDNEY:  Sure, sure.  How about

11   now?

12             MR. CIOLKO:  I didn't want to -- if

13   you were still doing -- I didn't want to break in.

14             MR. KIDNEY:  Nope.  Nope.  This was --

15   I was actually just thinking this was -- we should

16   take a break soon.  So this is great.  How long

17   would you guys like?

18             (A break was taken.)

19   BY MR. KIDNEY:

20   Q.         So, Miss Nedley, you -- we earlier

21   talked about a book that was in career services

22   that relates to dental school.  Does that book have

23   a name?

24   A.         It's the ADEA Dental Explorer.  There

25   might be a couple words after that, but that's the

Page 118

1      general name.

2      Q.          Okay.  So if we go to someone in

3      career services, is that how we would ask for it,

4      the ADEA?

5      A.          Yes.

6      Q.          ADEA.  Okay.  And --

7      A.          Like apple, dentist, Emma, apple.

8      Q.          Okay.  And the purpose of that book is

9      to help students who are applying to dental school?

10     A.          Yes.

11     Q.          And at the time you were looking for

12     that book, you were a second year?

13     A.          Yes.

14     Q.          And you applied to dental school in

15     your fourth year; is that correct?

16     A.          Prior to my fourth year.

17     Q.          Prior to your fourth year?

18     A.          Yes.

19     Q.          When did you apply?

20     A.          I started the application process in

21     January of 2021, like, physically submitted.

22     Q.          That was -- so that was in the middle

23     of your junior year?

24     A.          Yes.

25                 MR. CIOLKO:  My son's --

Page 119

1      BY MR. KIDNEY:

2      Q.              The WCONLINE problems, were you able

3      to figure out a workaround?

4      A.              I switched to Zoom, but the issue was

5      -- I was also having issues with Zoom.  So any time

6      I would log into Zoom it would cut off, several

7      times.

8      Q.              And did you eventually work those

9      issues out with Zoom?

10     A.              No.  There was no direct fix.

11     Q.              So as a result, if you got kicked out

12     of Zoom, you would have to log back in?

13     A.              Log back in.  But sometimes the

14     connection did not work there either, so we would

15     have to switch to just a Google Drive document.

16     Q.              And would the Google Drive document

17     enable you to fix the problem?

18     A.              Well, there was no way to communicate

19     with the students directly over Google Drive.  You

20     could leave a comment, but there was no way to

21     physically talk to the students.

22     Q.              What would you do in that case?

23     A.              There was nothing you really could do.

24     Students just didn't get the help that they needed.

25     Q.              If you tried to get on Zoom and lost

Page 120

1       the connection, you would try get back on Zoom, and
2       if the connection didn't work, you would end the
3       tutoring session early?
4       A.          We would look to Google Drive, but
5       with that, because -- when on Zoom, we would share
6       a document and be face-to-face, both looking at a
7       document.  So I -- but when Zoom didn't work, it
8       was just the document, but there was no way for the
9       student to effectively really communicate where
10      there issues were to ask for help.
11      Q.          But they -- you could use the
12      telephone?
13      A.          We're not supposed to disclose our
14      phone numbers.
15      Q.          So you would have to use Google Drive
16      and then use emails?
17      A.          Google Drive, you could -- there's a
18      chat function on Google Drive or Google Docs.  And
19      also you could leave comments.  But if the -- the
20      issue would be accessibility, because that took so
21      much time and nothing was really accomplished.
22      Q.          Uh-huh.  And how many -- how often
23      would that occur in the -- and I'm talking about
24      the spring 2020 semester post pandemic, would that
25      occur in 1 percent of the tutoring sessions, 95

Page 121

1      percent of the tutoring sessions?

2      A.          I would say 25 to 40 percent of them.

3      More than just once.

4      Q.          Would you agree you were able to

5      participate in at least one service or activity

6      offered by the university after the university

7      transitioned to remote instruction in the spring of

8      2020 semester that was supported by the general

9      fee?

10     A.          Can you elaborate on what services you

11     are detailing?

12     Q.          So, for example, we -- we spoke

13     earlier about some of the services you used in the

14     first half of the spring 2020 semester, such as,

15     let's see, some of the clubs and organizations you

16     participated in, like the Christian athlete

17     organization or -- trying to go back through my

18     notes.

19                 MR. CIOLKO:  Michael, I'm probably

20     going to ask you to repeat the question in another

21     second.

22                 MR. KIDNEY:  Okay.  Okay.

23     Q.          Penn Athletics Wharton Leadership

24     Academy, Penn Athletics health and wellness

25     captain, dental society, those sort of

Page 122

```
1      organizations we discussed prior to the break.
2                    MR. KIDNEY:  What was the question?
3                    MR. KIDNEY:  So let me ask --
4                    MR. CIOLKO:  What was the question?
5                    MR. KIDNEY:  Let me ask the question
6      again.
7      BY MR. KIDNEY:
8      Q.            So would you agree that you were able
9      to participate in either, sometimes remotely, at
10     least one activity or service supported by the
11     general fee that was offered by the university
12     after the university transitioned to remote
13     instruction in the spring 2020 semester?
14     A.            Yes.
15     Q.            Good.  I'm crossing things out I
16     already asked you, you'll be happy to know.
17                   So there are multi-cultural houses at
18     Penn.  Have you ever been to the multi-cultural
19     houses?
20     A.            I don't identify with the groups.
21     Q.            So you've never been to one of those
22     houses?
23     A.            No.
24     Q.            While you were in living at home in
25     the suburbs of Pittsburgh during the period of the
```

Page 123

1      spring 2020 semester, that was -- that had remote

2      instruction.  Did you make use of technological

3      services offered by the university?

4      A.          Can you detail what you mean by

5      technological services?

6      Q.          Well, at a minimum, I would say

7      something we've already discussed, participating in

8      Zoom, but then I'm going to ask you if you

9      participated in any other technological services.

10     A.          I used Zoom and the WCONLINE platform,

11     which is what I tutor through.

12     Q.          Anything else?

13     A.          I used Perusal for classes, which is

14     supported through the Canvas Network, which is

15     where our classes are held.  And that was just a

16     way to collaborate with students on a document.

17     Q.          Did you make use of any learning

18     support yourself?  We've already talked about you

19     tutoring.  Did you make -- did you utilize any

20     learning support during the period of the 2020

21     spring semester that was remote?

22     A.          I used office hours.

23     Q.          Understood.

24                 So let me turn and ask you about

25     computer lab facilities.

1          Prior to the pandemic, did you ever

2     use a computer lab at Penn?

3     A.          Yes.

4     Q.          And what did you use it for?

5     A.          I used the computer for classes to sit

6     and to do work.

7     Q.          Do you have your own computer as well?

8     A.          I do.

9     Q.          And so why did you -- why would you go

10    to a computer lab to use a Penn computer?

11    A.          Because I didn't have enough room on

12    my computer to have as many documents open as I

13    needed at the time.

14    Q.          And when -- and are we talking about

15    Word documents or more complicated documents?

16    A.          Word documents, as well as Zoom and

17    just documents for classes.  And syllabus.

18    Q.          So how often would you -- let's say --

19    let's talk about the spring 2020 semester, first

20    half before the pandemic hit.

21               How often would you go to a computer

22    lab?

23    A.          Less than five times.  But I was often

24    there presenting papers, and I would say I

25    presented documents 10 to 20 times.

1    Q.          And was there any limit on the number

2    of pages you can print?

3    A.          Yes.  There was a daily limit.

4    Q.          And what was the daily limit?  Do you

5    remember?

6    A.          I believe 20 to 40 pages.

7    Q.          And was there any special software you

8    needed access to in the computer lab?

9                MR. CIOLKO:  Objection to the extent

10   it's been asked and answered.  You can answer.

11   A.          Not in the computer lab.

12   Q.          Were there other places you needed to

13   go to access special software?

14   A.          Yes.

15   Q.          Tell me about that.

16   A.          Yes.  So I was in general chemistry

17   lab and physics lab at the time.  And in order to

18   do those, we need the chemicals that were in the

19   computer labs, as well as different things for

20   physics, and I didn't have access to those.

21   Q.          And so how did you solve that problem?

22   A.          The university --

23               (Discussion held off the record.)

24   BY MR. KIDNEY:

25   Q.          We didn't hear the answer to that.  If

Page 126

1    you're saying something, we can't hear it.

2    Are you going to call back in?

3                    (Discussion held off the record.)

4    BY MR. KIDNEY:

5    Q.              While we have a connection, I'll keep

6    going.  We didn't hear your last answer.  So let me

7    read you the last question.

8                    MR. KIDNEY:  Or maybe, Miss Court

9    Reporter, could you read the last question?

10                    (The last question was read back by

11    the court reporter.)

