**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| ASHA SMITH and EMMA NEDLEY, individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 2:20-cv-02086-TJS |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Timothy J. Savage |
| UNIVERSITY OF PENNSYLVANIA, | ) ) | |
| Defendant. | ) ) ) ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA**

Virginia A. Gibson (Bar No. 32520)
Alexander B. Bowerman (Bar No. 321990)
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone: (267) 675-4635
Facsimile: (267) 675-4601

Michael L. Kidney (*pro hac vice*)
Jessica L. Ellsworth (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5883
Facsimile: (202) 637-5910

*Attorneys for Defendant Trustees of the University of Pennsylvania*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND .................................................................................................................2

   A.  Procedural History ...............................................................................................2

   B.  Penn's Fee Descriptions & the Services and Activities Supported by the Fees ...........2

   C.  Plaintiffs' Experiences During the Spring 2020 Semester.............................................5

LEGAL STANDARD...........................................................................................................6

ARGUMENT.......................................................................................................................6

       I.     SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' FEE-BASED BREACH-OF-CONTRACT CLAIM BECAUSE THE DESCRIPTIONS OF THE SPRING 2020 SEMESTER FEES DID NOT CREATE A SPECIFIC, IDENTIFIABLE PROMISE. .............................. 6

           A.     The Description Of The General Fee Cannot Support A Contract Claim........................................................................................... 7

           B.     The Description Of The Technology Fee Cannot Support A Contract Claim.......................................................................... 11

           C.     The Description Of The Clinical Fee Cannot Support A Contract Claim.......................................................................... 12

       II.    SUMMARY JUDGMENT IS WARRANTED BECAUSE PENN DID NOT BREACH ANY CONTRACTUAL PROMISE. ........................... 13

           A.     Penn Offered Student-Related Activities, Services, and Spaces Consistent With the General Fee Description. ........................... 13

           B.     Penn Offered Computer Labs and Technological Services Consistent With the Technology Fee Description. ....................... 15

           C.     Penn Offered Unlimited Access to Student Health Service Consistent With the Clinical Fee Description. ........................... 16

       III.   PLAINTIFF NEDLEY SUFFERED NO LEGALLY COGNIZABLE DAMAGES.......................................................................... 16

CONCLUSION...................................................................................................................19

**Table of Authorities**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................................................................6

*Buschauer v. Columbia Coll. Chicago*,
  No. 20 C 3394, 2021 WL 1293829 (N.D. Ill. Apr. 6, 2021)....................................10

*Cavaliere v. Duff's Bus. Inst.*,
  605 A.2d 397 (Pa. Super. Ct. 1992)....................................................................7, 8

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................................6

*Chong v. Northeastern Univ.*,
  494 F. Supp. 3d 24 (D. Mass. 2020) ..................................................................9, 12

*Crawford v. Presidents & Dirs. of Georgetown Coll.*,
  537 F. Supp. 3d 8 (D.D.C. 2021) ...............................................................9, 10, 12

*Faber v. Cornell Univ.*,
  No. 3:20-CV-467 (MAD/ML), 2021 WL 4950287 (N.D.N.Y. Oct. 25, 2021) ................11, 12

*Fiore v. Univ. of Tampa*,
  No. 20-CV-3744 (CS), 2021 WL 4925562 (S.D.N.Y. Oct. 20, 2021) ........................9, 10, 12

*Hemphill v. Nationstar Mortgage LLC*,
  Civ. Action No. 18-2451, 2018 WL 4929864 (E.D. Pa. Oct. 10, 2018)................................17

*Murphy v. Duquesne Univ. of the Holy Ghost*,
  777 A.2d 418 (Pa. 2001) ...........................................................................................10

*Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*,
  311 F.3d 226 (3d Cir. 2002)........................................................................................6

*Rade v. Transition Software Corp.*,
  1998 WL 767455 (E.D. Pa. Oct. 30, 1998).............................................................17

*Smith v. Univ. of Pa.*,
  534 F. Supp. 3d 463 (E.D. Pa. 2021) ("*Smith I*") ......................................... *passim*

*Swartley v. Hoffner*,
  734 A.2d 915 (Pa. Super. Ct. 1999)............................................................................7

*Thorsen v. Iron and Glass Bank*,
      476 A.2d 928 (Pa. Super. Ct. 1984) ..................................................................17

*Vurimindi v. Fugua Sch. Of Bus.*,
      435 F. App'x 129 (3d Cir. 2011) ....................................................................7

*Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*,
      352 F. Supp. 3d 416 (E.D. Pa. 2018) ............................................................17

**Other Authorities**

Activity, *Merriam-Webster Dictionary* (Online ed., 2022) ..........................................10

Fed. R. Civ. P. 56(a) ...................................................................................................6

Services, *Merriam-Webster Dictionary* (Online ed., 2022)...................................11, 12

Spaces, *Merriam-Webster Dictionary* (Online ed., 2022) ..........................................11

Defendant Trustees of the University of Pennsylvania ("Penn" or the "University"), improperly named as the "University of Pennsylvania," respectfully submits this memorandum of law in support of its motion for summary judgment.

