## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ASHA SMITH and EMMA NEDLEY, each individually and on behalf of all others similarly situated, | ) ) ) ) | Case No. 2:20-cv-02086-TJS |
| Plaintiffs, | ) ) | |
| v. | ) ) | Hon. Timothy J. Savage |
| UNIVERSITY OF PENNSYLVANIA, | ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Virginia A. Gibson (Bar No. 32520)
Alexander B. Bowerman (Bar No. 321990)
HOGAN LOVELLS US LLP
1735 Market Street, Floor 23
Philadelphia, PA 19103
Telephone: (267) 675-4635
Facsimile: (267) 675-4601

Michael L. Kidney (*pro hac vice*)
Jessica L. Ellsworth (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5883
Facsimile: (202) 637-5910

*Attorneys for Defendant Trustees of the University of Pennsylvania*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    The Fees At Issue .................................................................................. 3

    B.    Penn's Response to the COVID-19 Pandemic, the Services Offered to
Students, and the Impact on Penn's Finances. ........................................... 4

        1.    General Fee ................................................................................. 5

        2.    Technology Fee.......................................................................... 14

        3.    Clinical Fee ............................................................................... 16

        4.    The Pandemic's Impact on Penn's Finances ............................... 17

    C.    Penn's Financial Aid to Students............................................................. 18

    D.    Plaintiffs' Enrollment & Experience At Penn ......................................... 19

    E.    Procedural History ................................................................................. 23

LEGAL STANDARD...................................................................................................... 24

ARGUMENT ................................................................................................................. 25

    I.    PLAINTIFFS CANNOT SATISFY RULE 23(a)'s TYPICALITY
REQUIREMENT............................................................................................. 26

    II.    PLAINTIFFS CANNOT SATISFY RULE 23(b)(3)......................................... 29

    A.    The Proposed Rule 23(b)(3) Class is Not Ascertainable .......................... 29

    B.    Plaintiffs Cannot Show Predominance. .................................................... 31

        1.    Plaintiffs cannot show the existence or terms of a contract
on a class-wide basis................................................................... 33

        2.    Plaintiffs cannot show a material breach through class-wide
proof. .......................................................................................... 37

        3.    Plaintiffs cannot show causation on a class-wide basis............... 42

        4.    Individualized questions regarding damages predominate. .......... 44

    C.    Class Litigation is Not Superior to Individual Litigation. ........................ 48

CONCLUSION.............................................................................................................. 50

**Page(s)**

**Cases**

*Abraham v. Ocwen Loan Servicing, LLC*,
    321 F.R.D. 125 (E.D. Pa. 2017) .......................................................................35

*Adaptive Digit. Techs., Inc. v. Kurtz*,
    No. CV 15-4062, 2015 WL 5595510 (E.D. Pa. Sept. 22, 2015) ...........................37

*Alexander v. Florida Int'l Univ. Board of Trs.*,
    No. 2021-009869 (Miami-Dade Cnty. 11th Jud. Cir. Ct. Feb. 2, 2022) .................48

*Am. Diabetes Ass'n v. Friskney Fam. Tr., LLC*,
    177 F. Supp. 3d 855 (E.D. Pa. 2016) ....................................................38, 39, 41

*Arch v. Am. Tobacco Co.*,
    175 F.R.D. 469 (E.D. Pa. 1997) ......................................................................49

*Arredondo v. Univ. of La Verne*,
    No. 2:20-CV-07665-MCS-RAO, 2022 WL 423389 (C.D. Cal. Jan. 11, 2022) .....................48

*ATACS Corp. v. Trans World Commc'ns, Inc.*,
    155 F.3d 659 (3d Cir. 1998) ...........................................................................44

*Basic Fun, Inc. v. X-Concepts, LLC*,
    157 F. Supp. 2d 449 (E.D. Pa. 2001) ................................................................39

*Blain v. Smithkline Beecham Corp.*,
    240 F.R.D. 179 (E.D. Pa. 2007) (Savage, J.) ...............................................48, 49

*Brezinski v. Widener Univ.*,
    No. 20-CV-4939-JMY, 2022 WL 267898 (E.D. Pa. Jan. 28, 2022) .......................24

*Byrd v. Aaron's Inc.*,
    784 F.3d 154 (3d Cir. 2015), *as amended* (Apr. 28, 2015) ................................34

*Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc.*,
    No. 8:08-CV-1931-T-30TBM, 2009 WL 928321 (M.D. Fla. Apr. 3, 2009) .........................40

*Carriage House Condos. GP, Inc. v. Deraimo*,
    No. CIV. A. 07-2120, 2008 WL 2683113 (E.D. Pa. July 8, 2008) .........................37

*Chudner v. Transunion Interactive, Inc.*,
    No. 09-CV-433-ER, 2010 WL 5662966 (D. Del. Dec. 15, 2010) ......................43, 48

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................................................................24, 44

*Cross v. Univ. of Toledo*,
    No. 2020-00274JD, 2021 WL 1822676 (Ohio Ct. Cl. Apr. 26, 2021) ....................................48

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*,
    321 F.R.D. 193 (E.D. Pa. 2017) ................................................................................................32

*Curley v. Allstate Ins. Co.*,
    289 F. Supp. 2d 614 (E.D. Pa. 2003) ................................................................................................46

*Doe v. Univ. of the S.*,
    687 F. Supp. 2d 744 (E.D. Tenn. 2009) ................................................................................................34

*Doe v. Univ. of Scis.*,
    No. CV 19-358, 2019 WL 632022 (E.D. Pa. Feb. 14, 2019) ...................................... *passim*

*Fagal v. Marywood Univ.*,
    No. 3:14-CV-02404, 2017 WL 4540613 (M.D. Pa. Oct. 11, 2017) ................................39, 41

*Farhangui v. Grossinger*,
    No. CV 20-2002, 2021 WL 37711 (E.D. Pa. Jan. 4, 2021) ................................................44, 45

*Ferreras v. Am. Airlines, Inc.*,
    946 F.3d 178 (3d Cir. 2019) ................................................................................................33

*Fiore v. Univ. of Tampa*,
    No. 20-CV-3744 (CS), 2021 WL 4925562 (S.D.N.Y. Oct. 20, 2021) ....................................34

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
    194 F.R.D. 484 (D.N.J. 2000) ................................................................................................49

*Hickey v. Univ. of Pittsburgh*,
    No. 2:20-CV-690, 2021 WL 1630579 (W.D. Pa. Apr. 27, 2021) ...........................................24

*Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*,
    40 A.3d 1261 (Pa. Super. 2012) ................................................................................37, 38, 39, 41

*Jamieson v. Vatterott Educational Centers, Inc.*,
    259 F.R.D. 520 (D. Kan. 2009) ................................................................................................40

*Jarzyna v. Home Props., L.P.*,
    321 F.R.D. 237 (E.D. Pa. 2017) ................................................................................................25, 29

*Johnson v. Weber*,
    239 A.3d 68 (Pa. Super. Ct. 2020), *appeal denied*, 244 A.3d 347 (Pa. 2021) ........................39

*Little v. Grand Canyon Univ. ("Grand Canyon I")*,
    No. CV-20-00795-PHX-SMB, 2021 WL 4263715 (D. Ariz. Sept. 20, 2021) ......................35

*Little v. Grand Canyon Univ. ("Grand Canyon II")*,
    No. CV-20-00795-PHX-SMB, 2022 WL 266726 (D. Ariz. Jan. 28, 2022) ....................35, 48

*Longest v. Green Tree Servicing LLC*,
    308 F.R.D. 310 (C.D. Cal. 2015) ............................................................................48

*Luppino v. Mercedes Benz USA*,
    718 F. App'x 143 (3d Cir. 2017) ............................................................................33

*Lyon v. Caterpillar, Inc.*,
    194 F.R.D. 206 (E.D. Pa. 2000) ............................................................................49

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ............................................................................29, 32

*Marino v. Home Depot U.S.A., Inc.*,
    245 F.R.D. 729 (S.D. Fla. 2007) ............................................................................39

*Martin v. Mountain State Univ., Inc.*,
    No. CIV.A. 5:12-03937, 2014 WL 1333251 (S.D. W. Va. Mar. 31, 2014) ..........................47

*McCausland v. Wagner*,
    78 A.3d 1093 (Pa. Super. 2013) ............................................................................37

*Metzner v. Quinnipiac Univ.*,
    528 F. Supp. 3d 15 (D. Conn. 2021) ............................................................................34

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016) ............................................................................46

*Mwantembe v. TD Bank, N.A.*,
    268 F.R.D. 548 (E.D. Pa. 2010) (Savage, J.) .................................................. *passim*

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015) ............................................................................31, 32, 44

*Ogrizovich v. CUNA Mut. Grp.*,
    No. 2:09CV371, 2013 WL 12140983 (W.D. Pa. Sept. 4, 2013) ..........................47

*Omicron Sys., Inc. v. Weiner*,
    860 A.2d 554, 564 (Pa. Super. Ct. 2004)) ............................................................................32

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015) ............................................................................49

*Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*,
    764 A.2d 1106 (Pa. Super. 2000) ............................................................44

*Ritti v. U-Haul Int'l, Inc.*,
    No. CIV.A. 05-4182, 2006 WL 1117878 (E.D. Pa. Apr. 26, 2006) .......................................48

*Roberts v. C.R. England, Inc.*,
    318 F.R.D. 457 (D. Utah 2017) ............................................................39

*Ryan v. Temple Univ.*,
    No. 5:20-CV-02164-JMG, 2021 WL 1581563 (E.D. Pa. Apr. 22, 2021) ..............................24

*Rynasko v. New York Univ.*,
    No. 20 CIV. 3250 (GBD), 2021 WL 1565614 (S.D.N.Y. Apr. 21, 2021) ..............................34

*Simms v. Jones*,
    296 F.R.D. 485 (N.D. Tex. 2013), *aff'd sub nom. Ibe v. Jones*, 836 F.3d 516
    (5th Cir. 2016) ............................................................39

*Smith v. U.S. Bank, N.A.*,
    No. 1:16-CV-21146-UU, 2017 WL 698530 (S.D. Fla. Feb. 22, 2017) ................................43

*Smith v. Univ. of Pennsylvania* (*"Smith I"*),
    534 F. Supp. 3d 463 (E.D. Pa. 2021) ..................................................... *passim*

*Swartley v. Hoffner*,
    734 A.2d 915, 919 (Pa. Super. 1999)). ............................................................34

*In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*,
    No. CV 2:11-07382, 2019 WL 2521958 (D.N.J. June 18, 2019) ...............................44, 47

*True R.R. Assocs., L.P. v. Ames True Temper, Inc.*,
    152 A.3d 324 (Pa. Super. 2016) ...............................................................39, 42

*Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.*,
    182 F.R.D. 500 (W.D. Mich. 1998) ...............................................................39, 40

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ............................................................39

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................33

*Wu v. Julie Robin Arouh, DMD, PC*,
    No. 14-CV-03902, 2016 WL 9772214 (E.D. Pa. Mar. 8, 2016), *amended sub*
    *nom. Wu v. Arouh*, No. 14-CV-03902, 2016 WL 9776072 (E.D. Pa. May 3,
    2016) ............................................................38

**Other Authorities**

Fed. R. Civ. P. 23(a) ................................................................................... *passim*

Fed. R. Civ. P. 23(a)(3) ........................................................................................28

Fed. R. Civ. P. 23(b) ...........................................................................................27

Fed. R. Civ. P. 23(b)(3) ............................................................................. *passim*

Fed. R. Civ. P. 23(b)(3)(D) ..................................................................................48

24 Williston on Contracts § 64:3 (4th ed.)..........................................................46

Defendant Trustees of the University of Pennsylvania ("Penn" or the "University"), improperly named as the "University of Pennsylvania," respectfully submits this response in opposition to Plaintiffs' Motion for Class Certification ("Mot." or "Motion").

## **INTRODUCTION**

This Court previously dismissed with prejudice the majority of Plaintiffs' claims, including all the claims seeking tuition refunds. Only Plaintiffs' breach of contract claim for fees—the General Fee, the Technology Fee, and the Clinical Fee—remains pending in this case. Class certification discovery has made clear that Plaintiffs' sole remaining claim lacks foundation and fails to meet the requirements to be certified as a class.

