# EXHIBIT 25

ASHA SMITH and EMMA
NEDLEY, individually and on behalf
of all others similarly situated,

        Plaintiffs,

v.

UNIVERSITY OF
PENNSYLVANIA,

        Defendant.

Case No. 2:20-CV-02086-TJS

# EXPERT REPORT OF

# BENJAMIN S. WILNER, Ph.D.

HIGHLY CONFIDENTIAL

# Table of Contents

I.      Summary of Analysis and Conclusions .......................................................................... 1

II.     Qualifications ............................................................................................................... 2

III.    Case Background .......................................................................................................... 3

    A.  Fees ....................................................................................................................... 4

IV.     The Plaintiff's Pro-Rata Damages Theory Is Fatally Flawed ........................................ 6

    A.  Students Received Value from the Portion of the Spring 2020 Semester After Penn Allegedly
        Closed or Reduced Its Services ............................................................................... 7

        1.  Contemporaneous Data Show That Putative Class Members Received Value from the
            Portion of the Spring 2020 Semester After Penn Allegedly Closed or Reduced Its Services
            ....................................................................................................................... 7

        2.  Even If There Were Some Diminishment in Value During the Time Penn Allegedly Closed
            or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized 17

    B.  The Number of Days Cannot Be Utilized to Calculate Pro-Rata Damages .......................... 20

        1.  Marginal Utility Is Different For Each Student ................................................ 20

        2.  The Number of Relevant Days Is Individualized ............................................... 21

    C.  Most of the Costs Associated with the Fees In Question Are Fixed ....................................... 21

V.      Even if Ms. Smith and Ms. Nedley Were Able to Demonstrate that the Services Associated with
        the Spring 2020 Semester Fees at Issue Were Less Valuable, Putative Class Members Were Not
        Necessarily Damaged .................................................................................................... 22

    A.  Students With an Expected Family Contribution Less than Their "Modified" Cost of
        Attendance Would Not Be Damaged ....................................................................... 23

    B.  Financial Aid from Penn and Other Payors Causes Students Not to Be Injured/ Damaged .. 25

    C.  COVID-19 Grants Could Cause Students Not To Be Damaged ............................................ 25

    D.  Notwithstanding Her EFC ███████████████████, Ms. Nedley Was Still Not
        Damaged Because She ███████████████ and COVID-19 Grants in Spring 2020 ........ 26

VI.     Conclusion ................................................................................................................... 28

# I.    Summary of Analysis and Conclusions

Alvarez & Marsal Disputes and Investigations, LLC ("A&M") has been retained by counsel representing the Defendant, University of Pennsylvania ("Penn"), to comment on the alleged injury and damages in the aforementioned matter. In particular, I, Benjamin S. Wilner Ph.D., have been asked to respond to the claim of Ms. Asha Smith and Ms. Emma Nedley ("Named Plaintiffs") that all people who paid fees for or on behalf of students enrolled in classes at Penn for the Spring 2020 Semester were injured and economically damaged by Penn's decision to de-densify campus near the end of the Spring 2020 Semester in response to the COVID-19 pandemic and that damages can be formulaically determined on a class-wide basis.

As discussed below, I find, to a reasonable degree of economic certainty, that the Plaintiffs and putative class members were not necessarily injured / damaged at all – much less in a formulaic, uniform manner that is capable of being measured on a class-wide basis.

In fact, the Plaintiffs' proposed damages theory is inconsistent with case facts. Penn provided similar, if not greater, services associated with the fees at issue in this lawsuit after Penn allegedly closed or reduced its services. While the Plaintiffs acknowledge that Penn provided services that they claim were "limited," but still valuable, their proposed damages theory assumes, to the contrary, that these services either did not exist or are valueless.

Even if the services were "limited" in some way, any diminished value students received would be highly individualized, depending on, among other things, each student's use of particular services both before and after the onset of the pandemic. In addition, the Plaintiffs' proposed damages theory is based upon the number of days that services were allegedly closed or reduced. However, the number of allegedly relevant days varies from student-to-student. Furthermore, Penn did not "save" money by allegedly "limiting" the services provided as most of the costs associated with the services in question were fixed.

Even if the Plaintiffs could demonstrate that the services supported by the Spring 2020 Semester fees at issue were less valuable, putative class members were not necessarily injured / damaged. To the extent Penn is found to owe students receiving financial aid any refund, Penn could simply determine that the cost of attendance for each student has been reduced by an amount equal to any such refund, leaving the expected financial contribution from students unchanged. Additionally, the value associated with the services supported by the Spring 2020 Semester fees at issue likely exceeds the amount most students paid in fees. Consequently, any "reduced" value likely would still exceed the amount most students paid in fees, causing no injury/damages. Furthermore, any COVID-19 related grants students received would have to be deducted from any refund the Plaintiffs might calculate, which the Plaintiffs did not do. Even though the aforementioned factors are highly individualized, I demonstrate that Ms. Nedley was not injured / damaged after accounting for them and the Plaintiffs' proposed damages theory, at a minimum, overstates Ms. Smith's damages.

I generated these conclusions by reviewing the documents listed in **Exhibit 1**. I reserve the right to modify and/or expand my opinions as I obtain and analyze additional information.[1]

A&M is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M is compensated at a rate of $695 per hour for my time. Other individuals from A&M also provided assistance in this matter; their hourly rates range from $250 to $695.[2]

# II.   Qualifications

My curriculum vitae (**Exhibit 2**) details my credentials, testimony, publications and awards.

I am a Managing Director at A&M. I have served as an expert witness and business consultant performing economic and statistical analyses in a great variety of engagements, including financial analysis, contract losses, and a wide range of class action, intellectual property, insurance claim, lost profits and lost income matters. I also received a special commendation from the Commissioner of U.S. Customs and Border Protection for revising a $2.5 billion annual tariff.

I hold a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from Penn as well as a General Course degree in Mathematics & Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science ("MEDS") from the Kellogg Graduate School of Management at Northwestern University. MEDS studies how consumers, governments and businesses make decisions in a wide variety of economic and other environments.

I served as a professor of economics, finance and statistics at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in peer reviewed academic journals including the *Journal of Finance*, the leading academic journal on the subject of finance. I have been awarded research grants from multiple universities and the National Science Foundation ("NSF"). My research has been cited by over 800 papers.[3] I also served as a referee for multiple academic journals and textbooks.

One of my areas of research was experimental economics, which is the application of experimental methods to study economic questions that arise in real-world situations. For my NSF grant, my coauthors and I statistically analyzed data from a consumer buying behavior survey we conducted that determined the prices respondents would pay for products that could be sold in bundles. My undergraduate advisor, Colin Camerer, a MacArthur Genius Award Winner, utilizes experimental economics to study psychological forces and their deeper neuroscientific foundations that influence economic decisions involving individuals and markets. The former President of the

---

[1] It is my understanding that discovery is still ongoing.
[2] No one who has contributed to this engagement has any known financial interest in any party to the matter. A&M's compensation is neither based nor contingent on the results of this analysis. This Report is provided solely for use in the matter described in the caption at the top of this Report. This Report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without the express written consent of A&M.
[3] https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on December 23, 2021.

University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers on utilizing experimental economics surveys to generate economic conclusions.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for analyzing environments that cause respondents to truthfully and accurately reveal their full preferences, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

## III. Case Background

COVID-19 caused business and school disruptions throughout the country, especially during the Spring of 2020. Penn was no exception. Penn's Spring 2020 Semester began on January 15, 2020.[4] On March 6, 2020, the Governor of Pennsylvania signed an emergency disaster declaration effective throughout the Commonwealth of Pennsylvania imposing potential work and travel restrictions with exceptions for essential workers.[5] Penn complied by asking those students who lived on campus to vacate their dormitories by March 17, 2020 and transitioning students to virtual instruction beginning on Wednesday March 23, 2020.[6]

Ms. Smith was a graduate student in the Graduate School of Education during the Spring 2020 Semester pursuing a Master's Degree in Education.[7] Ms. Smith continued taking classes at Penn throughout the Spring 2020 Semester and later during the Summer 2020 Semester.[8] She has since graduated and is now an English teacher at a private school in Delaware.[9]

Ms. Nedley was an undergraduate sophomore during the Spring 2020 Semester. Ms. Nedley continued with her classes at Penn during the Spring 2020 Semester and reenrolled in the Fall 2020 and subsequent semesters. She is currently a senior at Penn.

Penn refunded a portion of the room & board students paid for the Spring 2020 Semester[10] and provided additional COVID-related grants to students.[11]

---

[4] Consolidated Class Action Complaint and Demand for Jury Trial ("Class Action Complaint"), paragraph 38.
[5] Memorandum of Law in Support of Defendant University of Pennsylvania's Motion to Dismiss Plaintiffs' Consolidated Complaint, p. 2.
[6] Class Action Complaint, paragraph 41. By March 23, the City of Philadelphia had also ordered all non-essential businesses, including universities, to close, and the governor had issued a stay at home order, which he later extended until after the spring semester had ended (Memorandum of Law in Support of Defendant University of Pennsylvania's Motion to Dismiss Plaintiffs' Consolidated Complaint, p. 2).
[7] Smith Production.pdf, p. 4.
[8] Plaintiff Asha Smith's Objections and Responses to Defendant First Set of Requests for Admission, p. 2.
[9] https://www.linkedin.com/in/asha-genevieve-smith-96ab7310b/ viewed on December 20, 2021.
[10] https://web.archive.org/web/20191217184616/https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021.
[11] For example, see PENN_00000038 & https://web.archive.org/web/20200414114417/https://unsp.upenn.edu/penn-undergraduate-financial-aid-covid-19-updates/ viewed on December 16, 2021.

Ms. Smith and Ms. Nedley filed this lawsuit seeking to certify a class of "All people who paid fees for or on behalf of students enrolled in classes at the University for the Spring 2020 semester"[12] claiming that Penn should provide them additional refunds.

