# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ASHA SMITH , and EMMA NEDLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSITY OF PENNSYLVANIA,<br><br>Defendant. | Case No.: 2:20-cv-02086-TJS<br><br>Hon. Timothy J. Savage |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LYNCH CARPENTER, LLP**
Gary F. Lynch
Edward W. Ciolko*
Nicholas A. Colella*
1133 Penn Avenue 5th Floor
Pittsburgh, PA 15222
P. (412) 322-9243
F. (412) 231-0246
gary@lcllp.com
eciolko@lcllp.com
nickc@lcllp.com

**CARPEY LAW, P.C.**
Stuart A. Carpey, #49490
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
(610)834-6030
scarpey@carpeylaw.com

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin*
Roy T. Willey, IV*
Blake G. Abbott*
32 Ann Street
Charleston, SC 29403
P: (843) 614-8888
F: (843) 494-5536
Email: eric@akimlawfirm.com
roy@akimlawfirm.com
blake@akimlaw.com

*Admitted Pro Hac Vice

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... III

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD ................................................................................................. 2

ARGUMENT .............................................................................................................. 3

I.   THE DESCRIPTIONS OF THE SPRING 2020 SEMESTER FEES CREATED
     SPECIFIC, IDENTIFIABLE PROMISES AND DEFENDANT BREACHED
     THEIR CONTRACT WITH PLAINTIFFS WHEN THEY SHUT DOWN THE
     RELATED SERVICES ......................................................................................... 3

     A.  GENERAL FEE............................................................................................ 3

         1.  General Fee - Breach of Contract ...................................................... 8

     B.  CLINICAL FEE........................................................................................... 13

         1.  Clinical Fee – Breach of Contract...................................................... 16

II.  PLAINTIFF NEDLEY SUFFERED DAMAGES ................................................. 19

CONCLUSION............................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 2, 3

*Arredondo v. Univ. of La Verne*, Case No. 2:20-cv-07665-MCS-RAOx, 2021 WL 1588995 (C.D. Cal. Apr. 21, 2021)………………………………………………………………………………21

*Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020) ............................................................................................................................. 7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 3

*Chong v. Ne. Univ.*, No. CV 20-10844-RGS, 2020 WL 7338499 (D. Mass. Dec. 14, 2020) ..... 3,7

*Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554 (E.D. Pa. 1998)................ 3

*Croce v. St. Joseph's Coll.*, 73 Misc. 3d 632, 640, 155 N.Y.S.3d 51 (N.Y. Sup. Ct. 2021). .......... 8

*Figueroa v. Point Park Univ.*, No. 2:20-CV-01484, 2021 WL 4975196 (W.D. Pa. Oct. 26, 2021) ...................................................................................................................................... 7

*Fiore v. Univ. of Tampa*, No. 20-CV-3744 (CS), 2021 WL 4925562 (S.D.N.Y. Oct. 20, 2021)... 7

*Ford v. Rensselaer Polytechnic Institute*, 507 F.Supp.3d 406 (N.D.N.Y. 2020)........................... 8

*Haywood v. Univ. of Pittsburgh,* 976 F.Supp.2d 606 (W.D.Pa. 2013) ........................................ 20

*In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20 (D. Mass. 2021) ......................... 4

*In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021)............................ 5

*Ins. Co. of Greater New York v. Fire Fighter Sales & Services Co.*, 120 F. Supp. 3d. 449 (W.D. Pa. 2015) .............................................................................................................................. 20

*Zeno v. Ford Motor Co. Inc.*, 480 F.Supp.2d 825 (W.D. Pa. 2007) ........................................... 20

**Rules**

Fed. R. Civ. P. 15................................................................................................................... 19

Fed. R. Civ. P. 56(a) ................................................................................................................ 2

## INTRODUCTION

Defendant University of Pennsylvania's ("Defendant" or "Penn" or "the University") motion rests entirely on whether the University has shown that there is no contract between the University and its Students. This motion must be denied as Defendant has failed to show that there is no genuine dispute as to whether students, including Plaintiffs, entered into a contract with Defendant.  As the Court recognized in its Memorandum and Opinion (Dkt. 54): "Based on the plaintiffs' allegations and the fee descriptions themselves, the students were charged fees for certain resources and services that were later cancelled or unavailable. At the pleading stage, the Plaintiffs have alleged a claim for breach of contract on behalf of the Fees Class." Now, after engaging in discovery, absolutely nothing has changed.

Plaintiffs Asha Smith and Emma Nedley ("Plaintiffs") were enrolled as students at Defendant's institution for the spring semester of Defendant's 2019-20 academic year. ¶ 17[1]. Defendant is a university that markets and offers a comprehensive in-person, on-campus education. ¶¶ 20-21. Plaintiffs chose to attend Defendant's institution over all other colleges and universities, and specifically chose to accept Defendant's offer of admission to Defendant's on-campus program. ¶ 22.