12                    THE WITNESS:  So my professors

13    recorded -- had students.  And people -- I believe

14    graduate students were still allowed -- no, ignore

15    that.  So the professors that were still allowed on

16    campus for a few days, they had recorded themselves

17    performing the experiments, and that was supposed

18    to be the equivalent of me doing them.

19    BY MR. KIDNEY:

20    Q.              Understood.  Understood.

21                    By the way, you mentioned graduate

22    students being on campus.  So let's talk about the

23    softball team.

24                    What percentage of your teammates on

25    the softball team stayed in West Philadelphia and

Page 127

1      what percentage went home?

2      A.              Everyone went home.

3      Q.              Everyone.  Okay.

4                      And how about other students who were

5      not on the softball team who you were friends with,

6      do you have a rough percentage of your -- of the

7      people you knew who stayed in Philadelphia versus

8      those that went home?

9      A.              I don't know anyone that stayed in

10     Philadelphia on campus.  There were some people in

11     the suburbs, obviously, that went home.

12     Q.              So let me see here.  So while you were

13     at home, did you have any problems with Zoom such

14     that you had to speak live to somebody -- we

15     already talked about the WCONLINE.  But I'm

16     thinking, did you have any other problems with Zoom

17     in terms of attending classes?

18     A.              Several times I was unable to join

19     class or I was kicked out in the middle.  And I

20     just did not have access to them.

21     Q.              And were those classes recorded?

22     A.              Some of them, yes.  Other times I had

23     friends in the class that I would receive notes

24     from.

25     Q.              And did you -- was there a

Page 128

1   technological help line that Penn offered to call

2   where you could talk to someone who would help

3   solve some of these problems?

4   A.            I'm not sure.  But many of my friends

5   have the same issues, so it seemed like it was a

6   campus-wide thing.

7   Q.            Would you agree that the university

8   did provide technological services to students in

9   the portion of the spring 2020 semester that was

10  remote?

11  A.            Yes.

12  Q.            And did you -- were you aware that the

13  university provided access to virtual computer labs

14  where special software was available remotely in

15  the portion of the spring 2020 semester that was

16  remote?

17  A.            No.

18  Q.            You mentioned in your Interrogatory

19  responses that you had problems doing work on

20  campus outdoors.

21              When were you on campus outdoors that

22  you had problems?

23  A.            When I first was -- sorry.  So the

24  days that we were officially told that softball was

25  cancelled and classes went virtually, I stayed on

Page 129

1      campus for -- I don't remember the exact time.

2      Roughly, I would say less than a week before I went

3      home I had tried to do schoolwork on campus and the

4      WiFi connection just did not work.

5      Q.          And what were the problems with SSO

6      and Perusal?

7      A.          What was the first one you said?

8      Q.          SSO.

9      A.          Oh, that was the Zoom.  It was our

10     student -- that stands for something.  That was our

11     login for the university.

12     Q.          Okay.

13                 MR. CIOLKO:  Let me slip in here to

14     say objection; asked and answered.  But go ahead.

15     A.          I'm sorry.  What was the second one

16     you mentioned?

17     Q.          Perusal?

18     A.          Yes, with that --

19     Q.          If that's how you say it.

20     A.          Yes.  I did not have strong connection

21     to that either.

22     Q.          Have you reviewed your Interrogatory

23     responses recently?

24     A.          Yes.

25     Q.          And I can show them to you, but maybe

1      you remember off the top of your head.

2                    Do you remember that in one of the

3      Interrogatory responses, you said you had not used

4      career services in spring of 2020 semester?

5                    MR. CIOLKO:  Michael, would you mind

6      if she refreshed her memory by looking at the

7      Interrogatories?

8                    MR. KIDNEY:  Sure.

9      Q.            So this is one of the documents --

10     one, two, three, four, five, six -- the seventh

11     document in the ZIP is your responses to

12     Interrogatories.  And if you look at Rog number 10.

13                    MR. CIOLKO:  And, Michael, this has

14     not been introduced yet, if you want to do that.

15                    MR. KIDNEY:  That is correct.

16                    MR. CIOLKO:  Are you introducing that

17     as an exhibit?

18                    MR. KIDNEY:  I'm not yet.

19     Q.            There's a sentence that, plaintiff

20     further states that she did not utilize career

21     services from the university during the spring 2020

22     semester.

23     A.            Can you repeat the question, please?

24     Q.            So you had earlier told me -- well,

25     let me ask it another way.

1              Do you see in the Interrogatory

2     response where it says, plaintiff further states

3     that she did not utilize career services from the

4     university during the spring 2020 semester?

5     A.        Yes.

6     Q.        Is that accurate?

7     A.        At this point, I did not use career

8     services because I didn't have access to the book.

9     Which is what I was using career services for at

10    that stage.

11    Q.        And so --

12              MR. CIOLKO:  Are you marking this?

13              MR. KIDNEY:  I will later.  I will

14    with this deposition.

15              MR. CIOLKO:  Okay.  Thank you.

16              MR. KIDNEY:  Sure.

17    BY MR. KIDNEY:

18    Q.        So in the first half of the spring

19    2020 semester, did you go to career services -- I

20    thought you earlier said you had.  Is that wrong?

21    A.        Not in person.

22    Q.        And you had accessed career services

23    virtually in the first half of the spring 2020

24    semester?

25    A.        Yes.

1    Q.         How do you measure the value of your
2    experience at the University of Pennsylvania?
3                  MR. CIOLKO:  Objection; form.
4    Objection to the extent it calls for a legal
5    conclusion or expert testimony.  But you can
6    answer.
7    A.         Can you repeat the question, please?
8    Q.         Sure.  How do you measure the value of
9    your experience at the University of Pennsylvania?
10                 MR. CIOLKO:  Same objection.
11   A.         Yeah, I'm not sure I can place a value
12   on my education or the experience.
13   Q.         Do you -- go ahead.
14   A.         No, you're good.
15   Q.         Do you think other -- different
16   students value their experience at the University
17   of Pennsylvania differently?
18                 MR. CIOLKO:  Objection.  Speculation.
19   A.         I'm not sure.
20   Q.         When you say you're not sure, as you
21   sit here today, do you have any basis to dispute
22   that different students value their education -- or
23   value their experience, rather, differently at the
24   University of Pennsylvania?
25                 MR. CIOLKO:  I'm going to repeat the

Page 133

1    last two objections and asked and answered.  But
2    you can answer if you can.
3    A.          I would agree that people do have
4    different values based on where they come from.
5    What their expectations are, whether their parents
6    had this experience and they kind of know what to
7    expect.  Whereas I came in seeing everything on
8    television and in ads and based on what my coach
9    was saying and previous experiences, and those are
10   my expectations and values.  And things I looked
11   forward to and I think other students place value
12   on different things.
13   Q.          Okay.  So I will represent to you that
14   I'm now going to show you two documents from the
15   University of Pennsylvania production that
16   describes the general fee, clinical fee, and
17   technology fee.
18          The first document is a printout that
19   was available online on Penn's webpage in December
20   2019.  So this is -- it has been Bates-stamped as
21   Penn 1196.  It will be marked as Exhibit Number 7.
22                (Exhibit 7 was marked.)
23   A.          Uh-huh.
24   Q.          1196 is the very last document in the
25   ZIP file that you were sent.

Page 134

1     A.          Yes.

2     Q.          And you'll see this is a printout from

3     The Wayback Machine, the Google Wayback Machine.

4     And --

5               (Discussion held off the record.)

6               MR. KIDNEY:  I'm sorry.  Say that

7     again.

8               MR. CIOLKO:  I said I can't argue

9     about this, Michael, because plaintiffs use it as

10    well.

11    BY MR. KIDNEY:

12    Q.          All right.  And the top half asks for

13    a contribution to The Wayback Machine.  And then

14    below that, you will see a description of the

15    general fee, technology fee, and clinical fee on

16    what has been marked as Penn 00001197.  Do you see

17    that?

18    A.          1197?

19    Q.          Yes.

20    A.          Yes.

21    Q.          Take a minute and read what it says

22    under general fee, technology fee, and clinical

23    fee.  Tell me when you're done reading.