## **INTRODUCTION**

Plaintiffs' fee-based breach-of-contract claim rests on what their Consolidated Amended Complaint told the Court was the governing descriptions of those fee categories. This Court accepted those allegations as true, as it was required to, for purposes of ruling on Penn's motion to dismiss—and denied the motion. But Plaintiffs' allegations were wrong, as discovery has made abundantly clear. Class certification discovery demonstrated that—as a matter of undisputed fact—the fee descriptions Plaintiffs pulled from Penn's website in preparing and filing their Amended Complaint in August of 2020 were not descriptions of the spring 2020 semester fees. Instead, each of the spring 2020 semester fees was described in significantly broader and more general language. That governing language—which Plaintiffs do not dispute is applicable—is far different than the language addressed in the Court's motion-to-dismiss ruling. And under a straightforward application of the same Pennsylvania law that led the Court to dismiss Plaintiffs' tuition-based breach-of-contract claim, the fee language does not constitute a contractual promise.

Discovery proved Plaintiffs' allegations wrong in another way as well. The Amended Complaint alleges that following the transition to remote learning caused by the pandemic, Penn ceased offering any student-related services and banned all student-related activities for the next five and a half weeks. ECF No. 18, Am. Compl. ¶ 151 (alleging that Penn did not provide "any student activities" and did not offer "any student health or treatment services"). Not so. Following the transition to remote learning, Penn continued to offer services and activities

supported by the fees, as Plaintiffs have admitted in requests for admission and deposition testimony.

For each of these independent reasons, summary judgment is warranted to Penn on Plaintiffs' fee-based contract claim.

## **BACKGROUND**

Plaintiffs allege that, because Penn transitioned to distance learning and reduced campus population density to protect students, staff, and visitors when the COVID-19 pandemic began, they are entitled to refunds for a portion of student fees paid for the spring 2020 semester.

### A. Procedural History

Penn moved to dismiss Plaintiffs' Amended Complaint in its entirety. The Court dismissed the tuition-based claims for breach of contract, unjust enrichment, and conversion, and it dismissed the fee-based claims for unjust enrichment and conversion. *See Smith v. Univ. of Pa.*, 534 F. Supp. 3d 463, 478 (E.D. Pa. 2021) (dismissing Counts I, II, IV, and V) ("*Smith I*"). After canvasing the broadly worded descriptions and promotional materials that formed the basis of the tuition claims, this Court held that Plaintiffs failed to allege that Penn "violated an express, written contractual provision to provide in-person instruction and an on-campus experience in exchange for tuition." *Id*. at 475. The Court did not dismiss the fee-based breach of contract claim based on Plaintiffs' allegations as to the language governing Penn's use of those fees. *Id*. As a result, the sole remaining claim after the motion-to-dismiss ruling was Plaintiffs' fee-based breach-of-contract claim.

### B. Penn's Fee Descriptions & the Services and Activities Supported by the Fees

In their Amended Complaint, Plaintiffs recited the following descriptions of the three fees on which their remaining breach of contract claim is based:

147.    By way of example, Defendant describes its "General Fee" as follows:

A General Fee is assessed to all undergraduate, graduate, and professional students, and directly funds Penn's non-instructional student support services. The General Fee for full-time students provides them with full access to a wide variety of services and resources, including counseling and wellness, multicultural resource centers, student activities, recreation and fitness, career services, learning support, and much more.

148.    Defendant describes its "Technology Fee" as follows:

The Technology Fee is used to cover a broad group of technology-driven services, including online learning resources, data and network security, technology support, email services and support, technology-enabled spaces, provided software, electronic research tools, and other related costs.

149.    Defendant describes its "Clinical Fee" as follows:

This mandatory fee is assessed to all students and supports Penn Wellness services, including Campus Health, Counseling and Psychological Services, the Student Health Service, and the Office of Alcohol and Other Drug Programs.

150.    As such, in accepting these terms and paying this fee, a contract was formed between Plaintiff, including the Fees Class, and Defendant, which provided that Plaintiffs and other members of the Fees Class would pay this fee for or on behalf of themselves and, in exchange, Defendant would provide or make available the services, benefits and/or programs related to those fees, as promised.

ECF No. 18, Am. Compl. ¶¶ 147-150 (footnote citation omitted to https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees for each fee category).