Each of the fees at issue helps to pay for a bundle of resources and services, including many student services, activities, and spaces. Plaintiffs initially alleged that they entered into an enforceable contract with Penn by paying the fees, which Penn purportedly breached by entirely ceasing to provide the services, activities, and spaces supported by those fees during the latter portion of the spring 2020 semester. Discovery has made plain that allegation is false. Penn personnel went above and beyond to ensure Penn supported its students during an unprecedented pandemic. Their hard work paid off. Many student resources and services remained available in the spring 2020 semester after the transition to remote classes. In addition, following the transition to remote classes, Penn made additional services available to students in a number of categories by supplementing its preexisting resources and services with new offerings intended to respond to an extraordinary situation. Certain spaces even remained available to students for in-person visits, including Penn's student health facilities. Thus, while Plaintiffs have pivoted to arguing that Penn committed a breach by ceasing the provision of *in-person* services, that assertion is false, too.

Discovery showed that Penn's publicly available description of the three fees at issue for the spring 2020 semester materially differs from what Plaintiffs advocated at the motion-to-dismiss stage. As explained in Penn's Motion for Summary Judgment, Penn's actual description of the fees (that they "support[]" and "assist[]" non-specific services) did not create any specific, identifiable contractual promise, and it was not breached in any event.

Discovery further showed that a class of "[a]ll people who paid fees on or behalf of students enrolled in classes at the University for the Spring 2020 semester" cannot be certified under Federal Rule of Civil Procedure 23(b)(3). Attempting to litigate a breach of contract claim for that proposed class would inevitably raise intractable individualized issues. Some students stayed on or near campus and continued to use campus resources, while others moved away. Even those who moved away used the different services Penn provided to different degrees. Pennsylvania law requires a consideration of whether an alleged breach of contract is material. Thus, even if any common questions exist on class members' breach of contract claims, they would be overwhelmed by individual questions regarding materiality and causation. Any attempt to analyze damages will also require individualized analyses, including an assessment of individual students' financial aid, and an evaluation of an individual student's "expectation damages" under Pennsylvania law. Plaintiffs simply cannot satisfy their burden to show that resolution of these issues on a class-wide basis is appropriate or feasible.

The issues with the proposed class do not end there. Even identifying "all people who paid fees" would require numerous, burdensome individual inquiries, which prevent the class from being ascertainable. And Plaintiffs' claims are not typical of the claims of the thousands of undergraduate and graduate students (e.g., PhD, professional, and other graduate students) who

enrolled in the spring 2020 semester.  Among other differences, Nedley was not injured, and Smith was not charged one of the fees at issue.

In short, Plaintiffs cannot satisfy the stringent requirements of Rule 23(a) or Rule 23(b)(3).  Certification should be denied.

## **BACKGROUND**

### A.  The Fees At Issue

Plaintiffs seek a partial refund of the spring 2020 semester General Fee, Technology Fee, and Clinical Fee.  The description of these fees that were available at the time the spring 2020 semester fees were due, and when the pandemic began, was:

> The general fee is assessed to all undergraduate, graduate, and professional students and directly supports a variety of student related activities, services, and spaces.
>
> [The Technology Fee] assists with the cost of computer labs and technological services.
>
> [The Clinical Fee] gives students unlimited access to Student Health Service. Direct questions about this fee to Student Health Service or call 215-746-3535.

*See* Ex. A to Decl. of T. Lewis ("Lewis Decl.") (spring 2020 fee descriptions as of December 17, 2019); Ex. B to Lewis Decl. (spring 2020 fee descriptions as of June 1, 2020).[1]

---

[1] The relevant fee descriptions are also available on the Wayback Machine at the following web addresses.  *See* https://web.archive.org/web/20191217184616/https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees (spring 2020 fee descriptions as of December 17, 2019);
https://web.archive.org/web/20200601235816/https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees (spring 2020 fee descriptions as of June 1, 2020).

**B. Penn's Response to the COVID-19 Pandemic, the Services Offered to Students, and the Impact on Penn's Finances.**

On March 6, 2020, Governor Tom Wolf confirmed the first two presumed positive cases of COVID-19 in Pennsylvania and signed an emergency disaster declaration effective throughout the Commonwealth. *See* ECF No. 26-6 (March 6, 2020 Proclamation of Emergency Disaster). Penn moved quickly to safeguard the health and safety of its students, employees, and campus visitors. During spring break, the University reduced the population density on its campus by asking the approximately 5,939 residents living on campus to leave university housing by March 17, 2020. *See* ECF No. 26-8 (March 14, 2020 message from Penn's Provost to Penn Families); *see also* Ex. 1 to Kidney Decl. at PENN_00001294 (as of February 21, 2020, approximately 5,939 students were living on campus). Significantly, not all students who lived on campus were asked to leave. Penn was attentive to students' individual needs, and where a need was shown, allowed 433 students to remain on campus. *See* Ex. 2 to Kidney Decl. at PENN_00000950. And of course, Penn could not mandate that students who already lived off campus move away from Philadelphia. While Penn does not possess reliable data on the exact number of students who remained off-campus in Philadelphia after campus density was reduced, it is likely that many of the approximately 15,972 students who lived off-campus in Philadelphia remained in their residences. *See* Ex. 1. Plaintiff Smith is one example of a student who did so. ECF No. 78-5 (Ex. C to Plfs.' Mot. for Class Cert.) ("Smith Depo.") at 28:22-30:4.

As detailed below, for the remaining approximately five and a half weeks before the end of the spring semester, Penn nevertheless continued to provide students with a variety of services, activities, and spaces. For those students who remained on or near campus, this included access to in-person spaces.

### 1. General Fee

One of the fees at issue is the General Fee, which some students were assessed (in varying amounts), while others were not. Approximately 1,013 students were not charged a General Fee. *See* Lewis Decl. ¶ 5. Numerous programs at Penn did not even charge a General Fee, but rather a Program Fee. Ex. 3 to Kidney Decl. at PENN_00000871 (*see e.g.,* full-time study abroad undergraduates and Wharton School Executive MBA students). For those students who were assessed a General Fee, the amount charged (also known as the List Price) varied significantly. *See* Ex. 25 to Kidney Decl. Report of Benjamin S. Wilner ("Wilner Report") at 5 ("For example, the List Price of the General Fee for undergraduates, $2,568, was generally 1.5 times the List Price for graduate and Ph.D. students, though there was sizable variability. While the List Price was $1,660 for many graduate and Ph.D. students, this List Price was only $416 for Ph.D. students with a reduced tuition dissertation status while it was $1,867 for graduate students in the Teacher Education, M.Ed. program."). And, as discussed further *infra* pp. 5-17, even for those students who were charged the same amount, the amount they paid out-of-pocket, as compared to the amount paid by other payors such as Penn, varied significantly.

The General Fee "supports a variety of student related activities, services, and spaces." *See* Exs. A, B to Lewis Decl. At the motion-to-dismiss stage, this Court relied on Plaintiffs' allegation that Penn failed to provide "*any* student 'activities'" after the population density of the campus was reduced. *Smith v. Univ. of Pennsylvania ("Smith I")*, 534 F. Supp. 3d 463, 475-76 (E.D. Pa. 2021) (emphasis added); *see also* ECF No. 18 (Amended Complaint ("Am. Compl.")) ¶ 151. Class certification discovery has demonstrated that this allegation was false. Numerous student activities, services, and spaces were supported and available to students throughout the spring 2020 semester. Moreover, while the description of the General Fee did not promise

uninterrupted access to *specific* services, activities, and spaces, *see* Mot. for Summary Judgment Memorandum (ECF No. 82-1) ("MSJ Memo.") at Section I.A-C, a variety of spaces, activities, and spaces *were* available remotely and were used by students until the end of the spring 2020 semester. Even Plaintiffs do not dispute this. *See* Smith Depo. at 77:16-25 (agreeing Penn provided a variety of student services and spaces after the transition to remote instruction); *see also* ECF No. 81 (Ex. D to Plfs.' Mot. for Class Cert.) ("Nedley Depo.") at 122:8-14 (admitting she was able to participate in at least one activity or service supported by the General Fee that was offered by Penn after the transition).

Following the onset of the pandemic, Penn transitioned many of the services supported by the General Fee to a virtual platform and added new services. Penn was able to support students throughout the spring 2020 semester because *it never reduced funding* for the groups that received the proceeds of the General Fee. More specifically, as an accounting matter, Penn allocates the proceeds from the General Fee for distribution on a monthly basis—i.e., in 1/12th portions. Lewis Decl. ¶ 6. All of these allocations, including those for accounting categories associated with student services, were maintained throughout the fiscal year and were not reduced during the pandemic. *Id.*

In addition, "spaces" supported by the General Fee remained open for in-person services throughout the spring 2020 semester—despite the pandemic. For example, Penn continued to provide in-person counseling and psychological services, intervention services, and wellness checks, as well as making Penn's Public Safety Headquarters open to community members throughout the entire spring 2020 semester for walk-in services. Ex. 4 to Kidney Decl. at PENN_00001318; Ex. 5 to Kidney Decl. at PENN_00000088.

These spaces were utilized by Penn to make available a number of services. For example, Student Intervention Services ("SIS") provided crisis intervention and case management to students facing personal and COVID-19 related challenges. Ex. 4. Specifically, SIS served hundreds of students, including those who "walked in" with concerns and issues following the onset of the pandemic. *Id.* at PENN_00001318; *see also* Decl. of E. Gross ("Gross Decl.") ¶ 4. SIS also responded to crises and student support needs unrelated to the pandemic, including a suicide attempt, a significant psychiatric hospitalization, and other mental-health emergencies. *Id.* SIS, for example, conducted 48 wellness checks to track down students who were not responding to faculty or staff. *Id.* at PENN_00001319. Furthermore, Penn's Division of Public Safety ("DPS") continued to have a strong on-campus presence, maintaining the safety of the 400-plus students who remained on campus and the many more who lived-off campus but remained local. *See* Ex. 5; *see also* Wilner Report at 12. In particular, DPS continued to provide comprehensive safety and security services on a 24/7 basis, including, but not limited to, walking escorts, special checks, and a headquarters available for walk-in services. *Id.*

**Counseling and Wellness Services.** In addition to the in-person intervention and counseling and wellness services, CAPS and SIS were available to connect with students remotely, including via telehealth. Ex. 6 to Kidney Decl. at PENN_00001320; *see also* Ex. 4; Ex. 7 to Kidney Decl. at PENN_00000162; Wilner Report at 8. Many students needed these services more than ever due to the pandemic causing additional mental health issues. For example, between March 16 and the end of May, CAPS conducted 6,702 direct services such as on-going counseling sessions to students. Gross Decl. ¶ 5. These sessions were conducted in-person and remotely. *Id.* CAPS also conducted 228 initial assessments and held 118 "drop-in" appointments between March 16, 2020 and May 31, 2020. *Id.*; *see also* Ex. 6. In the intensive

period from March 12 to March 22, SIS served about 450 students with concerns related to the pandemic. *See* Ex. 4; Gross Decl. ¶ 4. And from March 23 to May 15, SIS served more than 400 students and managed about 85 cases per week. *See id.* Notably, for many students, use of these services increased significantly after the pandemic began. *See* Wilner Report at 8 ("Student use increased significantly to an average of 91.5 students per week" compared to "an average of 20.6 students a week. . . in the three academic years prior to 2019/20.").

**Student Activities.** In the spring 2020 semester, the Division of the Vice Provost of University Life ("VPUL"), which is "Penn's foremost provider of student activities, services, and support[,]" used the proceeds from the General Fee to support its mission, including by providing student activities after the population density of campus was reduced. Ex. 8 to Kidney Decl. at PENN_00000615. By way of example, after the pandemic began:

- VPUL technology services helped put on the Class of '20 "Final Toast." 624 undergraduate seniors attended this live, virtual event.

- U-Night, a "celebration of all things sophomores," was held virtually and attracted more than 10,000 social media views.

- Penn Women's Center organized "Take Back the Night," a virtual program addressing the topic of sexual violence. 165 people attended this program.

- 120 students took advantage of Online FGLI Mentoring, a new initiative that the Greenfield Intercultural Center created to support students who are the first in their families to go to college and/or who come from low-income households.