In particular, the Plaintiffs are seeking refunds because Penn allegedly closed or reduced its services during the Spring 2020 Semester due to COVID-19 and did not reduce its corresponding fees.[13]  The Plaintiffs allege that Penn "did not provide student activities, on-campus computer or lab facilities, access to recreational facilities, access to campus events, any student activities, or any student health and treatment services" for the latter part of the Spring 2020 Semester.[14]  The Plaintiffs further allege that the putative class members all

> paid the fees as a precondition for enrollment [to receive] access to on-campus and other events, services, and student activities. [They] also received access to facilities including: computer, lab, and recreation facilities; and student health/treatment services.[15]

The Plaintiffs claim that refunds for such curtailed services could be calculated in a uniform, formulaic manner via a Pro-Rata Damages Theory.  In particular, they assert that because there allegedly was 42% left in the Spring 2020 Semester when Penn allegedly closed or reduced its services, Penn should refund 42% of the Fees students paid.[16]

## A. Fees

The Plaintiffs' Complaint identifies three fees, of which the Plaintiffs claim they are entitled to refunds: 1) the General Fee, 2) Technology Fee and 3) Clinical Fee.

### 1. General Fee

According to the Plaintiffs' Complaint, which quotes a recent version of Penn's website,

> A General Fee is assessed to all undergraduate, graduate, and professional students, and directly funds Penn's non-instructional student support services.  The General Fee for full-time students provides with full access to a wide variety of services and resources, including counseling and wellness, multicultural resource centers, student activities, recreation and fitness, career services, learning support, and much more.[17]

However, this description of the General Fee is not the description that was available to students during and immediately before the Spring 2020 Semester.[18]  In particular, the relevant description for the Spring 2020 Semester was:

---

[12] Class Action Complaint, paragraph 56.
[13] *Id.*, paragraph 4.
[14] *Id.*, paragraph 151.
[15] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, pp. 2-3.
[16] *Id.*, pp. 3-4.  Plaintiff Emma Nedley's Objections and Responses to Defendant's First Set of Interrogatories, p. 6.
[17] Class Action Complaint, paragraph 147 and https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021.
[18] See e.g., PENN_00001196 (December 2019 fee description) and PENN_00001191 (June 2020 fee descriptions).

General Fee is assessed to all undergraduate, graduate, and profession students and **directly supports** a variety of student related activities, services, and spaces.[19]

***Exhibit 3*** shows the List Price for the General Fee during the Spring 2020 Semester for full-time and part-time students. The Exhibit shows that the List Price of the General Fee was not uniform and varied with students' class standing (e.g., undergraduate vs. graduate), school and degree, and for some, how many course units ("C.U.") in which they are enrolled (i.e., full-time or part-time students). For example, the List Price of the General Fee for undergraduates, $2,568, was generally 1.5 times the List Price for graduate and Ph.D. students, though there was sizable variability. While the List Price was $1,660 for many graduate and Ph.D. students, this List Price was only $416 for Ph.D. students with a reduced tuition dissertation status while it was $1,867 for graduate students in the Teacher Education, M.Ed. program. Furthermore, numerous programs at Penn did not even charge a General Fee, but rather a Program Fee (e.g., full-time study abroad undergraduates and Wharton School Executive MBA students).[20]

Additionally, variability exists for part-time students. The List Price for General Fees for part-time students are assessed per C.U.[21] For example, the List Price for part-time undergraduates was $642 per C.U., except for students in the School of Arts & Sciences who were only charged $312 per C.U. Furthermore, part-time graduate and Ph.D. students were charged only $414 per C.U.

## 2. Technology Fee

According to the Plaintiffs' Complaint, which quotes a recent version of Penn's website,

> The Technology Fee is used to cover a broad group of technology-driven services, including online learning resources, data and network security, technology support, email services and support, technology-enabled spaces, provided software, electronic research tools, and other related costs.[22]

However, this description of the Technology Fee that the Plaintiffs recite in their Complaint is not the description that was available to students during and immediately before the Spring 2020 Semester.[23] In particular, the relevant description for the Spring 2020 Semester was:

> [The Technology] fee **assists** with the cost of computer labs **and** technological services.[24]

Exhibit 3 also shows the List Price of the Technology Fee for the Spring 2020 Semester. As with the General Fee, the Technology Fee is non-uniform and varies depending upon a student's class standing, school and degree, and for some, how many C.U.'s in which they are enrolled. As shown in Exhibit 3, not all programs charged a Technology Fee. For example, Ms. Smith's program in

---

[19] *Ibid.* (emphasis added).

[20] PENN_00000871.

[21] Programs generally charge per C.U. up to two C.U.'s, but then charge the full-time rate to students taking three or more C.U.'s.

[22] Class Action Complaint, paragraph 148 and https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021.

[23] PENN_00001196 (December 2019 fee description) and PENN_00001191 (June 2020 fee descriptions).

[24] *Ibid.* (emphasis added)

the Graduate School of Education did not charge her, and she did not pay, a Technology Fee. The Exhibit shows that the List Prices for the programs that charged a Technology Fee ranged from $385 to $725 for full-time students. The Technology Fee for part-time students in programs that charged a Technology Fee ranged from $95 to $181 per C.U.[25]

### 3. Clinical Fee

According to the Plaintiffs' Complaint, which quotes a recent version of Penn's website, the Clinical Fee is

> assessed to all students and supports Penn Wellness services, including Campus Health, Counseling and Psychological Services, the Student Health Service, and the Office of Alcohol and Other Drug Programs.[26]

However, this description of the Clinical Fee that the Plaintiffs recite in their Complaint is not the description that was available to students during and immediately before the Spring 2020 Semester.[27] In particular, the relevant description for the Spring 2020 Semester was:

> [The Clinical Fee] gives students unlimited access to Student Health Services.[28]

Exhibit 3 further shows the List Price of the Clinical Fee for the Spring 2020 Semester. The List Price of the Clinical Fee is just a flat $304 per semester for full-time students though not all graduate schools charge the fee. Students who took two or less C.U.'s were not charged the Clinical Fee either.[29]

# IV. The Plaintiff's Pro-Rata Damages Theory Is Fatally Flawed

By seeking a refund of all of the allegedly relevant fees supposedly related to the portion of the Spring 2020 Semester after March 23, 2020, the Plaintiffs' Pro-Rata Damages Theory implies that Penn students did not receive any value for the services associated with the three fees at issue in this lawsuit during the period of time that Penn allegedly closed or reduced its services.

Contrary to the Plaintiffs' Pro-Rata Damages Theory, Penn students did **NOT** receive **ZERO** value from the services associated with their fees after Penn allegedly closed or reduced its services. As discussed in subsection A below, students received often greater value during this time. Individualized analyses would be required to demonstrate that a given student received reduced value and, if so, what that supposed reduced value was.

---

[25] PENN_00000871.

[26] Class Action Complaint, paragraph 149 and https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021.

[27] See e.g., PENN_00001196 (December 2019 fee description) and PENN_00001191 (June 2020 fee descriptions).

[28] *Ibid.*

[29] https://web.archive.org/web/20200429015137/https://www.sp2.upenn.edu/admissions/tuition-fees/msw/ viewed on December 16, 2021 and PENN_00000871.

Initially, the Plaintiffs alleged and argued that Penn, after campus de-densification, **ceased** providing all student activities and services associated with the fees in question.[30] However, the Plaintiffs have elsewhere acknowledged that Penn students received some services and, thus, some value during this time, but they claim that the services were "limited."[31]

By definition, the Plaintiffs' Pro-Rata Damages Theory **DOES NOT** properly assess damages when students received even "limited" services. The Plaintiffs acknowledging that such "limited" services have some value is inconsistent with their damages theory, which implies those services have **ZERO** value.

Even if the services were "limited" in some way, the Plaintiffs do not provide a common formulaic methodology to assess the value of the "limited" services they acknowledge students at least received. Nor did the Plaintiffs assess the value of the "added" services that students received during the Spring 2020 Semester.

Even if the Plaintiffs could somehow show that they could calculate a value diminishment during a portion of the Spring 2020 Semester in a uniform, class-wide basis, subsection B shows that such a diminishment would not be proportional to the number of days after Penn allegedly closed or reduced its services. If such a calculation needed to be performed, the relevant number of days would be highly individualized.

Subsection C shows that most of the costs associated with the services supported by the fees at issue are fixed.

## A. Students Received Value from the Portion of the Spring 2020 Semester After Penn Allegedly Closed or Reduced Its Services

After campus de-densification, Penn students arguably received similar, if not greater, value from the services associated with the three allegedly relevant fees. If a student experienced a value diminishment in any way, an individualized analysis on a student-by-student basis would be required to determine the value that that student received. Even if some services were reduced or changed in some way, individualized analyses would be required to assess the added / different services students received such as technology services and COVID-related medical assistance.

### 1. Contemporaneous Data Show That Putative Class Members Received Value from the Portion of the Spring 2020 Semester After Penn Allegedly Closed or Reduced Its Services

For each of the fees that the Plaintiffs claim should be fully refunded on a pro-rata basis, the services supported by the fees were still provided and were supplemented with additional services after Penn allegedly closed or reduced its services.

---

[30] See, e.g., Smith v. University of Pennsylvania, 534 F. Supp. 3d 463, 475 – 76 (E.D. Pa. 2021) "Penn **did not** provide 'on-campus computer or lab facilities, access to recreational facilities, access to campus events, any student activities, or any student health and treatment services for a portion of the Spring 2020 semester." (quoting Class Action Complaint, paragraph 151, emphasis added).

[31] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, p. 3-4.

### a. General Fee

As mentioned above, the General Fee, as described during and before the Spring 2020 Semester, "supports a variety of student related activities, services and spaces." Internally, Penn allocates the funds it receives from the General Fee to a variety of individual offices within the University that provide these activities, services and spaces.[32] In particular, the offices received 1/12th of their annual allocation monthly, irrespective of student usage.[33]

The more recent description Penn used **after** the conclusion of the Spring 2020 Semester that the Plaintiffs cite in the Complaint identified seven specific services and resources supported by the General Fee: i) counseling and wellness, ii) multicultural resource centers, iii) student activities, iv) recreation and fitness, v) career services, vi) learning support and vii) "and much more."

Even though these services and resources were not identified during and before the Spring 2020 Semester, Penn students continued to have access to and receive each one of these seven services after Penn allegedly closed or reduced its services. In fact, contrary to the Plaintiffs' allegation, the availability of many of these services increased in the latter portion of the Spring 2020 Semester.