In addition to tuition, Defendant charges substantial amounts of money for mandatory fees that are intended to provide students with access to "a variety of student related activities, services, and spaces." ¶ 28. Plaintiffs paid all required fees for the spring 2020 semester. ¶ 33. However, on March 15, 2020, Defendant suspended all in-person classes and asked all student living on campus to vacate their dormitories. ¶ 41. Likewise, Defendant cancelled all campus activities and closed

---

[1] All references and citations to the "Complaint" and "¶" in this Memorandum refer to Plaintiffs' Consolidated Class Action Complaint [Dkt. 18], filed August 31, 2020, which is the operative pleading.

most campus buildings, including, but not limited to Hospitality Services; Morris Arboretum; Off-Campus Services; Penn Bookstore; Penn Children's Center; University Ice Rink; all on-campus libraries; all student activities; and student centers. ¶ 30. Further, all in person networking opportunities were cancelled which had long been a haul mark of the Penn appeal – in person access to their expansive alumni network. Likewise, access to the gym and the ability to watch athletic events were all denied. This including al intramural events. Additionally, cost saving technological services were lost, such as access to WiFi and printing services. Not to mention, countless other arts, community service events, cultural and political group gatherings, and recreational organizations meetings that have long been promoted by Penn to entice applicants.

In cancelling these events and services, Defendant's President acknowledged not delivering on the contractual promises of enrollment, stating, "you have goals and dreams left undone, plays not being performed, games and meets not taking place, research interrupted, spontaneous late-night conversations not occurring, and thousands of other losses both large and small that we all mourn." ¶ 50. Nonetheless, Defendant has refused and continues to refuse to reduce or refund any of the fees that had already been pre-paid by Plaintiffs and members of the proposed Class. ¶ 51.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex*

2

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting Liberty Lobby, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." For reasons set forth below, Summary Judgment must be denied.

## <u>ARGUMENT</u>

I.  **THE DESCRIPTIONS OF THE SPRING 2020 SEMESTER FEES CREATED SPECIFIC, IDENTIFIABLE PROMISES AND DEFENDANT BREACHED THEIR CONTRACT WITH PLAINTIFFS WHEN THEY SHUT DOWN THE RELATED SERVICES**

   A.  **GENERAL FEE**

The University, citing *Chong*, argues that where students paid fees to "support" certain facilities, it does not create a specific, contractual right to in-person access to those resources. *Chong v. Ne. Univ.*, No. CV 20-10844-RGS, 2020 WL 7338499, at 4 (D. Mass. Dec. 14, 2020); Dkt. 82-1 at 9. The *Chong* court specifically distinguished fees which were intended to "'support' certain facilities during terms for which ... students are enrolled in classes" from fees which permitted the student to "gain access to ... [an] on-campus facility or resource ...." *Id.* at 4 (allowing breach of contract claim for campus recreation fee that granted students access to campus athletic events and fitness centers, which were subsequently closed). *Chong* held that plaintiffs had not

3

stated a claim for breach of contract regarding some fees, however, the court did hold that plaintiffs

had stated a plausible claim for breach of contract concerning other fees, and those fee descriptions

are nearly identical to what is found in the case at bar:

> Students also pay the campus recreation fee to "support" certain facilities.
> Payment of the campus recreation fee, however, gives students "the option to
> gain admission to home athletic events" and to "use the Marino Fitness Center,
> the SquashBusters athletic facility, and the Cabot Gym (fitness and pool)."
> Because plaintiffs allege that they lost the option to attend home athletic games
> or use fitness facilities after March 12, 2020, plaintiffs have stated a plausible
> claim for breach of contract with respect to the campus recreation fee.

*Id.*

Other courts have decided similarly and have allowed breach of contract claims, based on

fee descriptions when it also refers to specific activities occurring at specific locations:

> BU describes the fees in general terms of "support[ing]" programs or "offset[ting]"
> costs." [internal citations omitted] (noting that students pay the Sports Pass fee in
> exchange for "admission to all home events for ice hockey, basketball, lacrosse and
> soccer"). While such broad language would ordinarily weigh against a finding of a
> contractual right to access any particular on-campus facilities or resources, *the
> court finds it significant that the descriptions in this case also refer to specific
> activities occurring at specific locations* (e.g., "services at the George Sherman
> Union, East Campus Student Service Center, Residence Halls and other such
> student support spaces," or operations at the "student Health Services clinic at 881
> Commonwealth Avenue as well as the Fitness & Recreation Center and their
> satellite operations"), and that BU "dramatically curtailed" or no longer provided
> these activities after March 22, 2020. Under the circumstances, the court cannot
> say, as a matter of law, that plaintiffs could not have reasonably expected that their
> payment of mandatory fees would grant them access to at least some of the on-
> campus facilities and resources shut down by BU on March 22, 2020.