24    A.          I'm done.

25    Q.          Do you recognize this language?

Page 135

```
 1      A.           Yes.
 2      Q.           And when did you first see it?
 3      A.           Prior -- whenever I received my
 4      initial financial aid package and was just looking
 5      at the university in general.
 6      Q.           And I'm sorry.  I didn't hear the last
 7      thing you said.
 8                   Whenever you were looking into the
 9      university's what?
10      A.           In general.
11      Q.           Okay.  And so you saw that -- to be
12      clear, when you say your financial aid package,
13      this is the financial aid package you received
14      before you had accepted Penn's offer to be a
15      student?
16      A.           I'm not sure if I received the
17      financial aid package -- I received it after I was
18      accepted.
19      Q.           Okay.  But before you attended your
20      first class at Penn?
21      A.           Yes.
22      Q.           Okay.  And so let me show you now
23      another document.  This is the last -- this is
24      right above the one I just showed you in the ZIP
25      file.  The last four digits of the Bates number are
```

Page 136

1      1191, and I'm going to have this -- this will be
2      marked eventually as Exhibit 8.
3                     (Exhibit 8 was marked.)
4      BY MR. KIDNEY:
5      Q.           And I can represent to you the ZIP
6      document, as you can see also from the top line, is
7      a printout of the language as it existed on -- in
8      June 2020.  So after the conclusion of the spring
9      2020 semester.  And I'd ask that you, again, just
10     look at the language describing general fee,
11     technology fee, and clinical fee on page 1193.
12     A.           Okay.
13     Q.           And one thing I'm going to ask you is
14     -- well, I'll ask it to you now then since you've
15     already read it.
16                    Would you agree with me that the
17     descriptions of the three fees in these two
18     documents are identical?
19     A.           Yes.
20     Q.           So let me show you now the Nedley
21     complaint.  And the Nedley complaint is the
22     complaint that was first filed on your behalf in
23     this lawsuit.  It is the very first document in the
24     ZIP file, and it's going to be marked as Exhibit 9.
25                    (Exhibit 9 was marked.)

Page 137

1           MR. CIOLKO:  The first document, did
2     you say?
3           MR. KIDNEY:  Yes.
4     BY MR. KIDNEY:
5     Q.          And then I'm going to ask you to go to
6     paragraph 20 in this complaint, which is on  page
7     5.
8     A.          I have it open.
9     Q.          Okay.  So our records indicate that
10    this complaint was filed on June 25th, 2020.  Does
11    that sound right to you?
12          MR. CIOLKO:  Let me look at the top.
13    A.          Yeah.  Yes.
14          MR. CIOLKO:  Mike, before you ask your
15    next question, I want to remind the witness that no
16    matter what question that Mr. Kidney asked, you're
17    not to reveal any substantivwe conversations since
18    you retained us to investigate this matter and help
19    you put together this complaint.  You are not to
20    reveal any work product that we may have shared
21    with you.  But certainly, I want you to answer
22    Mr. Kidney's questions, but some of it may overlap
23    with material that would be privileged information
24    between the two of us.
25          THE WITNESS:  Okay.

Page 138

1    BY MR. KIDNEY:

2    Q.          Yes, I will not ask you, Miss Nedley,

3    anything that you discussed with your counsel, any

4    conversations you had.

5                So looking at the language on page 5

6    in paragraph 20 of your complaint, would you agree

7    with me that the descriptions of the three fees are

8    identical to the language in the two documents I

9    just showed you?

10               MR. CIOLKO:  To the best of your

11   ability.

12               THE WITNESS:  Yes.

13   BY MR. KIDNEY:

14   Q.          So let me show you now what it called

15   the consolidated complaint.  And that is the second

16   document in the ZIP.  And --

17   A.          Is there a way to keep these documents

18   open?

19   Q.          No, you can keep -- you can -- just

20   keep one of the documents we just looked at open.

21               MR. CIOLKO:  Which one, Michael?

22               MR. KIDNEY:  The December 2019 fee

23   description, which is the 1196.

24   Q.          Okay.  Now, let me direct your

25   attention to the consolidated complaint, which is

Page 139

1      going to being marked as Exhibit 10.

2                      (Exhibit 10 was marked.)

3      BY MR. KIDNEY:

4      Q.            And I'd like you to go to page 5,

5      paragraph 28.

6                      MR. CIOLKO:  Page 5?

7                      MR. KIDNEY:  Yes.

8                      MR. CIOLKO:  See it?

9                      THE WITNESS:  Okay.

10     BY MR. KIDNEY:

11     Q.            So in paragraph 28, do you see where

12     it says, the defendant describes the general fee as

13     supporting a variety of student-related activities,

14     services, and spaces?

15     A.            Yes.

16     Q.            Is that language in the quotations the

17     same as the language in the document that is open,

18     the December 2019 fee description that is four I

19     digits, 1196?

20     A.            Yes.

21     Q.            Did you rely -- so -- so let me show

22     you now paragraph -- in the same document, 147 to

23     149.

24                      MR. CIOLKO:  140 -- which one?

25                      MR. KIDNEY:  So this is page 27 of the

Page 140

1        consolidated complaint.

2                        MR. CIOLKO:   27.

3                        MR. KIDNEY:   And go to paragraph 147.

4                        MR. CIOLKO:   147?

5                        MR. KIDNEY:   Yes, 147.

6                        MR. CIOLKO:   Got you.

7        Q.            And tell me when you're there, Miss

8        Nedley.

9        A.            I'm here.

10                       MR. CIOLKO:   You want her to read

11       that, Michael?

12                       MR. KIDNEY:   I'm sorry?

13                       MR. CIOLKO:   Do you want her to read

14       that?

15                       MR. KIDNEY:   Yes.

16                       MR. CIOLKO:   If you want to read  that

17       --

18       BY MR. KIDNEY:

19       Q.            What I'll ask you to do is compare

20       paragraph 147 and paragraph 148 and paragraph 149

21       to the corresponding language in the other document

22       you have open, which represents the fee

23       descriptions in December 2019 and June 2020.

24                       MR. CIOLKO:   I want to note for the

25       record that 147, 148, and 149, the paragraphs cited

Page 141

1          in there are -- have a footnote that is where those

2          documents were available and that I want to note

3          for the record.

4                    MR. KIDNEY:  Understood.

5                    MR. CIOLKO:  I haven't seen the

6          documents from that HTTPS website provided as the

7          Bates number, but it's incorporated into the

8          paragraph.

9                    MR. KIDNEY:  I understand your

10         position.

11         BY MR. KIDNEY:

12         Q.          And, miss Nedley, go ahead and compare

13         the language.  And I'm going to ask you if you

14         agree that the language from paragraphs 147, 148,

15         and 149 is different from the language in the fee

16         descriptions for December 2019 and June 2020.

17                    MR. CIOLKO:  I'm going to object to

18         form.  One second.  Let me -- I'm trying to catch

19         up and reading it myself.  Yeah, I'll just object

20         to form.

21         BY MR. KIDNEY:

22         Q.          You can answer if you can, Miss

23         Nedley.

24         A.          I'm sorry.  What was the question

25         again?

Page 142

1    Q.              The language in paragraphs 147 to 149,
2    would you agree that it's different from the fee
3    description than what will be Exhibit 7 and 8,
4    which are the fee descriptions for -- printed out
5    for the time period between December 2019 and June
6    2020?
7                    MR. CIOLKO:  Objection; form.  But --
8    A.              Yes.
9                    MR. CIOLKO:  -- if you know what
10   Mr. Kidney is asking, please answer.
11   A.              Yes.  Yes.
12   Q.              You agree that they're different?
13   A.              Yes.
14   Q.              And do you recognize the fee language
15   in paragraphs 147 to 149?
16   A.              Yes.
17   Q.              When did you first see this fee
18   language?
19                   MR. CIOLKO:  Again, I'm going to
20   instruct my client not to reveal any substantive
21   discussions we may have had.  But please answer
22   Mr. Kidney.
23   A.              I'm unsure of the exact date.
24   Q.              Are you sure you've seen this language
25   before today?

Page 143

```
 1                    MR. CIOLKO:  Objection; asked and
 2          answered.
 3                    MR. KIDNEY:  Well, I don't --
 4                    MR. CIOLKO:  You should answer.  You
 5          should answer Mr. Kidney's question.
 6          A.        Can you repeat the question, please?
 7          Q.        Sure.  Miss Nedley, you said you're
 8          unsure of the exact date when you seen this
 9          language before.  So my follow-up question is:  Are
10          you sure you've seen this language before even if
11          you're unsure of the exact date?
12                    MR. CIOLKO:  Objection; asked and
13          answered.
14          A.        And yes.
15          Q.        Yes, you're sure you've seen it
16          before?
17          A.        Yes.
18          Q.        Other than seeing it in connection
19          with meeting with your lawyer, which I don't want
20          to know about, do you have a recollection of
21          reviewing this language at some prior time?
22          A.        Yes.
23          Q.        And even if you're unsure of the date,
24          can you tell me approximately when you saw this
25          language for the first time?
```

Page 144

1          A.          Within the last year.

2          Q.          Okay.  Let me direct your attention

3     back to what I'll call the December 2019 fee

4     description, which, again, is -- ends in 1196.