At this juncture in the case, however, it is a matter of undisputed fact that the governing descriptions of the three fee categories for the spring 2020 semester were the following:

**General Fee:**  The general fee is assessed to all undergraduate, graduate, and professional students and directly supports a variety of student related activities, services, and spaces.

**Technology Fee:** This fee assists with the cost of computer labs and technological services.

**Clinical Fee:** This mandatory fee gives students unlimited access to Student Health Service.

3

*See* Statement of Undisputed Material Facts ("SUMF") ¶¶ 23-27.[1]

Plaintiffs also alleged, and then argued to the Court in seeking to avoid dismissal, that Penn did not provide any student activities or services once the pandemic began in the spring 2020 semester.  ECF No. 50, Transcript of Motion to Dismiss Hearing at 44-45 (Plaintiffs' counsel: "We do allege on paragraph 35 of the complaint it says this: As to fees, plaintiffs and members of the fees class have paid fees in exchange for *certain identifiable services, amenities, access, and activities*, *none of which were provided during the second half of the Spring 2020 semester*.") (emphasis added).  Accepting those allegations as true, as it was required to on a motion to dismiss, this Court sustained Plaintiffs' fee-based breach of contract claim and even recited Plaintiffs' allegation that "Penn did not provide 'on-campus computer or lab facilities, access to recreational facilities, access to campus events, any student activities, or any student health and treatment services. . . .'"  *Smith I*, 534 F. Supp. 3d at 475-76 (quoting Am. Compl. ¶ 151).

But at this juncture in the case, it is an undisputed fact that Penn **did** in fact offer services, activities, and spaces to students after Penn's Covid-mandated pivot, for a portion of the semester, to remote classes.  Penn also offered technology related and Student Health services.  Plaintiffs themselves now admit this.  As further explained below, Plaintiffs repeatedly admit—in their responses to requests for admission, their interrogatory responses, and their deposition testimony—that Penn continued to provide some "student-related services, activities, and

---

[1]  After having used the correct descriptions in their initial complaints. SUMF ¶¶ 20-22, Plaintiffs added the incorrect fee descriptions when amending their complaint in August 2020—presumably because they relied on the fee descriptions that were on Penn's website in August 2020.  But they also retained, in one place in the background section, the correct General Fee description. *Compare* Am. Compl. ¶ 28 *with* ¶ 147.  After Penn pointed out that their Amended Complaint cited descriptions post-dating the spring 2020 semester, Plaintiffs attached the correct fee descriptions as Exhibit B to their Motion for Class Certification.  Ex. B to Pls.' Class Cert. Mot., ECF No. 78-4.

spaces," as well as technological and student health services during the remaining 5 weeks of the semester.

## C.  Plaintiffs' Experiences During the Spring 2020 Semester

Plaintiff Emma Nedley was a full-time undergraduate student during the spring 2020 semester.  SUMF ¶ 4.  She agreed to the Student Financial Responsibility Statement on August 20, 2019.  *Id.* ¶ 9.  The amount she owed for the spring 2020 semester was assessed and payable by November 8, 2019.  *Id.* ¶ 10.

Nedley provided multiple examples of services that Penn provided following the onset of the pandemic.  She conceded at her deposition that Penn continued to provide counseling and psychological services during the pandemic.  *Id.* ¶ 35.  She admitted that Penn provided virtual exercise classes during the pandemic.  *Id.*  ¶ 31.  Nedley herself continued to provide tutoring services to fellow students throughout the spring 2020 semester.  *Id.* ¶ 38.  She also admitted that—both before and after the onset of the pandemic—she participated in the Penn Athletics Wharton Leadership Academy.  *Id.* ¶ 29.  She also continued to make use of numerous technological services Penn made available following the onset of the pandemic.  *Id.* ¶ 38.

Plaintiff Asha Smith was a full-time graduate student in the Graduate School of Education during the spring 2020 semester.  *Id.* ¶ 3.[2]  She agreed to the Student Financial Responsibility Statement on August 14, 2019.  *Id.* ¶ 6.  The amount she owed for the spring 2020 semester was assessed and payable by November 26, 2019.  *Id.* ¶ 7.

Like Nedley, Smith provided multiple examples of services that Penn provided following the onset of the pandemic.  She conceded at her deposition that Penn continued to provide counseling and psychological services during the pandemic.  *Id.* ¶ 32.  Smith also admitted that

---

[2]  The Amended Complaint incorrectly identifies Asha Smith as an undergraduate student.  Am. Compl. ¶ 11.  She testified in her deposition that she was, in fact, a graduate student. SUMF ¶ 3.