- The Platt Student Performing Arts House Hosted an Open Mic Night, which 85 participants attended remotely, and also offered virtual career mentoring, study hall session, and a trivia night.

*Id.*; *see also* Ex. 9 to Kidney Decl. at PENN_00000902. These examples represent just a small fraction of the over 800 hours of virtual programming and office hours that VPUL offered between March 23, 2020 and May 15, 2020.

Student groups, which are supported by the Office of Student Affairs within VPUL, were also active near the end of the Spring 2020 semester.  The most active student groups on Zoom were Penn Common Cents (a finance club), Pi Kappa Alpha (a fraternity), and the Penn Social Deduction Club (a game playing organization).  In addition, there were 124 other student groups that conducted meetings on Zoom.  *See* Ex. 9.  Collectively, between April 16, 2020 and May 15, 2020, these student group meetings attracted approximately 11,014 total participants for 2,340 meetings on Zoom, totaling 10,188 hours.  *Id.*  If a student were to try to attend these meetings consecutively, one after another, for 12 hours each day during the pandemic, it would have taken 849 days to attend them all—whereas there were only 56 days between March 17, when many students who lived on campus were asked to vacate campus housing and the end of the term.  Simply put, students had access during the pandemic to more activities than any one of them could have reasonably enjoyed.

**Multicultural Resource Centers.**  A diverse array of multicultural centers and offices within VPUL continued to support the diverse needs of its student population throughout the spring 2020 semester, including the Center For Hispanic Excellence: La Casa Latina; Penn Violence Prevention; the PENNCAP/Pre- Freshman Program; the Lesbian Gay Bisexual Transgender Center; Makuu: the Black Cultural Center; the Pan-Asian American Community House; and the Office of Fraternity and Sorority Life.  *Id.*; *see also* Wilner Report at 9.  Set forth below are examples of activities sponsored by the multicultural centers during the spring 2020 semester after the pandemic began:

- The Greenfield Intercultural Center held 15 virtual office hours, engaging 407 students. In addition, 70 students participated in Greenfield Intercultural Center virtual programing.

- The Center for Hispanic Excellence: La Casa Latina held 12.5 hours of Zoom calls and nearly 60 one-on-one telephone calls. Additionally, 140 students participated across the resource center's 60 hours of virtual programming.

- The Lesbian Gay Bisexual Transgender Center held 90 virtual office hours and 101 students one-on-ones. Additionally, 106 students participated in the resource center's two virtual programs.

- Makuu: The Black Cultural Center held 15 virtual office hours, conducted 15-30 daily individual advisee check-ins and held three different virtual programs. Makuu Friday Living Room had 67 participants and the Senior Toast had 122 participants.

- The Pan-Asian American Community House held 78 virtual office hours and had 40 students participate in one-on-ones.

- The Penn Women's Center held confidential one-on-one sessions twice a week and had 6 virtual programs, totaling 219 participants.

*See* Wilner Report at 9; *see also* Ex. 9.

**Recreation and Fitness Services.** In their Motion, Plaintiffs claim that recreation is only available to students in-person. Mot. 4. That is incorrect. Penn students continued to have access to and receive recreation and fitness services and support following the onset of the pandemic. For example, Penn created on-demand online resources, such and fitness and wellness programs, for students to access remotely. Penn also implemented live recreation and fitness classes on Zoom, Facebook Live, and Instagram Live. Ex. 10 to Kidney Decl. at PENN_00001249; *see also* Ex. 11 to Kidney Decl. at PENN_00001181.

For many students, these virtual group classes represented a new benefit that was not available prior to the pandemic. While some students bought semester-long passes for group exercise classes at the beginning of the spring 2020 Semester, Penn voluntarily refunded over 50% of the pass' cost to approximately 376 students, and offered group exercise classes to all students free of charge after the pandemic began. Ex. 12 to Kidney Decl. at PENN_00001165; *see also* Ex. 11.

**Career Services.**  One of the benefits of a Penn education is the opportunity to participate in summer internships and to embark on a career after graduation.  For many, despite the unprecedented pandemic and challenges students faced when companies rescinded job and internship offers, Career Services made that opportunity a reality.  For example, in response to student requests, beginning in March 2020, Career Services staff conducted more than 2,200 advising sessions virtually.  *See* Ex. 8 at PENN_00000618.  During that same period, Career Services also organized 159 virtual employer events and facilitated the posting of 8,918 job and internship opportunities for students.  *See* Ex. 9 at PENN_00000921.  In addition, Career Services provided an online mentoring program, in which 120 students, 134 alumni, and 11 faculty and staff members participated.  *See id.* (between a total of 265 users, 474 messages were sent).  And 605 students attended "Life After Penn," a remote session hosted by Career Services. *See* Ex. 8 at PENN_00000691.

**Learning and Support Services.**  Penn also continued to make academic support services available to students following the onset of the pandemic in the spring 2020 semester. Between March 16, 2020 and May 15, 2020, Tutoring Services within the Weingarten Learning Resources Center oversaw 2,177 tutor-tutee interactions.  *See id.* at PENN_00000629-31. During the same period, Student Disabilities Services conducted 790 student encounters via Zoom, telephone, or email, and the Office of Learning Resources ("OLR") engaged with 551 students through individual Zoom appointments and 17 workshops.  *Id.*  Weingarten Learning Resources Center also held six virtual programs, which provided tutoring, consultations on learning strategies, and disability accommodations to students.  *See* Ex. 9 at PENN_00000926. Because student learning during this time was by necessity remote, OLR also revamped its

Resources for Remote Learning webpage and released an interactive module on Proactive Time Management for Learning Online.

**Graduate Student Center.**  Separate from VPUL, the General Fee also funds the Graduate Student Center, Family Resource Center, and Provost's Office.  Each of these groups provided additional support to students throughout the spring 2020 semester.  By way of example, the Graduate Student Center hosted at least 76 synchronous and asynchronous virtual activities during the period from March 13th to May 18th.  Ex. 13 to Kidney Decl. at PENN_00001402.  These activities included weekly language chats, wellness workshops, trivia night, and a weekly writing challenge.  *See id.*  In addition, the Graduate Student Center provided, among other things, comprehensive website resources, offered one-on-one support and advice to students, created new digital assets, and an increased presence on social media platforms.  *See* Wilner Report at 12-13; *see also* Ex. 13.  As described, *infra* pp. 13-14, the Graduate Student Center also provided Technology Grants and COVID Emergency Grants to graduate and professional students.

**Family Resource Center.**  The Family Resource Center serves under graduate and graduate students with children.  In the second part of the spring 2020 semester, the Family Resource Center hosted synchronous and asynchronous virtual activities, including virtual student parent support groups, virtual field trips, and a nutrition and cooking series.  *See* Ex. 14 to Kidney Decl. at PENN_00001322; Ex. 15 to Kidney Decl. at PENN_00001328; *see also* Wilner Report at 14.  The Family Resource Center also performed a multitude of services, including adding a comprehensive website with virtual resources for student parents; reinvigorating its Facebook group; providing virtual one-on-one advising; continuing to facilitate Family Leave and New Parent Accommodation for PhD students; co-producing videos to assist

with navigating interview questions and career options as a parent; and using social medial to provide tips for home-schooling.  *See* Wilner Report at 14.

**Office of Admissions.**  Significantly, the fees assessed to enrolled students also supported services, activities, and spaces that students cannot "access."  For example, the Admissions Office is supported by the General Fee and is the primary marketing and engagement division between the University and prospective and admitted students.  *See* Wilner Report at 13.  This office remained active throughout the spring 2020 semester.  Among other things, the Admissions Office finalized the list of students admitted to Penn's Class of 2024 and fielded questions and concerns for several weeks from prospective students.  *Id.*  The Office of Admissions also offered prospective students more virtual tours and invested in outreach and engagement.  Ex. 9 (discussing virtual programs held by College Access Programs).

**Student Registration and Financial Services Office.**  This office, which is also supported by the General Fee, continued to provide financial aid counseling and packages to students, including those were recently admitted to Penn.  Additionally, the Student Registration & Financial Services Office developed Financial Wellness resources and programs for the fall 2020 semester.  *See* Ex. 8.  Significantly, Penn Student Registration & Financial Services, in conjunction with SIS, Penn First Plus, the Graduate School of Education, the Provost's Office and other Penn offices, provided emergency, pandemic-related financial support directly to students, including approximately $11 million to assist with a variety of needs, including but not limited to travel costs incurred after the onset of the pandemic, expenses for food, laptops, and other technology costs.  *See* Wilner Report at 13.  More specifically, Penn provided approximately:

- $154,708 to assist 377 students with travel costs incurred after campus de-densification;

- $212,490 to assist 474 students with expenses for items such as food after they departed campus;

- $9,817,002 to assist 3,456 students by waiving all summer salary expectations, thereby freeing students to pursue a wider array of opportunities;

- $482,184 to 42 students whose financial aid packages were reevaluated between March and May 2020 due to pandemic-related family financial changes;

- At least $173,140 to students for laptops and technology costs; and

- $259,742 in COVID-19 Emergency Grants to assist 392 graduate and professional students with unanticipated expenses related to the onset of the pandemic.

*See* Lewis Decl. ¶ 10; *see also* Ex. 9.

*   *   *

In sum, Penn continued to provide services, activities, and spaces, supplemented by new programs and resources, as well as substantial additional direct financial support. As a result, students still had access to and received value from those programs that the General Fee supported.

### 2. Technology Fee

As with the General Fee, the Technology Fee is not uniform and varies depending upon each student's individual circumstances, such as school, degree program, and the number of courses the student takes. Not all of Penn's schools charge students a Technology Fee. For example, approximately 6,894 students, including Plaintiff Smith, were not charged a Technology Fee.[2] *See* Lewis Decl. ¶ 5; Ex. 3. Even for those students who were charged a

---

[2] Although Smith alleged she paid a Technology Fee, Am. Compl. ¶ 152, in her deposition, Smith admitted that her account statement indicated that she never paid a Technology Fee. *See* Smith Depo. at 27:8-14; *see also* ECF No. 82-9 (Ex. 2 to MSJ Memo.). In addition, Penn's list of applicable fees indicates that the Graduate School of Education charged no Technology Fee for Smith's program. *See* Ex. 3.

Technology Fee, the amount charged varied significantly. *See* Wilner Report at 5-6 ("[T]he List Prices for the programs that charged a Technology Fee ranged from $85 to $725 for full-time students" and from "$95 to $181" for part-time students.). And for those students who were charged the same amount, the amount they paid out-of-pocket, as compared to the amount paid by other payors such as Penn, also varied significantly. *See infra* pp. 5-17.

The Technology Fee "assists with the cost of computer labs and technological services." *See* Exs. A, B to Lewis Decl. This description describes how the Technology Fee is used, without promising that students would have uninterrupted access to any particular lab or service for a specified period. *See* ECF No. 82-1 (MSJ Memo.). In any event, Penn provided technology-related services, including the ability to use computer labs, throughout the spring 2020 semester. After the pandemic began, Penn invested in technology and infrastructure to facilitate remote learning and student life. For example, while some computer labs may have physically closed due to safety concerns from COVID-19, by the end of March 2020, Penn's School of Arts and Sciences ("SAS") provided Virtual Desktops that students could use to access software remotely that was previously available in campus computer labs. Decl. of W. Petrofsky ("Petrofsky Decl.") ¶ 3. Penn also engaged a third-party vendor, ModSquad, to provide students with 24/7 technology support. *Id.* ¶ 4. In addition to these added services, Penn continued to provide students with, among other things, technology support and email services and support, as well as Penn-provided software and research tools, including Symantec and Microsoft Office 360. *Id.* ¶ 5. As mentioned, the University and individual schools also provided students— including Plaintiff Smith—with emergency financial support so that they could purchase critical technological resources, including computers, printers, and WIFI hotspots. *See supra* pp. 13-14; *see also* Ex. 16 to Kidney Decl. at PENN_00001299.