### i. Counseling and Wellness Services

Penn students had access to and received even more counseling and wellness services after Penn allegedly closed or reduced its services. For example, Penn students utilized its Student Intervention Services, which provides crisis intervention and prevention, support, advocacy, solutions and coordination of services to Penn students, more after Penn allegedly closed or reduced its services. The Student Intervention Services were provided to an average of 20.6 students a week (= 1,071 / 52) in the three academic years prior to 2019/20.[34] In 2019/20, Student Intervention Services was even lower at an average of 11.9 students per week prior to the period when Penn allegedly closed or reduced its services in Spring 2020.[35] Student use increased significantly to an average of 91.5 students per week directly after Penn allegedly closed or reduced its services in Spring 2020.[36]

Penn students also continued to receive Campus Health, Counseling and Psychological Services ("CAPS") after Penn allegedly closed or reduced its services. Penn's CAPS office was available to connect with students via phone, video conference, or in-person.[37] For example, CAPS Direct Services conducted 6,702 remote appointments between March 16 and May 31, 2020.[38]

---

[32] PENN_00001183.
[33] For example, see PENN_00001182.
[34] PENN_00001318-PENN_00001319. Student Intervention Services served an average of 1,071 students per year over the past three years (July 1, 2016 – June 30, 2017, July 1, 2017 – June 30, 2018 & July 1, 2018 – June 30, 2019).
[35] *Ibid*. There were 509 students who utilized Student Intervention Services during the 42.7 weeks between July 1, 2019 and March 12, 2020 and between May 15, 2020 and June 30, 2020.
[36] *Ibid*. There were 850 students who utilized Student Intervention Services between March 12, 2020 and May 15, 2020.
[37] PENN_00000162 and PENN_00001307.
[38] PENN_00001320.

Penn students still had access to and received benefits from the multicultural resource centers after Penn allegedly closed or reduced its services.[39]  For example,

- *The Greenfield Intercultural Center* held 15 virtual office hours, engaging 407 students.[40] Additionally, 70 students participated in Greenfield Intercultural Center virtual programing.[41]
- *The Center for Hispanic Excellence: La Casa Latina* held 12.5 hours of Zoom calls and 59 phone one-on-ones.[42] Additionally, 140 students participated across the resource center's 60 hours of virtual programming.[43]
- *The Lesbian Gay Bisexual Transgender Center* held 90 virtual office hours and 101 students one-on-ones.[44] Additionally, 106 students participated in the resource center's two virtual programs.[45]
- *Makuu: The Black Cultural Center* held 15 virtual office hours, had 15-30 daily individual advisee check-ins and held three different virtual programs.[46] Makuu Friday Living Room had 67 participants and Senior Toast had 122 participants.[47]
- *The Pan-Asian American Community House* held 78 virtual office hours, had 40 students participate in one-on-ones and held two virtual programs.[48]
- *The Penn Women's Center* held confidential one-on-one sessions twice a week and had 6 virtual programs that saw a total attendance of 219 participants.[49]

These examples represent just a small fraction of the over 800 hours of virtual programming and office hours that centers within the Vice Provost of University Life ("VPUL") offered after campus de-densification.[50]

*iii. Student Activities*

Penn students still had access to and participated in student activities after Penn allegedly closed or reduced its services.  For example, student groups, which are supported by the Office of Student Affairs within VPUL, were active after campus de-densification, holding events such as:

---

[39] PENN_00000902, pp. 13-18 and PENN_0000952.
[40] PENN_00000902, p. 13.
[41] *Ibid.*
[42] *Id.*, p. 14.
[43] *Ibid.*
[44] *Id.*, p. 15.
[45] *Ibid.*
[46] *Id.*, p. 16.
[47] *Ibid.* **(**Makuu Friday Living Room was held Fridays via Bluejeans per https://static1.squarespace.com/static/5f237610d03c177486db15a4/t/5f49740dbf521a7b2fd0a92e/1598649357660/UPenn+Resource+List.pdf viewed on December 16, 2021. The Senior Toast was a virtual program where graduating seniors gave their closing remarks to their fellow 2020 graduates per https://www.facebook.com/MakuuPenn/videos/makuu-senior-toast-student-remarks/251492209298388/ viewed on December 16, 2021).
[48] *Id.*, p. 17.
[49] *Id.*, p. 18.
[50] For example, see PENN_00000902.

- Open mic night, study hall and trivia night were held virtually.[51] Students reported satisfaction with events such as open mic night, virtual career mentoring and Platt study hall while services were allegedly closed or reduced.[52] Additionally, students noted appreciation for the opportunity to engage with Platt alumni over remote platforms.[53]
- The Thriving at Penn initiative shifted online, with the creation of the Locust Scroll e-newsletter, which helped highlight opportunities for global student engagement and self-care.[54]
- U-Night, a "celebration of all things sophomore" was shifted to virtual. This program thrived with more than 10,000 social media views as it "highlighted 15 individual students and brought the class closer together while apart."[55]

Altogether, approximately 127 student groups conducted meetings via Zoom after Penn allegedly closed or reduced its services. Collectively, between April 16, 2020 and May 15, 2020 (only a portion of the allegedly relevant period), these student group meetings attracted approximately 11,014 total participants at 2,340 Zoom meetings, totaling 10,188 hours.[56]

*iv. Recreation and Fitness Services*

Penn students still had access to and received recreation and fitness services and support after Penn allegedly closed or reduced its services. For example, Penn created online remote resources links where anyone could go to find free programming and wellness resources. Additionally, Penn implemented live recreation and fitness classes on Zoom, Facebook Live and Instagram Live.[57]

For many students, these virtual group classes represented a benefit that they would not have received, but-for the pandemic. While some students bought semester-long passes for group exercise classes at the beginning of the Spring 2020 Semester, Penn voluntarily refunded over 50% of the pass' cost to approximately 376 students,[58] and offered group exercise classes to all students free of charge after Penn allegedly closed or reduced its services.[59] There are also benefits to working out online rather than going to a gym.[60]

Moreover, many varsity athletic teams met at least weekly with their coaches via video conferencing. Sports Performance also provided individual online meetings regarding mental health & wellness, strength & conditioning and nutrition to varsity athletes.[61]

---

[51] *Id.*, p. 31.
[52] PENN_00000615, p. 41.
[53] *Ibid.*
[54] *Id.*, p. 35.
[55] *Id.*, p. 36.
[56] PENN_00000902.
[57] PENN_0000086, PENN_00001249 and PENN_0000088, p. 10.
[58] PENN_00001165.
[59] PENN_00001181. Penn Recreation also organized video game intramural tournaments for students involving games such as Madden NFL Football, MLB The Show, NBA 2K and FIFA.
[60] For example, see https://www.makeuseof.com/working-out-online-pros-and-cons/ viewed on January 3, 2022.
[61] PENN_00001249.

### v. Career Services

Penn students still had access to and received Career Services after Penn allegedly closed or reduced its services. Not only did graduating students still need to make decisions about their post-Penn life, but the pandemic caused many companies to rescind job and internship offers. Career Services had to unexpectedly assist such students.

For example, during this time of alleged closed or reduced services, Penn's Career Services provided:

- 2,200 advising sessions virtually (during which Penn provided resume review, assistance with job leads and networking, etc.);[62]
- 159 virtual employer events;[63]
- 225 virtual employer information sessions;[64]
- 29 live workshops;[65]
- 15 online chat sessions;[66]
- an online mentoring program, which saw 265 users (120 students, 134 alumni, 11 faculty/staff) send 474 messages with a response rate of 89%;[67] and
- a "New COVID-19 Career Advice, FAQs, & Resources Community Page."[68]

Penn students praised Career Services after Penn allegedly closed or reduced its services. For example, one student said

> [w]hen Penn was moved to virtual instruction in the spring of 2020 and the uncertainty of the job market began to weigh on me, I felt anxious but also certain that what I needed to do was heavily rely upon the advisors at Career Services. Fortunately, they did not disappoint: navigating me from the beginning to end though a five-round interview process and celebrating my eventual offer of a marketing analyst role.[69]

### vi. Learning Support Services

Penn students still had access to and received learning support services after Penn allegedly closed or reduced its services. For example, online tutoring was made available.[70] In particular, the Weingarten Learning Resources Center had 347 meetings with students online/over the phone, 411 individual student meetings and six virtual programs (which provided tutoring, consultations on learning strategies and disability accommodations).[71]

---

[62] PENN_00000615, p. 4 & PENN_00000884.
[63] PENN_00000902, p. 20.
[64] PENN_00000899.
[65] PENN_00000902, p. 20 & PENN_00000899.
[66] *Ibid.*
[67] PENN_00000902, p. 11.
[68] *Id.,* p. 20.
[69] PENN_00000615, pp 6-7.
[70] *Id.*, p. 22.
[71] PENN_00000902, p. 25 & PENN_00000884.

*vii. "And Much More"*

Funds from the General Fee also provides funding for other services not explicitly identified on the version of Penn's website that the Plaintiffs quote in their Complaint, but which continued to operate and serve students after Penn allegedly closed or reduced services.

(1) Public Safety

Funds from the General Fee also supported Public Safety for Penn students. Even though fewer people were on campus, Public Safety officers continued to have a strong presence maintaining the safety of the over 400 students who remained on campus and the many more who lived off-campus and who likely remained local after de-densification as well as secured the many buildings and possessions that were left behind.[72] For example, Penn's Division of Public Safety continued to provide safety and security services, including, but not limited to, walking escorts and special checks, on a 24/7 basis.[73]

Additionally, Penn Violence Prevention held 115 virtual office hours and 11 hours of virtual programs.[74]

(2) Graduate Student Center

Funds from the General Fee also supported the Graduate Student Center, which performed a multitude of services after Penn allegedly closed or reduced its services, including:

- Assisting in designing, evaluating and disbursing Technology Grants Program and COVID Emergency Grants for graduate and professional students (which I explain more in Section V.C. below);
- Adding a comprehensive website with Spring 2020 Resources;
- Offering one-on-one support and advising to students;
- Offering graduate life programs remotely (e.g., language chats, trivia night, virtual cooking classes, web-based info sessions for incoming students, etc.);
- Offering academic support programs remotely (e.g., webinar on daily writing, weekly writing challenge, writing accountability groups, virtual dissertation boot camp);
- Continuing to advise and support other graduate programs, such as the Graduate and Professional Student Assembly and the Fontaine Society;
- Creating new digital assets (videos, content) for campus partners, including new welcome video;
- Increasing presence and resource-sharing on all social media platforms, as well as a social media campaign #PennGradWell to reinforce balance and supports for students; and

---

[72] PENN_00000886. As of February 21, 2020, approximately 20,004 enrolled students lived off-campus, and approximately 15,972 of those lived in Philadelphia. PENN_00001294. While Penn does not possess reliable data on the exact number of students who remained off-campus in Philadelphia after campus de-densification, it is likely that many of those approximately 16,000 students remained close enough after campus de-densification to benefit from the physical security afforded by Penn's campus safety program.
[73] PENN_00000088.
[74] PENN_00000902, p. 23.