*In re Bos. Univ. COVID-19 Refund Litig.*, 511 F. Supp. 3d 20, 24 (D. Mass. 2021)
(emphasis added).

Another court held nearly the same way in a similar case:

> The Columbia Plaintiffs are on stronger ground with their claim that Columbia
> breached a contract to provide access to certain campus facilities and activities
> in exchange for mandatory student fees. Specifically, they allege that they paid
> a Facilities Fee, which Columbia describes as the fee for "access to the facilities
> at the Dodge Physical Fitness Center and Lerner Hall"… and a Health and
> Related Services Fee, which confers "access [to] the programs and services

provided through Columbia Health's five departments, including 24/7 support from Counseling & Psychological Services, Medical Services, and Sexual Violence Response"… the Dodge Center and Lerner Hall were closed, student events and activities were cancelled, [and] student organizations were no longer operational… Columbia also allegedly closed its "libraries and other buildings and non-essential offices"… . These allegations adequately state a breach of contract claim.

*In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 426 (S.D.N.Y. 2021)

Even through the narrower view Penn uses from *Chong*, the students were entitled to access certain facilities through the Fees they paid. Contrary to Penn's assertions, The University, at the relevant time, did use language—as evidenced below—that entitled students access to specific resources as a result of paying the General Fee, and then deprived students of that access. [2]

### Fees included in the Cost of Attendance

**General Fee**
The general fee of $4,752 partially supports facilities such as the library systems, museums, and special laboratories, and also provides access to University fitness facilities

**Educational Technology Fee**
This fee assists with the cost of computer labs and services and is $820.

**Student Health Clinical Fee**
This $546 mandatory fee gives students unlimited access to Student Health Service. Direct questions to Student Health Service or call 215-746-3535.

This fee description that could be found on Penn's website as of August 2, 2019. This fee description expressly stated that the General Fee "provides access to University fitness facilities". Defendant admitted that the type of language as presented above would create a contractual relationship. Dkt. 82-1 at 7. Thus, by Defendant's own admission, the descriptions posted above, which was publicly available, created a contractual obligation on behalf of the University to provide all students with access to the identified services, facilities, and amenities.

---

[2]  https://web.archive.org/web/20190802113626/http://www.sfs.upenn.edu/paying/fees17-18.htm (August 1, 2019).

5

There are other instances from Penn's website where they expressly stated what access the General Fee includes: [3]

**General Fee:** Includes access to University libraries, recreational facilities, and other University services not directly associated with specific courses.

Here, Penn expressly described even more specific resources that students were entitled access to as a result of paying the General Fee. These specific resources were withheld by the University when the University closed campus during the Spring 2020 semester. There is further evidence from Penn's website that the General Fee entitled students access to university fitness and recreational facilities:[4]

Penn Card holders and approved affiliates are eligible to purchase a membership with Campus Recreation.  Most full-time graduate and undergraduate students that have been issued the General Fee have access to the Pottruck Health & Fitness Center and Fox Fitness Center.  Memberships are not available to the public.

Membership includes access to the Pottruck Health & Fitness Center, Sheer Pool, Fox Fitness Center, and Franklin Field Track.

> Penn Card holders and approved affiliates are eligible to purchase a membership with Campus Recreation.  *Most full-time graduate and undergraduate students that have been issued the General Fee have access to the Pottruck Health & Fitness Center and Fox Fitness Center.  Memberships are not available to the public.*
>
> *Membership includes access to the Pottruck Health & Fitness Center, Sheer Pool, Fox Fitness Center, and Franklin Field Track.* (emphasis added and rewritten for clarity).

Based on all the evidence above of, taken directly from the University's websites during the relevant timer period, Defendant expressly created a specific and contractual right to access facilities.

---

[3] https://web.archive.org/web/20191219202320/https://www.dental.upenn.edu/admissions-academics/graduate-dental-education-programs/periodontic-orthodontic-program/tuition-fees/ (December 19, 2019).
[4] https://web.archive.org/web/20191206222303/https://recreation.upenn.edu/sports/2019/9/25/membership-plan.aspx (December 6, 2019).