5                      And did you rely on this language

6     before deciding to register for the spring 2020

7     semester?

8                      MR. CIOLKO:  Objection to the extent

9     it calls for a legal conclusion.  But you can

10    answer.

11         A.          Did I rely on this language?

12    BY MR. KIDNEY:

13         Q.          Yes.  Let me ask it another way.

14                     Would you have registered to attend

15    Penn regardless of what this language said?

16                     MR. CIOLKO:  Objection; speculation.

17         A.          No.

18         Q.          Tell me more.  Why -- why -- why do

19    you say no?

20                     MR. CIOLKO:  Same objection.  But

21    answer if you can.

22         A.          Because I would want to see where my

23    money is going and to what services.

24         Q.          And so is there any language that

25    would have prevented you -- let me ask it another

Page 145

1    way.

2                   Did you make the decision to attend

3    the University of Pennsylvania before you saw this

4    language?

5                   MR. CIOLKO:  Objection to the extent

6    it's been asked and answered.  But you can answer.

7    A.             I'm not sure.

8    Q.             Did you earlier tell me that you

9    thought you received this language with your

10   financial aid offer, which was after -- which was

11   before you first attended classes, but after you

12   had decided to attend?

13   A.             Yes.

14   Q.             Is there anything in the language in

15   this document that we're looking at for the general

16   fee technology fee or clinical fee that you

17   consider a promise?

18                  MR. CIOLKO:  One clarification,

19   Michael.  You're talking about the 1196 document?

20                  MR. KIDNEY:  Yes, I am.

21                  MR. CIOLKO:  Okay.  I'm going to

22   object to the extent it calls for a legal

23   conclusion.  You can answer.

24   A.             It promises me access to activities,

25   services, spaces, computer labs, technological

Page 146

1       services, and student health.

2       Q.          Other than the general fee the

3       clinical fee, the technology fee, are there any

4       other fees that are you seeking to have partially

5       refunded as part of the litigation as you sit here

6       today?

7                   MS. CIOLKO:  Objection to the extent

8       it's been asked and answered.  But you can answer.

9       A.          No.

10      Q.          Other than the documents reviewed

11      today, are there any other documents that you

12      contend represent a promise by Penn related to the

13      fees at issue in this case?

14                  MR. CIOLKO:  I'll object to the extent

15      it calls for a legal conclusion and to the extent

16      that it would cause you to answer -- and your

17      answer would be -- your answer would bring to light

18      discussion that you have had with your attorney and

19      involving attorney work product.  Aside from that,

20      you can answer the question.

21      A.          Can you repeat the question?

22      Q.          Sure.  Other than the documents that

23      we have reviewed today, are there any other

24      documents that you contend represent a promise by

25      Penn related to the fees at issue in this case?

Page 147

1       A.              Not as of now.

2                       MR. CIOLKO:  Same objection.  But go

3       ahead.  So repeat your answer.

4       A.              No, not as of now.

5       BY MR. KIDNEY:

6       Q.              Would you -- we had earlier reviewed

7       the financial responsibility statement.  Do you

8       remember that?

9       A.              Can I references that again?

10      Q.              Yes.  Sure.  It is the fourth document

11      in the ZIP.  It's called docket 26-4, financial

12      responsibility statement for Emma Nedley.  It will

13      marked as Exhibit 3.  And I'll give you the Bates

14      number.  It does not have a Bates number because

15      it's already filed with the court.

16                      MR. CIOLKO:  Which one is that?

17                      MR. KIDNEY:  But -- so it's the very

18      fourth document in the ZIP file.

19                      MR. CIOLKO:  I got it.

20                      MR. KIDNEY:  And it's a --

21                      MR. CIOLKO:  It's docket 26.4?

22                      MR. KIDNEY:  Yes.

23                      MR. CIOLKO:  Got it.

24                      THE WITNESS:  I have it.

25      BY MR. KIDNEY:

1          Q.          Okay.  Here's my questions to you,
2      Miss Nedley.
3                      Do you agree that this document does
4      not make any specific promises in regard to fees?
5                      MR. CIOLKO:  Objection to the extent
6      it calls for a legal conclusion.  Otherwise, you
7      can answer.  Take your time.
8          A.          Can you repeat the question, please?
9          Q.          Sure.  So we earlier talked about the
10     language for the general fee, technology fee, and
11     clinical fee.  Now I'm asking you a different
12     question which relates to this financial
13     responsibilities statement.
14                     And my question is:  Do you agree that
15     that document did not make any specific promises in
16     regard to fees?
17                     MR. CIOLKO:  Same objection.  You can
18     answer.
19         A.          Yes.
20         Q.          Do you have an understand, Miss
21     Nedley, as to whether -- and you can put that
22     document down now.  Thank you.  Or close it.
23                     Do you have an understanding as to
24     whether Penn was able to drastically reduce cost
25     during the spring 2020 semester?

Page 149

1                    MR. CIOLKO:  I'm going to object only
2       to the extent that I ask that you not reveal any
3       information regarding discussions between you and
4       your lawyers or the investigation that's undertook
5       or undertaking with regard to such costs.
6       A.              Yes, I'm aware that there were
7       measures cut.
8       Q.              That there were -- I'm sorry.  Did you
9       say measures cut?
10      A.              Yes.  By the university.
11      Q.              And how did you -- what is the source
12      of your information for that?
13      A.              Based on my own experience as well as
14      others in my class.
15      Q.              And do you have an understanding as to
16      whether, as a result of these measures, Penn was
17      able to save money during the spring 2020 semester?
18                   MR. CIOLKO:  I'll give you the same
19      direction and object to the extent it calls for
20      expert testimony.  But you can answer.
21      A.              Yes, they were able to save money.
22      Q.              And do you have an expectation as to
23      whether the cost incurred by Penn in the spring
24      2020 semester are lower or higher than the costs in
25      the prior semester in the spring of 2019?

Page 150

1          MR. CIOLKO:  Objection.  And objection
2    to form.  But you can answer.
3    A.          You mean operating costs, like, that
4    the university has?  Can you specify what you mean
5    by costs?
6    Q.          All costs.  So every type of cost
7    where the university has to pay money out, whether
8    that's building maintenance, salaries, anything
9    where money is paid by the university.
10          MR. CIOLKO:  Same objection and
11    direction.
12    A.          I believe their costs were decreased.
13    Q.          Would it -- would it surprise you to
14    learn that if you looked at the budget and cost
15    information for the university, including in the
16    annual report of the university, that the costs
17    were higher in the spring of 2020 as compared to
18    the spring of 2019?
19          MR. CIOLKO:  I'm going to object as
20    speaking to evidence that is not in the record.
21    And evidence that is also subject to differing
22    legal and expert testimony.  But you can answer if
23    you can.
24    A.          I'm not aware of that.
25    Q.          Would it surprise you if you did learn

Page 151

1      that that was true?

2                      MR. CIOLKO:  Same objection.

3      A.          Yes.

4      Q.          Did you save any money by not

5      attending -- by not attending school and attending

6      classes in person in the spring of 2020 semester

7      and living at home?

8                      MR. CIOLKO:  Objection; form.

9      A.          No.

10     Q.          You're graduating on time -- or you

11     plan to graduate on time and consistent with what

12     your -- what you have always planned to be your

13     expected graduation date, since you matriculated to

14     the university; is that correct?

15     A.          Yes.

16     Q.          Did you ever complain to the

17     University of Pennsylvania about the services it

18     provided following the onset of the pandemic in

19     spring 2020?

20                     MR. CIOLKO:  I'll only object to the

21     extent it's been asked and answered.  You can

22     answer.

23     A.          No.

24     Q.          Prior to the start of this litigation,

25     did you ever ask Penn for a refund of the general

Page 152

1      fee, technology fee or clinical fee?

2                     MR. CIOLKO:  Objection to form.  Only

3      as to time.

4      A.          As to what?

5                     MR. CIOLKO:  As to time, the timeframe

6      we're talking about.

7      A.          Oh.  No.

8      Q.          Did you send any letters or emails

9      complaining about Penn's response to COVID?

10                    MR. CIOLKO:  Objection; form.  You can

11     answer.

12     A.          Yes.  In terms of transportation home.

13     Q.          And tell me about that.  Who did you

14     complain to?

15     A.          The financial aid office.

16     Q.          And what did you say?

17     A.          How am I supposed to get home?

18     Because I don't have a car.

19     Q.          And then did they -- were they the

20     ones that said you should rent -- you can rent a

21     car and bill us for the cost?

22     A.          Yes.

23     Q.          So were you satisfied with their

24     response?