Penn's Graduate School of Education continued to offer career services and tutoring and learning support services.  *Id.*

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This Rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

While this Court must view the evidence in the light most favorable to the non-movant, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to avoid summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Likewise, a "non-movant may not rest upon mere allegations, general denials, or . . . vague statements." *Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (internal quotations and citation omitted).  Instead, "the party bearing the burden of persuasion in the litigation is obligated to identify those facts of record which would contradict the facts identified by the movant."  *Id.*

## ARGUMENT

**I.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' FEE-BASED BREACH-OF-CONTRACT CLAIM BECAUSE THE DESCRIPTIONS OF THE SPRING 2020 SEMESTER FEES DID NOT CREATE A SPECIFIC, IDENTIFIABLE PROMISE.**

As this Court has recognized, Pennsylvania law is clear:  Plaintiffs can only assert a breach of contract claim against Penn by identifying "a specific contractual undertaking which was breached. . . ."  *Smith I*, 534 F. Supp. 3d at 470 (quoting *Cavaliere v. Duff's Bus. Inst.*, 605

A.2d 397, 401 (Pa. Super. Ct. 1992)).  Pennsylvania's strict requirement that students identify a specific "written contract" protects foundational principles of academic freedom.  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).  By only "examin[ing] whether [the contract] contains an express, written promise," *Smith I*, 534 F. Supp. 3d at 473, courts apply clear rules of decision and avoid subjective judgments about the operation of educational institutions. *Cavaliere*, 605 A.2d at 403 ("It would be unwise to inject the judiciary into an area where it would be called upon to make judgments despite often insurmountable difficulties . . . .").

In contrast to the incorrect allegations in the Amended Complaint that Plaintiffs emphasized at oral argument in seeking to avoid dismissal and that this Court credited in its motion-to-dismiss ruling, the actual description of the fees applicable to the spring 2020 semester did not make "specific and identifiable promise[s]." *Vurimindi v. Fugua Sch. Of Bus.*, 435 F. App'x 129, 133 (3d Cir. 2011).  Penn did not contractually promise access to specific resources (let alone in person) in exchange for the fees and did not cabin the University's discretion to act. To the contrary, the sort of broad, non-specific language used in the description is the kind of language that Pennsylvania courts have often held is not actionable in a contract claim; it offers no measurable standard for this Court to apply.  Plaintiffs' fee claim therefore fails as a matter of law.

### A.    The Description Of The General Fee Cannot Support A Contract Claim.

At the time Plaintiffs paid their fees for the spring 2020 semester, Penn's description of the General Fee made no specific and identifiable promise.  Penn stated only that the General Fee "directly supports a variety of student related activities, services, and spaces."  SUMF ¶¶ 20, 24, 25.  In three crucial respects, this amorphous language contrasts sharply with the more-definitive language highlighted in the Complaint.  And each of those three differences provides an independent reason to reject Plaintiffs' claim as a matter of law.

7

*First*, unlike the description of the General Fee highlighted in the Breach of Contract Count of the Complaint, the fee descriptions in effect during the spring 2020 semester did not reference *any* specific resources that Penn provided students.  At the motion-to-dismiss stage, this Court emphasized language in the Complaint describing "multicultural resource centers" and "recreation and fitness" resources.  *Smith I*, 534 F. Supp. 3d at 475.  But that language did not appear in the fee language applicable to the spring 2020 semester.  Absent too from the spring 2020 fee descriptions was any mention of "counseling and wellness," "career services," and "learning support"—all of which appeared in the Amended Complaint.  Am. Compl. ¶ 147.  Instead, the written language that governs this case broadly referenced "a variety of student related activities, services, and spaces," without any details.  Such non-specific language did not obligate Penn to undertake specific actions or cabined the University's discretion in deciding how to support the student community.  It is a far cry from the sort of "a specific contractual undertaking" required to sustain a breach-of-contract claim as a matter of law.  *Cavaliere*, 605 A.2d at 401.

*Second*, the description of the General Fee did not limit use of the fee to *providing physical access* to in-person or on-campus resources.  The description instead stated that the General Fee "directly supports" activities, services, and spaces.  The word "supports" described how Penn will spend the fee, namely to fund activities, services, and spaces.  But the written language did not require Penn to provide students with in-person access to the "support[ed]" resources.  *Contra* Am. Compl. ¶ 147 (alleging the General Fee was required to "provide[]" "*full access* to a wide variety of services and resources") (emphasis added).  Because Plaintiffs never possessed a specific, contractual right to physical or in-person access any resources, their claim fails.