### 3. Clinical Fee

Plaintiffs are also seeking refunds of the Clinical Fee, which was assessed to many—but not all—students for the spring 2020 semester and supports Student Health Service.  The Clinical Fee is a flat fee of $304 per semester for full-time students in most programs, but approximately 4,009 students were not charged a Clinical Fee.  *See* Lewis Decl. ¶ 5.  For example, not all graduate schools charged a fee.  And students who were enrolled in two or fewer course units were also not charged a Clinical Fee.  As with the General Fee and the Technology Fee, even for those students who were charged a Clinical Fee, the amount they paid out-of-pocket, as compared to the amount paid by other payors such as Penn, varied greatly.  *See infra* pp. 5-17.

This Court previously relied on Plaintiffs' allegation that Penn failed to deliver "any student health and treatment services for a portion of the Spring 2020 semester."  *Smith I*, 534 F. Supp. 3d at 475-476.  But, once again, class certification discovery has proven that Plaintiffs' allegation is false.  In fact, Penn's Student Health Service continued to provide student health and treatment services to over 5,200 students, including in-person and via telehealth in the final weeks of the spring 2020 semester.  Between March 16 and May 31, 2020, for example, Student Health conducted 669 *in-person* appointments.  *See* Ex. 6; *see also* Gross Decl. ¶ 3.  And between March 16 and the end of May, Student Health conducted 4,605 remote appointments.  *Id.*; *see also* Gross Decl. ¶ 3.  In addition, Penn's Office of Alcohol and Other Drug Programs continued to support students seeking recovery through virtual support group meetings, which were offered seven days a week.[3]  Penn also continued to provide other drug and alcohol education to students.[4]  Furthermore, Penn Wellness created additional online resources, such as

---

[3] *See* https://web.archive.org/web/20200330175342/https://aod.wellness.upenn.edu/initiatives/ (last visited Dec.15, 2021).

[4] *See id.*

15-minute daily exercise videos, an online sleep intervention program, guided meditation, and a pilot online sexual health education program to provide further aid to students. *See* Ex. 17 to Kidney Decl. at PENN_00000508.

Additionally, Penn began offering COVID specific care—which was, of course, not available to students before the pandemic began—including coordinated care and follow-up services for any students, regardless of their location, who were positive for, exposed to, or showed symptoms consistent with COVID-19. *See* Gross Decl. ¶ 6. For example, Penn performed 175 different instances of contract tracing due to COVID-19 before the end of April 2020. *Id.* Penn also *increased* staffing to handle the need for the in-person and telemedicine services offered by Student Health Services. *Id.*

### 4. The Pandemic's Impact on Penn's Finances

Contrary to Plaintiffs' allegations, Am. Compl. ¶¶ 136, 166, Penn did not enjoy a windfall as a result of the pandemic. To the contrary, providing students with the services, activities, and spaces described above had significant negative consequences for Penn's finances. Most of the costs that Penn was incurring prior to the pandemic (which were mostly labor costs) were fixed and continued unabated during the pandemic, and then Penn lost significant revenue as a result of the pandemic. *See* Wilner Report at 21-22. For example, from March through June 2020 (i.e., the last four months of Penn's fiscal year), Penn's revenues were $104,803,000 lower as compared to the same period the year before. *See* Lewis Decl. ¶ 9. After costs are subtracted, Penn's net assets from operations in the last four months of fiscal year 2020 decreased by

$9,003,000, or 10.8%, as compared to the last four months of fiscal year 2019. *Id.* In short, Penn's financial position did not benefit from the pandemic.[5]

### C. Penn's Financial Aid to Students

The money Penn lost during the pandemic did not affect its prior financial commitments to students. Since long before the pandemic began, the University has been providing its students with generous financial aid packages, typically in the form of grants and scholarships, which students are not required to repay. Financial aid at Penn is calculated by determining a student's total cost of attendance ("COA") and then subtracting the expected family contribution ("EFC").[6] The remaining difference is the student's demonstrated financial need, which (for at least undergraduates) Penn then covers through a combination of grant and work-study funding.[7] *See* Ex. 18 to Kidney Decl. at PENN_00000863 (sample student award letter). The cost of attendance, financial need, and the resulting financial aid award will vary from student to student. For example, for the spring 2020 semester, Penn provided financial aid to students ranging from $50 to $77,897. *See* Lewis Decl. ¶ 8.

---

[5] Plaintiffs have at times argued that Penn's endowment supports their claim for relief. That argument is legally meritless and misunderstands Penn's use of its endowment. In fiscal year 2020, Penn already paid out from its endowment approximately $655,000,000, an amount that supported a significantly larger percentage of the University's operating budget than it did a decade ago. And a significant majority of the endowment funds (69.1% in fiscal year 2020) are already dedicated to instructional use and financial aid, purposes that directly benefit students in many different ways. *See* https://www.finance.upenn.edu/wp-content/uploads/FY20-Annual-Financial-Report.pdf. Plaintiffs' argument that Penn should spend down its endowment to provide refunds for the spring 2020 semester would essentially put the interests of that semester's students above those of generations of future students.

[6] *See generally* https://srfs.upenn.edu/financial-aid/undergraduate-aid-program/financial-aid-101. The cost of attendance includes an estimate of tuition and fees; room and board (or living expenses for students who live off campus); books, supplies, transportation, and miscellaneous expenses.

[7] As a result of the pandemic, Penn waived all requirements that students obtain a summer job in the summer following the spring 2020 semester.

Overall, approximately 47% of Penn undergraduate students and approximately 52% of Penn non-undergraduate students receive some financial aid. Lewis Decl. ¶ 7. And Penn provided $360,863,000 in undergraduate and graduate financial aid grants and scholarships towards tuition and revenue during fiscal year 2020 (which includes the spring 2020 semester at issue). *Id.*[8] As compared to the prior fiscal year, students received $10,882,000 more in financial aid grants and scholarships.[9] Not only do aid packages heavily subsidize students' education and experience at Penn, but, as discussed *infra* Section II.B, they introduce individualized issues that prevent any class from being certified.

### D. Plaintiffs' Enrollment & Experience At Penn

Plaintiffs are examples of how individual student experiences differ in material ways. Plaintiff Smith attended Penn's Graduate School of Education ("GSE") during the spring 2020 semester, pursuing a Master's Degree in Education. Am. Compl. ¶ 38. She continued taking classes at Penn throughout the spring 2020 semester and re-enrolled for the summer 2020 session, even though she knew that the session would be conducted remotely. Smith Depo. at 95:22-96:13. Although she testified that she only continued with the spring 2020 semester because withdrawal was not a practical option, she previously withdrew from another graduate education program after enrollment. *See id.* at 7:9-8:19. She has since graduated from Penn and is now a teacher at a private school in Delaware.[10]

As part of her enrollment for the 2019-2020 academic year, Smith accepted the terms of the "Financial Responsibility Statement" on August 14, 2019. *See* ECF No. 26-1 ("MTD Memo.") at 12. According to Smith's "Student Account – Spring 2020 – Account Activity," the

---

[8] *See* https://www.finance.upenn.edu/wp-content/uploads/FY20-Annual-Financial-Report.pdf.
[9] *See id.* at 6.
[10] *See* Smith Depo. at 30:5-7.

amount that Smith owed in fees for the spring 2020 semester was assessed and payable by

November 26, 2019. *See* Ex. 2 to MSJ Memo. For the spring 2020 semester, █████████

████████████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████. Smith Depo. at 35:7-13. For the semester at issue, Smith paid a General Fee of $1,600

and a Clinical Fee of $304. Ex. 2 to MSJ Memo.; *see also* Smith Depo. at 27:4-7. She did not

pay a Technology Fee.[12] Multiple documents suggest, however, that she did request and receive

a COVID-related emergency technology grant in the amount of $210. Ex. 19 to Kidney Decl. at

PENN_00000862; Ex. 20 to Kidney Decl. at PENN_00000857; *see also* Ex. 16.[13]

Plaintiff Nedley's experience differs in material ways from Smith's. Nedley was an

undergraduate during the spring 2020 semester. She continued taking classes at Penn throughout

the spring 2020 semester and re-enrolled at Penn for the fall 2020 semester. Nedley did so even

though she knew that the fall 2020 semester would be remote and that she would pay a General

Fee, as well as *higher* amounts for the Technology and Clinical Fees (as compared to the spring

2020 semester). Nedley Depo. at 45:25-46:9. Nedley is now a senior at Penn and is scheduled

to graduate in May 2022. Following graduation, she plans to attend graduate school for dentistry

at the University of California, San Francisco. Nedley Depo. at 23:6-19.

---

[11] Pursuant to this Court's direction during the telephonic conference of the Parties with the Court on February 7, 2022, undersigned counsel has redacted from the public version of this memorandum (and supporting exhibits) information specific to the Plaintiffs that is protected by privacy considerations.

[12] *See supra* n.2.

[13] While Smith claimed at her deposition that she never received the money, evidence shows that the technology-related grant was direct deposited to her account and Penn has produced this document to opposing counsel. *See* Ex. 16.

As part of her enrollment for the 2019-2020 academic year, Nedley accepted the terms of the "Financial Responsibility Statement" on August 20, 2019. *See* MTD Memo. at 12. According to Nedley's "Student Account – Spring 2020 – Account Activity," the amount that Nedley owed in fees for the spring 2020 semester was assessed and payable by November 8, 2019. ECF No. 82-10 (Ex. 3 to MSJ Memo. ("NEDLEY 000003")).

Unlike Smith, Nedley, in addition to her own contribution, received financial support from various members of her family for the cost of attendance at Penn. Nedley Depo. at 163:1-16; 166:5-20. For the 2019-2020 academic year, Nedley's expected family contribution was ███████. ECF No. 82-11 (Ex. 4 to MSJ Memo. ("PENN_00000866")). Nedley's total COA was $76,444 for the 2019-2020 academic year. *Id.* While not obligated to, ███████ ███████████████████████████████████████████████████████████ ████████. *Id.* Specifically, for the Spring 2020 semester ████████████████ ████████████. *See* Nedley 000003. █████████████████████████ ████████████████. *Id.* Nedley paid a General Fee of $2,568, a Clinical Fee of $304, and a Technology Fee of $435 for the Spring 2020 semester. *See id.*

In addition to variations in which Penn school they were enrolled, what they were charged, and how they financed their education, Plaintiffs exemplify the variation in individual students' experiences, both before and after the pandemic began. Smith, who lived in close proximity to campus, continued to live in the same residence through the spring 2020 semester. Smith Depo. at 28:22-29:11, 29:23-30:4. Nedley, who lived near campus, chose to move away from Philadelphia for the remainder of the Spring 2020 semester. In doing so, she requested and received a $465 credit to her student account from Penn's COVID-related emergency fund for a rental car she used to return to her family home in Pittsburgh. Nedley Depo. at 42:23-43:5.

Plaintiffs' experiences varied in other ways, too. Prior to the onset of the pandemic, Smith regularly used the recreation and fitness services. Ex. 21 to Kidney Decl. (Plaintiff Smith's Answers and Objections to Defendant's Interrogatories (Set One) ("Smith Resps. to Interrogs.")) No. 9. Plaintiff Nedley, however, did not. ECF No. 82-8 (Ex. 1 to MSJ Memo. ("Nedley Resps. to Interrogs.")) No. 9. Instead, Nedley, as a varsity softball player, used other athletic and fitness facilities and services only available to student athletes. *Id.* at No. 14. While Smith worked on the Penn GSE Journal, *see* Smith Resps. to Interrogs. No. 13, Nedley was a student tutor and a member of the Penn Athletics Wharton Leadership Academy, Penn Athletics Health and Wellness Captains, and the Pre-Dental Society. *See* Nedley Respons. to Interrogs. No. 14. Both Smith and Nedley claim to have made little or no use of the virtual services, activities, and spaces that were available after the pandemic began, even though they knew of the availability of at least some of these services, activities, and spaces. *See* Nedley Resps. to Interrogs. Nos. 10, 11 (disclaiming the use of available services offered by Penn); Smith Resps. to Interrogs. Nos. 8, 10, 11 (claiming she did not "request or receive" available services offered by Penn); *see also* Smith Depo. at 54:23-55:4 (admitting Career Services continued to provide student support and services after the transition to remote instruction); Nedley Depo. at 96:4-7 (conceding she was aware she could access health services virtually); *id.* at 113:21-114:7 (admitting she knew CAPS continued to maintain an in-campus presence following the transition to remote learning); Smith Depo. at 60:4-9 (same). In this regard, both Plaintiffs are unlike the scores of students who did take advantage of virtual and in-person services, activities, and spaces near the end of the spring 2020 semester. *See supra* pp. 5-14. It is also notable that many students took advantage of virtual services that were offered prior to the pandemic. For example, although Nedley complained that, during the last 5 and a half weeks of the spring 2020 semester,

she was unable to visit the career services office in person, she also conceded that—during the entire period of the spring 2020 semester *prior* to the pandemic—she accessed the career services office on an entirely virtual basis. Nedley Depo. at 93:2-11, 131:18-25.