- Planning for both on-campus and virtual Graduate New Student Orientation.[75]

### (3) Undergraduate Admissions Office

Penn Admissions, which did not stop working after Penn allegedly closed or reduced its services, is also supported by the General Fee. The Admissions Office is the primary marketing and engagement arm of the university, promoting the international brand of the institution providing value to current students and alumni.[76]

After Penn allegedly closed or reduced its services, the Admissions Office finalized the list of students admitted to Penn's Class of 2024. It then fielded questions for several weeks as admitted students had to declare their college decision by May 1, 2020. The Admissions Office then had to decide which waitlisted students, if any, to admit.

### (4) Student Registration & Financial Services Office

The General Fee also supported the Student Registration & Financial Services Office. After Penn allegedly closed or reduced its services, this Office still provided ongoing financial aid counseling and packaging including work concurrent with the decisions of admits to Penn's Class of 2024. In addition, the Student Registration & Financial Services Office developed Financial Wellness resources and programs for the Fall 2020 semester.[77]

In addition, Penn Student Registration & Financial Services in conjunction with Student Intervention Services, Penn First Plus, the Graduate School of Education, the Provost's Office and other Penn offices provided emergency, pandemic-related financial support directly to students after Penn allegedly closed or reduced its services including providing approximately:

- $154,704 to assist 377 students with travel costs incurred after campus de-densification;
- $212,490 to assist 474 students with expenses for items such as food after they departed campus;
- $9,817,002 to assist 3,456 students by waiving summer salary expectations, thereby freeing those students to pursue a wider array of employment opportunities;
- $482,184 to 42 students whose financial aid packages were reevaluated between March and May 2020 due to pandemic-related family financial changes;[78]
- At least $173,140 to students for laptops and technology costs;[79] and
- $259,742 in COVID-19 Emergency Grants to assist 392 graduate and professional students with unanticipated expenses related to the onset of the pandemic.[80]

---

[75] PENN_00000886.
[76] *Ibid.*
[77] *Ibid.* and PENN_00000088, pp. 2-3.
[78] PENN_00000870.
[79] PENN_00000902, p.4 and PENN_00001403.
[80] PENN_00001321.

(5) Information Systems & Computing Office

The General Fee also supported the Information Systems & Computing Office in conjunction with the Technology Fee.  This office still operated and provided support and communications to Penn students after Penn allegedly closed or reduced its services as detailed in Subsection ii below.

(6) Family Resource Center

The General Fee also supported the Family Resource Center, which performed a multitude of services after Penn allegedly closed or reduced its services including:

- Assisting in designing, evaluating and disbursing Technology Grants Program and COVID Emergency Grants for graduate and professional students (which I explain more in Section V.C. below);
- Adding a comprehensive website with virtual resources for student parents;
- Reinvigorating Parents@Penn Facebook group;
- Providing virtual one-on-one advising;
- Continuing to facilitate Family Leave and New Parent Accommodation for Ph.D. students;
- Offering family programs remotely (e.g., virtual student parent support group, virtual field trips, weekly online English lessons for family members);
- Co-producing with Career Services a 3-part video series on Strategies to Explore Careers, Write Resumes, and Navigate Tricky Interview Questions as a Parent; and
- Using social media to provide tips for home-schooling.[81]

Therefore, Penn still provided services, supplemented by new programs and resources, after Penn allegedly closed or reduced its services, and students still had access to and received value from the programs that the General Fee supported.

### ii. *Technology Fee*

As mentioned above, the Technology Fee, as described during and before the Spring 2020 Semester, "assists with the cost of computer labs **and** technological services."  Internally, Penn allocates the funds it receives from the Technology Fee to a variety of schools within the University that provide services and resources to students.[82]

The more recent description Penn used **after** the conclusion of the Spring 2020 Semester that the Plaintiffs cite in the Complaint describes the Technology Fee as providing students with services and resources including: online learning resources, data and network security, technology support, email services and support, technology-enabled spaces, specialized software programs, electronic research tools, and other related costs.

Penn students still had access to and received technology services after Penn allegedly closed or reduced its services.  In fact, the need for such technology services increased significantly when Penn allegedly closed or reduced its services as significant unanticipated costs were incurred to support students, in addition to faculty and staff.

---

[81] PENN_00000886.
[82] PENN_00001183.

Penn's Information Systems & Computing Office coordinated and facilitated each individual school's transition to online learning. For example, they held weekly group calls with each school at Penn and provided individual consultations/meetings with faculty members. It also supported a Courseware Steering group to aid in class transition.[83]

From an IT equipment perspective, Penn prepped and provided 15 new laptops, webcams, and keyboards for faculty and staff home use. Penn also incurred $27,293 COVID-19-related technology expenses for administrative staff.[84]

To deliver online learning support for students, Penn's Information Systems & Computing Office provided additional online learning resources for students including an FAQ webpage for taking online classes and a webpage for strategies for taking classes online.[85] The Office further provided remote IT support to students by, for example, instituting a technology grant program that provided hardware and internet services to full-time graduate and professional students with demonstrated financial needs.[86] This program was in addition to the funding, discussed above, that was made available to undergraduates for laptops and other technology costs. Penn also made a range of free services and software programs available to students, including Adobe.[87]

Penn's Office of Information Systems and Computing also set up a call center for Student Health Services, expended significant effort in multiple areas related to contracting and licensing (e.g., Panopto, Zoom, O365/Teams, Box, etc.), planned for hybrid classrooms and possible acceleration of conferencing tech deployment for the Fall 2020 Semester, expanded LinkedIn Learning access for students, and increased monitoring and response to security events that could affect remote learning (e.g., ZoomBombing).[88]

While some technology-enabled spaces, such as the computer labs may have physically closed due to safety concerns from COVID-19, I understand that Penn students by around March 18, 2020 had remote access to on-campus computer labs through Virtual Desktop. In addition, Penn students received extended hours coverage for the Tech Center, PennKey and Two Step support.[89] To aid this extended hours coverage, additional preparation, scheduling and training was required.[90]

Furthermore, Penn's Information Systems & Computing Office created a central point for other student support by, for example, contracting and onboarding the third-party vendor ModSquad to

---

[83] PENN_00000886. The Courseware Steering group "provide[s] guidance, decisions, and direction based on recommendations from the Courseware Advisory." Per https://infocanvas.upenn.edu/about/governance/ viewed on December 16, 2021.
[84] PENN_00000902, p. 42.
[85] PENN_00000236.
[86] PENN_00000016.
[87] *Ibid.*
[88] PENN_00000885.
[89] *Ibid.* The Tech Center "provides assistance to all Penn constituents with technical issues. Support is provided to off-campus Undergraduate and Graduate students, residents of Sansom Place East and West, Greek Houses, and users of the Library." Per https://techcenter.upenn.edu/support/solutions viewed on December 16, 2021. Additional hours of support were given for both PennKey (student login) and Two Step Support. Two Step Support is the multi-factor identification system used at Penn.
[90] *Ibid.*

provide 24/7 technology support as well as providing the corresponding scripting, training and testing.[91]

In addition to these added services, Penn students continued to receive previously provided data and network security services, technology support, email services and support, Penn-provided software, and electronic research tools after Penn allegedly closed or reduced its services.

Therefore, Penn still provided services, supplemented with new programs and resources, after Penn allegedly closed or reduced its services, and students still had access to and received value from the programs that the Technology Fee supported.

### iii. Clinical Fee

As mentioned above, the Clinical Fee, as described during and before the Spring 2020 Semester, provides "students unlimited access to Student Health Services."

The more recent description Penn used **after** the conclusion of the Spring 2020 Semester that the Plaintiffs cite in the Complaint describes the Clinical Fee as providing students with services and resources including: Student Health Service, Campus Health, Counseling and Psychological Services, Penn Wellness services and the Office of Alcohol and Other Drug Programs.

Penn students still had access to, including in-person access, and received these services supported by the Clinical Fee.[92]

As discussed above, many Penn students after campus de-densification remained on-campus or remained local in the Philadelphia-area. Those students had physical access to Student Health throughout the entire Spring 2020 Semester.[93] For example Student Health conducted 669 in-person appointments with students between March 16 and before the end of May.[94]

Not only did the Student Health Services continue to offer in-person services as almost all of its staff were considered essential personnel not subject to Philadelphia's stay-at-home order,[95] but it increased its telemedicine services. For example, between March 16 and the end of May, Student Health conducted 4,605 remote appointments.[96] The need for the in-person and telemedicine services provided by the Student Health Services increased so much that staffing was increased,[97] even as Penn's revenue declined.[98]

Furthermore, Penn offered COVID-19 specific care, including coordinated care and follow-up services to any student, regardless of location, who tested positive for, exposed to or showed symptoms consistent with COVID-19. Campus Health performed 175 different instances of contract tracing due to COVID-19 before the end of April 2020.[99]

---

[91] *Ibid.*
[92] PENN_00000086.
[93] PENN_00000008.
[94] PENN_00001320.
[95] https://web.archive.org/web/20210413185437/https://shs.wellness.upenn.edu/ viewed on December 15, 2021 and PENN_00000508.
[96] PENN_00001320.
[97] PENN_00001320 & PENN_00000004.
[98] PENN_00001185.
[99] PENN_00000884.

Penn Wellness services created 15-minute daily exercise videos, an online sleep intervention program, guided medication and a pilot online sexual health education program to aid student needs after Penn allegedly closed or reduced its services.[100]

Penn's Office of Alcohol and Other Drug Programs continued to direct students seeking recovery support groups to join virtual meetings which were offered for an hour 7 days a week.[101] Additionally, the office's website continued to provide information and education to students about drugs and alcohol.[102] These services were even more critical due to the COVID-19 pandemic causing additional mental health and addiction issues. Social distancing, anticipated cycles of stay-at-home orders, and business and school closures produced widespread social isolation and economic distress that has led to additional "deaths of despair" from suicide and drug or alcohol misuse.[103]

Therefore, Penn still provided services, supplemented by new programs and resources after Penn allegedly closed or reduced its services, and students still had access to and received value from the programs that the Clinical Fee supported. As mentioned above, certain health-related facilities did not even cease providing in-person services after Penn allegedly closed or reduced its services, contrary to the Plaintiffs' allegations.