Furthermore, courts are not as settled on this interpretation of "support" as Penn tries to assert. In *Bergeron v. Rochester Institute of Technology*, the court denied the university's motion to dismiss and highlighted that statements on RIT's website stating that the Student Activity Fee "supports programs, events, and services that enhance the quality of student life at RIT", and that this promise, was enough for the court to find these promises sufficiently specific enough to survive the motion to dismiss. *Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682, at *8 (W.D.N.Y. Dec. 18, 2020).

In *Figueroa v. Point Park University*, the court held that "the university's website descriptions of fees as supporting a wide range of services/activities/facilities which were only available/accessible on campus "amount[ed] to a specific promise to provide [those] services, resources and facilities to students." *Figueroa v. Point Park Univ.*, No. 2:20-CV-01484, 2021 WL 4975196, at *5 (W.D. Pa. Oct. 26, 2021). In *Fiore*, the court, in analyzing their case with help from *Chong*, stated, "[i]f it were plausible that these fees provided physical access to specific programs or activities that were unavailable after the change to online classes… the outcome might be different." *Fiore v. Univ. of Tampa*, No. 20-CV-3744 (CS), 2021 WL 4925562, at *17 (S.D.N.Y. Oct. 20, 2021). In *Fiore*, the plaintiffs did not even allege that those facilities, mentioned in the generic description of the fees, did not provide services to the students while they were learning, but still the court allowed the plaintiffs to amend their complaint because "[p]laintiffs may be able to provide facts rendering it plausible that the fees were intended specifically for access to facilities that became unavailable". *Id*.

Similar generic fee descriptions were used in *Ford*. The court in *Ford* held: "as to activity fees, plaintiffs plausibly stated a claim because school's catalogue stated that the fee included access to a vast array of service, media, recreation, club sports, performing and visual arts and

other student organizations but plaintiffs had no access to the facilities, activities and services after date of shutdown." *Ford v. Rensselaer Polytechnic Institute*, 507 F.Supp.3d 406 (N.D.N.Y. 2020). In *Croce*, the court looked at student activities fees which were fees for participation in various organizations and student activities, and held, "[i]t is reasonable to conclude that the sporting activities, Greek life, intramural activities, and cultural activities could not, and did not, take place due to the pandemic since those activities would likely have involved person-to-person contact. Accordingly, as to the $75.00 Student Activity Fee, the plaintiff has plausibly stated a claim for breach of contract." *Croce v. St. Joseph's Coll.*, 73 Misc. 3d 632, 640, 155 N.Y.S.3d 51, 57 (N.Y. Sup. Ct. 2021).

Therefore, summary judgment must be denied because there is a genuine issue as to whether the General Fee descriptions promise students access to specific services, facilities, and amenities.

### 1.    General Fee - Breach of Contract

Students were granted access to the aforementioned facilities by paying the General Fee and Defendant breached their contract with the students when they denied them access. As of March 16th, 2020, Penn closed all fitness and recreational facilities to students. As a result, all students no longer had access to any of the fitness and recreational facilities or programs for the remainder of the spring 2020 semester:[5]

3.13

Effective Monday, March 16th, all Campus Recreation facilities and programs will be suspended until further notice.  This page will be updated as more information becomes available.  You can contact Campus Recreation by emailing DRIA-pennrec@pobox.upenn.edu.

---

[5] https://recreation.upenn.edu/sports/2020/3/9/covid-19.aspx.

Effective Monday, March 16th, *all Campus Recreation facilities and programs will be suspended until further notice.* (emphasis added and rewritten for clarity)

In addition to fitness centers and recreational facilities and programs, Penn also closed all libraries and denied students access during part of the spring 2020 semester:[6]

All Penn Libraries locations, including Van Pelt-Dietrich Library Center, are closed until further notice. All in-person Libraries events are cancelled until further notice.

Access to all physical materials has been suspended until further notice. Given current restrictions on staff access to Libraries locations and offsite storage, we're unable to provide any access to our physical collections. We're not able to Scan and Deliver texts or mail physical copies of books at this time. As most of our partner libraries are likewise closed, many interlibrary loan activities, including Borrow Direct and E-ZBorrow, have been suspended.

All access to special and non-circulating physical collections has been suspended. This includes access to items held by the Kislak Center for Special Collections, Rare Books and Manuscripts.

These facilities and programs were specifically listed by the University as giving studens access as a result of the General Fee. However, the University closed all associated facilities and services, which denied students the ability to access the facilities and services already paid for. A majority of the University's activities and services were canceled, and most on-campus spaces were closed. By way of example, while not an exhaustive list, the following campus services were closed: Hospitality Services; Morris Arboretum; Off-Campus Services; Penn Bookstore; Penn Children's Center; University Ice Rink; all on-campus libraries; all student activities; student centers, and generally all other activities, services, and spaces not considered "life-sustaining" to the University.[7]

---

[6]https://web.archive.org/web/20200421203038/https://www.library.upenn.edu/blogs/libraries-news/covid-19-libraries-policies-and-information (April 21, 2020).
[7]*See,*          *e.g.,*          https://coronavirus.upenn.edu/students-families/student-faq; https://coronavirus.upenn.edu/faculty-staff/march15-message-from-libraries; https://coronavirus.upenn.edu/content/march-20-2020-message-penn-faculty-and-staff-regarding-university-operations.