25     A.          To that, yes.

1    Q.          Aside from your contention that you're

2    entitled to a refund, overall, are you happy with

3    how the University of Pennsylvania responded to the

4    COVID pandemic?

5    A.          No.

6    Q.          Tell me why not.

7                MR. CIOLKO:  Objection to relevance

8    and form.  But you can answer.

9    A.          I have now been online for several

10   semesters when I had anticipated a completely

11   in-person education.  And I'm starting school on

12   Wednesday online again.

13   Q.          And do you think -- if you were in

14   charge and you were the president of Penn, what

15   would you do?

16               MR. CIOLKO:  Objection; form,

17   relevance.

18   Q.          About this issue.

19               MR. CIOLKO:  Go ahead.  You can

20   answer.

21   A.          I'm not the president of Penn for a

22   reason.

23   Q.          Well, your -- you just told me you are

24   not happy because you are -- your classes are

25   online beginning on Wednesday.  Is that correct?

Page 154

1                       MR. CIOLKO:  Objection as to form.

2          But you can answer.

3          A.              Yes.  And they have been online for

4          some time now.

5          Q.              And what do you -- is there anything

6          -- is this something that is -- is this Penn's

7          fault or is this just due to the pandemic?

8                       MR. CIOLKO:  Objection; speculation.

9          Objection; form.

10         A.              Other universities have been making it

11         work.  So I don't understand why Penn has not been

12         able to, also.

13         Q.              And when you say by making it work,

14         you mean present -- you mean have in-person

15         classes?

16         A.              In-person classes with low positivity

17         rates.

18         Q.              So -- so let me make sure I

19         understand.  Your -- your complaint is that Penn

20         has been relying too much on online courses and

21         online instruction?

22                      MR. CIOLKO:  Objection to form and

23         mischaracterizing her prior testimony.  You can

24         answer.

25         A.              It's not only that Penn is relying on

1        online classes, but when I had chose to come to the

2        university and continue to come back, it's with the

3        expectation of having access to all of these other

4        things, like athletics and the ability to talk to

5        other people and make connections and use career

6        services and get top notch healthcare and

7        everything like that.  And that is not being

8        fulfilled.

9        Q.          And is your softball team meeting this

10       semester?

11       A.          As of now.  But it's been cancelled

12       the last two semesters -- two years.  Sorry.

13       Q.          So let me introduce to you or show you

14       again the document I showed you before, which is

15       your Interrogatory responses.  And that is in the

16       ZIP file midway down.  It's called Nedley responses

17       to interrogatories.  Tell me when you have them.

18                   MR. CIOLKO:  It's the one I don't have

19       open.

20                   MR. KIDNEY:  This is going to be

21       marked as Exhibit Number 11.

22                   (Exhibit 11 was marked.)

23                   MR. CIOLKO:  I got it.

24       BY MR. KIDNEY:

25       Q.          Do you recognize this document?

Page 156

1      A.          Yes.

2      Q.          And you have -- when is the last time

3      you read through this document?

4      A.          This week.

5      Q.          And was there anything in here that

6      was inaccurate or that you thought should be

7      supplemented?

8      A.          One second, please.  Can you repeat

9      the question, please?

10     Q.          Sure.  Is there anything in this

11     document that is not accurate or that should be

12     updated?

13     A.          No.

14     Q.          Prior to the finalization of this

15     document, did you assist with the preparation of

16     the document?

17                 MR. CIOLKO:  Objection; form.  You can

18     answer.

19     A.          Yes.

20     Q.          Let me show you now -- you can close

21     that document.  Let me show you your RFP responses.

22     And this will be marked as Exhibit 12.  And this is

23     in the ZIP file, and it's called, Nedley and Smith

24     responses to RFPs.

25                 (Exhibit 12 was marked.)

```
                                                Page 157
 1                      MR. CIOLKO:  Hold on.  I'm an old man.
 2         I move slow.
 3                      MR. KIDNEY:  You're a young man, Ed.
 4         Don't kid yourself.
 5                      MR. CIOLKO:  Not what my neck and
 6         knees are telling me.  I've got the doc.  Thank
 7         you.
 8         A.          Yes.
 9         BY MR. KIDNEY:
10         Q.          Do you recognize this document, Miss
11         Nedley?
12         A.          Yes.
13         Q.          Have you read this document in the
14         last week?
15         A.          Yes.
16         Q.          I'm going to ask you the same
17         question.  Is there anything in this document that
18         is inaccurate or that should be updated?
19                      MR. CIOLKO:  I'll have a small
20         objection to the extent it calls for a legal
21         conclusion.  But take your time.  Read through.
22         Lawyers write a lot.
23                      THE WITNESS:  I can see that.
24                      MR. KIDNEY:  Jim, this one is your
25         fault.
```

Page 158

1                    (Discussion held off the record.)

2                    MR. CIOLKO:  Miss Nedley, I can't hear

3          you again.

4                    (Discussion held off the record.)

5          BY MR. KIDNEY:

6          Q.          So, Miss Nedley, do you want me to

7          repeat the question?

8          A.          No.  It's okay.  Everything looks

9          fine.

10         Q.          Okay.  Prior to the initial complaint

11         being filed, the Nedley complaint, have you read

12         it?

13         A.          Yes.

14         Q.          Prior to the consolidated complaint

15         being filed, have you read it?

16         A.          Yes.

17         Q.          Were there any specific parts of the

18         consolidated complaint that you provided

19         information for?

20                    MR. CIOLKO:  I'm going to warn you

21         again one more time that we're really -- it's

22         difficult to answer the question without revealing

23         communications.

24                    So could you word it a different way,

25         Michael, because I might have to instruct her not

Page 159

```
 1      to answer.  I don't want to.
 2      BY MR. KIDNEY:
 3      Q.            Yeah, I don't want to know anything
 4      you said to your counsel.  And I certainly don't
 5      want to know about anything you said that didn't
 6      end up in the Complaint.
 7                    But is -- are there any sections of
 8      the complaint that was filed with the court that
 9      you provided specific information for?
10      A.            Several different aspects.
11      Q.            Say that again?
12      A.            Several different aspects.
13      Q.            Okay.  And do you recall what those
14      were off the top of your head?
15                    MR. CIOLKO:  To the best you can, best
16      ability.  And if you feel yourself getting to an
17      area that -- it's discomfort because something came
18      about through discussions between the two of us or
19      Bailey or Nick, I'm going to instruct you not to
20      answer that.
21      A.            From an undergraduate perspective.
22                    MR. CIOLKO:  That's the answer.
23      A.            Yes.  I provided information from an
24      undergraduate perspective.
25                    MR. CIOLKO:  That's a good way to put
```

Page 160

1      it.

2      Q.           Did you read Penn's motion to dismiss

3      the consolidated complaint?

4      A.           Can you point me towards that?

5                   MR. CIOLKO:  I'm sorry.

6      A.           You're fine.  I can still see it here.

7                   MR. CIOLKO:  Can you hear us, Michael?

8                   MR. KIDNEY:  Yes.  Yes.

9                   MR. CIOLKO:  Miss Nedley asked if you

10     can point her to that document.

11                  MR. KIDNEY:  Oh, it's not a document

12     that we have as an exhibit.  So let me rephrase the

13     question.

14     Q.           Do you -- as you sit here today, do

15     you -- have you -- do you recall reading a document

16     that is entitled, motion to dismiss the

17     consolidated complaint?

18                  MR. CIOLKO:  Same direction as before.

19     But answer if you can.

20     A.           Yes.

21     Q.           And when did you review that document?

22     A.           I'm really not sure.

23     Q.           A long time ago?

24                  MR. CIOLKO:  Objection to form.

25     A.           Throughout my time at the University

Page 161

1      of Pennsylvania.

2      Q.          How much time have you spent on this

3      case, approximately?

4      A.          On what?  I'm sorry.

5                  MR. CIOLKO:  You're cutting out at the

6      end.

7      BY MR. KIDNEY:

8      Q.          How much time have you spent on this

9      case, approximately?

10     A.          Around a year and a half.

11     Q.          No, I mean how many hours have you put

12     into this case, approximately?

13                 MR. CIOLKO:  Objection to the extent

14     it's asked and answered.  But you can answer.

15     Don't be shy.

16     A.          Roughly, Like, 24 hours.

17     Q.          How much time do you expect to spend

18     on this case in the future?  How many hours?

19                 MR. CIOLKO:  I only object to the

20     extent it calls for legal conclusions.  But you can

21     answer.