This careful interpretation of the word "support" dovetails with how other courts have approached nearly identical language in similar lawsuits.  For instance, in denying Penn's motion to dismiss the fee claim, this Court cited *Chong v. Northeastern Univ.*, 494 F. Supp. 3d 24 (D. Mass. 2020).  *See Smith I*, 534 F. Supp. 3d at 476.  *Chong* dismissed a breach of contract claim where students paid fees "to '*support*' certain facilities."  494 F. Supp. 3d at 29 (emphasis added).  The *Chong* court reasoned that the word "support" did not create a promise "to gain access to any on-campus facility or resource."  *Id.*  By contrast, the *Chong* court permitted the lawsuit to proceed for a narrow category of fees described in writing as providing "students 'the option *to gain admission* to home athletic events' and to '*use*['] " certain fitness facilities.  *Id.* at 29 (emphasis added).  According to the *Chong* court, the words "gain admission" and "use" promised students rights of access.  *Id.*  In this case, Penn's description of the General Fee as *supporting* activities, services, and spaces did not promise a specific, contractual right to access resources and is directly analogous to the category of claims *Chong* dismissed.

*Chong* represents a trend "in the emerging case law."  *Crawford v. Presidents & Dirs. of Georgetown Coll.*, 537 F. Supp. 3d 8, 27 (D.D.C. 2021).  A district court in D.C. similarly scrutinized written language and rejected fee claims against Georgetown College and American University.  Those schools had variously described their fees as "support[ing] on-campus services" or paying "for building maintenance and service costs."  *Id.* at 26-27.  Neither school specifically promised students the contractual right to use resources.  Another district court in New York similarly rejected a claim against the University of Tampa where "[t]he plain language of each fee description state[d] that the fees go toward the '*support*' of programs, not '*access*,' and Plaintiffs [had] not alleged that the programs were not supported."  *Fiore v. Univ. of Tampa*, No. 20-CV-3744 (CS), 2021 WL 4925562, at *17 (S.D.N.Y. Oct. 20, 2021) (emphasis

added); *see also Buschauer v. Columbia Coll. Chicago*, No. 20 C 3394, 2021 WL 1293829, at *6 (N.D. Ill. Apr. 6, 2021) ("[M]aterials describing the student center, health center, or information technology department merely provide information about what facilities and services [college] provides students, not any specific promises of access to these facilities and services in-person at all times."). The same is true here. The General Fee description did not specifically promise a right of access.[3]

*Third*, the description of the General Fee also did not promise students specific resources "which are only available and accessible on-campus." *Smith I*, 534 F. Supp. 3d at 475. Instead, "activities, services, and spaces" could all refer to resources provided online, as well as in person. The "[e]ssential [m]eaning of activity" is "something that is done for pleasure and that usually involves a group of people." *See* Activity, *Merriam-Webster Dictionary* (Online ed., 2022).[4] Activities can occur online, as well as in person. *See Crawford*, 537 F. Supp. 3d 8, 27 (D.D.C. 2021) ("None of the quoted language from Georgetown's website specifies that the 'activities' funded by students' fees would take place on campus"). Similarly, the plain meaning of "services" is "useful labor that does not produce a tangible commodity." Services, *Merriam-Webster Dictionary*, *supra*.[5] Here too, nothing prevented Penn from providing intangible "useful labor" over the internet.

---

[3] Context further bolsters the conclusion that Penn's General Fee did not promise students a right of access. Immediately beneath the spring 2020 semester description of the General Fee, Penn actually described the Clinical Fee as giving "students unlimited access to Student Health Service." This is the sort of language used to describe a specific right to use services. *See Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) ("Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed."). As explained, *infra* pp. 12-13, the description of the Clinical Fee does not constitute an enforceable, contractual promise in this context for other reasons—namely, it does not guarantee identifiable or in-person services.

[4] Available at https://www.merriam-webster.com/dictionary/activity.

[5] Available at https://www.merriam-webster.com/dictionary/service.

Even the word "spaces" did not specifically promise resources "only available and accessible on-campus." *Smith I*, 534 F. Supp. 3d at 475. To be sure, "spaces" can refer to physical locations, such as a physical "room." Spaces, *Merriam-Webster Dictionary*, *supra*. But spaces can be virtual, too—such as a Zoom meeting room. The absence of any promise to provide only physical spaces is fatal to Plaintiffs' claim. *See Faber v. Cornell Univ.*, No. 3:20-CV-467 (MAD/ML), 2021 WL 4950287, at *3 (N.D.N.Y. Oct. 25, 2021) (no promise to provide only in-person instruction). In any event, even if the single word "spaces" must mean only physical locations, the absence of any identifiable space and lack of any written promise that students could "access" that space nonetheless defeats Plaintiffs' contract claim. *See supra* pp. 8-9.

**B.     The Description Of The Technology Fee Cannot Support A Contract Claim.**

According to the fees description in effect during the spring 2020 semester, the Technology Fee "assists with the cost of computer labs and technological services." SUMF ¶ 23. By using this language, Penn did not make a specific and identifiable contractual promise to access resources.