There are also services that neither Smith nor Nedley used either before or after the pandemic began. For example, Nedley did not use multicultural resources from Penn during the spring 2020 semester, which was supported by the General Fee. *See* Nedley Resps. to Interrogs. No. 13. Additionally, Smith did not identify any health-related services that she sought or received during the spring 2020 semester. *See* Smith Resps. to Interrogs. No. 7.

The differences in students' experiences both before and after the pandemic began has implications for how they value those experiences. For example, Smith admits that access to the gym was more valuable to her than access to the student health building, which she never visited. *See* Smith Depo. at 95:6-15. This type of difference would not be limited to Smith. Indeed, she herself conceded that measuring the value of each students' experience is an "individualistic" exercise. *See id.*

At bottom, not only does the likelihood of each student using particular services, activities, and spaces at any point during the spring 2020 semester vary, but so does the value each student associates with those services, activities, and spaces.

### E. Procedural History

This Court previously dismissed with prejudice most of Plaintiffs' claims against Penn. The Court agreed that Penn never promised students that it would provide in-person instruction in all circumstances in exchange for tuition, much less during an unprecedented global pandemic. *Smith I*, 534 F. Supp. 3d at 474 ("there is no specific, written promise to provide in-

person instruction").[14]  This Court also rejected Plaintiffs' arguments that a contractual

obligation should be inferred from the fact that Penn provided in-person instruction for the first

part of the spring 2020 semester and prior to the onset of the pandemic.  *See id.* at 471 (Plaintiffs

"cannot base their claim for breach of contract on Penn's prior course of conduct").  All that

remains pending in this litigation is Plaintiffs' contract claim seeking fee refunds.  *See id.* at 476.

On February 4, 2022, Plaintiffs filed their Motion for Class Certification, seeking to

certify, pursuant to Rule 23(b)(3), a proposed class defined as: "All people who paid fees for or

on behalf of students enrolled in classes at the University for the Spring 2020 semester."  Mot. 8.

## **LEGAL STANDARD**

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)

(internal quotations and citations omitted).  To come within this exception, a plaintiff must

establish by a preponderance of evidence that the proposed class satisfies the four prerequisites

in Rule 23(a).  *Mwantembe v. TD Bank, N.A.*, 268 F.R.D. 548, 555-56 (E.D. Pa. 2010) (Savage,

J.).  "Rule 23(a) is more than a pleading rule."  *Id.* at 555.  The plaintiff must in fact prove that

the rule's requirements have been satisfied by a preponderance of the evidence, which requires

that a plaintiff "do more than make a threshold showing."  *Id.*  A court reviewing a motion to

---

[14] Most other courts applying Pennsylvania law have reached similar conclusions when
dismissing students' claims for tuition and fee refunds.  *See, e.g., Hickey v. Univ. of Pittsburgh*,
No. 2:20-CV-690, 2021 WL 1630579, at *5 (W.D. Pa. Apr. 27, 2021) ("Plaintiffs have failed to
identify any specific language from the University's websites, promotional materials, circulars,
admission papers, and publications that exclusively promises in-person and live education.");
*Ryan v. Temple Univ.*, No. 5:20-CV-02164-JMG, 2021 WL 1581563, at *8 (E.D. Pa. Apr. 22,
2021) ("Plaintiffs have not identified a contractual duty that Defendant breached when it decided
to transition classes to an online forum" in response to the COVID-19 pandemic).  Indeed, other
courts applying Pennsylvania law have relied on this Court's prior opinion when dismissing the
claims before them.  *See e.g., Brezinski v. Widener Univ.*, No. 20-CV-4939-JMY, 2022 WL
267898, at *4 (E.D. Pa. Jan. 28, 2022).

certify a class should conduct a "rigorous analysis" which "entails a critical review of the elements of the cause of action" and "requires some inquiry into the merits" to resolve factual and legal disputes. *Id.* at 556 (citations omitted).

A plaintiff also must qualify for at least one of the three subsections to Rule 23(b). *Id.* Here, Plaintiffs invoke Rule 23(b)(3), which requires a finding that common questions of law or fact predominate over questions affecting only individual class members, and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A plaintiff seeking certification of a Rule 23(b)(3) class must also prove by a preponderance of the evidence that the class is "ascertainable," meaning that the class is "defined with reference to objective criteria," and there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Jarzyna v. Home Props., L.P.*, 321 F.R.D. 237, 240 (E.D. Pa. 2017).

## ARGUMENT

For many reasons, Plaintiffs have not carried their burden of demonstrating that the putative class, as defined by Plaintiffs, should be certified. Plaintiffs cannot satisfy Rule 23(a)'s typicality requirement. Besides the fact that Plaintiff Nedley was not injured at all in light of her financial aid package, each Plaintiff paid different fees, and used different services provided by Penn in different amounts, raising individualized questions regarding materiality, causation, and damages. *See infra* Section I.

Plaintiffs also cannot satisfy the requirements of Rule 23(b)(3). First, Plaintiffs cannot show the proposed class ("All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester") is ascertainable; they propose no method to determine who paid fees "for on behalf of" each one of Penn's approximately 24,000 students,

as Penn's records do not reflect each student's payor (or payors).  *See infra* Section II.A.

Second, Plaintiffs cannot show that common questions predominate over individualized ones, as

adjudicating breach of contract claims on behalf of the members of the putative class would

require individualized inquiries regarding (1) the existence (and terms) of any contract with

Penn, which would turn on what fees (if any) each putative class member paid; (2) whether any

breach was material, which would turn on an assessment of what services were important to a

particular student; (3) whether any breach caused any damages suffered by a putative class

member; and (4) what damages each putative class member can recover, which would turn on

each student's financial aid, as well as the value each student assigned to particular services.  *See*

*infra* Section II.B.  Third, and finally, Plaintiffs fail to show class litigation is superior to other

methods, as they have not submitted *any* proposed trial plan, let alone a workable one, to address

the many individualized inquiries inherent in trying the breach of contract claims of thousands of

different students.  *See infra* Section II.C.

I.      **PLAINTIFFS CANNOT SATISFY RULE 23(a)'s TYPICALITY REQUIREMENT.**

Plaintiffs fail to satisfy Rule 23(a) because neither Plaintiff is typical of the putative class.

The typicality prong of Rule 23(a) requires that the claims or the defenses of the plaintiffs are

typical of the class.   Fed. R. Civ. P. 23(a)(3).   "There are three 'distinct, though related,' parts to

the typicality assessment: (1) the class representative and the members of the class must share

both the legal theory and the factual circumstances supporting that theory; (2) the class

representative must not be subject to a defense that is both inapplicable to many members of the

class and likely to become a major focus of the litigation; and (3) the class representative's

interests and incentives must be sufficiently aligned with those of the class."  *Mwantembe*, 268

F.R.D. at 556-57 (citations omitted).  And "typicality requires more than just 'one unifying

factual or legal question.'" *Id.* (citations omitted).

As this Court has explained, assessing "whether an individual is sufficiently similar to the class as a whole" requires the Court to "consider the attributes of the proposed representatives and the class as a whole, and the similarity between the proposed representatives and the class." *Id.* Yet Plaintiffs offer no discussion of their similar attributes to those of the putative class— much less the attributes of the putative class as a whole. They make only conclusory assertions that Plaintiffs allegedly "contracted with [Penn] for in-person, on-campus instruction, and use of facilities" in exchange for "tuition and Mandatory Fees," and that Plaintiffs were denied "access to the campus" and in-person services. Mot. 11-12.[15] By relying on this conclusory assertion, Plaintiffs fail to address "the numerous factual and legal differences between the [two] representatives and the class members" revealed during discovery, which "defy[] typicality." *Mwantembe*, 268 F.R.D. at 556-57.

First, Plaintiff Nedley is not a typical representative because she has not been injured. *See* Wilner Report at 23-27 (analyzing Plaintiff Nedley's lack of injury). Specifically, Plaintiff Nedley's expected family contribution ███████████████████████. *Id.* Because Nedley was ████████████████████████████████████████████, her out-of-pocket costs would have been the same if she had not been charged any fees at all. *Id.*; *see also supra* pp. 19-21. Put simply, and as further explained in Penn's summary judgment memorandum, she has not been injured by any alleged failure to retroactively lower—and

---

[15] To the extent that this assertion relies on "in-person on-campus instruction" and "tuition," Plaintiffs disregard this Court's order dismissing their tuition-related claims with prejudice. Plaintiffs also ignore this Court's ruling that neither Penn's "[p]romotional and recruitment materials" nor Penn's "admission letter[s]" are "part of the agreement" between Penn and its students, *Smith I*, 534 F. Supp. 3d at 473, by basing their typicality argument on Plaintiffs' "Acceptance Letter and . . . other documents." Mot. 11; *see also* Mot. 3-5 & n.1 (discussing promotional materials).

refund—fees.  *See id.* at 23; *see also* MSJ Memo. at Section III.[16]  This is not the case for all putative class members.  Nedley also received $465 in COVID-related aid, which would offset any purported injury from the allegedly diminished services Penn provided during the pandemic.  *See supra* p. 21.  Not all students received such aid.  As a result, Nedley's claims are subject to hurdles that other class members are not.

In addition, Nedley moved away from Philadelphia, *see* Nedley Depo. at 30:12-18, and was thus was unable to utilize in-person services on Penn's campus regardless of whether Penn provided them or not.  This makes her claims in this litigation different from many of the putative class members who remained on or near campus, including Plaintiff Smith and some of her friends.  *See supra* pp. 21; Smith Depo. at 71:8-25.  Not only are the "factual circumstances" supporting their claims materially different, including with respect to critical issues like whether a purported breach by Penn is material, *see infra* pp. 37-42, students like Nedley who moved away from Philadelphia may "be subject to [] defense[s]" regarding causation and damages that are "inapplicable to many members of the class and likely to become a major focus of the litigation." *Mwantembe*, 268 F.R.D. at 556-57.

In addition, Nedley (an undergraduate) and Smith (a graduate student) paid different types of fees and different fee amounts from each other and from other putative class members.  *See supra* pp. 19-23.  For instance, although Plaintiffs alleged that Smith paid a Technology Fee, Am. Compl. ¶ 152, class certification discovery revealed that she did not.  Smith Depo. at 27:8-

---

[16] On February 23, 2022—two days after Penn filed its motion for summary judgment, but *44* days after the close of class discovery—Plaintiffs produced what appears to be a payment history from Plaintiff Nedley's PennPay account (Penn's online billing system), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 22 to Kidney Decl. at NEDLEY 000008 ("NEDLEY 000008").  While this record does not mention Nedley's financial aid, it nevertheless proves Penn's point:  The document does not reflect *any* payments by Nedley or any other payor on her behalf for the spring 2020 semester.  *See id.*

14. As a result, she has no claim relating to Penn's provision of services "assist[ed]" by the Technology Fee, Ex. A to Lewis Decl., making her "legal theor[ies]," "interests," and "incentives" different from Nedley and other class members who *did* pay a Technology Fee. *Mwantembe*, 268 F.R.D. at 556-57. And like all other students, Plaintiffs' use of the services provided by Penn varied considerably, both before and during the pandemic, *see supra* pp. 19-23, making each putative class member's arguments regarding materiality and damages significantly different. *See infra* Section II.2 and II.4. Simply put, these "differences overwhelm any similarities." *Mwantembe*, 268 F.R.D. at 557. As a result, Plaintiffs are not typical of the putative class, and class certification should be denied.

## II. PLAINTIFFS CANNOT SATISFY RULE 23(b)(3).

Plaintiffs have not shown that the proposed Rule 23(b)(3) class is ascertainable or that it satisfies the predominance or superiority requirements.