### 2. Even If There Were Some Diminishment in Value During the Time Penn Allegedly Closed or Reduced Its Services, That Supposed Diminishment Would Be Highly Individualized

Even if certain services were curtailed, the Plaintiffs claim that they could ignore individual student usage of such services because all students commonly paid for and had their access to on-campus services curtailed.[104]

For starters, I understand that Penn believes that the descriptions of the General, Technology and Clinical Fees that were provided during the Spring 2020 Semester do not guarantee access to any particular on-campus service, much less during the unexpected pandemic. Even if students no longer had physical access during the last weeks of the Spring 2020 Semester to a certain on-campus service that they previously had access to, students would value that access differently depending upon, among other things, their usage. Nobel Prize-winning options theory states that the value of an option to access certain services depends upon the likelihood of that person utilizing the services.[105] An option would be worthless to someone who would never exercise it.

---

[100] PENN_00000508.

[101] https://web.archive.org/web/20200330175342/https://aod.wellness.upenn.edu/initiatives/ viewed on December 15, 2021.

[102] https://web.archive.org/web/20200330174355/https://aod.wellness.upenn.edu/ viewed on December 15, 2021.

[103] https://www.impact.upenn.edu/covid-19/covid-19-pandemic-mental-health-addiction/ viewed on December 20, 2021.

[104] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, p. 2-8.

[105] Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–54, http://www.jstor.org/stable/1831029. On p. 638, it states "...if the price of the stock is much less than the exercise price, the option is almost sure to expire without being exercised, so its value will be near zero."

Therefore, Penn students who do not utilize on-campus services, such as the gym or Houston Hall (Penn's student union), at all were not damaged by their closure. Ms. Nedley is a good example. According to the records I received, during the first part of the Spring 2020 Semester, she did not physically access either the David Pottruck Health & Fitness Center or the Fox Fitness Center, both of which receive support from the General Fee.[106] The option to physically access these services would be worthless to Ms. Nedley. She would have been in the same economic position even if the services had not been physically closed.

Many students likely would be in a similar position. 13,595 unique individuals physically accessed Pottruck or Fox between January 1 and March 31, 2020, even though both facilities were physically open during most of that time period.[107] Even if one conservatively assumes that all of these 13,595 individuals were students (faculty, staff and their family members also utilized Pottruck and Fox and are included among these 13,000+ users), at least approximately half of Penn's 26,311 Spring 2020 Semester students never accessed Pottruck or Fox while they were physically opened.[108] Thus, any "right of access" to those facilities would be worthless to them, and they were not injured by the facilities' physical unavailability during the final weeks of the Spring 2020 Semester.

Just because a particular student never utilized a specific service (even when available) does not mean that they should avoid financially supporting it. One educator found that "the majority of students agree that they should fund programs they may never utilize with student fees."[109] Such services enhance the Penn brand, which students at least benefit from in later years even if some of the benefits were allegedly diminished during the Spring 2020 Semester.

Even when students do utilize a particular service, any losses they might have suffered because access to such on-campus, in-person services were allegedly curtailed would also be different. Utilizing options-pricing terminology, because the likelihood a given student would utilize a given service as well as the value that student would receive if it were utilized varies from student-to-student, so would the value of physical access to those services if utilized. Therefore, any alleged diminishment in campus use also would be highly individualized.

Individualized analyses would be required to determine the likelihood of a given student utilizing a particular service and the current as well as future brand-enhancement benefits they would receive from the bundle of services they did utilize. For example, studies have even shown that certain demographics (e.g., commuter students) tend to not utilize certain on-campus services, like the gym or student union.[110] Also, using the Houston Hall example, some students may eat at its restaurants daily. Some students may attend events there weekly; others might have different social outlets including going to their primary residence on weekends. Freshman might utilize the Houston Hall in different ways than upperclassmen. Additionally, studies have shown that

[106] PENN_00001164.
[107] PENN_00001190.
[108] PENN_00001294.
[109] Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"), p. 20.
[110] Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"), p. 142.

students who pay fees themselves (as opposed to parents or other third-parties) are more likely to utilize the services associated with those fees.[111]

Furthermore, the Named Plaintiffs are good examples of how individual student use patterns will vary, depending upon the particular service at issue. For example, both Ms. Smith and Ms. Nedley did not request or receive any career services, tutoring or other resources related to learning support; and Ms. Nedley did not request or receive multicultural resources from Penn during the Spring 2020 Semester,[112] all of which were supported by the General Fee. Ms. Smith also did not request or receive any technology-related services (other than the Tech Grant described below) during the Spring 2020 semester,[113] which were supported by the Technology Fee. Ms. Smith and Ms. Nedley further did not identify any health-related services that they sought or received during the Spring 2020 semester,[114] which were supported primarily by the Clinical Fee.[115]

While the Named Plaintiffs did not utilize many of the services supported by the three allegedly relevant fees, they did utilize others to varying degrees. For example, Ms. Smith stated that she used the recreation and fitness-related services three to four times per week during the Spring 2020 semester.[116] As a varsity softball player, Ms. Nedley would have utilized other athletic and fitness services, including Weiss Gym and Weightman Physical Therapy.[117] Consequently, the two Named Plaintiffs' use of one allegedly relevant service differs, necessitating an individualized inquiry to determine any access-related damages. Additionally, the two Named Plaintiffs differed in the other services that they utilized at Penn. While Ms. Smith worked on the Penn GSE Perspectives on Urban Education Journal,[118] Ms. Nedley was a student tutor and a member of the Fellowship of Christian Athletes, Penn Athletics Wharton Leadership Academy, Penn Athletics Health and Wellness Captains, and Pre-Dental Society.[119] Therefore, an individualized inquiry would be required to assess if these campus activities were even supported by one of the allegedly relevant fees, what services related to these activities were available before campus de-densification, what services were available after and the extent to which those services even allegedly diminished.

Not only does the likelihood of each student utilizing the services that were allegedly curtailed differ on an individualized basis, but so does the value students received from utilizing those services. As a varsity athlete, Ms. Nedley might obtain greater value from utilizing Penn's intercollegiate athletic facilities than other students.

Exhibit 3 shows that the List Prices for the three allegedly relevant fees are highly individualized. The Plaintiffs have not demonstrated that the alleged loss of access to services are tied to the fees

---

[111] For example, see a discussion of how payment methodology could affect consumption in Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on January 3, 2022.

[112] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, pp. 6-8. Plaintiffs Emma Nedley's Answers and Objections to Defendant's Interrogatories (Set One), pp. 11-12.

[113] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, pp. 5-6.

[114] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, p. 5. Plaintiffs Emma Nedley's Answers and Objections to Defendant's Interrogatories (Set One), p. 8.

[115] CAPS was also supported by the General Fee.

[116] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, p. 6.

[117] Plaintiffs Emma Nedley's Answers and Objections to Defendant's Interrogatories (Set One), p. 10.

[118] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, p. 8.

[119] Plaintiffs Emma Nedley's Answers and Objections to Defendant's Interrogatories (Set One), p. 13.

students paid. For example, as the List Price of the General Fee for undergraduates is generally 1.5 times the List Price for graduate and Ph.D. students, the Plaintiffs' Pro-Rata Damages Theory implies that undergraduate students value Penn's recreation and fitness-related services 1.5 times more than graduate and Ph.D. students. Additionally, since Executive MBA students are not charged a General, Technical or Clinical Fee, the Plaintiffs' Pro-Rata Damages Theory implies that those students do not value recreation and fitness-related services, health services and technology services at all. The Plaintiffs have presented no evidence consistent with such varying valuations.

Even if Penn did deny students access to some services, it is questionable if students would have accessed those services without Penn's actions. For example, during the Spring of 2020, many Penn students voluntarily opted not to congregate with other people for fear of catching COVID-19. Such students likely would not have utilized the allegedly curtailed in-person services even if Penn kept them physically open. As a result, Penn's actions did not harm such COVID-careful students.

The Plaintiffs did not provide any economic model to value the allegedly curtailed services. In addition, the Plaintiffs have failed to identify a model suggesting that the value each student received from the services they actually did utilize was less than the List Prices for the fees at issue or the prices each student actually paid as these services were also supported by Penn's other revenue sources.

As a result, if access was a proper means to assess damages as the Plaintiffs allege, which I understand Penn denies, the different ways students utilize campus amenities and the value they receive from their use, especially amidst COVID-19, would cause damages to be highly individualized.

## B. The Number of Days Cannot Be Utilized to Calculate Pro-Rata Damages

Even if some Pro-Rata Damages Theory were viable, it is economically incorrect to assume that the diminished value of the services at issue would be proportional to the number of days of the remote portion of the Spring 2020 Semester.

Such an assumption implies that that each day in the Semester was equally valuable to students. While such an assumption might be convenient, it is not economically correct. Not only does each students' marginal utility of individual days differ, but the number of days students are on campus also varies on an individualized basis.

### 1. Marginal Utility Is Different For Each Student

One economic maxim is that people generally obtain decreasing marginal utility for consuming products.[120] In other words, the additional benefits one receives from consuming an additional unit of a product decreases as one consumes more. For example, a person generally gets greater benefits from consuming the first slice of pizza than the tenth slice.

---

[120] https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on January 3, 2022.

Plaintiffs' proposed Pro-Rata Damages Theory does not consider whether students received greater benefits from access to campus services during the first part of the Spring 2020 Semester than they would have in the second part if Penn had not de-densified campus or moved to virtual services. There are an enumerable number of individualized reasons why such an economic phenomenon could occur. For example, students with a New Year's Resolution may be motivated to use the gym at the beginning of the semester, but lose motivation or begin exercising outside and no longer go to the gym by late March, when the gym physically closed. Students may also study more and utilize fewer services as finals approach. Conversely, there could be some students who would work out more in the gym as a stress relief during finals.

As a result, the degree to which putative class members experienced decreasing marginal utility during the Spring 2020 Semester would be individualized. Consequently, the Plaintiffs cannot reliably value putative class members' alleged losses with their pro-rata assumption.