The University argues that at least *some* on-campus facilities stayed open, and students always had access to those facilities in person. This argument lacks logic because it is irrelevant whether a couple of buildings happened to stay open when students did not have access to, or use of any of them. After all, in March 2020 the University ordered students to leave the University of Pennsylvania and return home immediately, while simultaneously moving all classes to remote instruction.[8] How could students have access these on-campus facilities when they were not even allowed to be on campus at the time?

Another argument that Penn asserts is that, even after the pandemic moved classes online, they still used the proceeds of the General Fee towards providing students with virtual student-related activities, virtual student-related services, and virtual spaces. This argument fails because the cost to provide these remote services is not the same as the cost to provide the on-campus and in-person services they usually provide for nor are they akin to what was contractually promised. Penn, itself, values the remote options they can provide as less than the on-campus and in-person options. Even before the pandemic, Penn had a completely remote option for students and charged those students an "Online General Fee," which is substantially less than the General Fee charged to on-campus students. This highlights that Penn knows the capabilities to provide student-related activities, student-related services, and spaces is limited remotely which results in lower costs to the university and lower value to the students. Penn's website stated:[9]

_____

[8] https://coronavirus.upenn.edu/announcement/important-message-provost-penn-families.
[9] PENN LPS ONLINE STUDENT HANDBOOK (academic year 2019-2020) https://lpsonline.sas.upenn.edu/sites/default/files/2019-10/Penn-LPS-Online-Certificate-Course-Taker-Handbook-2019-20.pdf.

**Online General Fee**
The online student general fee supports the specific activities, services, and virtual spaces that Penn Online students can access from a distance.

There is a clear difference in value between what the school can provide remotely and at a distance versus what they can provide to students on-campus and in-person. The Online General Fee was $130 per credit unit:[10]

### Summer 2019–Spring 2020 tuition and fee rates for Penn LPS Online courses

| COURSE UNIT (C.U.) | TUITION | ONLINE SERVICES FEE | TOTAL |
|---|---|---|---|
| 1 c.u. | $2,250 per c.u. | $130 per c.u. | $2,380 |

**Online general fee:** The general fee constitutes a partial contribution to the support of such essential services as a library system and student services.

One "c.u." is usually converted to a four-semester hour course.[11] Thus, if a student is taking the usual five classes in a semester, their Online General Fee would be a total of $650.00 for a semester, or a total of $1,300 for an academic school year (two semesters). Now comparing the cost of the Online General Fee to the General Fee for on-campus and in-person students allows you to see the drastic difference in value the university, itself, places on what they can and will provide remotely versus on-campus and in-person. For comparison, below is the price for the General Fee charged to on-campus and in-person students. [12]

---

[10]https://web.archive.org/web/20200206152724/https:/lpsonline.sas.upenn.edu/tuition-aid/course-tuition (February 6, 2020).
[11] *Id.*
[12]https://web.archive.org/web/20200319151049/https:/srfs.upenn.edu/costs-budgeting/undergraduate-tuition-and-fees (March 19, 2020).

# 2019-2020 Academic Year

| | |
|---|---|
| Tuition | $51,156 |
| General Fee | $5,136 |
| Technology Fee | $870 |
| Clinical Fee | $608 |
| **Total Tuition and Fees** | **$57,770** |

Career Services further evidences the difference between on-campus and in-person students versus online students, and what the General Fee provides for on-campus students versus the lower valued Online General Fee for distance students: [13]

## Career Services Policies

### Eligibility for Services

Students enrolled in online degree programs in one of the above schools have access to Career Services' online resources, including job and internship listings on Handshake, online workshops, and various digital subscriptions that the office provides. Students in online degree programs do not have access to on-campus recruiting, on-campus career fairs, on-campus employer events such as information sessions, or individual career advising or document review.

### Career Fair Policies (For Students)

Career Fairs organized by Career Services are for on-campus, degree seeking Penn students and alumni only.

---

[13]https://web.archive.org/web/20200331135853/https://careerservices.upenn.edu/career-services-polices/ (March 31, 2020).