22     A.          I honestly have no clue.

23                 MR. CIOLKO:  Maybe too honest.

24     BY MR. KIDNEY:

25     Q.          If a class is certified, what is your

Page 162

1          understanding of what your relationship is to the
2          other class members?
3          A.          I will serve as a representative for
4          the class and all others impacted and be the voice
5          for the entire group.
6          Q.          Have you ever been a defendant in a
7          lawsuit?
8          A.          No.
9          Q.          Have you ever been part of another
10         class action?
11                     MR. CIOLKO:  Objection only to the
12         extent it calls for legal conclusion.  But go
13         ahead, answer.
14         A.          No.
15         Q.          So let me clean up some things.  I'm a
16         bit confused about some of the information about
17         who is paying for your bills at Penn.  Let me ask
18         you to look at Penn 866.  That's in the ZIP file.
19         Tell me when you're there.  It's marked as Exhibit
20         5.  It's the Nedley award notice.
21         A.          I'm there.
22         Q.          And on the very last page, it says,
23         expected family contribution, $24,620.  Do you see
24         that?
25         A.          Yes.

Page 163

1    Q.              Now, I understand from your earlier
2    testimony that your parents have paid your rent and
3    your dining hall charges.  Is that correct?  Did I
4    get that right?
5    A.              Yes.
6    Q.              But that still leaves quite a
7    significant expected family contribution.  Dining
8    hall charges we said are about 1400 a semester.  So
9    if you take that 24,620, and your parents pay the
10   rent and the dining hall charges, are they -- am I
11   understanding correctly that they are also paying
12   something else, or are you saying you're paying the
13   entire balance of that 24,000 minus the dining hall
14   and rent charges?
15   A.              I've taken out loans to help pay for
16   my education and then have used savings.
17   Q.              Okay.  But there's also been -- your
18   account statement indicates that there's -- well,
19   let me ask you this.
20                   How much have you paid from your
21   savings to the University of Pennsylvania?
22                   MR. CIOLKO:  Are you asking for the
23   whole time she's been there?
24                   MR. KIDNEY:  Yes.
25   A.              I'm not sure of the exact breakdown.

Page 164

1    I would have to look.

2    Q.          That's fine.  I'm not looking for an

3    exact amount.  I'm -- I'm just looking for an

4    approximate amount.

5              MR. CIOLKO:  Are you looking for a

6    percentage, Michael?

7              MR. KIDNEY:  Nope.  An approximate

8    amount, a number.

9    Q.          Let me ask it this way, Miss Nedley.

10             I imagine when you started work --

11   when you started attending school at the University

12   of Pennsylvania, you had a savings account or a

13   checking account; is that correct?

14   A.          Yes.

15   Q.          And I imagine you know how much money

16   you saved for the university -- to attend the

17   University of Pennsylvania; is that correct?

18   A.          Relatively.  I received scholarships

19   that I mentioned earlier.

20   Q.          Okay.  And how much of the -- what was

21   your bank account value at the beginning of the

22   time that you attend the University of

23   Pennsylvania?

24             MR. CIOLKO:  I'm going to object as to

25   form and relevance.  But you can answer, if you

Page 165

1   remember.
2   A.          I'm not sure of the exact number.  I
3   believe I have received roughly 10,000 in
4   scholarships, outside scholarships.  And then I had
5   also received money from, like, a graduation type
6   party.  But early on in my --
7   Q.          How much -- I'm sorry.
8   A.          I'm sorry.
9   Q.          How much money did you get from the
10  graduation type party?
11              MR. CIOLKO:  Same objection.
12  A.          Between, like, 8 to $12,000.
13  Q.          In addition to the 10,000 in
14  scholarships?
15  A.          Yes.
16  Q.          Okay.  Now, I know -- I don't want you
17  -- I know you don't know the exact amount in your
18  checking or savings account at the time you started
19  at Penn.  Can you give me an approximate value?
20              MR. CIOLKO:  If you can.
21  A.          It was changing in and out.  I would
22  say it stayed around, like, 12 to $15,000.
23  Q.          Before you attended Penn.
24  A.          Yes.  Because I didn't get most of the
25  scholarships until after, and some of those went

Page 166

1      directly to the school.

2      Q.          And how much of that 12 to 15,000, how

3      much of that did you pay to Penn?

4      A.          All of it.

5      Q.          All of it.  Okay.

6                  So let me make sure I understand.  So

7      your parents paid for housing and meals.  You have

8      paid -- and then there was 10,000 in scholarships,

9      8 to 12,000 from a party, and then 12 to 15,000

10     from your savings?

11     A.          Yes.

12     Q.          And then -- and for most -- for most

13     of the 10,000 in scholarships, you -- that money

14     went directly to Penn; is that correct?

15     A.          Some of it.  I don't remember the

16     exact breakdown.

17     Q.          Okay.  So -- so here's where this

18     doesn't add up for me.  When we go to the

19     spreadsheet -- and I can do it with you and take

20     the time to do it with you.  But the spreadsheet

21     shows that there have been payment cash payments of

22     53,000 so far, that is in addition to the loans.

23                 So if you only had 12 to 15,000 in

24     your checking or savings account, and then you had

25     8 to 12 from the party, and then 10 -- less than 10

```
1     for the scholarship, that still doesn't account for
2     quite a bit of money that somebody is paying to
3     Penn on your behalf.  So I'm wondering if your
4     parents -- perhaps you are forgetting that perhaps
5     your parents did pay money to Penn that goes beyond
6     your housing and dining hall charges.
7                    MR. CIOLKO:  I'm going to object to
8     the multiple compound parts of that question.  And
9     you can answer.  You already have asked and
10    answered this question multiple times.  So if you
11    can provide an answer that's different than before
12    or confirm, that's fine.  But answer if you can.
13    A.          Does that take into account the money
14    from my great aunt and great uncle?
15    Q.          For your what?  I'm sorry.
16    A.          From my great aunt and great uncle.
17    Q.          You said they're paying for your
18    senior year; is that correct?
19    A.          Yes, I believe that's what -- I would
20    have to touch base with them.
21    Q.          I'm sorry.  Say that again?
22                    MR. CIOLKO:  Go ahead.
23    A.          I'll re-talk to them.
24    Q.          Okay.  All the money that I see in the
25    spreadsheet, it is -- this spreadsheet date is July
```

Page 168

1        and -- the latest date is August 9th of 2021.

2        So almost all this money that has been received --

3        has been received prior to your last year.  And

4        it's all through the Penn.Pay payment system.  And

5        it's --

6        A.          I don't --

7        Q.          It's totally separate --

8                    MR. CIOLKO:  Let Michael finish.

9        A.          You're good.

10       Q.          I'm sorry?

11       A.          You're good.

12       BY MR. KIDNEY:

13       Q.          I was going to say it's separate from

14       your plus direct loan refund and the Pennsylvania

15       state grants.

16                   MR. CIOLKO:  I'm going to say

17       objection to the form of the question.  She's given

18       you her answers about where the money came from.

19       And she's answered about whether she's -- whether

20       she knows whether there's additional parts from it.

21                   Frankly, I can't go through this

22       spreadsheet and confirm that what you're saying is

23       correct about distribution of monies.  So I don't

24       think this question is appropriate.

25                   MR. KIDNEY:  Ed, I was just trying to

Page 169

```
 1      -- not to drag out this deposition.  But if -- if
 2      -- if you want me to go into more detail, we can --
 3      we can do that.  And I can explain -- we can sort
 4      this right now and explain how we, on the break,
 5      got to this 53,000 number.
 6                    MR. CIOLKO:  You just got to that
 7      number on a break today?
 8                    MR. KIDNEY:  Yeah.
 9      BY MR. KIDNEY:
10      Q.            So if you -- do you know how to sort a
11      Microsoft Excel, Miss Nedley?
12                    MR. CIOLKO:  I'm not going to have
13      Miss Nedley sort an Excel spreadsheet.
14      Q.            Do you know how to sort an Excel
15      spreadsheet, Miss Nedley?
16      A.            No.
17      Q.            No?
18      A.            (Witness shakes head.)
19      Q.            Okay.  So do you -- as you sit here
20      today, Miss Nedley, do you remember ever making a
21      payment to Penn from your checking account or your
22      savings account?
23      A.            Yes.
24      Q.            Yes?
25                    And do you have a -- are you a
```

Page 170

```
 1      Penn.Pay authorized user?
 2      A.              I believe so.
 3      Q.              Okay.  And when you make payments to
 4      Penn, how have you made those payments?  Do you
 5      make -- do you write a check?  Do you do an
 6      electronic fund transfer?  How did you do that?
 7      A.              I've done both.
 8      Q.              Okay.  And do you still have those
 9      checks?
10      A.              I'm not sure.  I would have to look.
11      Q.              Okay.  I'd ask that if you still --
12      I'd ask that you look for those checks and send
13      copies of them to your lawyer.  And if you have
14      records of electronic funds transfers that you did
15      versus your parents, I would ask that you send
16      those to your lawyer as well.
17                      What -- when you wrote a check, what
18      is the bank that you wrote the check?  On what is
19      the name of the bank?
20      A.              Westmoreland.
21      Q.              I'm sorry.  That was really --
22                      MR. CIOLKO:  Say it a little louder.
23      A.              Westmoreland County Federal Credit
24      Union.
25      Q.              Okay.
```

Page 171

1      A.          It's changed names, though.

2      Q.          And what is its new name?

3      A.          Pheple, P-H-E-P-L-E.

4      Q.          And your parents have an account at

5      the same institution?