At the outset, the fact that the Technology Fee "*assists* with the cost of computer labs and technological services" is fatal to Plaintiffs' claim. Just as the verb "support" did not promise access to resources funded by the General Fee, *see supra* pp. 7-11, neither did the verb "assist" guarantee students access to the resources funded by the Technology Fee. Instead, like the verb "support," the verb "assist" denoted how Penn spent that particular fee, namely to pay "the cost of computer labs and technological services." For this reason alone, the Court could should reject Plaintiffs' claim based on the Technology Fee. *See Chong*, 494 F. Supp. 3d at 29; *Fiore*, 2021 WL 4925562, at *17; *Crawford*, 537 F. Supp. 3d at 26-27.

11

Additionally, the phrase "technological services" is insufficiently specific to constitute an enforceable promise.  Technological services encompasses *any* tangible "useful labor" involving technology.  Services, *Merriam-Webster Dictionary*, *supra.*  As with the description of "services" in the General Fee, the generalized phrase "technological services" did not limit Penn's discretion to provide a particular type of technological resource.   Nor must "technological services" be provided in person.  Indeed, because of their digital nature, technological services can generally be, and often are, provided remotely.

Similarly, the reference in the Technology Fee description to "computer labs" did not clearly promise an identifiable resource that could be provided only in person.  To be sure, a "computer lab" can mean a physical bank of computers.  But a computer lab can *also* refer to a virtual software library that, for example, provides "in-demand titles that students can't easily access by other means"[6] (like the Virtual Desktop that Penn made available following the onset of the pandemic, *see infra* p. 15 ).  For this reason as well, Penn did not make a specific, written promise that students possessed the right to access identifiable physical resources in person.  *See Faber*, 2021 WL 4950287, at *3.

### C.   The Description Of The Clinical Fee Cannot Support A Contract Claim.

Finally, Penn's description of the Clinical Fee also did not create a promise to specific and identifiable medical services or their provision in-person.  Unlike the other two fees, the Clinical Fee did affirmatively provide students "unlimited access to Student Health Service." *See supra* pp. 7-12.  But the Clinical Fee description never defined what "Student Health Service" meant.  It did not specify any category of services that Penn promised to provide, such as mental health counseling or inpatient procedures.  Nor did this brief description specify

---

[6] *Penn Libraries Virtual Computer Lab: About vLab*, PennLibraries, https://guides.library.upenn.edu/vlab.

whether Penn would provide services at on-campus facilities, via telemedicine, through a third-party provider, or through some combination of all three.  This sparse language meant that Penn retained discretion over what health services it provided and how to provide them.  And that meant Penn did not breach a specific and identifiable contractual undertaking.

Here again, the language that governs this case contrasts sharply with the language alleged in the Amended Complaint that Plaintiffs relied upon.  The broad governing language does not amount to a specific contractual undertaking as a matter of Pennsylvania law.

## II.     SUMMARY JUDGMENT IS WARRANTED BECAUSE PENN DID NOT BREACH ANY CONTRACTUAL PROMISE.

Summary judgment is warranted for a second reason.  Even if the Court concludes that the actual fee descriptions from the spring 2020 semester created contractual obligations to Plaintiffs, the undisputed facts show that Penn did not breach any such duty.  As detailed below and further explained in the SUMF, Penn plainly offered student-related activities, services, and spaces—as well as technological services and access to Student Health Service.[7]

### A.     Penn Offered Student-Related Activities, Services, and Spaces Consistent With the General Fee Description.

Consistent with the General Fee description, Penn used proceeds from the General Fee to support "student related activities, services, and spaces," *see* Exs. A, B to Decl. of T. Lewis (*"Lewis Decl."*), which Penn continued to offer after the pandemic began.  Penn will address each of these three categories in turn.

---

[7]  As will be explained in Penn's forthcoming Opposition to Plaintiffs' Motion for Class Certification, it is noteworthy that in many categories, Penn provided more, not less, services. However, as the applicable fee descriptions did not promise any specific level of services, it is not necessary for Penn to address the level of services in order to prevail on this motion for summary judgment.  For this reason, Penn does not undertake, in this motion, to demonstrate that it provided a particular level of services.

*First*, Plaintiffs admit that Penn continued to offer "student related activities" even after Penn shifted to remote classes and undertook efforts to significantly lower the density of the student population on campus. In her response to requests for admission, Nedley admitted that, following the transition to remote instruction in the spring 2020 semester, students could participate in at least "some virtual/remote student activities." SUMF ¶ 28. Smith made exactly the same admission. *Id.* In addition, in Smith's deposition, she testified that, although the student-related activities provided after the pandemic began were "different," she admitted that Penn did provide "student-related activities" after the transition. *Id.* ¶ 36.