### A. The Proposed Rule 23(b)(3) Class is Not Ascertainable

Plaintiffs have not met their burden to establish that "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Jarzyna v. Home Props., L.P.*, 321 F.R.D. 237, 240 (E.D. Pa. 2017) (internal quotations and citations omitted). Plaintiffs do not identify what records they contend could establish who "paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester." Mot. 8 (quoting Am. Compl. ¶ 56); *see* Mot. 17. The evidence produced during discovery demonstrates that doing so would require "extensive and individualized fact-finding" and "mini-trials." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (internal quotations omitted). Where, as here, "nothing in the [defendant's]

databases shows or could show whether individuals should be included in the proposed class, the class definition fails." *Id.*

Take Plaintiff Nedley for example. Penn's records, including her student account ledger, do not show any payments she or other members of her family made on her behalf for the spring 2020 semester. *See* NEDLEY 000003. The only payments for the spring 2020 semester reflected in her account ledger are a ██████████████████████████████ ██████. *Id.* None of these entries identifies Nedley or any other individual as a payor who should be included in the putative class.[17] While Nedley's student account ledger for *other* semesters reflects payments received through PennPay (Penn's online billing system), there are no such payments by Nedley or her family members that are identified for the spring 2020 semester. *See* Ex. 23 to Kidney Decl. at NEDLEY 000004-05. Similarly, while Nedley's belatedly-produced PennPay statement identifies payors for other semesters, it does not show any payments for the spring 2020 semester. *See* NEDLEY 000008; see also *see supra* p. 28 n.16. Plaintiffs have therefore failed to show any categories of documents or reliable methods for identifying class members; to the contrary, the record demonstrates that the parties would need to collect documents and/or conduct interviews on an individualized basis to ascertain what payor or payors, if any, meet the class definition.

---

[17] The nature of PLUS Direct Loans indicates that ████████████ is *not* the payor, as "Direct PLUS Loans are federal loans that *parents of dependent undergraduate students* can use to help pay for college or career school." U.S. Dep't of Education, Federal Student Aid, *Parent Plus Loans*, https://studentaid.gov/understand-aid/types/loans/plus/parent (last visited Feb. 24, 2022) (emphasis added). The Court may take judicial notice of the U.S. Department of Education's description of the Direct PLUS Loan program under Federal Rule of Evidence 201. In any event, although Penn requested a copy of ████████████████████, Plaintiffs have not produced them. *See* Ex. 24 to Kidney Decl. (Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Production) Nos. 2, 3; *see also* Nedley Depo. at 186:6-14.

Completing such inquiries would be no simple task. Take Plaintiff Nedley again: While Nedley initially represented that she was the source of funds for payments made to Penn, her deposition testimony shows that is far from clear. For example, Nedley testified that she is "unsure" how much she and her parents contributed to her cost of attendance during her four years at Penn, including whether she herself contributed ███████ for the spring 2020 semester. *See* Nedley Depo. at 49:2-20, 58:12-24. And Nedley indicated that sometimes her parents provided the money she paid to Penn. *Id.* at 184:11-185:24. Nedley also described various sources of funds, including ██████████████ from a "graduation type party" and a "fund" from her great aunt and uncle, but she was generally unsure whether she or her family members were the source of the funds used to contributed to her cost of attendance. *Id.* at 51:10-52:4, 162:15-167:20, 186:1-4. More fundamentally, Nedley's contention only became apparent at her deposition, and there is no feasible way to interview every student to determine the source of funds for the payments they made for fees.[18]

Thus, Plaintiffs have not shown that their proposed class—which is defined as fee payors—is ascertainable. The difficulties in actually *administering* the class—for instance, distributing any refund or other recovery to all of the different payors involved—would be even greater. *See infra* Section II.C. Plaintiffs' motion for certification should therefore be denied.

**B. Plaintiffs Cannot Show Predominance.**

Plaintiffs have also failed to show that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Neale v. Volvo*

---

[18] In fact, when Penn's counsel asked about financial information that might have shed light on this issue, Plaintiff Nedley's counsel improperly instructed her not to answer questions regarding her parents' bank information, or the name of her great aunt and uncle who contributed to her cost of attendance. *Id.* at 169:19-174:16, 181:17-183:14.

*Cars of N. Am., LLC*, 794 F.3d 353, 370-71 (3d Cir. 2015). "Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' a standard 'far more demanding' than the commonality requirement of Rule 23(a)." *Mwantembe*, 268 F.R.D. at 560 (quoting *In re Hydrogen Peroxide*, 552 F.3d 305, 311 (3d Cir. 2008)).

"To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)." *Neale*, 794 F.3d at 370-71. "Class certification is not appropriate if proof of the essential elements of the cause of action requires individual treatment." *Mwantembe*, 268 F.R.D. at 560.

Plaintiffs acknowledge that the predominance inquiry "begins, of course, with the elements of the underlying cause of action," Mot. 14 (quoting *Neale*, 794 F.3d at 370), but make no attempt to discuss the elements of their only surviving claim for breach of contract. "Under Pennsylvania law, a breach of contract claim requires the plaintiff to establish three elements: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Doe v. Univ. of Scis.*, No. CV 19-358, 2019 WL 632022, at *6 (E.D. Pa. Feb. 14, 2019) (citing *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 182 (3d Cir. 2015); *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)). All of these elements, and certainly the "more important" ones, "require individual rather than common proof," rendering class certification "unsuitable." *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 321 F.R.D. 193, 210 (E.D. Pa. 2017). For many reasons, Plaintiffs have not (and cannot) supply generalized proof regarding (1) the essential terms of a contract between Penn and members of the putative class; (2) whether Penn's performance amounted to a material breach; (3) whether any alleged breach caused Plaintiffs' claimed injuries; or (4) the nature and amount

of Plaintiffs' damages.[19]

### 1. Plaintiffs cannot show the existence or terms of a contract on a class-wide basis.

Plaintiffs cannot establish the first element of their contract claim—"the existence of a contract, including its essential terms"—through class-wide proof. *Univ. of Scis.*, 2019 WL 632022, at *6. Plaintiffs do not explain how they would. They make only the conclusory assertion that each student, regardless of "academic major, scholarships, or any other ancillary criteria," has the same "contractual arrangement[]": "receiving in-person, on-campus instruction, educational services, and use of facilities." Mot. 15. Plaintiffs (again) gloss over this Court's dismissal of their tuition-related claims, and they do not acknowledge the fee descriptions that were actually in place for the spring 2020 semester. Nor do Plaintiffs point to any fee language or otherwise that could establish the "contractual arrangements" they contend exist. Mot. 16. Examination of the record reveals that establishing contractual relationships and/or the terms of any such relationship would require individualized inquiry.

For starters, the class definition is overbroad as it includes many individuals, such as parents, friends, relatives, and other payors who are not in contractual privity with Penn and thus

---

[19] Because "Rule 23(b)(3)'s stricter predominance requirement incorporates Rule 23(a)'s commonality requirement," this Court can "jointly analyze the two." *Luppino v. Mercedes Benz USA*, 718 F. App'x 143, 146 (3d Cir. 2017) (citing *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008)). As discussed further in this section, Plaintiffs' failure to present common evidence relating to many of the critical issues in this case also means that they cannot satisfy Rule 23(a)(2)'s commonality requirement because they have not demonstrated "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations and citations omitted). To the contrary, there are "[d]issimilarities within the proposed class" that would "impede the generation of common answers." *Ferreras v. Am. Airlines, Inc.*, 946 F.3d 178, 185 (3d Cir. 2019).

have no valid claim for breach.[20]  As this Court recognized in ruling on Penn's motion-to-dismiss, "[t]he relationship between a *student* and a private educational institution is contractual in nature under Pennsylvania law," and as such, "[a] *student* may bring an action for breach of contract against a college or university where it violates the terms of the written contract."  *Smith I*, 534 F. Supp. 3d at 470 (emphasis added) (citing *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. 2007); *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999)).  Plaintiffs offer no facts or authority to support the notion that the parents of any Penn students, or any other non-student payors, have a contractual relationship with Penn.  Courts around the country have repeatedly held to the contrary:  The payment of tuition (or fees) alone "does not create a contractual relationship between parents and a college when the parents' child is over the age of majority."  *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 761 (E.D. Tenn. 2009) (citing *Apffel v. Huddleston,* 50 F. Supp. 2d 1129, 1133 (D. Utah 1999)); *accord, e.g.*, *Rynasko v. New York Univ.*, No. 20 CIV. 3250 (GBD), 2021 WL 1565614, at *3 (S.D.N.Y. Apr. 21, 2021) ("While Plaintiff maintains that she paid her daughter's tuition, such payment stems from an arrangement between Plaintiff and her daughter, not a contractual relationship between Plaintiff and NYU."); *Fiore v. Univ. of Tampa*, No. 20-CV-3744 (CS), 2021 WL 4925562, at *11 (S.D.N.Y. Oct. 20, 2021) (collecting cases and concluding that "the payment of tuition alone does not create a contractual relationship between parents and a college" (internal quotations omitted)); *Metzner v. Quinnipiac Univ.*, 528 F. Supp. 3d 15, 25 (D. Conn. 2021) (similar).  Thus, the Court would have to conduct an individualized analysis to determine whether each of the putative class members is

---

[20] While the Third Circuit has held that overbreadth should not be "inject[ed]" into the ascertainability analysis, *Byrd v. Aaron's Inc.*, 784 F.3d 154, 168 (3d Cir. 2015), *as amended* (Apr. 28, 2015), this Court may consider it as a "potential predominance problem." *Abraham v. Ocwen Loan Servicing, LLC*, 321 F.R.D. 125, 163 (E.D. Pa. 2017) (citing *Byrd*, 784 F.3d at 167-69).

actually in contractual privity with Penn, i.e., whether a person is a fee-paying student (which, as demonstrated by the deposition of Plaintiff Nedley, can be a fact-intensive inquiry in itself, *see supra* p. 28), or whether there is any other basis for finding a contractual relationship (for instance, if a parent paid fees on behalf of a minor student).

One district court denied class certification of claims against a university because of this very issue. In *Little v. Grand Canyon Univ. ("Grand Canyon I")*, the court concluded the class definition—which is nearly identical to Plaintiffs' proposed definition in this case—was overbroad because it included third parties who potentially paid for fees on behalf of a student and who had "not entered into contracts with" the university.[21] No. CV-20-00795-PHX-SMB, 2021 WL 4263715, at *2 (D. Ariz. Sept. 20, 2021). A similar conclusion is appropriate in this case.

In addition, fees assessed to students varied significantly, with some schools not charging anything. *See* Lewis Decl. ¶ 5. As a result, determining the essential terms of any contractual arrangement between Penn and students or other payors will require an individualized inquiry to determine which fees that student paid (if any), and what performance from Penn was expected in return.

Reviewing Penn's fee rates by program for academic year 2019-2020 makes clear the difficulty with class-wide proof on this point. *See* Ex. 3. Different fees were charged to full-time and part-time students in different undergraduate, masters, PhD, and other graduate or professional programs. *Id.* at PENN_00000871-82. While some students were charged a

---

[21] The putative class definition in *Grand Canyon II* was amended to not include "[a]ll people who paid fees for or on behalf of students. . . ." *Little v. Grand Canyon Univ. ("Grand Canyon II")*, No. CV-20-00795-PHX-SMB, 2022 WL 266726, at *4 (D. Ariz. Jan. 28, 2022). Plaintiffs rely extensively on *Grand Canyon I* in their Class Certification Memorandum, *see* Mot. 10, 15-17, but ignore this aspect of the opinion in *Grand Canyon II*.

General Fee, Technology Fee, and Clinical Fee, other students were charged some, but not all, of those fees. For example, approximately 6,894 students were not charged a Technology Fee, including Plaintiff Smith and (for example) students enrolled in the Weitzman School of Design. *Id.* at PENN_00000871; *see also supra* p. 14. For those students, the terms of any fee-related contract with Penn could not include the Technology Fee language. *See* Ex. A to Lewis Decl. Some programs (like certain executive education programs in the Graduate School of Education and the Executive MBA programs in the Wharton School) did not charge a General Fee, Technology Fee, or Clinical Fee, but instead charged a "Program Fee," while still other programs (like the Medical Educator program and certain dissertation programs) charged no fees at all. Ex. 3 at PENN_00000872-75. For any of the students who were not charged a General Fee, Technology Fee, or Clinical Fee, none of the language associated with those fees would be part of any fee-related contract with Penn.