### 2. The Number of Relevant Days Is Individualized

Even if each day in the Spring 2020 Semester were equally valuable to all putative class members, the number of relevant days is highly individualized. The Plaintiffs suggest that their pro-rata percentage could be calculated by taking the number of days that Penn closed campus divided by the total number of relevant days in the Spring 2020 Semester. However, individualized analyses would be required to determine both the numerator and denominator of this proportion.

For example, the Spring 2020 Semester ended on May 12, 2020 with Finals Week; Commencement occurred six days later.[121] Students whose finals ended early during the Spring 2020 Semester might leave campus early. The number of semester days on-campus would be lower for such early leavers as compared to students whose finals ended later. Differences would also arise for students who went home for some or all weekends.[122]

The aforementioned logistical issues make the claimed formulaic calculation of damages highly individualized. Consequently, contrary to Plaintiffs' unsupported assumption, any decreased price Penn might charge for the fees would be highly individualized and not necessarily tied to the number of days as alleged.

### C. Most of the Costs Associated with the Fees In Question Are Fixed

Some of the costs associated with the meal plans Penn students received are variable as Penn and its suppliers could reduce the amount of meat, vegetables and other foods it purchased in response to the campus closure during the Spring 2020 Semester. On the other hand, nearly all of costs associated with the services associated with the fees in question are fixed.

The fees in question primarily fund staff salaries.[123]

---

[121] https://almanac.upenn.edu/articles/three-year-academic-calendar-63-34 viewed on December 16, 2021.
[122] For example, Wharton Graduate students might be more likely to leave on weekends as classes in the Wharton Graduate School were never scheduled on Fridays during the semester.
[123] PENN_00000003 and PENN_00001185.

HIGHLY CONFIDENTIAL

It is my understanding that Penn retained its faculty and full-time staff during the Spring 2020 Semester.[124] Penn kept its full-time employees on (and hired new employees) not only to continue to provide the services described in the prior subsection, but because, in general, it would be more costly to rebuild its staff once the campus reopened and there was uncertainty about when that would be.[125]

Additionally, the fees in question fund fixed assets such as campus police cars. Such fixed costs do not vary with campus access and usage. It is also common for mandatory student fees at American universities to be related to debt service on student union-related bonds.[126] At Penn as well, at least part of the General Fee was used for debt services.[127] Even though physical access to some in-person services might have decreased, the required bond payments did not. Consequently, these costs that underlie the fees did not decrease with the lessened access.

Just like funds collected from Penn students supported the building renovations that were occurring on campus and were not accessible during the Spring 2020 Semester, they should have to pay for at least the salaries and fixed costs associated with the fees in question.

Consistent with the access-invariant nature of the fees in question, as discussed above, Penn distributes 1/12th of each office's General Fee allocation monthly even though student use of the relevant services are generally less when school is not in session.

# V. Even if Ms. Smith and Ms. Nedley Were Able to Demonstrate that the Services Associated with the Spring 2020 Semester Fees at Issue Were Less Valuable, Putative Class Members Were Not Necessarily Damaged

Notwithstanding the aforementioned, even if Ms. Smith and Ms. Nedley were able to demonstrate that the List Price for some or all of the fees at issue should have been lower, the actual prices putative class members paid might cause there to be no injury/damages. If such damages occurred, individualized analyses would be required to quantify them.

For starters, not all students were assessed a General, Technology or Clinical Fee during the Spring 2020 Semester. For example, Ms. Smith was not assessed and did not pay a Technology Fee.[128]

For those students who were assessed one or more of these fees, the price they paid, if any, varied significantly. It is important to note that there are three relevant prices relating to college attendance: the List Price, the Net Price Penn receives and the Net Price students pay. When a fee

---

[124] The total compensation and benefits Penn paid its faculty and staff were greater in FY20, which contains the Spring 2020 Semester at issue, than FY19. PENN_00001185.
[125] The cost of staff turnover is generally high. For example, see https://www.gnapartners.com/resources/articles/how-much-does-employee-turnover-really-cost-your-business viewed on January 5, 2022.
[126] Sterritt, p. 78.
[127] PENN_00001182.
[128] PENN_00000862.

is assessed, List Prices are the amounts Penn states are being charged on its website and in brochures. As shown in Exhibit 3, these List Prices are individualized.

Further fee differences arise as only a minority of Penn students who were assessed the fees at issue pay these List Prices. Most Penn students receive financial aid of some sort.[129] As discussed further below, the financial aid students already received means that a great many of them would not benefit economically from the fee refund that the Plaintiffs seek in this litigation. In addition, the Plaintiffs' Pro-Rata Damages Theory fails to account for, on a class-wide basis, the financial aid students received or account for the supposed damages in terms of the Net Prices students actually paid for the fees at issue. Moreover, the Plaintiffs' Pro-Rata Damages Theory does not account for the additional financial relief that Penn provided individual students after the onset of the pandemic.

## A. Students With an Expected Family Contribution Less than Their "Modified" Cost of Attendance Would Not Be Damaged

Two factors are the main monetary drivers of the need-based financial aid Penn grants: Penn's Cost of Attendance ("COA") and the student's Expected Family Contribution ("EFC").

Utilizing information from the federal government's Free Application for Federal Student Aid ("FAFSA") form, Penn calculates the EFC, which equals how much it expects a student's family to contribute to the student's education.[130] For example, Ms. Nedley's EFC was ███ for the 2019 – 2020 Academic Year.[131]

The COA is the amount it will cost a student to attend Penn. The COA includes an estimate of tuition and **fees**; the cost of room and board (or living expenses for students who do not contract with the school for room and board); the cost of books, supplies, transportation, loan fees, and miscellaneous expenses (including a reasonable amount for the documented cost of a personal computer); an allowance for child care or other dependent care; costs related to a disability; and/or reasonable costs for eligible study-abroad programs. For example, Ms. Nedley's COA was $76,444 for the 2019 – 2020 Academic Year.[132]

While not obligated to, Penn could, and typically does, grant sufficient scholarships, which do not have to be repaid, so that a student's out-of-pocket costs do not exceed their EFC. For example, Penn elected to limit Ms. Nedley's out-of-pocket costs to her EFC. It did so by providing her with

---

[129] https://nces.ed.gov/collegenavigator/?q=university+of+penn&s=PA&pg=2&id=215062#expenses viewed on November 3, 2021 and PENN_00001317. It is my understanding that approximately 47% of Penn undergraduates and 52% of Penn non-undergraduates receive some sort of financial aid, and that aggregate value of the aid Penn provides is significant. In the 2020 Fiscal Year, Penn provided over $360 million in undergraduate and graduate financial aid grants and scholarships. https://www.finance.upenn.edu/wp-content/uploads/FY20-Anual-Financial-Report.pdf viewed on December 31, 2021.
[130] Students provide detailed family financial information as well as information about the schools students are considering attending on the FAFSA form. The EFC calculation considers information about the student's/family's taxed and untaxed income, assets, and benefits (such as unemployment or Social Security), as well as demographic characteristics such as the student's family size and the number of family members who will attend college during the year. See https://studentaid.gov/complete-aid-process/how-calculated viewed on January 3, 2022.
[131] PENN_00000866.
[132] *Ibid.*

█████████████████████████████████ scholarship (= 76,444 – ██████ for the 2019 – 2020 Academic Year.

Scenario 1 in *Figure 1* below shows that Ms. Nedley's actual out-of-pocket costs to attend Penn were ██████



In this lawsuit, the Plaintiffs allege that students are owed certain refunds. If such refunds were to occur, each student's COA would be reduced by the amount of that refund. For example, the List Price of Ms. Nedley's fees for the Spring 2020 Semester was $3,307. The Plaintiffs allege that she should receive a 42% refund of those fees, or $1,389 (less any value received).[133]

If Ms. Nedley were to receive a $1,389 refund, her "Modified" Cost of Attendance would be $75,055 ($76,444 less the $1,389 refund). (See Scenario 2 in Figure 1) Assuming her EFC was unchanged and Penn continued to elect to limit Ms. Nedley's payment to her EFC, her out-of-pocket costs would be unchanged. They would still equal ██████████████████

As a result, even if the Plaintiffs were able to show that refunds should be awarded, Ms. Nedley and the many other similarly situated scholarship students would not be injured/damaged. Their out-of-pocket costs would be unchanged irrespective of the refund.

This example shows that the relief sought by the Plaintiffs' Pro-Rata Damages Theory would not necessarily result in refunds, at least to students on need-based financial aid. Rather, such relief, if awarded, would only serve to reduce those students' COA and financial aid. Penn's Office of

---

[133] Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories, pp. 3-5; Plaintiff Emma Nedley's Objections and Responses to Defendant's First Set of Interrogatories, pp. 6-7.

HIGHLY CONFIDENTIAL

Financial Aid regularly adjusts aid amounts in response to changes in a student's COA. One common example causing such an adjustment to a student's COA is if they add or drop classes.[134]

Alternatively, if students received a refund, their EFC for the Spring 2020 Semester (and potentially subsequent semesters) would increase, which would permit Penn to make additional financial aid modifications.

Determining whether a student's financial aid would obviate any fee reduction implied by the Plaintiffs' Pro-Rata Damages Theory would be highly individualized as economists have found that "the net price of college (listed tuition [and fees] minus grants) has become increasingly individualized."[135] For example, COVID-19 could have changed a student's financial situation, which could require a recalculation of their EFC along with their COA.

## B. Financial Aid from Penn and Other Payors Causes Students Not to Be Injured/ Damaged

If, as the Plaintiffs contend, there is some uniform value associated with the services supported by the fees in question, that value would be at least the List Price of those fees. The value could be greater if Penn utilized endowment funds or other revenue sources to subsidize these services.

Focusing on the General Fee for Penn undergraduates,[136] at most, the Plaintiffs' analysis would demonstrate that there should have been some reduction off of the $2,568 List Price for the Spring 2020 Semester. Assuming, for the sake of argument, they could somehow demonstrate that the List Price should have been $50 lower, a student who received a $1,600 scholarship that Penn could allocate to the General Fee would not have been injured/damaged. If that student also received a $500 scholarship from their local Chamber of Commerce that Penn chose to allocate to the General Fee, such a student received something worth at least $2,568, but only paid $468 for it (=$2,568 - $1,600 - $500).[137]

## C. COVID-19 Grants Could Cause Students Not To Be Damaged

To assess any refunds owed, one must not only look at fees changes and the impact of financial aid, but at any additional benefits Penn students may have received after the onset of the pandemic.