While we invite online students to access these online resources designed for them, please note that individual appointments and walk-ins, as well as on campus programs, interviewing and career fairs are designed and reserved for on campus students. Please refer to your program administrators if you have questions and see our eligibility policies for more information.

14

Please note that career fairs are open to the students served by the Career Services office.  (On-line students are not eligible to attend live career fairs, but may attend any virtual career fairs scheduled.)

15

      As such, there is a clear difference in costs and services/programs the university can and does provide for online students versus on-campus and in-person students.

**B.    CLINICAL FEE**

      Penn concedes that the Clinical Fee did affirmatively provide students "unlimited access to Student Health Services," but argues that the fee description never defined what "Student Health Service" meant. Dkt. 82-1 at 18. Penn argues that the Clinical Fee description did not specify that it would provide services at on-campus facilities. *Id.* at 12-13. Penn also argues that students had unlimited access to Student Health Services throughout the entire semester because of the virtual option.

      The first problem with Penn's argument is that Student Health Service is a physical building located on campus, thus inherently the students would need to be on-campus and in-person to have "unlimited" and "full" access to Student Health Services:[16]

---

[14]https://web.archive.org/web/20200331140059/https://careerservices.upenn.edu/channels/online-students/ (March 31, 2020).
[15]https://web.archive.org/web/20191217184948/https://careerservices.upenn.edu/career-fairs/ (December 17, 2019).
[16]https://web.archive.org/web/20191218033300/https://shs.wellness.upenn.edu/inreq/#Clinical (December 18, 2019)

**What is the Clinical Fee?**

Student Health Service is located on campus and committed to partnering with you to treat illnesses and injuries, promote wellness, and provide you with health education and information. All full-time status students, as well as exchange students pay a Clinical Fee as part of tuition, which allows full access to our health services. This fee is also charged to students enrolled in PSIP regardless of status. The clinical fee for academic year 2019-2020 is $304 per semester. A full list of our services can be found **here**.

The fact that Student Health Service is a physical building on campus is evidenced in other parts of Penn's website as well:

## SHS Location

**How to get to us:**

Student Health Service is located at **3535 Market Street, Suite 100** (1st floor). Our building is on the north side of Market Street, at the intersection of 36th & Market Streets. If you see Subway, PNC Bank, or FedEx, you are in the right location! Once inside the building, please press "1" on the elevator keypad and wait for the screen to tell you which elevator to get on.

---

[17] https://web.archive.org/web/20170720171950/http://www.vpul.upenn.edu/shs/location.php (July 20, 2017)



Students paying the Clinical Fee are expressly eligible to be seen at Student Health Service:[19]

---

[18] https://www.facilities.upenn.edu/maps/locations/student-health-service.
[19]https://web.archive.org/web/20170801193225/http://www.vpul.upenn.edu/shs/eligibility.php
(August 1, 2017).

## Eligibility

**Eligibility of Students for Care at Student Health Service**

- The Clinical Fee is mandatory for all full-time students.
- The Clinical Fee is automatically billed to full-time students.
- All matriculating students are eligible to be seen at the Student Health Service by paying the Clinical Fee or by enrolling in the Penn Student Insurance Plan.
- Part-time students may choose to use Student Health, by paying the Clinical Fee or enrolling in a PSIP.
- Students in special programs should check with their school to see if they are eligible for care.
- Spouses and domestic partners of Penn students may be seen on a fee-for-service basis, by presenting a Penn Guest Card.
- English-language program (ELP) students will be automatically eligible to use Student Health while they are taking classes, through payment of a Clinical Fee through their department.

**Clinical fee:** Covers usage of Student Health Services. [20]

- **Clinical Fee**
  All full-time students are required to maintain coverage at Student Health. Coverage is established by payment of the clinical fee. Most students will see a clinical fee posted to their account. This fee allows unlimited access to Student Health on a semester basis.

[21]

### 1.   Clinical Fee – Breach of Contract

As a result of Penn closing campus and ordering students to return home, the students did not have "unlimited" access to the Student Health Services building. Therefore, in doing so, Defendant breached their contract with students regarding the Clinical Fee. Furthermore, students

---

[20]https://www.dental.upenn.edu/admissions-academics/graduate-dental-education-programs/periodontic-orthodontic-program/tuition-fees/ (December 19, 2019).
[21]https://web.archive.org/web/20191217194152/https://portal.apps.upenn.edu/penn_portal/story.php?channelname=CampusLife&storyid=152 (December 17, 2019).