6                  MR. CIOLKO:  That's -- I'm going to

7      object to that question and advise you not to

8      answer.

9                  That's her parents' private matters.

10     You have -- Penn has all this information in its

11     own -- you know, within its own payment systems.

12     I'm not going to have my client talk about her

13     parents' financial institutions unless you want to

14     mark this part of the deposition highly

15     confidential.  And even then, I would have to get

16     permission of her parents.

17                 MR. KIDNEY:  Ed, there is an issue in

18     this case -- I mean, the documents that I have

19     shown to you shows that Miss Nedley's family was

20     expected to contribute $100,000, and over four

21     years.  And even if you assume that the great aunt

22     and uncle paid for the last year, that's $75,000.

23     And there is -- this just does -- is not adding up.

24                 MR. CIOLKO:  You can argue that then

25     -- she didn't pay -- she paid money herself.

Page 172

1     That's been established beyond a doubt.  So I don't

2     know what -- what you're trying to prove.  She has

3     paid her own money herself for fees and tuition.

4     Other than that, I don't know what's relevant of

5     that certification.

6                    MR. KIDNEY:  What is relevant is there

7     is a possible issue of standing to the extent that

8     Miss Nedley's parents paid a portion of this.  And

9     it seems -- I don't know of any explanation other

10    than that they have paid a portion of this.

11                   If you are instructing the witness not

12    to answer, we'll ask the court to give adverse

13    inference to that because we're trying to obtain

14    information that we think is relevant to who is in

15    and not in the class.  And you've also told the

16    witness not to manipulate the Excel sheet.  We're

17    not -- all we're trying to do is refresh the

18    witness's recollection because it's obvious that a

19    bank account of 8 to 12,000 can't pay $75,000 in

20    costs even after you account for loans.

21                   MR. CIOLKO:  Well, loans.

22                   MR. KIDNEY:  And --

23                   MR. CIOLKO:  You have not asked any

24    questions about employment and summer employment.

25    The 8 to $12,000 is her money she got from

Page 173

1    graduation, not anybody else's money.  That's her

2    money she got from graduation, as well as

3    additional scholarships.  So I don't know if you

4    want to send me a letter that shows me what the gap

5    in the money is.

6              And I -- I want Miss Nedley to say if

7    she remembers her -- any of her family members,

8    whether it's her great aunt or uncle or parents or

9    what have you, if she remembers anyone else

10   specifically, a non-loan person or a non-school or

11   non-scholarship or non-funds of her own.  I want --

12   I'm not instructing her not to answer that.

13             What I'm saying is, don't -- don't --

14   you don't need to tell the defendant where your

15   parents keep their money.  That's the only thing I

16   say no to.

17             MR. KIDNEY:  I --

18             MR. CIOLKO:  And --

19             MR. KIDNEY:  That is relevant to --

20   you -- the class has been defined as people who

21   have paid feeds.  And we're trying to figure out if

22   Miss Nedley's parents are in the class or not.  And

23   that is certainly relevant.

24             And we are trying to -- I have -- we

25   have -- I am trying to explain and get some

```
 1      information to help the witness refresh her
 2      recollection as to whether her parents would have
 3      paid for more than room and board.  It's simply
 4      that.
 5                  MR. CIOLKO:  And dining, correct?
 6                  MR. KIDNEY:  Yes.  Dining, I'm
 7      thinking of, is included in room and board.  But
 8      we're happy if Miss Nedley knows the name of the
 9      bank where -- her parents' bank, to put that under
10      highly confidential.
11      A.          I would like to --
12                  MR. KIDNEY:  No, we're not -- we're
13      not.
14                  MR. CIOLKO:  I'm not going to allow
15      her to answer that today.  I need her to speak to
16      her parents.
17                  MR. KIDNEY:  Well, we -- I will just
18      note for the record then we would hold this
19      deposition open in order to obtain that
20      information.  And we also think it is relevant to
21      the class certification deadline.  It's also
22      relevant to the class certification hearing.
23                  So I want to note for the record that
24      I disagree with that.  I think it's improper.  And
25      we're -- it's not getting into a privileged area.
```

1      And we're also happy to afford any protections,

2      including highly confidential.

3                    MR. CIOLKO:  I think my response to

4      that is -- let me respond to that.  Because I do --

5      not arguing necessarily the relevance of the basic

6      question, which was what were the sources of the

7      funds from Miss Nedley's education.  And really,

8      the only thing that matters is for that spring

9      semester, so anything beyond that is frankly

10     irrelevant to this case.

11                    I think I've been allowed a lot of

12     leeway to ask questions that are quite personal and

13     have nothing to do with the semester that we're

14     talking about here.  So I'm happy to have Miss

15     Nedley answer now and then for us to go back and

16     relook and try to figure out what the other --

17     where -- where your blank spot is and where the

18     funds are coming from.  I'm happy to do that.

19                    If you wanted to lay that up, then I

20     would put that in the spreadsheet and say, where

21     did this amount of money come from?  And I'm happy

22     to look at that and show Miss Nedley that.  She's

23     not able to answer now and say, let's figure out

24     exactly where the rest of this money came from,

25     especially with regards to spring 2020 semester.

Page 176

```
 1                   Beyond that, I will try to get
 2        response to documents, but there's -- to me,
 3        there's a direct relevance objection, even the
 4        class certification, about who paid money beyond
 5        the spring 2020 semester.
 6                   MR. KIDNEY:  I understand.
 7                   MR. CIOLKO:  Besides the spring 2020
 8        semester, you can answer Mr. Kidney's question.
 9        A.         What was the question?
10        BY MR. KIDNEY:
11        Q.         The question that was on the table
12        was:  Where do your parents have an account?  So I
13        don't have any -- and your counsel has directed you
14        not to answer that.
15                   But -- so why don't we -- we -- your
16        counsel and I have stated our objections for the
17        record, so I will move on.
18                   I have one -- I'm going to take -- I
19        think I have just one more question, which is --
20        which we can handle this over -- why don't we take
21        a break and give you a chance to read it over.  But
22        I'm going to ask you about Nedley responses to
23        RFAs, and I'm going to ask you the same question
24        that I asked earlier about the RFPs and the
25        interrogatories, which is:  Is there anything in
```

1      that document that is either inaccurate or should

2      be supplemented?  That will probably be my last

3      question.

4                    But I'm also going to take a break.

5      And Mr. Clayton, who is smarter than I am, may give

6      me a couple more questions.

7                    MR. CIOLKO:  So you want Miss Nedley

8      to look at RFAs and the Rogs?

9                    MR. KIDNEY:  Yes.  Just the RFAs.

10                   MR. CIOLKO:  Right.  Because you

11     already looked at the --

12                   MR. KIDNEY:  Yes, just the RFAs.  She

13     already looked at the Rogs.

14                   MR. CIOLKO:  Okay.  She'll do that.

15                   MR. KIDNEY:  And that is in the ZIP

16     file.  And so then why don't we take a ten-minute

17     break and be back at 3:30, and then I'll ask you if

18     you have any changes to the RFA responses.

19                   MR. CIOLKO:  Okay.  Deal.

20                   MR. KIDNEY:  All right.  Thank you.

21                   (A break was taken.)

22                   MR. CIOLKO:  With Bailey and Emma's

23     help, we were able to work out a few things.  Now,

24     I focused on, for what I believe relevance reasons

25     but also for expediency reasons, on the spring 2020

Page 178

1      portion of the spreadsheet you provided.  We have

2      to double-check that.  But the payments that were

3      made during that semester, Penn payment I guess

4      it's called --

5                    MR. KIDNEY:  Yes.

6                    MR. CIOLKO:  -- actually made by the

7      Plaintiff.  But we want to confirm that and send

8      you confirmation.

9                    MR. KIDNEY:  Okay.  And --

10                    MR. CIOLKO:  And as to any money

11     provided by -- I don't want to get a relative

12     wrong.

13                    (Discussion held off the record.)

14                    MR. CIOLKO:  Even money that was

15     provided, even if the parents were -- did provide

16     money, it was -- it's a personal loan.  So Miss

17     Nedley is on the hook for any money she would have

18     gotten from her parents.