*Second*, Plaintiffs also admit that Penn continued to offer student-related "services" following the onset of the pandemic. In her response to requests for admission, Nedley admitted that, following the transition to remote instruction in the spring 2020 semester, students could participate in at least "some virtual services." *Id.* ¶ 30. Smith made exactly the same admission. *Id.* Moreover, in Smith's deposition, she testified that, although she thought that the student-related services provided after transition to remote learning were "different," she admitted that Penn did provide student-related "services" after the transition. *Id.* ¶ 36. Nedley similarly complained that the services offered after the onset of the pandemic were different. In particular, Nedley complained that, during the last 5 and a half weeks of the spring 2020 semester she was unable to visit the career services office in person,[8] but she also conceded that—during the entire period of the spring 2020 semester prior to the pandemic—she accessed the career services office only virtually. ECF No. 78-6 ("Nedley Depo.") at 93:2-11; 131:18-25. Nedley also admitted in

---

[8] According to Nedley, this prevented her from accessing a particular book as well as building a relationship with a career services advisor in her second year who she would then ask to write a recommendation when it came time to apply to dental school. Nedley Depo. at 93:17-94:2; 181:2-16. In any event, Nedley was accepted to her first choice "dream" dental school. *Id.* at 23:6-9.

her deposition that, following the transition to remote instruction, she was able to participate in at least one "service" or "activity" supported by the General Fee.  SUMF ¶ 29.

*Third*, even if the word "spaces" were limited to in person spaces—and it is not—Penn continued to provide in-person "spaces" for students throughout the spring 2020 semester.  In Smith's deposition, she admitted that Penn did provide student-related "spaces" after the transition.  *Id.* ¶ 36.  Nedley acknowledged during her deposition that Penn's Counseling and Psychological Services center continued to maintain an on-campus presence for in-person appointments.  *Id.* ¶ 35.  In addition, Penn's Public Safety Headquarters remained open to community members for walk-in services.  *Id.* ¶¶ 33, 34.

It is thus undisputed that Penn offered "a variety of student related activities, services, and spaces"—consistent with the General Fee description—following the onset of the pandemic.

### B. Penn Offered Computer Labs and Technological Services Consistent With the Technology Fee Description.

Consistent with the Technology Fee description, Penn used proceeds from the Technology Fee before and during the last five weeks of the spring 2020 semester to "assist[] with the cost of computer labs and technological services."  Exs. A, B to Lewis Decl.  It is undisputed that at least some technological services were available after the onset of the pandemic.  Plaintiff admitted as much.  In her deposition, Nedley admitted that Penn offered a number of technological services that she utilized once the pandemic began, such as Zoom, the WCONLINE platform through which she tutored, and Perusal (supported by the Canvas Network).  SUMF ¶ 38.  Class certification discovery further confirmed that Penn's School of

Arts and Sciences provided Virtual Desktops that students could use to access software remotely that was previously available in campus computer labs.  *Id.* ¶ 37.[9]

C.     **Penn Offered Unlimited Access to Student Health Service Consistent With the Clinical Fee Description.**

Finally, consistent with the Clinical Fee description, Penn used proceeds from the Clinical Fee to provide "students unlimited access to Student Health Service," Exs. A, B to Lewis Decl., which continued following the onset of the pandemic.  Nedley conceded in her deposition that she knew that, while residing at her Pittsburgh-area home following the onset of the pandemic, she could have accessed Student Health Service (albeit virtually).  SUMF ¶ 38. Indeed, students had in-person and virtual access to the Student Health Service throughout the entire spring 2020 semester.  SUMF ¶¶ 39, 41, 42.  The access was "unlimited"; there was no limit on the number of times a student could access Student Health Service.  *Id.* ¶¶ 40, 43.  And the reference to "unlimited access" cannot reasonably be read as promising specific treatment options.  *See supra* pp. 12-13.

Plaintiffs' allegations that Penn did not offer general, technological, or clinical services belie reality.  Penn is entitled to summary judgment.