The individualized analysis needed to determine the existence and essential terms of any contractual relationship with Penn would impact any litigation on the merits in this case. The parties would need to litigate which fees were charged to individual students, and, based on those fees, what terms comprised any contract with Penn. From there, the parties would need to litigate whether Penn's performance amounts to a material breach, which would vary based on the different terms of different students' contractual relationships with Penn (among other factors), as well as what damages (if any) were caused by any breach. *See infra* Sections II.B.2 to II.B.4. Plaintiffs do not address how Penn's many different programs charge different fees, or the differences in services provided to and used by students in different programs; they treat an undergraduate student in Penn's College of Arts & Sciences the same as a student in the Graduate School of Education's School and Mental Health Counseling Executive Education

program.  Nor do Plaintiffs address students enrolled in *multiple* programs.  Even though it is their burden to do so, Plaintiffs fail completely to address the impact of the differences between Penn's programs on putative class members' claims.  Plaintiffs thus fail to show that common questions would predominate.

### 2.  Plaintiffs cannot show a material breach through class-wide proof.

Whether Penn breached any alleged contract also requires an individualized inquiry. Under Pennsylvania law, a court must consider not only whether the plaintiff can show a breach of a duty imposed by the contract, but also whether the breach is "material" or whether the defendant has "substantially performed" under the contract.  *See Univ. of Scis.*, 2019 WL 632022, at *6 ("the alleged breach must be material, and not immaterial or "simple"); *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. 2013) ("a party might breach the contract but still substantially perform its obligations under the agreement," in which case "the breach is deemed nonmaterial and the contract remains in effect"); *see also Carriage House Condos. GP, Inc. v. Deraimo*, No. CIV. A. 07-2120, 2008 WL 2683113, at *2-3 (E.D. Pa. July 8, 2008) ("The doctrine of material breach is simply the converse of the doctrine of substantial performance.  Substantial performance is performance without a material breach, and a material breach results in performance that is not substantial.").  Only a material breach "relieve[s] the 'nonbreaching party . . . from any obligation to perform.'"  *Adaptive Digit. Techs., Inc. v. Kurtz*, No. CV 15-4062, 2015 WL 5595510, at *3 (E.D. Pa. Sept. 22, 2015); *see also, e.g., Johnson v. Weber*, 239 A.3d 68 (Pa. Super. Ct. 2020), *appeal denied*, 244 A.3d 347 (Pa. 2021).

Determining whether a breach is material is a "complex, often fact-intensive question" under Pennsylvania law, and requires a plaintiff to make a "substantial showing" of materiality. *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1274 (Pa. Super. 2012).

Pennsylvania courts analyze a number of factors to "guide the inquiry":

> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;
> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Id.* at 1271. Whether a breach is "material" "is a question of degree," and "must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." *Id.*; *see, e.g.*, *Wu v. Julie Robin Arouh, DMD, PC*, No. 14-CV-03902, 2016 WL 9772214, at *11-12 (E.D. Pa. Mar. 8, 2016) (concluding breach was non-material under *Int'l Diamond Importers* factors), *amended sub nom. Wu v. Arouh*, No. 14-CV-03902, 2016 WL 9776072 (E.D. Pa. May 3, 2016). The materiality factors are applied "in the light of the facts of each case in such a way as to further the purpose of securing for each party [its] expectation of an exchange of performances." *Am. Diabetes Ass'n v. Friskney Fam. Tr., LLC*, 177 F. Supp. 3d 855, 868 (E.D. Pa. 2016). For this reason, "the materiality analysis may well turn on subjective assessments as to the state of mind of the respective parties." *Fagal v. Marywood Univ.*, No. 3:14-CV-02404, 2017 WL 4540613, at *9 (M.D. Pa. Oct. 11, 2017) (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 96 (3d Cir. 2008)). The relative importance of a particular term must be assessed; if a breach of a particular provision is "entirely inconsequential" to the plaintiff, the breach not material. *True R.R. Assocs., L.P. v. Ames True Temper, Inc.*, 152 A.3d 324, 339 (Pa. Super. 2016) (condition requiring that appraiser was independent was "not a material provision" to plaintiff); *see also,*

*e.g.*, *Int'l Diamond Imps.*, 40 A.3d at 1273 ("Inasmuch as the 'heart' of the landlord-tenant relationship is the exchange of rent for occupancy rights, whether Appellants' failure to maintain a going business constituted a 'material' breach must be assessed by a jury in light of the factual context." (citation omitted)); *Am. Diabetes Ass'n*, 177 F. Supp. 3d at 868 (finding material breach where defendant violated "a central section of the Agreement"); *Basic Fun, Inc. v. X-Concepts, LLC*, 157 F. Supp. 2d 449, 455 (E.D. Pa. 2001) (finding material breach based on testimony that term was "the most important term to" the non-breaching party).

Because of the nature of the materiality inquiry, materiality frequently prevents a finding of predominance in breach of contract cases where the plaintiffs seek class certification. *See, e.g.*, *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1273-74 (11th Cir. 2009) ("Even positing a common contract, this testimony illustrates the existence of significant individualized issues with respect to breach, materiality, and damages."); *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 521-22 (D. Utah 2017) (question of materiality created "individualized breach issues for each individual driver"); *Simms v. Jones*, 296 F.R.D. 485, 508-09 (N.D. Tex. 2013), *aff'd sub nom. Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016) (for plaintiffs alleging obstructed view of football game constituted breach of contract, "an individualized inquiry to determine the extent of obstruction is necessary for purposes of gauging the materiality of the breach and the amount of damages suffered by each class member"); *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 734-35 (S.D. Fla. 2007) ("Certifying this class would lead to a situation where the trier of fact had to make individualized determinations as to materiality for every class member."); *Van Vels v. Premier Athletic Ctr. of Plainfield, Inc.*, 182 F.R.D. 500, 508 (W.D. Mich. 1998) (in class action arising out of hidden fitness club charges and "closure of [] several fitness centers," "[s]ince the question of materiality must be determined individually for each class member,

Plaintiffs' breach of contract claims are not amenable to class certification"); *see also*

*Cardiovascular Care of Sarasota, P.A. v. Cardinal Health, Inc.*, No. 8:08-CV-1931-T-30TBM,

2009 WL 928321, at *6 (M.D. Fla. Apr. 3, 2009) ("Courts have repeatedly held that breach of

contract claims are inappropriate for class certification where, as here, they involve

individualized inquiries to determine liability and damages.").

The decision in *Jamieson v. Vatterott Educational Centers, Inc.*, is instructive. 259

F.R.D. 520 (D. Kan. 2009). In *Jamieson*, the plaintiffs asserted, among other things, a breach of

contract claim on behalf of a putative class of students against Vatterott College, "an educational

institution that provides occupational training" to students. *Id.* at 524. The plaintiffs alleged that

students "did not receive the hours and weeks of instruction promised in the" contracts they

signed upon enrollment. *Id.* The court denied class certification because plaintiffs had not

established that common questions predominated over individualized questions as required by

Rule 23(b)(3). The court found it was not sufficient that the contract claim arose "from a

common document applicable to the class as a whole (i.e. the enrollment agreement)[.]" *Id.* at

547. Rather, the court found that the plaintiffs' "claim that Vatterott failed to provide instructors

as promised require[d] proof pertaining to individual classrooms, not to the class members as a

whole." *Id.* The court concluded that while the class members "may generally share the same

legal theory of how the agreement was breached, the dominant issue on this claim appears to the

court to require something approaching individual proof—i.e., the degree to which particular

plaintiffs were deprived of an instructor in particular classes." *Id.* at 547-48.

Here, questions of whether an alleged breach is material will similarly require

individualized proof regarding each student because measuring the value of each students'

experience is an "individualistic" exercise, as Plaintiff Smith admits. Smith Depo. at 72:24-25.

In other words, even if Plaintiffs could establish a technical breach on a class-wide basis (and they cannot), they cannot establish that any such breach would be material to all putative class members.  As explained in detail above, each fee supported a wide range of services and the students' use of those services varied significantly.  *See supra* pp. 5-17.  Given this, the question of whether Penn's provision of services amounts to a material breach will be fact-intensive and individualized.  And this Court will need to examine the services available to each student and analyze, among other factors, whether the student has been "deprived of the benefit which he reasonably expected," and the "extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived."  *Int'l Diamond Importers*, 40 A.3d at 1274; *see also Am. Diabetes Ass'n*, 177 F. Supp. 3d at 868 (materiality "looks at the benefit bargained for").  This will involve "subjective assessments as to the state of mind" of different students, namely, how they valued each service provided by Penn, particularly any services that were unavailable as a result of the pandemic.  *Fagal*, 2017 WL 4540613, at *9.

Plaintiffs assert, without any factual support, that the "nature" of the alleged breach "is the same for each member of the Class" because, Plaintiffs say, Penn "failed to provide any in-person, on-campus instruction, educational services, or use of campus facilities."  Mot. 15.  Plaintiffs are wrong.  Plaintiffs ignore completely the fee language at issue, none of which relates to "instruction," much less promises that education and services will be provided "in-person."  And Plaintiffs ignore completely the extensive evidence in the record, discussed above, indicating that Penn *did* provide a significant amount of services, including some that were even in-person. *See supra* pp. 5-17.

Plaintiffs make no attempt to demonstrate how this Court could determine on a class-wide basis how Penn's performance amounts to a material breach, and the evidence makes clear

such a class-wide determination is not possible.  Many students remained on or near campus throughout the spring 2020 semester and thus had access to the in-person and remote services, activities, and spaces made available by Penn, including, for example, Student Health.  *See supra* pp. 4-17.  Those who moved away from Philadelphia still had virtual access to services, activities, and spaces, including virtual access to computer labs and other technology related services, as well as Student Health resources.  *See supra* p. 14-15.  Penn used the fees students paid to provide these services, activities, and spaces, and students received the value of fees they paid during the second half of the spring 2020 semester.  *See generally* Wilner Report at 7-17 (detailing services provided using fees).  Determining whether students lost (or gained) access to services, activities, and spaces that were important to them involve individualized questions—as does determining whether Penn's provision of services constituted substantial performance.

Plaintiffs Smith and Nedley are good examples:  Smith remained in Philadelphia, while Nedley moved away, and each Plaintiff took advantage of different services offered by Penn both before and after the onset of the pandemic.  *See supra* pp. 4, 21.  To take just one example: Smith regularly used the Pottruck Health and Fitness Center, while Nedley did not.  As such, the closing of Pottruck (and replacement with virtual fitness options) might be significant to Smith, but it would not be for Nedley; for her, the inability to use a facility she never used would be "entirely inconsequential," and thus, not material.  *True R.R. Assocs.*, 152 A.3d at 339.  Because this sort of inquiry will be necessary for every single member of the putative class, Plaintiffs fail the predominance requirement.

### 3.  Plaintiffs cannot show causation on a class-wide basis.

Plaintiffs also cannot show class-wide proof to establish the third element of their breach of contract claim:  that any injury suffered by class members was *caused* by an alleged breach,

i.e., "*resultant* damages." *Univ. of Scis.*, 2019 WL 632022, at *6 (emphasis added). As this Court has explained, "proof of . . . causation in a contract claim is inherently individualized." *Mwantembe*, 268 F.R.D. at 561; *see also, e.g.*, *Chudner v. Transunion Interactive, Inc.*, No. 09-CV-433-ER, 2010 WL 5662966, at *1 (D. Del. Dec. 15, 2010) (denying class certification and explaining that "the impact of a breach is important because it may call for individual, as opposed to common proof" (citing *Hydrogen Peroxide,* 552 F.3d at 311)); *Smith v. U.S. Bank, N.A.*, No. 1:16-CV-21146-UU, 2017 WL 698530, at *12 (S.D. Fla. Feb. 22, 2017) ("Plaintiff and putative class members must prove that Defendant's alleged breached caused them damages, which would require individualized proof.").