For example, many Penn students received COVID-relief payments from Penn that they would not have otherwise received but-for the pandemic. In fact, due to the pandemic, Penn distributed direct grants and financial aid enhancements worth over $10 million to students who applied for

---

[134] For example, Penn increased Ms. Nedley's financial aid award by ▮▮▮ when her COA increased by an identical amount. (Comparing her COA as of January 16, 2020 and April 16, 2020. PENN_00000866. Also see https://www.college.upenn.edu/courseload-risk viewed on January 3, 2022.

[135] Scott-Clayton, Judith "Information Constraints and Financial Aid Policy" NBER Working Paper 17811, February 2012.

[136] A similar analysis could be performed for the other fees and students in question. I would propose to testify regarding a similar analysis for the other fees should this matter proceed further, including to trial.

[137] Economists have shown that the consumption benefits of college are unrelated to its costs. Avery, Christopher and Caroline M. Hoxby "Do and Should Financial Aid Packages Affect Students' College Choices?," September 2004, p. 242 (www.nber.org/chapters/c10102). Alternatively, if there was a $50 refund off the List Price, such a student received something worth $2,518, but only paid $468 for it.

HIGHLY CONFIDENTIAL

assistance during the pandemic.[138] Additionally, as discussed above, Penn provided additional technological, health-related, recreational and other support to students when it allegedly closed or reduced its services. For example, $210 in COVID-Related Aid was credited to Ms. Smith's account.[139] Some students also received aid for food, water and transportation back home; whereas others received direct grants to enhance their financial aid.[140]

In order to evaluate the position each student would have been in but-for the pandemic, such benefits would need to be subtracted from any losses implied by the Plaintiffs' Pro-Rata Damages Theory. Given Plaintiffs have a duty to mitigate, the Finder of Fact could further determine that benefits that were available to, but not taken by, students should also be subtracted.

The Plaintiffs have not proposed a methodology for such subtraction. As the COVID-relief payments, enhancements and benefits available to and taken by Penn students was highly individualized, so would be any offset. Consequently, at a minimum, the Plaintiffs' proposed damages theory overstates Ms. Smith's alleged damages.

### D. Notwithstanding Her EFC ███ Ms. Nedley Was Still Not Damaged Because She ███ and COVID-19 Grants in Spring 2020

As demonstrated in Section V.A. above, Ms. Nedley was not damaged because her ███ ███ for 2019-20. Alternatively, the financial aid and COVID-19 grants that Ms. Nedley received in the Spring of 2020 also caused her not to be damaged.

*Figure 2* below displays Ms. Nedley's tuition, fees and ███ or the Spring 2020 Semester.



---

[138] PENN_00000870.
[139] I understand that Ms. Smith denies receiving the $210 in COVID-Related Aid, but multiple documents, including her student account statement, reflect that she did receive that amount. For example, PENN_00000862, PENN_00000857 and PENN_00001299.
[140] PENN_00000870.

| Figure 2 Tuition, Fees and Financial Aid for Ms. Nedley | |
|---|---|
| **Description** | **Spring 2020 Amount** [141] |
| Tuition | $25,578 |
| **Fees** | |
| General Fee | $2,568 |
| Technology Fee | $435 |
| Clinical Fee | $304 |
| **Subtotal – Fees** | **$3,307** |
| **Total – Tuition & Fees** | **$28,885** |
| ███████████████████████████████ | |
| COVID-Related Aid | $465 |
| ███████████████████████████████ | |

Ms. Nedley received at least two types of financial aid in Spring 2020. First, Ms. Nedley's received ████████████████████████ which accounted for 83% of her total payments to Penn.[142] Second, Ms. Nedley received $465 of COVID-Related Aid from Penn.

These facts demonstrate that Ms. Nedley was not damaged under the Plaintiffs' Pro-Rata Damages Theory.

Under the Plaintiffs' Theory, Ms. Nedley's Fees should only have been $1,918 (42% less than the $3,307 in fees she was charged) in Spring 2020. However, assuming her grants were proportionately allocable to tuition and fees,[143] Ms. Nedley only paid $569 in Fees (Total Fees less her ████ in ████████████. Consequently, she received more in value for her Fees than she paid. Additionally, Penn had the right to adjust her ██████████ so that she still would have paid $569 in fees even if the List Price for the fees at issue was reduced.[144] In other words, her EFC would have remained the same and any refund that the Plaintiffs contend Penn should issue would only reduce the COA. Furthermore, any losses that Ms. Nedley might have suffered would have to be reduced by at least the $465 in COVID-Related Aid she received.

As a result, further financial analyses under the Plaintiffs' Pro-Rata Damages Theory demonstrate that Ms. Nedley was not damaged.

---

[141] PENN_00000865.
[142] This percentage conservatively does not include her COVID-Related Aid (= ██████████████
[143] It is my understanding that Penn does not make any promise to undergraduates about how it will allocate grants and other revenue streams to charges, and students do not see such allocations. Thus, Penn, as an economically rational actor, could elect to allocate financial aid grants in different ways. The aforementioned example assumes that financial aid is proportionately allocated to tuition and fees. Alternatively, Penn could allocate financial aid to fees first. Under such a scenario, both Ms. Nedley and Ms. Smith would not have any out-of-pocket expenditures for fees.
[144] PENN_00000866.

# VI.   Conclusion

I conclude, to a reasonable degree of economic certainty, that the Plaintiffs and the putative class members were not damaged / injured in a formulaic, uniform manner.

The Plaintiffs' proposed damages theory does not account for the valuable, individualized services that even they acknowledge students received after the onset of the pandemic during the Spring 2020 Semester.  Their theory is further flawed because it does not account for the individualized amount of time students spent on campus.  The Plaintiffs also do not account for the effects of financial aid and COVID-19 grants that students received.

Accounting for such factors, I demonstrate that Ms. Nedley was not injured / damaged and the Plaintiffs' proposed damages theory, at a minimum, overstates Ms. Smith's damages.  Many putative class members likely were also not injured / damaged, or at least did not suffer damages consistent with the Plaintiffs' proposed damages theory.


January 10, 2022

Benjamin S. Wilner, Ph.D.

**Asha Smith & Emma Nedley v. University of Pennsylvania**
**Documents Considered**

Exhibit 1

| I. Legal Filings |
| --- |
| Consolidated Class Action Complaint and Demand for Jury Trial ("Class Action Complaint"). |
| Court's Opinion on Defendant University of Pennslyvania's Motion to Dismiss Plaintiffs' Consolidated Complaint. |
| Memorandum of Law in Support of Defendant University of Pennsylvania's Motion to Dismiss Plaintiffs' Consolidated Complaint. |
| Plaintiff Asha Smith and Emma Nedley's Objections and Responses to Defendant's First Set of Requests for Production. |
| Plaintiff Asha Smith's Objections and Responses to Defendant First Set of Requests for Admission. |
| Plaintiff Asha Smith's Objections and Responses to Defendant's First Set of Interrogatories. |
| Plaintiffs Emma Nedley's Answers and Objections to Defendant's Interrogatories (Set One). |
| Plaintiffs Emma Nedley's Answers and Objections to Defendant's Requests for Admission (Set One). |
| Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss Consolidated Complaint. |
| Reply Brief in Support of Defendant University of Pennsylvania's Motion to Dismiss Plaintiff's Consolidated Complaint. |
| University of Pennsylvania's Motion to Dismiss Plaintiffs' Consolidated Complaint. |

| II. Documents Received from Counsel |
| --- |
| PENN_00000001-PENN_00001410 |
| Nedley Production.pdf |
| Smith Production.pdf |

| III. Texts |
| --- |
| Black, Fischer, and Myron Scholes. "The Pricing of Options and Corporate Liabilities." *Journal of Political Economy*, vol. 81, no. 3, University of Chicago Press, 1973, pp. 637–54, http://www.jstor.org/stable/1831029. |
| Gourville, John T. and Dilip Soman "Pricing and the Psychology of Consumption" *Harvard Business Review*, September 2002. https://hbr.org/2002/09/pricing-and-the-psychology-of-consumption viewed on January 3, 2022. |
| Newbold, John J., Sanjay S. Mehta and Patricia Forbus "Commuter Students: Involvement and Identification with an Institution of Higher Education", *Academy of Educational Leadership Journal*, Vol 15, 2011, ("Newbold"). |
| Scott-Clayton, Judith "Information Constraints and Financial Aid Policy" NBER Working Paper 17811, February 2012. |
| Sterritt, Adam Burke "State Governance, Politics, and Mandatory Student Fees: Navigating a New Reality in the University System of Georgia." Doctoral Dissertation, University of Georgia, 2011, ("Sterritt"). |

| IV. Other Documents Considered |
| --- |
| https://almanac.upenn.edu/articles/three-year-academic-calendar-63-34 viewed on December 16, 2021. |
| https://infocanvas.upenn.edu/about/governance/ viewed on December 16, 2021. |
| https://nces.ed.gov/collegenavigator/?q=university+of+penn&s=PA&pg=2&id=215062#expenses viewed on November 3, 2021. |
| https://penntoday.upenn.edu/announcements/message-penn-community-fiscal-year-2021-budget viewed on January 7, 2022. |
| https://scholar.google.com/scholar?hl=en&as_sdt=0%2C14&q=benjamin+wilner&btnG= viewed on December 23, 2021. |
| https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021. |
| https://static1.squarespace.com/static/5f237610d03c177486db15a4/t/5f49740dbf521a7b2fd0a92e/1598649357660/UPenn+Resource+List.pdf viewed on December 16, 2021. |
| https://studentaid.gov/complete-aid-process/how-calculated viewed on January 3, 2022. |
| https://techcenter.upenn.edu/support/solutions viewed on December 16, 2021. |
| https://web.archive.org/web/20191217184616/https://srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees viewed on December 16, 2021. |
| https://web.archive.org/web/20200330174355/https://aod.wellness.upenn.edu/ viewed on December 15, 2021. |
| https://web.archive.org/web/20200330175342/https://aod.wellness.upenn.edu/initiatives/ viewed on December 15, 2021. |

| IV. Other Documents Considered (cont.) |
|---|
| https://web.archive.org/web/20200414114417/https://unsp.upenn.edu/penn-undergraduate-financial-aid-covid-19-updates/ viewed on December 16, 2021. |
| https://web.archive.org/web/20200429015137/https://www.sp2.upenn.edu/admissions/tuition-fees/msw/ viewed on December 16, 2021. |
| https://web.archive.org/web/20210413185437/https://shs.wellness.upenn.edu/ viewed on December 15, 2021. |
| https://www.college.upenn.edu/courseload-risk viewed on January 3, 2022. |
| https://www.facebook.com/MakuuPenn/videos/makuu-senior-toast-student-remarks/251492209298388/ viewed on December 16, 2021. |
| https://www.finance.upenn.edu/wp-content/uploads/FY20-Anual-Financial-Report.pdf viewed on December 31, 2021. |
| https://www.impact.upenn.edu/covid-19/covid-19-pandemic-mental-health-addiction/ viewed on December 20, 2021. |
| https://www.investopedia.com/terms/l/lawofdiminishingutility.asp viewed on January 3, 2022. |
| https://www.linkedin.com/in/asha-genevieve-smith-96ab7310b/ viewed on December 20, 2021. |
| https://www.makeuseof.com/working-out-online-pros-and-cons/ viewed on January 3, 2022. |