16

did not have "full" access either because some of the services Student Health Services provides are not available remotely:

> We are a full-service primary care center providing accessible, cost-effective, and customer-focused health care designed to meet student needs.  This includes care for acute and chronic health problems, preventive health services, and health and wellness education. We work in close collaboration with the other departments in the University Life Division, and with our colleagues in the University of Pennsylvania Health System. [22]

## Services

**Click the icons below for more information on Student Health services.**

PRIMARY CARE also includes well and sick visits, physicals, chronic disease management, STI treatment, PrEP, and transgender health. GYNECOLOGIC CARE includes uterine, vaginal, ovarian, and breast concerns, contraceptive management, preventive care, and cervical Pap tests.

| ACUPUNCTURE | ALLERGY DESENSITIZATION | GYNECOLOGIC CARE |
|---|---|---|
| IMMUNIZATION | MASSAGE | NUTRITION |
| PODIATRY | PRIMARY CARE | SEXUAL HEALTH |
| SMOKING CESSATION | SPORTS MEDICINE | STRESS REDUCTION |
| TRAVEL MEDICINE | IMMUNIZATION COMPLIANCE | INSURANCE COMPLIANCE |

[23]

[22]https://web.archive.org/web/20191217184716/https://shs.wellness.upenn.edu/parentspage/ (December 17, 2019).
[23] https://web.archive.org/web/20191217184044/https://shs.wellness.upenn.edu/services/.

**Our primary care providers offer care for all your general health needs, including but not limited to:**

- **Sick visits, minor injuries, and illnesses**
- **Chronic health** problems
- **Physical Exams**
    - ○ General physicals and driver license physical
    - ○ Pre-employment and pre-sports physicals

- Coordination of outside care and specialist **referrals**
- **Screening** and preventive health services
- **Sexual and reproductive health** concerns, including
    - ○ Sexually Transmissible Infections (**STI**)
    - ○ **PrEP** (pre-exposure HIV prophylaxis)
    - ○ Post-Exposure Prophylaxis for HIV (**PEP**)
    - ○ **Contraception** counseling and prescriptions

- **LGB/Q** health care
- **Transgender** health care including hormone therapy
- **Concussion** care
- Management of **Eating Disorders**
- Consultation in advance of **International Travel**
- **Clinical and Lab-Related Exposures** (needle and scalpel injuries, animal bites and scratches)

[24]

---

[24]https://web.archive.org/web/20191218133125/https://shs.wellness.upenn.edu/primarycare/ (December 18, 2019).



Services at SHS cover the spectrum from medical evaluation prior to initiating an exercise program, to diagnosis and treatment of acute and chronic injuries. Emphasis is placed on safety through injury prevention, optimizing performance, and safely returning to the classroom or activity after injury or illness.

The sports medicine physicians complement the available services at SHS by offering treatment and rehabilitation modalities on-site that include casting, splinting, bracing, and injections. The sports medicine physicians also work closely with trainers, physical therapists, orthopedic and podiatric surgeons, nutritionists, and other medical specialists to help individuals reach and maintain their activity goals.

25

Students did not have "unlimited" access to Student Health Services for the entirety of the spring 2020 semester. Student Health Services is a physical location, and that location was not accessible to students that were ordered off-campus and sent home. Students also did not have "full" access to services provided by Student Health Services because some of the services, as evidenced above, require a person to be in-person and on-site, which was not possible because Penn ordered the students off-campus and sent them home.

## II.      PLAINTIFF NEDLEY SUFFERED DAMAGES[26]

Penn attempts to argue that because Plaintiff Nedley received a scholarship from the University of Pennsylvania, she was not injured and is not a proper Class representative. Defendant's argument is predicated almost entirely on the presumption that when Penn awards a

---

[25]https://web.archive.org/web/20200331172617/https://shs.wellness.upenn.edu/sportsmed/ (March 31, 2020).

[26] For the issue of damages, particularly as they pertain to Plaintiff Nedney, this will be dealt with in more detail in Plaintiffs' Class Certification Reply. This document explicitly incorporates such.

student a scholarship, the scholarship is first applied to the fees charged to that student, and whatever is left after the fee deduction is applied to the remaining tuition balance. This dispersal method of a student's scholarship does not make logical or factual sense, notably because Penn offers *no* proof to back such a claim up. Moreover, while Plaintiff Nedley did receive a need-based scholarship from the University, it is entirely illogical to think that she is no longer capable of being injured simply because she received this financial award.

It is more logical and practical that when Penn awards a student a scholarship, it is either a scholarship for full tuition[27] or a general scholarship disbursed on a pro-rata basis. If a scholarship is for full tuition, the student needs only to pay the fees charged for that semester. If it is a generalized scholarship, the scholarship is applied proportionately to the fees and tuition. For example, and by way of illustration, PA University, for the Spring Semester, charges its students $50,000. Of that $50,000, $40,000 was tuition charges and $10,000 were fees. PA University awards Student A a $25,000 scholarship for the spring semester. The scholarship awarded to Student A would be applied towards their total cost for the semester, with 50% of the scholarship being applied to their tuition cost ($20,000) and the other 50% being applied to her fee cost ($5000), leaving $20,000 left in tuition and $5000 left in fees, or $25,000 in total, in Student A's remaining balance after the scholarship is applied.