19                    I realize that we want to paper that

20     somehow.  I just want to get as much information to

21     you as possible, especially the fact that any

22     payment that was -- appears to have been made

23     during that spring 2020 semester was made by Miss

24     Nedley, the fee and tuition payment is the way it

25     adds up.

1              It's a direct plus loan, one loan that

2      appears not to have been cancelled out that she and

3      her parents might be on the hook for together.

4              MR. KIDNEY:   Okay.

5              MR. CIOLKO:   I imagine the folks at

6      student aid would confirm that as well with that

7      update.

8              And thank you, Bailey, and thank you,

9      Miss Nedley.

10             She's also read through the RFAs.   And

11     ask away.

12             MR. KIDNEY:   So thank you for that

13     clarification, Ed.   That is helpful.

14     BY MR. KIDNEY:

15     Q.          So, Miss Nedley, have you had an

16     opportunity to review your RFA responses?

17     A.          Yes.

18     Q.          And by RFA, I mean request for

19     admission.

20     A.          Yes.

21     Q.          And is -- are all of the responses

22     accurate, Miss Nedley?

23     A.          Yes.

24             MR. CIOLKO:   Of course, we obviously

25     retain the right to amend if any new information

Page 180

1      comes up.  Go ahead.

2                    MR. KIDNEY:  Understood.

3      BY MR. KIDNEY:

4      Q.           As you sit here today, Miss Nedley, is

5      there anything that was inaccurate in your

6      responses or that you wish to supplement?

7      A.           No.

8      Q.           Do you know people, Miss Nedley, who

9      contracted COVID during the Spring 2020 semester?

10                   MR. CIOLKO:  Objection; relevance.

11     But you can answer.

12     A.           Can I have a few seconds, please?

13     Q.           Sure.

14     A.           I honestly cannot keep track of it

15     right now because so many of my friends and

16     classmates have COVID, and I would have to think

17     about that and get back to you.

18     Q.           Do you know -- as you sit here today,

19     do you know of any students who worked with student

20     health in the spring of 2020 in order to conduct --

21     I'm sorry, contact tracing?

22     A.           I don't believe in the spring of 2020.

23     Q.           Career services, in the first half of

24     spring 2020, you obtained information from career

25     services virtually; is that correct?

1     A.          Yes.

2     Q.          In the second half of the spring 2020

3     semester, after the pandemic hit, you were able to

4     obtain the same information from career services

5     that you obtained in the first half of the

6     semester; is that correct?

7               MR. CIOLKO:  Objection;

8     mischaracterization of testimony and form.

9     A.          I was able to receive the information,

10    but I was not able to go build relationships with

11    the advisors who were going to be writing my

12    letters of recommendation for dental school.

13    Q.          And are -- the advisors who write your

14    letters of recommendation for dental school, are in

15    career services?

16    A.          Yes.

17    Q.          What is the name of your great aunt

18    and great uncle?

19               MR. CIOLKO:  I'm -- I need to confer

20    with my client, Michael.

21               (Discussion held off the record.)

22               MR. CIOLKO:  My first answer, this --

23    whatever goes on the record here, I request it be

24    marked highly confidential.

25               MR. KIDNEY:  We have no objection.

Page 182

1              MR. CIOLKO:  The second, I'm going to

2        object from a relevance standpoint, and I'm also

3        going to reiterate that any payment that was made

4        -- we believe any payment that was made during the

5        relevant semester to Penn was made by plaintiffs.

6        If we find that untrue, we, of course, will tell

7        you who made the payment and what the contact

8        information is.

9              But aside from the relevance

10       objection, we have a personal privacy situation

11       with regards to Miss Nedley's great aunt and uncle

12       regarding a death in the family.  So I'm going to

13       instruct her not to answer your questions with

14       regards to their information at the current time.

15             If it turns out that they're the

16       source of payments that are reflected in the

17       spreadsheets, I certainly will advise my client

18       that that information may need to be shared.  But

19       I'm -- I'm not comfortable providing that

20       information, especially since, to our best

21       knowledge, none of their funds were utilized during

22       the semester that is relevant to this litigation.

23             MR. KIDNEY:  For the record, we take

24       -- we disagree with the objection.  There's clear

25       case law that a client should not be instructed not

```
 1      to answer in the absence of privilege.  It's not
 2      appropriate to instruct a witness not to answer on
 3      the basis of relevance.
 4                   And we think it is relevant because
 5      Miss Nedley earlier testified she was not sure if
 6      these relatives had just gave money for her last
 7      year and she would have to check with them.
 8                   MR. CIOLKO:  And we'll be checking
 9      that.
10                   MR. KIDNEY:  So I want to make clear
11      that it is -- we think the objection is improper --
12                   MR. CIOLKO:  Understood.
13                   MR. KIDNEY:  -- under existing case
14      law.
15      BY MR. KIDNEY:
16      Q.           So, Miss Nedley, let me make sure I
17      understand where we are right now on these payment
18      issues.
19                   If I'm understanding, your counsel has
20      represented -- can you hear me okay?
21                   THE WITNESS:  Can you hear us now?
22                   MR. KIDNEY:  Can you hear me now?  We
23      can.
24                   THE WITNESS:  Can you speak again?
25                   MR. KIDNEY:  Say that again?
```

```
                                        Page 184
 1               MR. CIOLKO:  My computer got kicked
 2      off the Zoom.
 3               MR. KIDNEY:  Oh.
 4      Q.       So, Miss Nedley, let me ask you -- I
 5      want to make sure I understand where we are at this
 6      stage in the deposition, again, with respect to
 7      this payment issue.
 8               I appreciate your counsel has
 9      represented some things, and I want to make sure I
10      understand.
11               So your -- is it your testimony that
12      your parents may have indeed paid for more than
13      your rent and your meal plan, but if they did, even
14      though they paid with their own funds, that is --
15      your parents are expecting, and you have agreed,
16      that you will eventually pay them back; is that
17      correct?
18               MR. CIOLKO:  I would like Miss Nedley
19      to answer, but that is a mischaracterization of my
20      statement.  Only to the extent of any payments
21      would have come from Miss Nedley, we're giving you
22      the source of some of those funds in Miss Nedley's
23      account.
24               MR. KIDNEY:  All right.
25      BY MR. KIDNEY:
```

Page 185

1      Q.          So the money came from you, Miss

2      Nedley, but you obtained the money from your

3      parents sometimes?

4      A.          Yes.

5      Q.          Rather than your parents --

6      A.          Yes.

7      Q.          -- directly writing a check?

8      A.          Yes, yes.  But I had that same

9      question earlier, and that was my money directly.

10     Q.          I'm sorry.  Say that again?

11     A.          The scholarship and the savings that

12     we had discussed earlier --

13     Q.          Yes.

14     A.          -- that is my money personally.

15     Q.          Okay.  But then when that money ran

16     out, is it your -- am  I understanding this right,

17     that your parents wrote a check or however else,

18     they transferred money, and rather than sending it

19     directly to the University of Pennsylvania, they

20     gave it to you, and then you paid that money to the

21     University of Pennsylvania?

22                 MR. CIOLKO:  Objection to form.  But

23     you can answer if you can.

24     A.          Yes.

25     BY MR. KIDNEY:

1    Q.          And to the best of your knowledge,

2    your parents never paid money directly to the

3    University of Pennsylvania?

4    A.          I don't believe so.  I will check with

5    them.

6    Q.          And then on the plus direct loan, it's

7    your understanding -- even if -- if we obtain a

8    copy of that loan and you haven't signed it -- and

9    it's my understanding that undergrauates are not

10   asked to sign it -- am I understanding this

11   correctly that it's your expectation and your

12   parents' expectation that you will pay that loan

13   off eventually?

14   A.          Yes.

15               MR. KIDNEY:  I think those are all my

16   questions.  Thank you for your time today.

17               THE WITNESS:  Thank you.

18               MR. CIOLKO:  I'm good.  There's no

19   redirect.

20               MR. KIDNEY:  Okay.  All right.  Well,

21   you are free to go, Miss Nedley.

22               (Concluded 3:46 p.m.)

23                    CERTIFICATE

24

25         I do hereby certify that the aforesaid

Page 187

1        testimony was taken before me, pursuant to notice,

2        at the time and place indicated; that said deponent

3        was by me duly sworn to tell the truth, the whole

4        truth, and nothing but the truth; that the

5        testimony of said deponent was correctly recorded

6        in machine shorthand by me and thereafter

7        transcribed under my supervision with

8        computer-aided transcription; that the deposition

9        is a true and correct record of the testimony given

10       by the witness; and that I am neither of counsel

11       nor kin to any party in said action, nor interested

12       in the outcome thereof.

13                          _____

                            Leandra Stoudt, RPR, CRR

14                          CBC, CCP, Notary Public

15

16

17

18

19

20

21

22

23

24

25