III.    **PLAINTIFF NEDLEY SUFFERED NO LEGALLY COGNIZABLE DAMAGES.**

To state a breach of contract claim under Pennsylvania law, Plaintiffs must prove (1) the existence of a contract; (2) breach; and (3) recoverable resultant damages.  *Hemphill v. Nationstar Mortgage LLC*, Civ. Action No. 18-2451, 2018 WL 4929864 at *7 (E.D. Pa. Oct. 10, 2018) (dismissing breach of contract claim where plaintiff failed to sufficiently allege resultant damages).  It is "fundamental that damages are an essential element of a breach of contract

_____

[9]  In her deposition, Smith admitted that her student account statement indicated that she never even paid a Technology Fee.  SUMF ¶ 8.  For this additional reason, Penn should be awarded summary judgment on Plaintiff Smith's claims based on the Technology Fee.

action." *Rade v. Transition Software Corp.*, 1998 WL 767455, at *2 (E.D. Pa. Oct. 30, 1998)

(granting summary judgment on breach of contract claim where plaintiff failed to support

damages beyond mere allegations in complaint).[10]   Class certification discovery has revealed

that Nedley has not identified any legally cognizable alleged damages.  Nedley's claim for fee

reimbursement rests upon the contention that she "paid these fees…either by paying out of

pocket or by using student loan financing, or otherwise," and is entitled to a pro-rated amount as

damages for Penn's alleged breach.  Am. Compl. ¶¶ 152, 157.  But because Nedley received a

need-based financial aid award from Penn that was greater than the amount she claims to be

owed, she sustained no losses.  If Penn were to issue reimbursements for these fees, it would be

entitled to reimburse itself—not Nedley.

The details of Nedley's financial aid award, established through discovery, illustrate why

she sustained no losses.  Penn calculated Nedley's need-based financial aid by subtracting her

Expected Family Contribution from the total Cost of Attendance ("COA"), and then offering an

aid award to cover the entire difference.  SUMF ¶ 16.  Nedley's cost of attendance was $76,444

for the 2019-2020 Academic Year.  *Id.* ¶ 17.  Based on her family's financial information, Penn

calculated her Expected Family Contribution ("EFC") to be ███.[11]  *Id.* ¶ 18.  Penn then

---

[10] Nor can the possibility of nominal damages alone defeat summary judgment. *Welding Eng'rs Ltd. v. NFM/Welding Eng'rs, Inc.*, 352 F. Supp. 3d 416, 434-35 (E.D. Pa. 2018) (granting summary judgment where plaintiff failed to present sufficient evidence of damages, despite arguing entitlement "to at least nominal damages").  To survive summary judgment, a plaintiff who cannot prove recoverable damages must have properly alleged nominal damages.  *Id.*; *see also Thorsen v. Iron and Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984) (affirming summary judgment on breach-of-contract claim where plaintiff sustained no loss from alleged breach and failed to allege nominal damages).  Plaintiffs did not request nominal damages in their Amended Complaint, *see* Am. Compl. at Prayer for Relief, nor in their responses to Penn's Interrogatories.

[11]  Pursuant to this Court's direction during the telephonic conference of the Parties with the Court on February 7, 2022, undersigned counsel has redacted from the public version of this memorandum (and supporting exhibits) information specific to the Plaintiffs that is protected by privacy considerations.

provided Nedley with an award to make up the difference between her EFC and the total COA.
*Id.* ¶ 16. This award totaled ███████ (or $76,444 – ███████). *Id.* ¶ 19.

Nedley alleges that she is entitled to 42% of the $3,307 spring 2020 Semester fees, or
$1,389 (less a possible reduction for the economic value of any services received). *Id.* ¶¶ 5, 15.
Even if Penn were to retroactively reduce the fees as Nedley demands, that reduction would only
lower the total COA by a maximum of $1,389, and the COA would ███████████ Nedley's
EFC. Her COA would then be $75,055 ($76,444 – $1,389 = $75,055). Penn would still cover
the difference between the COA and the EFC with financial aid; the only difference would be
that the financial aid grant would be lower because the COA is lower. More specifically,
because the COA would be lowered by $1,389, Penn's aid award would likewise be lower by
$1,389 to make up the difference between Nedley's EFC and the new COA. As *Figure 1* shows,
Nedley and her family would remain responsible for the exact same amount:



Figure 1
Ms. Nedley's Estimated Cost of Attendance, Expected
Family Contribution & Out of Pocket Costs for 2019-2020

Plaintiff has not offered any facts to contradict this result. Because any refund would not
alter the amount that Nedley was expected to contribute, she has sustained no losses from Penn's

decision not to issue a refund.  Because Nedley fails to establish the essential element of resultant damages, summary judgment is warranted for her breach of contract claim.

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs' breach of contract claim for a refund of the fee payments should be dismissed with prejudice.


Dated: February 21, 2022

/s/Virginia A. Gibson
Virginia A. Gibson, PA Bar No. 32520
Alexander B. Bowerman, PA Bar No. 321990
HOGAN LOVELLS US LLP
1735 Market Street
Philadelphia, PA 19103
Telephone: (267) 675-4635

Michael L. Kidney (admitted *pro hac vice*)
Jessica L. Ellsworth (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910


*Counsel for Defendant Trustees of the University of Pennsylvania*