Plaintiffs do not address causation in any meaningful way. *See* Mot. 15. But much like the materiality inquiry, whether Penn's pandemic-related measures caused any injury to a class member will depend on their individual circumstances and use of services provided by Penn. A student who never used any of Penn's multicultural resources, for instance, would not be caused any injury by the elimination of such resources. *See supra* pp. 9-10. Further, any student who would not have used certain in-person services (like fitness centers) even if they were open during the pandemic—i.e., to reduce their risk of exposure to COVID-19—cannot establish that the lack of those in-person services caused them any injury. The same is true on a much broader level: Many Penn students moved away from Philadelphia during the pandemic, *see supra* p. 28, including some of Smith's friends. Smith Depo. at 71:8-25. For any students who moved away for reasons unrelated to Penn's directive that most students living on campus should depart—i.e., to reduce their risk of COVID-19 exposure, or to be with family during the pandemic—the unavailability of in-person services on Penn's campus cannot have caused them any injury.

Resolving these issues will require depositions of and discovery from each individual putative class member.

### 4. Individualized questions regarding damages predominate.

Beyond failing to show the elements of their claim are susceptible to class-wide proof, Plaintiffs fail to show that damages "are capable of measurement on a class-wide basis." *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. CV 2:11-07382, 2019 WL 2521958, at *8 (D.N.J. June 18, 2019). "[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and "courts must conduct a rigorous analysis to determine whether that is so." *Comcast*, 569 U.S. at 35. "A model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiff's] theory [of liability]." *Id.* In other words, to satisfy predominance, the model must measure damages resulting from the particular injury alleged by plaintiff. *Id.* at 35-36; *Tropicana Orange Juice*, 2019 WL 2521958, at *8.

Plaintiffs hardly attempt to meet this burden, and instead try to shirk it. They suggest that, in *Neale*, the Third Circuit cabined the impact of *Comcast* such that individualized questions regarding damages will not defeat predominance. *See* Mot. 14-15. *Neale* did no such thing, and the Third Circuit has made clear since *Neale* that "[t]he predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if 'questions of individual damage calculations overwhelm questions common to the class.'" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016) (alterations omitted) (quoting *Comcast*, 569 U.S. at 34).

Plaintiffs assert, without any support, that "class-wide damages can be provided directly, based upon information in possession of Defendant," Mot. 15, without specifying what kinds of

measures of "damages" they intend to recover, or what "information" Penn purportedly has (and their basis for asserting Penn has it). Alternatively, Plaintiffs contend there is "a sampling methodology and formula" the Court can use. Mot. 15. But Plaintiffs' motion does not identify any "methodology" or "formula" they propose, or what kind of "objective, quantifiable data" one party or the other can purportedly provide. *See id.*[22]

Given the nature of Plaintiffs' claims, any damages calculation as to Plaintiffs' breach of contract claim would be inherently individualized. Under Pennsylvania law, determining damages on a claim for breach of contract requires consideration of the plaintiff's "expectation" or "expectancy" interest. "The policy behind contract law is to protect the parties' expectation interests by putting the aggrieved party in as good a position as he would have been had the contract been performed." *Reformed Church of Ascension v. Theodore Hooven & Sons, Inc.*, 764 A.2d 1106, 1109 (Pa. Super. 2000). "Toward that end, expectation damages are measured by the losses caused and gains prevented by defendant's breach, to the extent [they] are in excess of any savings made possible by nonperformance." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998); *see also, e.g.*, *Farhangui v. Grossinger*, No. CV 20-2002, 2021 WL 37711, at *4 (E.D. Pa. Jan. 4, 2021) (expectation damages are "[t]he preferred basis of

---

[22] While they do not cite them in their motion, Plaintiffs advanced two different damages theories in discovery. *See* Smith Resps. to Interrogs. No. 5; Nedley Resps. to Interrogs. No. 5. While it is perhaps understandable that Plaintiffs may want to "hedge their bets," Plaintiffs offer no case law permitting them to advance different theories. In any event, their first theory is based entirely on a pro rata reduction formula. See Smith Resps. to Interrogs. No. 4; Nedley Resps. to Interrogs. No. 4. This is flawed because expectation damages are the proper measure of damages on Plaintiffs' contract claim, as discussed below. *See generally* Wilner Report at 6-21 (discussing flaws with "pro rata" theory). Plaintiffs' second theory acknowledges that any "resulting [damages] number may be further adjusted based upon expert testimony and/or other evidence or damages models set forth by Defendant" with respect to the value of services that remained available after the pandemic. *See* Smith Resps. to Interrogs. No. 5; Nedley Resps. to Interrog. No. 5. Plaintiffs' second theory is closer to the mark but still does not properly consider expectation damages.

contract damages" which "seeks to protect an injured party's 'expectation interest'—that is, the interest in having the benefit of the bargain").

A proper analysis of class members' expectation damages presents intractable individualized inquiries. Plaintiffs cannot dispute that putative class members received value from the services Penn provided during the pandemic. Plaintiffs' expectation damages must account for the value Plaintiffs received.[23] Determining expectation damages involves consideration of the parties' own expectations and valuation. *See generally* 24 Williston on Contracts § 64:3 (4th ed.) ("[T]he best measure of the value of the broken promise is the value assigned to it by the parties themselves," which "represent[s] the promisee's assessment of the value, thereby indicating its importance to him or her[.]"); *id.* § 64:7 ("the plaintiff's own valuation of the subject matter may be relevant to a determination of its value"). Students used and valued the various services differently. As Smith admitted, this is an inherently "individualistic question." Smith Depo. at 72:24-25.

On top of that, differences in financial aid calculations means that some class members cannot show *any* injury resulting from an alleged breach. For some students, ███████████ ████████ the expected family contribution calculated by Penn's financial aid office is lower than their cost of attendance, and Penn provides those students with grants to offset their out-of-pocket costs of attending Penn, including to offset the fees at issue in this litigation. *See supra* p. 28. For any such students receiving financial aid, the out-of-pocket cost of attending Penn would be unchanged if they were charged no fees at all, as discussed above. *See supra* pp. 44-48;

---

[23] Plaintiffs cannot claim that Penn should simply be required to disgorge the fees it received; "[w]hen [a] non-breaching party elects to sue on the contract, ordinary contract rules limit compensatory damages to his expectancy interest, even if this measure of relief fails to disgorge the [alleged] breacher's profits." *Curley v. Allstate Ins. Co.*, 289 F. Supp. 2d 614, 620-21 (E.D. Pa. 2003).

46

Wilner Report at 23.

Further, *any* student that received greater value in services from Penn than they actually paid in fees could not show any injury. *See* Wilner Report at 23-25 (explaining that financial aid causes students not to be injured or damaged, including because of the "value associated with the services in question"). The impact of COVID-19 grants make this outcome even more likely: Such grants would have to be subtracted from any award of damages in this litigation because the students would not have received those grants but for the pandemic, and doing so would cause at least some students' award to be less than zero, meaning they cannot demonstrate a legally cognizable injury. Indeed, this is the case for ███████. *See supra* pp. 19-21; Wilner Report at 25-26. These issues can be resolved only through individualized inquiry, precluding Plaintiffs from satisfying predominance. *See Ogrizovich v. CUNA Mut. Grp.*, No. 2:09CV371, 2013 WL 12140983, at *7 n.4 (W.D. Pa. Sept. 4, 2013) (denying class certification in a case involving a breach of contract claim in part because "the defined class is so broad that there are members subsumed by the definition that suffered no injury at all"); *Martin v. Mountain State Univ., Inc.*, No. CIV.A. 5:12-03937, 2014 WL 1333251, at *5-6 (S.D. W. Va. Mar. 31, 2014) (explaining that the "various forms of financial aid available to" students enrolled at the defendant university meant, among other things, that causation and damages could not be established on a class-wide basis as "different students likely had very different experiences and outcomes from one another").

On the whole, Plaintiffs' failure to provide a method of calculating damages is fatal to class certification. While Plaintiffs need not calculate a precise damages figure at the class certification stage, they are required to show "some cognizable theory linking the complained-of conduct and her alleged damages." *Tropicana Orange Juice* , 2019 WL 2521958, at *13.

Plaintiffs "must provide more than an 'assurance to the court that it intends or plans to meet the requirements' of Rule 23." *Chudner*, 2010 WL 5662966, at *1 (citing *Hydrogen Peroxide*, 552 F.3d at 318). To pass a "rigorous" examination under Rule 23, a Plaintiff must do more than "state a formula that could be used to calculate class-wide damages" or "assert[] that an expert could create a model to calculate damages." *Id.* (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154,187–88 (3d Cir. 2001)); *see also Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 333 (C.D. Cal. 2015) (predominance not satisfied absent evidence of a "damages measurement method" based on "the facts of *this* case"). Plaintiffs have not done so here. In short, the need for an individualized damages inquiry provides further confirmation that this case is not suited for class certification. *See Ritti v. U-Haul Int'l, Inc.*, No. CIV.A. 05-4182, 2006 WL 1117878, at *12 (E.D. Pa. Apr. 26, 2006) (explaining that "individual damages issues" on a breach of contract claim "underscore the inadvisability of certification").[24]

### C. Class Litigation is Not Superior to Individual Litigation.

For similar reasons, Plaintiffs cannot satisfy Rule 23(b)(3)'s superiority requirement. Rule 23(b)(3) requires "that a class action [be] superior to other available methods" of adjudication. Among other factors, this requires consideration of "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). This Court has explained that, "[i]n

---

[24] Plaintiffs cite decisions from other courts outside the Third Circuit certifying classes in lawsuits against universities relating to fees charged during the COVID-19 pandemic. *See Little v. Grand Canyon Univ. ("Grand Canyon II")*, No. CV-20-00795-PHX-SMB, 2022 WL 266726 (D. Ariz. Jan. 28, 2022); *Cross v. Univ. of Toledo*, No. 2020-00274JD, 2021 WL 1822676, at *1 (Ohio Ct. Cl. Apr. 26, 2021); *Alexander v. Florida Int'l Univ. Board of Trs.*, No. 2021-009869 (Miami-Dade Cnty. 11th Jud. Cir. Ct. Feb. 2, 2022); *see also Arredondo v. Univ. of La Verne*, No. 2:20-CV-07665-MCS-RAO, 2022 WL 423389 (C.D. Cal. Jan. 11, 2022). None of these decisions analyzed the materiality, causation, or expectation damages issues that preclude certification here. These cases are distinguishable and not persuasive for that reason, among others.

examining the manageability of the proposed class," the Court considers "the manageability of the plaintiffs' proposed trial plan." *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 192 (E.D. Pa. 2007) (Savage, J.). Where the plaintiff "fails to offer a workable plan" as to how the litigation would be tried with respect to individual issues, the superiority requirement is not met. *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 223 (E.D. Pa. 2000); *see also, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 165 (E.D. Pa. 2015) (plaintiffs failed to submit "anything approximating" a "detailed plan" for managing litigation); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 194 F.R.D. 484, 495 (D.N.J. 2000) ("the Court is not satisfied that plaintiffs have set forth a workable plan for resolution of the abundant individual issues in this case"); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 492-93 (E.D. Pa. 1997) ("Plaintiffs simply do not offer a workable plan as to how this litigation would be tried with respect to the numerous individual issues.").

Plaintiffs offer no proposal whatsoever for addressing any of the individualized questions discussed above, nor can they. The "particularized circumstances of each class member as described in the typicality and predominance analysis defy manageability. 'Complicated mini-litigations' on factual issues would be required to determine liability and damages, which would not be an efficient use of the class action device." *Mwantembe*, 268 F.R.D. at 562 (quoting *Danvers Motor Co.,* 543 F.3d at 149). As this Court concluded in *Mwantembe*, because Plaintiffs "have not submitted a proposed trial plan" addressing "the numerous problems presented with adjudicating, administering and trying" the claims of all the putative class members, Plaintiffs have failed to demonstrate that "their proposed class action is superior to other available methods." *Id.* at 563.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

Dated: February 25, 2022

/s/ *Virginia A. Gibson*
Virginia A. Gibson, PA Bar No. 32520
Alexander B. Bowerman PA Bar No. 321990
HOGAN LOVELLS US LLP
1735 Market Street
Philadelphia, PA 19103
Telephone: (267) 675-4635

Michael L. Kidney (admitted *pro hac vice*)
Jessica L. Ellsworth (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Counsel for Defendant Trustees of the*
*University of Pennsylvania*