**Exhibit 2**



**Alvarez & Marsal**
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

## Benjamin S. Wilner, Ph.D.

Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals and textbooks as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

### Testimony before a Trier of Fact

- Employment Hearing Testimony in Scott Coren v. Ronald Pieri, Board of Fire and Police Commissioners, Highwood, Illinois, October 2019 & January 2020
- Sentencing Hearing Testimony in United States v. Mark Hazelwood, United States District Court, Eastern District of Tennessee, September 2018

### Deposition Testimony

- Paul E. Dubuque v. Dubuque Coffee Co., LLC and Charles T. Dubuque, State of Illinois, Circuit Court of Cook County, October 2021
- Winamac Southern Railway Company v. Irving Materials, Inc., State of Indiana, County of Howard, October 2021
- Brooke Smith v. The Ohio State University, Court of Claims for the State of Ohio, September 2021
- H&T Fair Hills, Ltd., et al. v. Alliance Pipeline L.P., United States District Court, District of Minnesota, April 2021
- Thomas P. Gorczynski, et al. v. Electrolux Home Products, Inc., et al., United States District Court, District of New Jersey, Camden Division, February 2020
- Thomas Allegra, et al. v. Luxottica Retail North America, United States District Court, Eastern District of New York, Brooklyn Division, December 2019
- Sdahrie Howard, et al. v. Cook County Sheriff's Office and County of Cook, United States District Court, Northern District of Illinois, Eastern Division, April 2019
- In re: Whole Foods Market Group, Inc. Overcharging Litigation, United States District Court, Southern District of New York, January 2019
- WHB International, Inc. and WHB Fundição, S/A v. Allison Transmission, Inc., Marion Superior Court, Indiana Commercial Court, December 2018
- Teresa Elward, et al. v. Electrolux Home Products, Inc., United States District Court, Northern District of Illinois, Eastern Division, August 2018
- Roger Coffelt, Jr., et al. v. The Kroger Co., The Pictsweet Company and CRF Frozen Foods LLC., et al., United States District Court, Central District of California, Riverside Division, May 2018
- Rick Lindsey v. Officer Michael Orlando, Officer Jamie Falardeau, the City of Chicago, Delta Airlines, Thomas Steinfels, and Marcella Pirvu, United States District Court, Northern District of Illinois, Eastern Division, March 2018



**Awards**
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994

**Professional Memberships**
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)

**Publications**
- "Does (Sample) Size Matter" *For the Defense*, February 2019
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) *Trébol*, July 2013



*Source: PENN_00000871.pdf*

| Type of Program | General Fee | Clinical Fee | Technology Fee | Program / Other Fee |
|---|---|---|---|---|
| | | | 2019-2020 Academic Year | |
| *FULL-TIME PROGRAMS* | | | Per Semester Rate | |
| **Full-Time Undergraduate** | | | | |
| Arts & Sciences, Engineering, Nursing, Wharton | $ 2,568 | $ 304 | $ 435 | n/a |
| | | | | |
| **Full-Time Undergraduate Study Abroad** | | | | |
| Arts & Sciences, Engineering, Nursing, Wharton | n/a | n/a | n/a | $ 2,372 |
| | | | | |
| **Full-Time Ph.D. Programs** | | | | |
| Full Tuition - Annenberg, Arts & Sciences, Design, Education, Social Policy & Practice | $ 1,660 | $ 304 | n/a | n/a |
| Reduced Tuition - Annenberg, Arts & Sciences, Design, Education, Social Policy & Practice | $ 416 | $ 304 | n/a | n/a |
| Full Tuition - Engineering, Nursing, Wharton | $ 1,660 | $ 304 | $ 435 | n/a |
| Reduced Tuition - Engineering, Nursing, Wharton | $ 416 | $ 304 | $ 435 | n/a |
| Full Tuition - Biomedical Sciences | $ 1,660 | $ 304 | $ 541 | n/a |
| Reduced Tuition - Biomedical Sciences | $ 416 | $ 304 | $ 541 | n/a |
| | | | | |
| **Other Full-Time Graduate/Professional** | | | | |
| School of Dental Medicine | $ 1,660 | $ 304 | $ 476 | n/a |
| Weitzman School of Design | $ 1,660 | $ 304 | n/a | n/a |
| Graduate School of Education | | | | |
|    Graduate (excl. Teacher Education) | $ 1,660 | $ 304 | n/a | n/a |
|    Teacher Education, M.Ed. | $ 1,867 | $ 304 | n/a | n/a |
|    Executive Education | n/a | n/a | n/a | $ 2,360 |
|    Higher Education Management | n/a | n/a | n/a | $ 9,761 |
|    Mid Career & Mid Career Dissertation | n/a | n/a | n/a | $ 3,821 |
|    School Leadership Program - 10 C.U. Program | n/a | n/a | n/a | $ 2,420 |
|    School Leadership Program - 5 C.U. Program | n/a | n/a | n/a | $ 1,210 |
|    Independent School Teaching Residency - Boarding School | n/a | n/a | n/a | $ 4,020 |
|    Independent School Teaching Residency - Day School | n/a | n/a | n/a | $ 4,210 |
|    Penn Chief Learning Officer | n/a | n/a | n/a | $ 9,390 |
|    Penn Chief Learning Officer - Dissertation Tuition | n/a | n/a | n/a | $ 22,995 |
|    Education Entrepreneurship | n/a | n/a | n/a | $ 1,810 |
|    Urban Teaching Residency (per Course Unit) | $ 414 | n/a | n/a | $ 234 |
|    Cert Only Program (per Course Unit) | n/a | n/a | n/a | $ 1,638 |
|    Medical Educator | n/a | n/a | n/a | n/a |
| Law School | $ 1,660 | $ 304 | $ 534 | n/a |
| Law School - JD-MBA | $ 1,660 | $ 304 | $ 534 | $ 18,133 |
| Perelman School of Medicine | $ 1,660 | $ 304 | $ 725 | n/a |
| School of Nursing | $ 1,660 | $ 304 | $ 435 | n/a |
| Social Policy & Practice | $ 1,660 | $ 304 | $ 385 | n/a |
| School of Veterinary Medicine | $ 1,660 | $ 304 | $ 601 | n/a |
| Wharton School | | | | |
|    Lauder Institute - 1st Year | $ 1,660 | $ 304 | n/a | $ 17,675 |
|    Lauder Institute - 2nd Year | n/a | n/a | n/a | $ 6,350 |
|    Wharton MBA - 1st Year | $ 1,660 | $ 304 | n/a | $ 1,475 |
|    Wharton MBA - 2nd Year | $ 1,660 | $ 304 | n/a | $ 475 |
|    Executive MBA - East Coast Program - 1st Year | n/a | n/a | n/a | $ 28,385 |
|    Executive MBA - East Coast Program - 2nd Year | n/a | n/a | n/a | $ 26,960 |
|    Executive MBA - West Coast Program - 1st Year | n/a | n/a | n/a | $ 28,385 |
|    Executive MBA - West Coast Program - 2nd Year | n/a | n/a | n/a | $ 26,960 |
| | | | | |
| **Other Tuition / Undergraduate** | | | | |
| Nursing - Accelerated Program | $ 2,568 | $ 304 | $ 435 | n/a |
| | | | | |
| **Other Tuition** | | | | |
| Doctoral (non-Ph.D.) Dissertation Tuition | n/a | n/a | n/a | n/a |

HIGHLY CONFIDENTIAL

**Asha Smith & Emma Nedley v. University of Pennsylvania**
**List Price of Fees for 2019-2020 Academic Year**

**Exhibit 3**

*Source: PENN_00000871.pdf*

| Type of Program | 2019-2020 Academic Year | | | |
| --- | --- | --- | --- | --- |
| | General Fee | Clinical Fee | Technology Fee | Program / Other Fee |
| *PART-TIME PROGRAMS* | Per Course Unit (C.U.) Rate | | | |
| **Part-Time Undergraduate** | | | | |
| Engineering, Nursing, Wharton | $ 642 | n/a | $ 108 | n/a |
| School of Arts & Sciences | $ 312 | n/a | $ 108 | n/a |
| | | | | |
| **Part-Time Ph.D. Programs** | | | | |
| ASP(47), GAS(31), GFP(44), EDP(43), SWP(77) | $ 414 | n/a | n/a | n/a |
| BMP(65), GEP(48), NUP(60), WHP(45) | $ 414 | n/a | $ 108 | n/a |
| | | | | |
| **Other Part-Time Graduate/Professional** | | | | |
| School of Arts & Sciences | $ 414 | n/a | n/a | Various |
| Graduate School of Education | $ 414 | n/a | n/a | n/a |
| Weitzman School of Design | $ 414 | n/a | n/a | n/a |
| School of Engineering & Applied Science | $ 414 | n/a | $ 110 | n/a |
| Law School | $ 414 | n/a | $ 132 | n/a |
| Perelman School of Medicine | | | | |
|   All Master's and Certificates | $ 414 | n/a | $ 181 | n/a |
|   Master of Science in Clinical Epidemiology & Certificate in Clinical Research | $ 414 | n/a | $ 95 | n/a |
|   Certificate in Health Care Innovation | $ 130 | n/a | $ 150 | n/a |
| School of Nursing | $ 414 | n/a | $ 108 | n/a |
| Social Policy & Practice | $ 414 | n/a | $ 100 | n/a |
| Wharton School | $ 414 | n/a | n/a | $ 114 |