The same line of logic follows for student payments. Using the hypothetical above, Student A owes PA University, after their scholarship is applied, $25,000 for the spring semester. If Student A makes a payment of $10,000 to PA University, their payment would be disbursed on a pro-rata basis, with 50% going to fees and 50% going to tuition. As made clear in her deposition,

---

[27] https://www.design.upenn.edu/scholarships-and-prizes.

Ms. Nedley did pay Penn a portion of the tuition and fees for Spring 2020 out of her own pocket. *See* Nedley Deposition at 43-44. Because Ms. Nedley made a payment to Penn in Spring 2020, her payment was disbursed on a pro-rata basis, with some of the money going directly towards the fee payment. The fees were charged by Penn to students, as articulated above, for access to on-campus services for the entirety of the Spring 2020 semester. Such services were no longer accessible and/or were offered in a limited capacity when Defendant shut down its campus, breaching its contract to the students who paid Penn fees for such services. Accordingly, because Plaintiff Nedley did, in part, pay a portion of the fees charged and the related services for which the fees paid for were not available to her or the Class, Ms. Nedley was, in fact, injured.[28] Therefore, Plaintiff Nedley sustained an injury that is analogous to the proposed Class and is in a position to represent the interests of the Class adequately.[29] Therefore, Defendant's motion for summary judgment because Plaintiff Nedley cannot show damages must be denied.[30]

## CONCLUSION

---

[28] *See Arredondo v. Univ. of La Verne*, Case No. 2:20-cv-07665-MCS-RAOx, 2021 WL 1588995 (C.D. Cal. Apr. 21, 2021) (Court held that even though the Plaintiff received a scholarship, that did not negate their ability to recover damages for the University's breach of contract in analogous factual situation)

[29] Regardless, Defendant's argument still fails. "Under Pennsylvania law, if a party is able to prove breach of contract but can show no damages flowing from the breach, the party is entitled to recover nominal damages." *Haywood v. Univ. of Pittsburgh,* 976 F.Supp.2d 606, 645 (W.D.Pa. 2013). "Consequently, '[a] grant of summary judgment on the sole basis of absence of provable damages ... is generally improper.'" *Ins. Co. of Greater New York v. Fire Fighter Sales & Services Co.*, 120 F. Supp. 3d. 449, 461 (W.D. Pa. 2015)(internal citations omitted). Thus, "In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages." *Zeno v. Ford Motor Co. Inc.*, 480 F.Supp.2d 825, 834 (W.D. Pa. 2007).

[30] Plaintiffs will address Ms. Nedley's harm, commonality, typicality, and other related issues including that of damages in their upcoming Reply in Support of Class Certification ("Reply") in more detail and this Opposition of Summary Judgement motion document should be seen as incorporating the upcoming Reply in toto."

For the reasons provided above and for good cause shown, Plaintiffs respectfully request that the Court deny Defendant's motion for summary judgment in its entirety.  Should the Court grant any aspect of Defendant's motion, Plaintiffs request that any such decision be without prejudice and with leave to amend under the liberal provisions of Fed. R. Civ. P. 15(a).

Dated March 7, 2022

**ANASTOPOULO LAW FIRM, LLC**
*/s/ Blake G. Abbott*
Blake G. Abbott*
Eric M. Poulin*
Roy T. Willey, IV*
32 Ann Street
Charleston, SC 29403
P: (843) 614-8888
F: (843) 494-5536
Email: eric@akimlawfirm.com
roy@akimlawfirm.com
blake@akimlaw.com

**LYNCH CARPENTER, LLP**
Gary F. Lynch
Edward W. Ciolko*
Nicholas A. Colella*
1133 Penn Avenue 5th Floor
Pittsburgh, PA 15222
P. (412) 322-9243
F. (412) 231-0246
gary@lcllp.com
eciolko@lcllp.com
nickc@lcllp.com

**CARPEY LAW, P.C.**
Stuart A. Carpey, #49490
600 W. Germantown Pike, Suite 400
Plymouth Meeting, PA 19462
(610)834-6030

scarpey@carpeylaw.com

*Admitted Pro Hac Vice

**ATTORNEYS FOR PLAINTIFF AND
THE PROPOSED CLASS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document filed today through the Court's CM/ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

Dated March 7, 2022

*/s/ Ralph J. D'Agostino III*

24